UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x
                               :

                               :

IN RE: COMMODITY EXCHANGE, INC.     :  Case No. 14-MD-2548 (VEC)
GOLD FUTURES AND OPTIONS        :
TRADING LITIGATION               :  ECF CASE

                               :

This Document Relates To All Actions    :  ORAL ARGUMENT REQUESTED

                               :

---------------------------------------------------------x


**MEMORANDUM OF LAW OF DEFENDANTS UBS AG AND UBS SECURITIES LLC
IN SUPPORT OF THEIR MOTION TO DISMISS
PLAINTIFFS' SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**


GIBSON, DUNN & CRUTCHER LLP

200 Park Avenue
New York, NY  10166-0193
Telephone: (212) 351-4000

555 Mission Street, Suite 3000
San Francisco, CA  94105
Telephone:  (415) 393-8200

1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone: (202) 955-8500

*Attorneys for Defendants*
*UBS AG and UBS Securities LLC*


April 30, 2015

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

ARGUMENT .................................................................................................................... 2

      I.        The Antitrust Claims Fail Because UBS Was Not A Gold Fixing Member
               And Plaintiffs Do Not Show That It Otherwise Conspired. ................................... 2

              A.      UBS Had No Role In Setting The Gold Fix Price. ..................................... 3

              B.      UBS Did Not Otherwise Join The Alleged Conspiracy To Suppress
                    Gold Prices. ............................................................................................... 4

      II.      The Commodities Manipulation Claims Fail Because UBS Did Not
               Intentionally Cause The Artificial Gold Fix Price That Allegedly Inflicted
               Injury. .................................................................................................................... 9

CONCLUSION ................................................................................................................ 10

**TABLE OF AUTHORITIES**

<u>Pages</u>

**CASES**

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)................................................................................................ 2, 9

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)......................................................................................... 1, 3, 5, 8

*Cortec Indus., Inc. v. Sum Holding L.P.,*
  949 F.2d 42 (2d Cir. 1991) ............................................................................................ 6

*In re Amaranth Natural Gas Commodities Litig.,*
  730 F.3d 170 (2d Cir. 2013) ...................................................................................... 9, 10

*In re Commodity Exchange, Inc., Silver Futures & Options Trading Litig.,*
  560 F. App'x 84 (2d Cir. 2014) ............................................................................... 5, 9, 10

*In re Commodity Exchange, Inc., Silver Futures & Options Trading Litig.,*
  2012 WL 6700236 (S.D.N.Y. Dec. 21, 2012),
  aff'd, 560 F. App'x 84 (2d Cir. 2014) ......................................................................... 9

*In re Elevator Antitrust Litig.,*
  502 F.3d 47 (2d Cir. 2007) ......................................................................................... 9

*In re Platinum & Palladium Commodities Litig.,*
  828 F. Supp. 2d 588 (S.D.N.Y. 2011) ......................................................................... 6

*Lipsky v. Commw. United Corp.,*
  551 F.2d 887 (2d Cir. 1976) ....................................................................................... 6

*Mayor of Balt. v. Citigroup,*
  709 F.3d 129 (2d Cir. 2013) ................................................................................ 2, 3, 5, 7

*Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE,*
  763 F.3d 198 (2d Cir. 2014) ....................................................................................... 6

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
  551 U.S. 308 (2007)..................................................................................................... 6

*Yak v. Bank Brussels Lambert,*
  252 F.3d 127 (2d Cir. 2001) ....................................................................................... 6

TABLE OF AUTHORITIES
(cont'd)

Pages

**STATUTES**

15 U.S.C. § 1 ........................................................................................................... 2

7 U.S.C. § 1 ............................................................................................................. 9

7 U.S.C. § 13 ........................................................................................................... 9

**RULES**

Fed. R. Civ. P. 12(b)(6) ........................................................................................ 2, 6

Fed. R. Civ. P. 8(a)(2) ............................................................................................ 2

**INTRODUCTION**

The Complaint in this purported class action alleges that the members of the London

Gold Market Fixing—a panel that determined a reference price for gold until November 2014—

conspired to artificially suppress gold prices for nine-and-a-half years by setting the Gold Fix

price at unduly low levels.  The panel members (Defendants Bank of Nova Scotia, Barclays,

HSBC, Société Générale, and Deutsche Bank) allegedly engaged in this artificial-suppression

and false-pricing scheme to benefit their investments in certain instruments whose value is de-

rived from the price of physical gold.  As Plaintiffs concede, however, ***UBS AG and UBS Secu-***

***rities LLC never participated in the Gold Fix*** with the panel members.  Plaintiffs nevertheless

seek to hold these companies (collectively, "UBS") liable under antitrust and commodities laws,

among others.  UBS fully concurs with the other Defendants that the Complaint should be dis-

missed under Rule 12 in its entirety as to all Defendants.  The allegations as to UBS's conduct

also suffer from additional, and even more glaringly fatal, flaws addressed in this separate mo-

tion.[1]  When the Complaint's labels and conclusory allegations are filtered out, as they must be,

nothing remains to support an inference that UBS conspired with the Gold Fix panel members to

suppress the price of gold.  At most, the Complaint describes isolated instances of parallel con-

duct by UBS and a panel member, which is inadequate under Section 1 of the Sherman Act:

"[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice." *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

The Complaint attempts to compensate for the lack of factual matter supporting a plausi-

ble inference of conspiracy by directing attention to three things:  **(1)** UBS's role as a London

---

[1]   UBS joins Defendants' Memorandum of Law in Support of their Motion to Dismiss the Second Consolidated
Amended Class Action Complaint ("Co-Defendants' Memo").  To avoid needless redundancy, this Memoran-
dum adopts the Background section of the Co-Defendants' Memo.  The Complaint should be dismissed as to all
Defendants, and nothing in this separate motion by UBS should be construed otherwise.

Bullion Market Association ("LBMA") market maker in various markets; **(2)** the November 2014 assertions by the Swiss financial regulatory agency about certain inappropriate conduct by UBS employees that has nothing to do with Plaintiffs' claims; and **(3)** UBS's price quotations on the short-term (spot) market for physical gold at various points during a meager eleven days of the class period's *several thousand* trading days.  But none of these things gives rise to a plausible inference that UBS conspired with any other Defendants to exploit the Gold Fix.  Nor does the Complaint show that UBS intentionally caused the allegedly artificial prices to which Plaintiffs attribute their injuries.  Accordingly, in addition to the fatal insufficiency of the Complaint's allegations against all of the Defendants, the claims against UBS in particular are woefully inadequate under governing law, and should be dismissed under Rule 12(b)(6).

### ARGUMENT

I.      **The Antitrust Claims Fail Because UBS Was Not A Gold Fixing Member And Plaintiffs Do Not Show That It Otherwise Conspired.**

The Complaint does not allege facts sufficient to show that Plaintiffs' antitrust claims against UBS have "facial plausibility."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); Fed. R. Civ. P. 8(a)(2), 12(b)(6).  Plaintiffs allege that all Defendants engaged in a "combination and conspiracy" in violation of, *inter alia*, Section 1 of the Sherman Act, 15 U.S.C. § 1 (Second Consolidated Amended Class Action Complaint ("C.") ¶ 350), for a Class Period spanning nine- and–a-half years (C.¶ 341).  "The crucial question in a Section 1 case is . . . whether the challenged conduct 'stems from independent decision or from an agreement, tacit or express.'"  *Mayor of Balt. v. Citigroup*, 709 F.3d 129, 135 (2d Cir. 2013).  The "plaintiff's job . . . is to allege enough facts to support the inference that a conspiracy actually existed."  *Id.* at 135-36.

*Direct* allegations of a conspiracy "would consist, for example, of a recorded phone call in which two competitors agreed to fix prices at a certain level."  *Id.*  By contrast, "[c]ircumstan-

2

tial facts" of a conspiracy require *more* than an allegation of "conscious parallelism."  *Id.* at 136

(emphasis added); *see Twombly*, 550 U.S. at 556.  The plaintiff must present "additional facts or

circumstances," referred to as "plus factors," and those additional "facts must . . . lead to an in-

ference of conspiracy."  *Mayor*, 709 F.3d at 137.  That is, "parallel conduct" allegations "must be

placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct

that could just as well be independent action."  *Twombly*, 550 U.S. at 557.  Here, the Complaint

does not allege "enough facts to support the inference that a conspiracy actually existed" as to

*any* of the Defendants, but it is even more deficient as to UBS, given that UBS was not even a

Gold Fix panel member.  The Complaint does not present any facts, or any required "plus fac-

tor," sufficient to portray UBS as a participant in the purported conspiracy.

**A.      UBS Had No Role In Setting The Gold Fix Price.**

The Gold Fix is at the heart of Plaintiffs' claims.  The Complaint's central contention is

that the "Defendants' suppression of the gold benchmark was intended to and did directly affect

the price of physical gold, gold futures, . . . and other Gold Investments, causing the Class to sell

these investments at artificially low prices."  C.¶ 115.  That is, Plaintiffs allege that "the Fixings

themselves served as a forum for Defendants to collude over gold prices" (C.¶ 268), and that "the

Fixing Bank Defendants" deployed their "*control over* the Fixing . . . [to] ratify, then magnify,

downward spikes occurring around the Fixing *they controlled*" (C.¶ 201) (emphases added).

Those "[d]ownward spikes at the Fixing" allegedly "allowed them to buy gold cheaper than they

would have been able to—creating an opportunity to profit if and when gold went up as the ef-

fects of the suppression abated."  C.¶ 230.  The Complaint thus asserts that the Gold Fix panel

members took "systematic short positions" (C.¶ 327(g)), allowing them to "cash in on their *fore-*

*knowledge* of the direction in the price of gold," (C.¶ 5), such that, "regardless of their overall

stake in gold at the onset of a given day, [they] profited off of *foreknowledge* that a price spike

was coming" (C.¶ 229 (emphases added)).  "[B]ecause Defendants *controlled* the levers to the market and had established their reliability, such returns were essentially *risk-free* profits." C.¶ 229 (first emphasis added).  Plaintiffs allege, in short, that "[t]he Fixing Bank Defendants . . . colluded to ensure there was coordinated manipulation and fixing of the opening price and the quoted buy/sell levels."  C.¶ 317.

But UBS concededly was neither a "Fixing Bank" nor a co-owner of the entity that administered the Gold Fix.  C.¶¶ 1, 72-74, 201, 236.  So even on Plaintiffs' baseless theory, UBS did not have "control over the Fixing" (C.¶ 201), and was not poised to "influence prices" through the "forum" of the Fixing (C.¶¶ 105, 201, 268, 270).  Nor does the Complaint describe communications between UBS and any Gold Fix panel member during the alleged "suppression of the gold benchmark" (C.¶ 115) through which any supposed "foreknowledge" inherent in Gold Fix panel membership was purportedly conveyed to UBS (C.¶¶ 5, 229).  Indeed, Plaintiffs allege to the contrary—that the "discussions among Fixing Banks" and their "knowledge of demand and supply conditions ahead of and during" the "opaque" Fixing was "undisclosed to other market participants."  Complaint Appendix ("C. App.") *C*, Nos. 4.b, 4.c, 5.b.

Therefore, even if the Gold Fix panel members could be treated as having acted in concert, which they cannot be, nothing would connect UBS to that alleged agreement.  The allegations as to the Fixing Banks cannot state an antitrust claim against UBS.

**B.      UBS Did Not Otherwise Join The Alleged Conspiracy To Suppress Gold Prices.**

Failing to present facts showing UBS to be a conspirator is a fatal deficiency, and what Plaintiffs *do* allege about UBS does not compensate for that deficiency.  The Complaint presents three clusters of allegations as to UBS—that **(1)** UBS is a market maker in the gold spot (short term) and related markets (C.¶¶ 70, 76, 90); **(2)** the Swiss Financial Market Supervisory Authority ("FINMA") made certain assertions about UBS conduct as to precious metals trading in re-

solving a regulatory investigation (C.¶¶ 234-37, 241, 295-303);[2] and **(3)** UBS allegedly quoted

prices lower than market averages at intervals "around" the Gold Fix on 11 specified trading

days (C.¶¶ 248-49, 261-62; C. App. *I*; C. App. *C*, No. 2.a).  These allegations do not amount to

any valid "plus factor" because they are not "facts that tend to ensure that courts punish concert-

ed action—an actual agreement—instead of the unilateral, independent conduct of competitors."

*Mayor*, 709 F.3d at 137.  Plaintiffs have not alleged facts indicating that UBS engaged in, for

example, "parallel behavior that would probably not result from chance, coincidence, independ-

ent responses to common stimuli, or mere interdependence unaided by an advance understanding

among the parties."  *Twombly*, 550 U.S. at 556 n.4.

    **1. Market Making.**  UBS's activities as a "full" market maker—one of five LBMA

"members [who] are responsible for quoting bid and offer prices in gold spot, futures, and/or op-

tions prices to each other during the London business day for agreed minimum quantities"—

cannot imply unlawful conduct in concert with the Fixing Banks.  C.¶ 90.  The Complaint offers

no basis whatsoever for inferring conspiracy from the mere fact of continuous active participa-

tion in a market.  As in the related commodities manipulation context, no "inference of intent" to

engage in illicit conduct can be drawn from the fact that a firm is a major participant in a market,

even where it has market power (which is not alleged here as to UBS).  *In re Commodity Ex-*

*change, Inc.*, 560 F. App'x 84, 86 (2d Cir. 2014) ("*COMEX II*").  If anything, UBS's market-

making role undercuts the plausibility of the assertion that UBS had an economic motive to par-

ticipate in the alleged scheme.  As a market maker, UBS was "responsible for" selling as well as

buying physical gold to satisfy orders in the market, the timing of which UBS could not dictate;

---

[2]  UBS disagrees with the Complaint's characterization of the FINMA process, but for purposes of this motion it addresses the facts as pleaded.

that is, as Plaintiffs recognize, UBS had a duty to quote both "bid and offer prices."  C.¶ 90.  Improper suppression of gold prices would have devalued gold UBS held, not benefitted UBS.

 **2. FINMA Assertions.**  FINMA's assertions following the "investigation" whose resolution it announced on November 12, 2014 do not implicate UBS in the conspiracy Plaintiffs allege.  C.¶ 299.  Those assertions are "not an adjudication of the underlying issues" in Plaintiffs' case, and so Plaintiffs "are . . . prohibited from relying on the [FINMA statements] to plead the underlying facts of liability."  *In re Platinum & Palladium Commods. Litig.*, 828 F. Supp. 2d 588, 594 (S.D.N.Y. 2011).  Non-binding assertions, including "pleadings, settlements, and government investigations in other cases," should be stricken as "immaterial" under Rule 12(f).  *Id.* at 593 (citing *Lipsky v. Commw. United Corp.*, 551 F.2d 887, 894 (2d Cir. 1976)).

 In any event, even if Plaintiffs could avoid *Lipsky*, the FINMA assertions would not support Plaintiffs' claims.[3]  The FINMA Release selectively quoted in the Complaint and the news coverage of the related FINMA Report must be viewed in their proper context.  *See Tellabs*, 551 U.S. at 322; *supra* note 3.  That report—which focused mainly on conduct in the foreign exchange market—briefly made assertions about events in precious metals markets in which UBS

---

[3] At the Rule 12(b)(6) stage, the court examines the complaint "augmented by . . . 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'"  *Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 202 (2d Cir. 2014) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)); *see Yak v. Bank Brussels Lambert*, 252 F.3d 127, 130-31 (2d Cir. 2001) (court properly views document "integral" to complaint because pleaded claims depend on its contents even when pleading "[c]arefully avoid[s] all mention" of it) (citing *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991)).

In that regard, Plaintiffs here selectively refer to documents FINMA released on November 12, 2014.  C.¶ 237 n.54, ¶ 299 n.90.  FINMA issued that day: (1) a press release, *FINMA sanctions foreign exchange manipulation at UBS* 1 (Nov. 12, 2014) ("FINMA Release"), and (2) a report setting forth FINMA's allegations, *Foreign exchange trading at UBS AG: investigation conducted by FINMA* 2 (Nov. 12, 2014) ("FINMA Report").  *Available at* http://www.finma.ch/e/aktuell/pages/mm-ubs-devisenhandel-20141112.aspx.  The Complaint also refers (C.¶¶ 19 & n.5, 301 & n.92) to a Bloomberg News article that discussed the FINMA report and that quoted FINMA's chief executive officer, Mark Branson, as stating that "[t]he behavior patterns in precious metals were somewhat similar to the behavior patterns in foreign exchange," and that "[w]e have also seen clear attempts to manipulate fixes in the precious metals markets."  N. Larkin & E. Logutenkova, *UBS Precious Metals Misconduct Found by Finma in FX Probe*, Bloomberg News, Nov. 12, 2014, *available at* http://www.bloomberg.com/news/articles/2014-11-12/finma-s-ubs-foreign-exchange-settlement-includes-precious-metals.

employees engaged in "*conduct against the interests of [the bank's] own clients*."  FINMA Report § 3.3.3, at 12 (emphasis added).  FINMA asserted that UBS employees had shared the confidential order information of UBS's precious metals trading customers with unnamed "third parties," and also engaged in impermissible "front running"—that is, capitalizing on confidential customer order information to trade on UBS's behalf—including as to "*silver fix* orders of one client."  *Id.* (emphasis added).  But FINMA's report did not allege that the "third parties" were Gold Fix panel members, and Plaintiffs do not describe themselves as UBS customers whose confidential gold-related order information potentially was said to have been misused.  Plaintiffs' claims rest on purported "foreknowledge" of the Gold Fix results (C.¶¶ 5, 14-16, 105, 198, 229), not knowledge about customer orders from a bank that never had control over the Gold Fix.

Departing from the FINMA release and report, which lend no support to the conspiracy allegations, the Complaint instead refers to a news article reporting an alleged assertion of FINMA's Mr. Branson regarding "clear attempts to manipulate fixes in the precious metals markets."  C.¶¶ 19 & n.5, 301 & n.92.  But Mr. Branson's reported allegation does not even mention gold or name UBS or any alleged co-participants.  In any event, "manipulate" has many possible meanings, and nothing in the Complaint shows that Mr. Branson used that term to assert that any specific company (let alone UBS in particular) participated in the conspiracy to suppress gold prices alleged in the Complaint.  Moreover, any such assertion would be inconsistent with the agency's own report, which contains no suggestion that UBS had any role in any conspiracy concerning "foreknowledge" of the Gold Fix results.  C.¶¶ 5, 14-16.  Mr. Branson's alleged remark thus would not "lead to an inference of conspiracy" as alleged.  *Mayor,* 709 F.3d at 137.[4]

---

[4]   Allegations concerning a November 2014 settlement between UBS and the Commodities Futures Trading Commission ("CFTC") and CFTC and Department of Justice inquiries said to be pending likewise fail. C.¶¶ 20, 235, 237.  These unadjudicated assertions should be stricken under Rule 12(f).  At any rate, the settled
*(Cont'd on next page)*

**3. Price Quoting.**  Plaintiffs' assertions about UBS's price-quoting activity—based on portions of 11 trading days (amounting to less than 0.5% of the alleged conspiracy period)—also fail to present a plausible claim.  Plaintiffs offer no facts connecting their description of alleged statistical disparities in gold pricing to any unlawful activity by UBS, so the Complaint instead directs attention to the trading activity on the specified dates as purported "instance[s]" of UBS and other banks "driving" or "triggering" a "downward" movement of the gold price.  C.¶¶ 248, 261; C. App. *I*; C. App. *C*, No. 2.a.  But these are the only such examples identified in the Complaint, out of allegedly thousands of "suspicious" trading days, and beyond labels and conclusions, the Complaint provides no facts establishing that the price quotations on these dates raise a plausible inference of conspiracy, or even that they are representative of UBS's gold pricing conduct.  The price-quoting contention as to UBS is especially incongruous given Plaintiffs' allegations of disparities distinguishing "[t]he five fixing members' quoted prices" from those of "other market actors" (such as UBS).  C.¶¶ 256, 263.

In any event, the bare submission of purportedly parallel or correlated price quotes in a dynamic market cannot support an inference of conspiracy, absent additional facts showing that such quotes "would *probably not* result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by *an advance understanding* among the parties."  *Twombly*, 550 U.S. at 556 n.4 (emphases added); *see also id.* at 557.  Here, Plaintiffs offer no non-conclusory grounds for inferring that UBS's price quotes on the 11 trading days plucked from the nine-and-a-half year class period resulted from "an advance understanding" between UBS and any Fixing Bank.  "[S]imilar pricing can suggest competition at least as plausibly as it

_____

*(Cont'd from previous page)*

CFTC matter is entirely inapposite here:  The CFTC assertions concerned conduct as to certain foreign exchange benchmark rates, not the Gold Fix.  C.¶ 237 & n.53.

can suggest anticompetitive conspiracy." *In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007). The Complaint's "paragraphs describ[ing] . . . market price fluctuations," coupled with "bald assertions" that the fluctuations are the result of unlawful conduct, thus fall well short of the minimum Rules 8 and 12 demand. *In re Commodity Exchange, Inc.*, 2012 WL 6700236, *20 (S.D.N.Y. Dec. 21, 2012) ("*COMEX I*"), *aff'd*, *COMEX II*, 560 F. App'x at 86-87.

**II.      The Commodities Manipulation Claims Fail Because UBS Did Not Intentionally Cause The Artificial Gold Fix Price That Allegedly Inflicted Injury.**

The Complaint does not allege facts sufficient to show that Plaintiffs' manipulation claims against UBS have "facial plausibility" under the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 *et seq.*—whether based on UBS's primary conduct as a principal (Claims Two through Five) or secondary conduct as an alleged aider and abettor (Claim Six). *Iqbal*, 556 U.S. at 678. Because the pleading fails to meet Rule 8, it also fails to meet Rule 9.

The CEA "prohibits any person from 'manipulat[ing] or attempt[ing] to manipulate the price of any commodity.'" *COMEX I*, 2012 WL 6700236, *10 (quoting 7 U.S.C. § 13). Manipulation is found "where (1) Defendants possessed an ability to influence market prices; (2) an artificial price existed; (3) Defendants caused the artificial prices; and (4) Defendants specifically intended to cause the artificial price." *In re Amaranth Natural Gas Commods. Litig.*, 730 F.3d 170, 173 (2d Cir. 2013) (internal quotation marks omitted); *COMEX II*, 560 F. App'x at 86-87.

Plaintiffs' CEA theory fails as to UBS for the same reasons that the antitrust conspiracy theory fails. The Gold Fix is the moving force behind the alleged manipulation. *See, e.g.*, C.¶¶ 84, 105, 115, 117, 194, 201, 229, 231, 268, 317. But Plaintiffs allege no facts supporting a plausible inference that UBS had any role in that purported scheme.

Plaintiffs fail to satisfy the elements of a CEA manipulation claim as to UBS. UBS lacked "ability to influence" the Gold Fix outcome even under Plaintiffs' theory, given that UBS

9

did not participate in the Gold Fix.  *Amaranth*, 730 F.3d at 173.  The Complaint also fails to

show that UBS "[c]aused the artificial prices" alleged or that it "specifically intended to cause"

any such price.  *Id.*  Furthermore, "[a]s plaintiffs fail[] to allege a CEA violation, their aiding and

abetting claim [is] properly dismissed as well."  *COMEX II*, 560 F. App'x at 87.[5]  Moreover, aid-

ing and abetting "requires knowledge of the primary violation and an intent to assist it," *Ama-*

*ranth*, 730 F.3d at 183, but no alleged facts support those inferences as to UBS.  And for the

same reasons discussed above with respect to Plaintiffs' antitrust claim, none of the three clusters

of allegations concerning UBS's conduct compensates for these deficiencies.  *See COMEX II*,

560 F. App'x at 86-87 (quoting *Amaranth*, 730 F.3d at 183).

## CONCLUSION

For the foregoing reasons, all claims in the Complaint should be dismissed as to UBS.

DATE:  April 30, 2015                                          Respectfully submitted,

                                                               GIBSON, DUNN & CRUTCHER LLP

                                                               /s/  Joel S. Sanders
Thomas G. Hungar (*pro hac vice* motion pending)               Joel S. Sanders
D. Jarrett Arp                                                 555 Mission Street, Suite 3000
Melanie L. Katsur                                              San Francisco, CA  94105
1050 Connecticut Avenue, N.W.                                  Telephone: (415) 393-8200
Washington, D.C.  20036                                        jsanders@gibsondunn.com
Telephone: (202) 955-8500

Peter Sullivan
Indraneel Sur                                                  *Attorneys for Defendants*
200 Park Avenue                                                *UBS AG and UBS Securities LLC*
New York, NY 10166
Telephone: (212) 351-4000

---

[5]  UBS's role as a market maker also undercuts the plausibility of the allegation that it had an economic motive to suppress prices over nine-and-a-half years.  *Supra*, Point I.B.1.  Plaintiffs' further attempt to plead CEA claims premised on "false reports concerning market information or conditions" (C.¶ 368) fails as to UBS for all the reasons set forth in the Co-Defendants' Memo and also because UBS was not a Gold Fix panel member.