UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                                       :
IN RE:                                  :
                                         :
COMMODITY EXCHANGE, INC., GOLD     :     1:14-MD-2548 (VEC)
FUTURES AND OPTIONS TRADING         :     1:14-MC-2548 (VEC)
LITIGATION                          :
                                         :
                                         :     **ORAL ARGUMENT**
                                         :     **REQUESTED**
*This Document Relates To All Actions*    :
                                         :
-------------------------------------------------------------x

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO
DISMISS THE SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

April 30, 2015

## TABLE OF CONTENTS

*Page*

**PRELIMINARY STATEMENT** ...................................................................1

**BACKGROUND** .......................................................................................3

    A.    The Parties ....................................................................................3

    B.    The Gold Market............................................................................4

    C.    The London Gold Fixing .................................................................6

    D.    Plaintiffs' Claims ...........................................................................8

**ARGUMENT** ...........................................................................................16

**I.**    **THE COURT CANNOT CREDIT THE OPINIONS OF EXPERTS
OR ALLEGATIONS COPIED FROM REGULATORY
SETTLEMENTS** ...............................................................................17

    A.    The Court Cannot Consider Opinions of Experts at the Pleading
Stage.............................................................................................17

    B.    Allegations of Investigations and Settlements are Immaterial as a
Matter of Law and Should Be Stricken............................................22

**II.**    **PLAINTIFFS FAIL TO PLEAD AN ANTITRUST CONSPIRACY** .........23

    A.    Plaintiffs Fail To Allege Direct Evidence of an Agreement To
Manipulate the London Gold Fixing.................................................24

    B.    Plaintiffs Fail To Allege Parallel Conduct and Circumstantial
Evidence that Plausibly Suggests an Agreement To Manipulate the
London Gold Fixing.........................................................................26

        1.    Plaintiffs' Allegations of Parallel Conduct Do Not Support a
Plausible Inference of Conspiracy ..........................................27

        2.    Plaintiffs' Alleged Plus Factors Do Not Support a Plausible
Inference of Conspiracy..........................................................28

    C.    Plaintiffs Lack Antitrust Standing .....................................................31

        1.    Plaintiffs' Claims Are Too Indirect To Support Standing........32

        2.    The Other Antitrust Standing Factors Also Support Dismissal................34

**III.  PLAINTIFFS FAIL TO STATE A CLAIM FOR VIOLATION OF THE CEA** ..................................................................................37

    A.    Plaintiffs Do Not Allege Facts Giving Rise to a Strong Inference of Scienter ..................................................................................37

        1.    Plaintiffs Do Not Allege Defendants Had Motive To Commit Manipulation ......................................................................... 38

        2.    Plaintiffs Do Not Allege Conscious Misbehavior or Recklessness .......... 42

    B.    Plaintiffs Fail To Allege the Remaining Elements of Price Manipulation .................................................................................43

        1.    Plaintiffs Fail To Allege the Existence of Artificial Prices ..................... 43

        2.    Plaintiffs Fail To Allege That Defendants Caused Artificial Prices ......... 44

        3.    Plaintiffs Fail To Allege That Defendants Had the Ability To Influence Prices ......................................................................... 45

    C.    Plaintiffs Fail To Plead Their Manipulative Device Claims with Particularity ................................................................................46

    D.    Plaintiffs Fail To Allege Principal-Agent or Aiding and Abetting Liability .......................................................................................47

    E.    Plaintiffs Lack Standing Under the CEA Because They Do Not Allege Actual Damages ................................................................47

**IV.  PLAINTIFFS FAIL TO STATE A CLAIM FOR UNJUST ENRICHMENT** ...............................................................................48

**CONCLUSION** .........................................................................................49

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*AD/SAT, Div. of Skylight, Inc.* v. *Associated Press,*
   181 F.3d 216 (2d Cir. 1999) .................................................................25

*Allen* v. *Dairy Farmers of Am., Inc.,*
   No. 09-230, 2014 WL 2610613 (D. Vt. June 11, 2014) .......................33

*In re Amaranth Natural Gas Commodities Litig.* ("*In re Amaranth I*"),
   587 F. Supp. 2d 513 (S.D.N.Y. 2008) ...............................37, 38, 47, 49

*In re Amaranth Natural Gas Commodities Litig.* ("*In re Amaranth II*"),
   612 F. Supp. 2d 376 (S.D.N.Y. 2009) ..........................................37, 38

*In re Amaranth Natural Gas Commodities Litig.* ("*In re Amaranth III*"),
   730 F.3d 170 (2d Cir. 2013) .............................................37, 43, 46, 47

*Andrews* v. *Metro N. Commuter R.R. Co.,*
   882 F.2d 705 (2d Cir. 1989) .................................................................21

*Antoine L. Garabet, M.D., Inc.* v. *Autonomous Techs. Corp.,*
   116 F. Supp. 2d 1159 (C.D. Cal. 2000) .........................................34, 36

*Apex Oil Co.* v. *DiMauro* ("*Apex II*"),
   822 F.2d 246 (2d Cir. 1987) ...........................................................29, 45

*Ashcroft* v. *Iqbal,*
   556 U.S. 662 (2009) .......................................................................16, 17

*Associated Gen. Contractors of Cal., Inc.* v. *Cal. State Council of Carpenters,*
   459 U.S. 519 (1983) .................................................................31, 34, 35

*AstraZeneca AB* v. *Mylan Labs., Inc.,*
   No. 00-6749, 2010 WL 2079722 (S.D.N.Y. May 19, 2010) ................17

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.,*
   493 F.3d 87 (2d Cir. 2007) ...................................................................46

*Bazak Int'l Corp.* v. *Tarrant Apparel Grp.,*
   347 F. Supp. 2d 1 (S.D.N.Y. 2004) .....................................................49

*Bell Atl. Corp.* v. *Twombly,*
   550 U.S. 544 (2007) ..................................................................... *passim*

*Billy Baxter, Inc.* v. *Coca-Cola Co.*,
    431 F.2d 183 (2d Cir. 1970)..........................................................................32

*Bros.* v. *Saag*,
    No. 13-466, 2014 WL 838890 (N.D. Ala. Mar. 4, 2014) .......................................18

*Brown* v. *Lower Brule Cmty. Dev. Enter., LLC*,
    No. 13-7544, 2014 WL 5508645 (S.D.N.Y. Oct. 31, 2014)....................................16

*Burtch* v. *Milberg Factors, Inc.*,
    662 F.3d 212 (3d Cir. 2011)...................................................................24, 29

*Cargill, Inc.* v. *Monfort of Colo., Inc.*,
    479 U.S. 104 (1986)..............................................................................34

*Carver* v. *City of New York*,
    621 F.3d 221 (2d Cir. 2010)......................................................................33

*CDC Techs., Inc.* v. *IDEXX Labs., Inc.*,
    186 F.3d 74 (2d Cir. 1999)........................................................................31

*CFTC* v. *Amaranth Advisors, LLC*,
    554 F. Supp. 2d 523 (S.D.N.Y. 2008)...........................................................43

*CFTC* v. *Parnon Energy, Inc.*,
    875 F. Supp. 2d 233 (S.D.N.Y. 2012)...........................................................43

*Chambers* v. *Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002)........................................................................4

*City of Royal Oak Ret. Sys.* v. *Juniper Networks, Inc.*,
    No. 11-04003, 2013 WL 2156358 (N.D. Cal. May 17, 2013)..................................19

*Colliton* v. *Cravath, Swaine & Moore LLP*,
    No. 08-0400, 2008 WL 4386764 (S.D.N.Y. Sept. 24, 2008) ..................................21

*In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.* ("*In re Silver I*"),
    No. 11-2213, 2012 WL 6700236 (S.D.N.Y. Dec. 21, 2012) .......................... *passim*

*In re Commodity Exch., Inc. Silver Futures & Options Trading Litig.* ("*In re Silver II*"),
    560 F. App'x 84 (2d Cir. 2014) ........................................................39, 43, 47

*Corsello* v. *Verizon N.Y., Inc.*,
    18 N.Y.3d 777 (N.Y. 2012) ..................................................................48, 49

*In re Crude Oil Commodity Litig.*,
    No. 06-6677, 2007 WL 1946553 (S.D.N.Y. June 28, 2007) .....................37, 38, 39, 42

*Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993)..................................................................................18, 19

*DeMarco* v. *Depotech Corp.*,
    149 F. Supp. 2d 1212 (S.D. Cal. 2001)..................................................................18

*In re Digital Music Antitrust Litig.*,
    812 F. Supp. 2d 390 (S.D.N.Y. 2011)..................................................................36

*Dura Pharm., Inc.* v. *Broudo*,
    544 U.S. 336 (2005)..................................................................................46

*Elecs. Commc'ns Corp.* v. *Toshiba Am. Consumer Prods., Inc.*,
    129 F.3d 240 (2d Cir. 1997)..................................................................31

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2007)..................................................................23, 26, 27, 29

*In re Energy Transfer Partners Natural Gas Litig.*,
    No. 07-3349, 2009 WL 2633781 (S.D. Tex. Aug. 26, 2009) ..................................................................48

*Fin. Acquisition Partners LP* v. *Blackwell*,
    440 F.3d 278 (5th Cir. 2006) ..................................................................18

*Footbridge Ltd.* v. *Countrywide Home Loans, Inc.*,
    No. 09-4050, 2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010) ..................................................................22

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
    No. 13-7789, 2015 WL 363894 (S.D.N.Y. Jan. 28, 2015) ..................................................................24

*Garber* v. *Legg Mason, Inc.*,
    347 F. App'x 665 (2d Cir. 2009) ..................................................................4

*Gatt Commc'ns., Inc.* v. *PMC Assocs., LLC*,
    711 F.3d 68 (2d Cir. 2013)..................................................................32, 34

*Gen. Elec. Corp.* v. *Joiner*,
    522 U.S. 136 (1997)..................................................................19

*Georgia Malone & Co.* v. *Rieder*,
    19 N.Y.3d 511 (2012)..................................................................49

*Gotlin* v. *Lederman*,
    367 F. Supp. 2d 349 (E.D.N.Y. 2005) ..................................................................22

*In re Graphics Processing Units Antitrust Litig.*,
    527 F. Supp. 2d 1011 (N.D. Cal. 2007) ..................................................................22

*Gross* v. *New Balance Athletic Shoe, Inc.*,
   955 F. Supp. 242 (S.D.N.Y. 1997)................................................................34

*H. L. Moore Drug Exch.* v. *Eli Lilly & Co.*,
   662 F.2d 935 (2d Cir. 1981).........................................................................30

*Hinds Cnty., Miss.* v. *Wachovia Bank N.A.*,
   620 F. Supp. 2d 499 (S.D.N.Y. 2009).........................................................49

*Hinds Cnty., Miss.* v. *Wachovia Bank, N.A.*,
   708 F. Supp. 2d 348 (S.D.N.Y. 2010).........................................................30

*Ill. Brick Co.* v. *Illinois*,
   431 U.S. 720 (1977).....................................................................................33

*In re Ind. Farm Bureau Coop. Ass'n Inc.*,
   No. 75-14, 1982 WL 30249 (CFTC Dec. 17, 1982) ....................................43

*Jung* v. *Ass'n of Am. Med. Colls.*,
   300 F. Supp. 2d 119 (D.D.C. 2004) ............................................................25

*Kalnit* v. *Eichler*,
   264 F.3d 131 (2d Cir. 2001).........................................................................38

*Kendall* v. *Visa USA, Inc.*,
   518 F.3d 1042 (9th Cir. 2008) .....................................................................23

*Kramer* v. *Time Warner Inc.*,
   937 F.2d 767 (2d Cir. 1991)...........................................................................4

*Kumho Tire Co.* v. *Carmichael*,
   526 U.S. 137 (1999).....................................................................................18

*Lawline* v. *Am. Bar Ass'n*,
   956 F.2d 1378 (7th Cir. 1992) .....................................................................36

*Laydon* v. *Mizuho Bank, Ltd.*,
   No. 12-3419, 2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014)......................... *passim*

*Lexmark Int'l, Inc.* v. *Static Control Components, Inc.*,
   134 S. Ct. 1377 (2014).................................................................................32

*In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*In re LIBOR I*"),
   935 F. Supp. 2d 666 (S.D.N.Y. 2013).......................................................... *passim*

*In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*In re LIBOR II*"),
   962 F. Supp. 2d 606 (S.D.N.Y. 2013).......................................................47, 48

*In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*In re LIBOR III*"),
    27 F. Supp. 3d 447 (S.D.N.Y. 2014)................................................................37, 39, 43

*Lipsky* v. *Commonwealth United Corp.*,
    551 F.2d 887 (2d Cir. 1976)...........................................................................................22

*In re Magnetic Audiotape Antitrust Litig.*,
    No. 99-1580, 2002 WL 975678 (S.D.N.Y. May 9, 2002) .......................................49

*Malin* v. *XL Capital Ltd.*,
    499 F. Supp. 2d 117 (S.D.N.Y. 2007)............................................................................4

*Mason* v. *Am. Tobacco Co.*,
    346 F.3d 36 (2d Cir. 2003)......................................................................................16, 18

*Masters* v. *Wilhelmina Model Agency, Inc.*,
    No. 02-491, 2003 WL 1990262 (S.D.N.Y. Apr. 29, 2003) ...................................49

*Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*,
    475 U.S. 574 (1986).......................................................................................................29

*Mayor & City Council of Balt. Md.* v. *Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013)............................................................................... *passim*

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    218 F.R.D. 76 (S.D.N.Y. 2003) ...................................................................................23

*Mid-W. Paper Prods. Co.* v. *Cont'l Grp., Inc.*,
    596 F.2d 573 (3d Cir. 1979)..........................................................................................35

*Mooney* v. *AXA Advisors, LLC*,
    19 F. Supp. 3d 486 (S.D.N.Y. 2014).............................................................................31

*Muller-Paisner* v. *TIAA*,
    289 F. App'x 461 (2d Cir. 2008) ...................................................................................4

*Ocean View Capital, Inc.* v. *Sumitomo Corp. of Am.*,
    No. 98-4067, 1999 WL 1201701 (S.D.N.Y. Dec. 15, 1999) ...................................34

*In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*,
    997 F. Supp. 2d 526 (N.D. Tex. 2014) ......................................................................29

*In re Parcel Tanker Shipping Servs. Antitrust Litig.*,
    541 F. Supp. 2d 487 (D. Conn. 2008).........................................................................26

*Peter F. Gaito Architecture, LLC* v. *Simone Dev. Corp.*,
    No. 08-6056, 2009 WL 5865686 (S.D.N.Y. May 22, 2009) ...................................16

*Ping He (Hai Nam) Co., Ltd.* v. *Nonferrous Metals (U.S.A.) Inc.*,
    22 F. Supp. 2d 94 (S.D.N.Y. 1998)..................................................................47

*In re Platinum & Palladium Commodities Litig.*,
    828 F. Supp. 2d 588 (S.D.N.Y. 2011)..................................................22, 25, 47

*Prime Mover Capital Partners, L.P.* v. *Elixir Gaming Techs., Inc.*,
    793 F. Supp. 2d 651 (S.D.N.Y. 2011)..............................................................42

*In re Pub. Offering Antitrust Litig.*,
    No. 98-7890, 2004 WL 350696 (S.D.N.Y. Feb. 25, 2004)...............................33

*Reading Indus., Inc.* v. *Kennecott Copper Corp.*,
    631 F.2d 10 (2d Cir. 1980)...............................................................................35

*Reed Constr. Data Inc.* v. *McGraw-Hill Cos., Inc.*,
    49 F. Supp. 3d 385 (S.D.N.Y. 2014)................................................................19

*Ross* v. *Am. Express Co.*,
    35 F. Supp. 3d 407, 442 (S.D.N.Y. 2014)........................................................28

*Rothman* v. *Gregor*,
    220 F.3d 81 (2d Cir. 2000).................................................................................4

*S&A Farms, Inc.* v. *Farms.com, Inc.*,
    678 F.3d 949 (8th Cir. 2012) ............................................................................47

*Skidmore* v. *Swift*,
    323 U.S. 134 (1944)..........................................................................................40

*Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan* v.
    *Morgan Stanley Inv. Mgmt. Inc.*,
    712 F.3d 705 (2d Cir. 2013)..............................................................................17

*Stoneridge Inv. Partners, LLC* v. *Scientific-Atlanta, Inc.*,
    552 U.S. 148 (2008)..........................................................................................46

*Superior Offshore Int'l, Inc.* v. *Bristow Grp. Inc.*,
    738 F. Supp. 2d 505 (D. Del. 2010)..................................................................22

*Time Warner Cable Inc.* v. *FCC*,
    729 F.3d 137 (2d Cir. 2013)..............................................................................31

*Todd* v. *Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001)..............................................................................33

*Total Benefits Planning Agency, Inc.* v. *Anthem Blue Cross & Blue Shield*,
    552 F.3d 430 (6th Cir. 2008) ............................................................................25

*In re TVIX Sec. Litig.*,
    25 F. Supp. 3d 444 (S.D.N.Y. 2014)......................................................................36

*Johnson ex rel. United States* v. *Univ. of Rochester Med. Ctr.*,
    686 F. Supp. 2d 259 (W.D.N.Y. 2010) .................................................................37

*Virgin Atl. Airways Ltd.* v. *British Airways PLC*,
    257 F.3d 256 (2d Cir. 2001)..................................................................................31

*In re Viropharma, Inc., Sec. Litig.*,
    No. 02-1627, 2003 WL 1824914 (E.D. Pa. Apr. 7, 2003).....................................18

*Weyerhaeuser Co.* v. *Ross–Simmons Hardwood Lumber Co., Inc.*,
    549 U.S. 312 (2007)...............................................................................................33

*Zinser* v. *Cont'l Grain Co.*,
    660 F.2d 754 (10th Cir. 1981) ...............................................................................33

**Statutes**

Clayton Act,
    15 U.S.C. § 15b .....................................................................................................49

Commodity Exchange Act,
    7 U.S.C. § 1, *et seq.*....................................................................................... *passim*
    7 U.S.C. § 9 ............................................................................................................37
    7 U.S.C. § 13 ..........................................................................................................37
    7 U.S.C. § 25 .....................................................................................................47, 49

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203 ......................46

Sherman Act,
    15 U.S.C. § 1 *et seq.*..............................................................................................23

**Rules**

Federal Rule of Civil Procedure,
    Rule 9(b) ................................................................................................................37

N.Y. C.P.L.R. § 214(3) ...................................................................................................49

**Regulations**

17 C.F.R.
    § 180.1..............................................................................................................37, 46
    § 240.10b-5 ......................................................................................................38, 46

**Other Authorities**

Prohibition on the Employment, or Attempted Employment, of Manipulative and
    Deceptive Devices and Prohibition on Price Manipulation,
    76 Fed. Reg. 41,398 (July 14, 2011)................................................................................38, 46

## PRELIMINARY STATEMENT

In this putative class action, plaintiffs allege that, for nearly a decade, defendants conspired to fix prices and manipulate the price of gold through the London Gold Fixing, a twice-daily gold bullion auction.  Plaintiffs contend that this conspiracy suppressed gold prices worldwide by an average of 0.04% during the 10 to 15 minute interval of the afternoon Gold Fixing on certain days from January 1, 2004 to June 30, 2013.  Relying on the opinions of paid experts describing these "anomalous" patterns, plaintiffs assert that there must have been a massive conspiracy among defendants to manipulate the price of gold downward (during nearly a decade in which gold prices quadrupled).

Despite its heft and abundant innuendo, plaintiffs' second consolidated amended complaint ("SAC") is noticeably devoid of facts.  Plaintiffs allege neither a single conspiratorial communication, nor the name or general position of even a single member of the purported conspiracy nor how the alleged conspiracy operated.  Lacking facts, plaintiffs recite a laundry list of every known form of market manipulation, and speculate that defendants must have used some or all based on supposed pricing "anomalies" identified by their "experts."  Recognizing the weaknesses of their claims, plaintiffs elected to amend in response to defendants' first motion to dismiss.  Their amendments, however, have not cured those deficiencies and instead actually exacerbate the weakness of their claims:

*First*, instead of facts suggesting manipulation, plaintiffs rely heavily on expert opinions that the pricing patterns around the Gold Fixing were "anomalous" and that these "anomalies" must have resulted from collusion and manipulation.  Such conclusory assertions are not entitled to a presumption of truth.  This principle applies with particular force to the opinions of "experts" whose qualifications have not been (and cannot be) ruled upon, and whose

assumptions and theories have not been tested.  Setting aside the conclusory opinions of their paid experts, plaintiffs fail to allege any facts that suggest that downward price movements are at all unusual in the context of a precious metal with a daily liquidity event like the Gold Fixing. To the contrary, the allegations of the complaint and the admissions in plaintiffs' prior pleading confirm that downward pricing movements are not unusual in the gold market.  Plaintiffs' assertion that securities markets do not have similar downward movements ignores fundamental—and obvious—differences in the structures of the gold and securities markets. Presumably aware that the facts undermine their theory, plaintiffs tried to simply delete from their second amended complaint their own prior allegation that the afternoon Fixing is the most liquid time of day to trade (which could explain why the afternoon Fixing attracts selling pressure).  That amendment does not make their admission go away; it still binds them.  And the fact that plaintiffs' paid experts flip-flop so readily from one theory to another underscores the danger in relying on paid-for opinions, rather than *facts*, at the pleading stage.

       *Second*, plaintiffs fail to allege any other facts that demonstrate or even hint at the existence of a price-fixing conspiracy (a required component to sustain their antitrust claims) or that give rise to a strong inference that defendants acted with scienter (necessary to sustain plaintiffs' Commodity Exchange Act ("CEA") claims).  Absent direct evidence of wrongdoing, plaintiffs must allege facts sufficient to infer an unlawful agreement or show defendants' motive to break the law.  Plaintiffs initially alleged that defendants had a motive to suppress the price of gold because defendants had a "short" trading position in COMEX gold futures, which would increase in value if gold futures prices decreased.  As defendants pointed out in their first motion to dismiss, however, a bank's trading position is comprised of its combined position in the futures and the over-the-counter market (including spot gold).  Thus, even if defendants did have

a short position in futures, plaintiffs do not allege that defendants' *overall* exposure to gold was "short" such that defendants would benefit from a decrease in the price of gold.  Plaintiffs amended their complaint to allege that defendants could profit even from a price-neutral (*i.e.*, hedged) position based on the time value of margin payments from the futures position.  This "allegation" is sheer speculation; plaintiffs do not even allege that defendants actually profited in this way—they assert only that it is hypothetically possible.  Hypothetical possibilities are not factual allegations.  This alone is fatal to plaintiffs' antitrust and CEA claims.

*Third*, even if plaintiffs stated viable antitrust claims, they lack standing to assert them because they do not allege that any of the named plaintiffs transacted with defendants, and their claims are too remote to confer standing.  For nearly 40 years, federal antitrust law has recognized that only *direct* purchasers or sellers—*i.e.*, consumers who purchased directly from, or suppliers who sold directly to, alleged conspirators—have standing to pursue antitrust claims.  Plaintiffs likewise lack standing to bring CEA claims because they do not allege that they traded during the afternoon Fixing, when prices were supposedly "artificial" as a result of the purported manipulation.  Plaintiffs' new theory, that "artificial" prices supposedly persisted for an undefined time period after the afternoon Fixing, is contradicted by their own pleading; in any case, plaintiffs do not even allege that they traded during any period in which artificial prices supposedly "persisted."

For these reasons, and others, the complaint must be dismissed with prejudice.

## BACKGROUND

### A.    The Parties

Plaintiffs are individuals and entities that allegedly sold physical gold, gold futures traded on COMEX, shares in gold ETFs, or options on gold ETFs, from January 1, 2004 to June 30, 2013 (the "Class Period").  (SAC ¶¶ 29-56, 341.)

Defendants are UBS AG and UBS Securities LLC; The London Gold Market Fixing Ltd. ("LGMF"); and the five LGMF member banks during the Class Period:  The Bank of Nova Scotia, Barclays, Deutsche Bank, HSBC, and Société Générale (collectively, the "Member Banks").  (SAC ¶¶ 58-74.)  LGMF is an English private company that is allegedly "owned and controlled" by the Member Banks and, during the Class Period, administered the London Gold Fixing.  (SAC ¶ 72-74.)

No plaintiff is alleged to have been a client of any defendant.  None is even alleged to have sold gold or gold-related investments to any defendant (directly or indirectly); none is alleged to have ever participated in the London Gold Fixing or traded gold at or after the time of day that the afternoon Fixing occurred.

### B.     The Gold Market

The $20 trillion gold market is an active and highly liquid market that attracts a range of participants, including miners, refiners, jewelers, investors, speculators, and central banks.  (Ex. 1[1] (Liam Vaughan, Nicholas Larkin & Suzi Ring, *London Gold Fix Calls Draw Scrutiny Amid Heavy Trading*, Bloomberg, Nov. 26, 2013 ("Vaughan")), at 1.)  Between 2004

---

[1]     Unless otherwise noted, all references to "Ex." refer to exhibits to the declaration of Stephen Ehrenberg, dated April 30, 2015.  The Court may consider these exhibits because they are (i) "statements or documents incorporated into the complaint," (ii) "documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit," *Rothman* v. *Gregor*, 220 F.3d 81, 88 (2d Cir. 2000); *accord Chambers* v. *Time Warner*, *Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002), (iii) financial markets data of which the court can take judicial notice, *see Malin* v. *XL Capital Ltd.*, 499 F. Supp. 2d 117, 134 (S.D.N.Y. 2007), (iv) "press coverage" (introduced for the fact that the coverage "contained certain information, without regard to the truth of [its] contents"), *Garber* v.  *Legg Mason, Inc.*, 347 F. App'x 665, 669 (2d Cir. 2009), or (v) other documents of which the court may take judicial notice, *see Kramer* v. *Time Warner Inc.*, 937 F.2d 767, 773-74 (2d Cir. 1991), including public testimony, *Muller-Paisner* v. *TIAA*, 289 F. App'x 461, 466 n.5 (2d Cir. 2008).

and 2012, a long bull market in gold prevailed, during which the price of gold steadily increased over fourfold.  (*See* SAC ¶ 110.)

The London over-the-counter gold market handles an average daily trading volume of more than $33 billion.  (Ex. 1 (Vaughan), at 1.)  There are numerous other venues for trading gold, including markets in New York, Zurich, and Dubai.  (*See* Ex. 2 (SPDR Gold Trust Prospectus, Apr. 26, 2012), at 15.)  In these venues, physical gold can be traded over the counter 24 hours a day.  (SAC ¶ 95.)  Liquidity in gold trading venues varies during the trading day.  The greatest liquidity is available after U.S. trading venues open, when "trading in the European time zones overlaps with trading in the United States."  (Ex. 2 (SPDR Gold Trust Prospectus, Apr. 26, 2012), at 15.)

In addition to physical (or spot) market trading, gold can be traded using forward, options or futures contracts.   (SAC ¶¶ 97-101.)  The seller of a futures contract agrees to deliver, and the buyer agrees to accept, a stated quantity of physical gold meeting certain standard specifications, at a set future date.  (*See* SAC ¶ 100.)  The buyer of the contract has a "long" position, while the seller is "short."  (SAC ¶ 100.)  Futures traders typically offset prior to delivery.  For example, a long buyer of 10 contracts can offset by selling 10 contracts, after which the trader's net position is zero and he does not need to take delivery of physical gold.  Traders earn profits, or incur losses, based on the price difference between the original contract and the offsetting position.  If the price has declined, the short seller will profit; if the price has increased, the long buyer will profit.  (*See* SAC ¶ 100.)  Futures trade on the COMEX more than 23 hours a day, five days a week.  (*See* Ex. 3 (CME Group, Gold Futures Contract Specs, http://www.cmegroup.com/trading/metals/precious/gold_contract_specifications.html).)  Traders can also trade options, either on an exchange or over the counter.  (SAC ¶ 101.)

The bank defendants are market makers that trade both physical gold and gold derivatives. (SAC ¶¶ 58-71, 76.)  London Bullion Market Association ("LBMA") members that are market makers in gold—14 in all—quote "bid and offer prices in gold spot, futures and/or options prices to each other during the London business day for agreed minimum quantities." (SAC ¶¶ 87, 90.)  Some defendants also operate gold vaults.  (SAC ¶¶ 58, 64.)  Businesses that deal in physical gold or other gold investments can use futures, options, or derivatives to hedge their market risk.  (SAC ¶¶ 217-220.)  For example, if a bank holds 5,000 troy ounces of physical gold in inventory for sale to clients, the bank faces a risk that gold prices will decline—reducing the value of the bank's holding.  The bank may hedge that risk by selling short 50 futures on COMEX (which are for 100 troy ounces each (SAC ¶ 216)).  If the gold price falls by $1 an ounce, the bank's physical gold will be worth $5,000 less, but the short futures will increase in value by $5,000, offsetting the loss.  This hedge renders the bank "price neutral," meaning the bank is indifferent to changes in the price of gold.  Banks like defendants that make markets in gold are subject to regulations and risk-based capital requirements that encourage them to hedge risks from volatile commodities like gold.  (Def. Mem. Supp. Mot. Dismiss 6 n.4, ECF No. 36.)

## C.    The London Gold Fixing

The London Gold Fixing, formed in 1919 by gold bullion traders and refiners, facilitates the trading of physical gold among the Member Banks and affords opportunities for gold producers to sell physical gold.  (SAC ¶¶ 76, 78, 173.)  Member Banks that trade on the Gold Fixing must deliver physical gold within two days to settle their trades.  (Ehrenberg Decl. (Feb. 13, 2015) Ex. 7, at ¶ 27, ECF No. 37-7; *see also* SAC ¶ 97.)  Non-members cannot trade directly on the Gold Fixing, but can trade with Member Banks.  (SAC ¶ 80.)

During the Class Period, the Gold Fixing occurred twice every U.K. business day, at 10:30 a.m. (the "AM Fixing") and 3 p.m. (the "PM Fixing") London time.  (SAC ¶ 79.)

Members Banks only traded London Good Delivery gold bars, which contain about 400 troy ounces of fine gold of precise quality specifications.  (Ex. 2 (SPDR Gold Trust Prospectus, Apr. 26, 2012), at 15.)  At the start of the Gold Fixing, the chairman (chosen from one of the Member Banks) announced a "trying price" based on prevailing spot and futures prices.  (Ex. 2 (SPDR Gold Trust Prospectus, Apr. 26, 2012), at 16; Ehrenberg Decl. (Feb. 13, 2015) Ex. 7, at ¶ 5, ECF No. 37-7.)  Each Member Bank then announced the number of gold bars it wished to buy or sell.  (SAC ¶ 82.)  If there was an imbalance of supply or demand, the chairman adjusted the trying price upward or downward as appropriate.  (SAC ¶ 82.)  As this process took place, the trying price was communicated to each bank's trading room, which could give clients the Gold Fixing price via Bloomberg or other services.  (*See* Ex. 2 (SPDR Gold Trust Prospectus, Apr. 26, 2012), at 16.)

During the Gold Fixing, clients who had expressed interest in buying or selling could cancel or modify their orders, or place new orders.  (Ex. 2 (SPDR Gold Trust Prospectus, Apr. 26, 2012), at 16.)  If a member bank wanted to revise its net position in response to changes in its client orders, it could raise a "flag" temporarily to prevent the chairman from fixing the price.  (Ehrenberg Decl. (Feb. 13, 2015) Ex. 7, at ¶¶ 22-24, ECF No. 37-7.)

Supply and demand were not always matched perfectly.  If there was no buying or selling interest, the chairman could declare the initial trying price as "fixed" even if no trades occurred.  (SAC ¶ 82.)  The chairman also could declare the price "fixed" if supply and demand were balanced within 50 or, in some cases, 100 bars.  (SAC ¶ 82; Ehrenberg Decl. (Feb. 13, 2015) Ex. 7, at ¶ 21, ECF No. 37-7.)  When necessary, Member Banks reduced and increased their orders, *pro rata*, to equalize the number of bars exchanged.  (Ehrenberg Decl. (Feb. 13, 2015) Ex. 7, at ¶¶ 19-20, ECF No. 37-7.)  The LBMA published the Gold Fixing price

immediately after each Fixing.  (SAC ¶ 82.)  The Gold Fixing price is one of many prices for

gold (*see* SAC ¶ 76) and does not directly control the price of COMEX futures or options.[2]

### D.      Plaintiffs' Claims

Plaintiffs allege that defendants colluded to manipulate the PM Fixing price

downward (SAC ¶¶ 10-12), and assert three kinds of claims:  (i) antitrust conspiracy (Claim

One); (ii) market manipulation under the CEA (Claims Two through Six); and (iii) unjust

enrichment (Claim Seven).  (SAC ¶¶ 349-379.)  Unlike complaints in certain past benchmark

manipulation cases, the complaint does not refer to any direct evidence of manipulation or

collusion.  Plaintiffs instead premise their claims solely on circumstantial allegations:

**Downward Price Movements.**  Plaintiffs paid "experts" to analyze a subset of

market prices.  (SAC ¶¶ 117, 158-163, 168, 250-255, 332.)  Their experts allegedly concluded

that, for much of the Class Period, spot gold prices decreased in the minutes around the PM

Fixing more frequently than they increased (prices moved down about 70% of the time).  (SAC

¶¶ 120, 123-125, 138, 182.)  Plaintiffs allege that these downward price movements—which

averaged 0.04% (or 0.0004 in decimal terms)—were larger than price movements at other times

of the trading day.  (SAC ¶¶ 142, 147-153.)  Plaintiffs assert (without citation) that the

downward movements are anomalous because "one would expect . . . an even split between up

---

[2]      After the Class Period, the International Organization of Securities Commissions
("IOSCO") promulgated new Principles for Financial Benchmarks that called for independent
governance for all benchmarks.  (Ehrenberg Decl. (Feb. 13, 2015) Ex. 8, at 15-19, ECF No. 37-
8.)  The U.K. Financial Conduct Authority ("FCA") endorsed these principles on September 19,
2013.  (*See* Ehrenberg Decl. (Feb. 13, 2015) Ex. 9, ECF No. 37-9.)  On November 7, 2014, the
LGMF announced that it would transition to an electronic system administered by ICE
Benchmark Administration Ltd.  (*See* Ehrenberg Decl. (Feb. 13, 2015) Ex. 10, ECF No. 37-10.)

days and down days."  (SAC ¶ 124; *see also* SAC ¶ 120.)[3]  The phenomenon of downward price movements at the time of the Fixing may not be unique to gold.  Plaintiffs in other lawsuits involving other precious metals that, like gold, have a daily fixing process conducted by means of an auction, claim to have identified similar pricing patterns.  *See* First Consolidated Am. Class Action Compl. ¶¶ 97-124, *In re Platinum and Palladium Antitrust Litig.*, No. 14-09391 (S.D.N.Y. Apr. 21, 2015); Consolidated Am. Class Action Compl. ¶¶ 178-188, *In re London Silver Fixing, Ltd. Antitrust Litig.*, No. 14-02573 (S.D.N.Y.  Jan. 26, 2015).

        In the first motion to dismiss, defendants argued that downward price movements at the time of the Gold Fixing (which are not unusual) cannot support any inference of manipulation, because there are many explanations for such price movements.  (Def. Mem. Supp. Mot. Dismiss 23, ECF No. 36.)  Among other things, gold is constantly mined and sold, and the Gold Fixing—which was originally established to help gold "mining houses . . . sell all of their gold" (SAC ¶ 78)—attracts significant selling pressure.  This is particularly true of the PM Fixing, which (as plaintiffs initially alleged) is "one of the most liquid times of the day for gold trading."  (Consolidated Am. Compl. ("CAC") ¶ 145; *see also* CAC ¶¶ 142, 144 (PM Fixing is "an especially liquid time of day").)

---

[3]        Plaintiffs allege that prices moved downward 70% of the time during the PM Fixing (and by an average of 0.04%).  These allegations overstate the average frequency of downward price movements during the Class Period, because the period plaintiffs used for their statistics (2001-2012 (*see* SAC ¶¶ 123, 141-143, 150, 182)) does not correspond to the Class Period (2004 to mid-2013 (*see* SAC ¶ 341)).  Plaintiffs included 2001-2003 in the statistics (the years with some of the highest frequency of downward price movements) and omitted 2013 (the year with the smallest such frequency)—with the effect, in both cases, of exaggerating the frequency of downward price movements.  Most of the statistical allegations in the complaint involve similar, and similarly biased, temporal mismatches.  (*See, e.g.*, SAC ¶¶ 123, 125, 128, 130, 135, 138, 141, 146, 150, 180, 182, 253, 256.)

In response to defendants' motion, plaintiffs and their experts dutifully reversed their position that the PM Fixing was "one of the most liquid times of the day for gold trading." (CAC ¶ 145.)  Plaintiffs now assert the opposite:  that "gold markets . . . were *not* uniquely" "liquid around the PM Fixing."[4]  (SAC ¶ 175 (emphasis added).)  Plaintiffs do not allege that any other time of day offered sellers more liquidity than the PM Fixing.

Plaintiffs also contradicted their earlier complaint in the course of arguing in the new complaint that selling pressure cannot explain the alleged price movements.  (SAC ¶ 177.) Plaintiffs' claim that prices "often did not" rebound after the PM Fixing (SAC ¶ 177) is contradicted by plaintiffs' allegation in the previously amended complaint that prices "recovered following the Fixing," at least partially.  (CAC ¶ 122.)  Plaintiffs' graphs show that prices did recover after the Fixing.  (SAC ¶ 142.)

**Absence of Downward Price Movements in 2013.**  Plaintiffs allege that "downward swings began to abate as the banks' benchmarking practices came under increased scrutiny" in 2013.  (SAC ¶ 174; *see also* SAC ¶¶ 10, 124.)  But 2013 was not a watershed year for the investigation of financial benchmarks.  LIBOR investigations were publicly disclosed early in 2011, and dozens of LIBOR-related class-actions were filed starting in April 2011.  The first major LIBOR regulatory settlement was announced in mid-2012.

---

[4]      Plaintiffs included two charts apparently to suggest that the Gold Fixing was not the most liquid time of day.  These charts show the opposite.  One chart shows gold *futures* volume. (SAC ¶ 176.)  Plaintiffs do not allege any correlation between gold futures volume and gold *spot* volume.  Even if there were a correlation, gold futures volume jumps significantly at the PM Fixing (SAC ¶ 176)—which confirms that the PM Fixing *is* an especially liquid time for gold trading.  The other chart shows the "Number of Gold Spot Quotes" per minute (relatively constant during normal business hours in London).  (SAC ¶ 175.)  The *number* of quotes, however, tells us almost nothing about *volume*.  Plaintiffs' reliance on quote data is misplaced in any event.  (*See infra* note 7 and accompanying text.)

The most obvious fact that distinguished 2013 from the preceding decade or more is that while gold increased in value (in U.S. dollar terms) every year from 2000 through 2012, in 2013 the price of gold plummeted 27%.  (Ex. 6, (Bloomberg Historic PM Fixing Data, Years 2000-2014); SAC ¶ 110.) [5]  Plaintiffs did not address this fact in their complaint.  Plaintiffs also did not address the fact that gold prices stabilized in 2014, and downward price movements at the Gold Fixing resumed, as in the period 2000-2012 (SAC ¶ 170), even though regulatory scrutiny of benchmark practices did not ebb.

**Collusion Among Defendants.**  Plaintiffs contend that the alleged downward price movements were caused by collusion among defendants.  Plaintiffs offer no facts to support this assertion and admit that they cannot "track" each defendant's transactions, because there is no "publically [sic] available data" that would "link[] transactions to particular market actors."  (SAC ¶ 250.)  Plaintiffs try to compensate for the lack of data by relying on "expert" opinions that on days when the gold spot price dropped during the PM Fixing, defendants' gold spot quotes around the PM Fixing were (a) closer to one another's quotes than to other market participants' quotes (SAC ¶¶ 252-254), and (b) lower than those of other parties (SAC ¶¶ 255-258).  But even as to quotes, plaintiffs offer no facts to support their experts' conclusions.  The claim that quotes were "clustered" is supported only with summary statistics, lacking facts about the methodology or data, or even which defendants' quotes were identified.  (SAC ¶¶ 250-254.)

---

[5]     *See In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*In re LIBOR I*"), 935 F. Supp. 2d 666, 680 (S.D.N.Y. 2013) (referring to 20-F filing in March 2011); Ex. 4 (Carrick Mollencamp & David Enrich, *Banks Probed in Libor Manipulation Case*, Wall St. J., Mar. 16, 2011); Ex. 5 (Joseph Palazzolo, Jean Eaglesham & Carrick Mollencamp, *U.S. Asks If Banks Colluded On Libor*, Wall. St. J., Apr. 14, 2011), at C1 ("For the past year, law-enforcement officials have been investigating . . . Libor."); Class Action Compl., *FTC Capital GMBH* v. *Credit Suisse Group AG*, No. 11-2613 (S.D.N.Y. Apr. 5, 2011).

While plaintiffs attempted (but ultimately failed) to allege that there are no innocent explanations for price movements around the time of the PM Fixing (SAC ¶¶ 164-193), they do not allege that there are no legitimate reasons that defendants' price quotes would be "clustered" together.  There are many—including that Fixing members may disproportionately attract gold miners and refiners as clients, which may give Fixing members a different perspective on the market from other traders, with a different client mix.

**Non-U.S. Banks' Short COMEX Futures Position.**  Plaintiffs allege that defendants were "motivated" to manipulate the PM Fixing downward because "during all or most of the Class Period" defendants held short gold futures positions on COMEX, which increased in value when gold futures prices fell.  (SAC ¶¶ 104, 209-213, 217.)  This allegation is based on CFTC reports showing that as many as 21 unidentified non-U.S. banks, in the "aggregate," had a short futures position on COMEX.  (*See* Ex. 7 (CFTC, *Bank Participation Reports*, http://www.cftc.gov/marketreports/bankparticipationreports); SAC ¶¶ 211-213.)  These reports say nothing about the scale or long versus short position of any *individual* bank; they do not even disclose which banks are included.  (*See* Def. Mem. Supp. Mot. Dismiss 12 n.7, ECF No. 36.)  A short futures position can be (and often is) used to hedge another gold position.  (SAC ¶ 217.)[6]  None of the reports plaintiffs cite indicates that non-U.S. banks' *overall* positions

---

[6]      Plaintiffs further allege that defendants had large gold derivatives positions that were mostly "active trading" positions (rather than hedging) under accounting rules.  (*See* SAC ¶ 202-208.)  The reports plaintiffs cite reveal that "active trading positions" includes market-making (*i.e.*, positions banks establish to serve clients).  (*See, e.g.*, Ex. 8 (The Bank of Nova Scotia, *Annual Report:  Form 40-F*, Dec. 6, 2013, http://www.sec.gov/Archives/edgar/data/9631/000119312513465220/0001193125-13-465220-index.htm), at Ex-3, 139; Ex. 9 (UBS AG, *Annual Report:  Form 20-F/A*, May 21, 2009, http://www.sec.gov/Archives/edgar/data/1114446/000095012309009240/y77164e20vfza.htm), at 313.)  Plaintiffs do not allege that these "derivatives" positions were short positions.  A derivatives portfolio can include both long and short positions, such that the overall derivatives
(*footnote continued*)

(including physical gold, derivatives, and over-the-counter positions) were net short.  Plaintiffs'
allegation "that each bank had a significant net short gold position *during all or most of the Class
Period*" (SAC ¶ 210 (emphasis added)) also does not square with the fact that gold prices nearly
quadrupled from 2004 to 2012.  (SAC ¶ 110.)  If defendants had "a significant net short gold
position" for all or most of that period, they would be reeling from losses on those positions.

　　　　After defendants explained these deficiencies in the motion to dismiss plaintiffs'
first amended complaint (Def. Mem. Supp. Mot. Dismiss 11-12, ECF No. 36), plaintiffs
amended their complaint again, now arguing that an entity engaged in manipulation could profit
even from a "hedged" position because of "the Time Value of Money."  (SAC ¶ 221.)  Plaintiffs'
theory is that an entity with a short futures position would benefit from manipulating its short
position by receiving cash margin payments daily (because futures are marked to market daily).
(SAC ¶¶ 218-221.)  Plaintiffs speculate that, if the offsetting long position were structured as a
"forward contract" that did not mature until far into the future, the hypothetical manipulator
could invest the proceeds from the manipulation of its short position and earn interest (reflecting
"the Time Value of Money").  Although the manipulator ultimately would lose "the same
amount of cash" on its long position as it had gained on the short position, it supposedly could
keep the interest that it had earned from investing the proceeds of the short manipulation as they
were paid daily.  (SAC ¶ 220.)

　　　　Plaintiffs do not allege that defendants actually structured their positions in this
fashion.  They merely refer to the hypothetical profit as something that "would" occur if the

---

(*footnote continued*)
portfolio is price neutral (even if the individual positions within the portfolio are not treated as
hedges for accounting purposes).  Short futures positions can also be used to hedge long
derivatives positions established to serve clients.

banks did what plaintiffs hypothesize.  (SAC ¶¶ 217-218, 221.)  The theory makes little sense.  First, holding a short position only "generates daily cash flows for the holder of the futures contract if the market moves in favor of the holder's position."  (SAC ¶ 218.)  From 2004 to 2012, gold prices nearly quadrupled, so if defendants had short positions for "all or most of" this period (SAC ¶ 210), they would be *paying* margin—not receiving it.  (*See* SAC ¶ 218.)  Moreover, even if prices moved downward at the PM Fixing, prices often recovered to pre-Fixing levels before the COMEX futures were settled, in which case there would be no benefit from manipulation (only more costs).  (SAC ¶ 142; CAC ¶ 122.)  Finally, plaintiffs ignore that, for much of the period of alleged manipulation, interest rates were so close to zero that it would be impossible to earn more than a trivial sum, especially in light of minimal margin payments one could earn from the 0.04% price movement during the PM Fixing.  (*Cf.* SAC App'x A (alleging manipulation on 907 days from 2009 to 2013); SAC ¶ 142 (alleging price movement of 0.04%); *infra* note 18 and accompanying text.)

    **Regulatory Investigations and Settlements.**  Plaintiffs allege that government regulators have investigated and settled various benchmark manipulation cases.  (SAC ¶¶ 277-308.)  Plaintiffs do not—and cannot—allege that any of these investigations has yielded evidence of a manipulative conspiracy among the members of the Gold Fixing.  In fact, after plaintiffs filed their original complaint, at least two of the investigations they cite were "closed."  (SAC ¶ 277 n.69.)  Plaintiffs do not describe the circumstances of the closures, but there is no allegation in the latest complaint that these "closed" investigations resulted in any settlement, finding of wrongdoing, or evidence that would show a manipulative conspiracy.  Plaintiffs nevertheless continue to invoke the specter of these closed investigations as if they somehow support plaintiffs' claims.  (SAC ¶ 279.)

The complaint describes regulatory investigations relating to LIBOR and foreign exchange benchmarks (the subject of separate class actions). Plaintiffs point to just two examples (Barclays and UBS) that involve precious metals at all, and those concern alleged unilateral conduct in certain transactions, not an ongoing, multiple-bank price-fixing conspiracy. (SAC ¶¶ 283-291; SAC ¶¶ 295-303.)

In May 2014, Barclays and the FCA settled allegations related to trading conduct by one trader, on one specific day (which is not a date on which plaintiffs allege they traded gold), related to one off-exchange contract. (SAC ¶¶ 283-291, App'x B.) According to the settlement, the FCA concluded that the former trader at Barclays (Daniel Plunkett) "preferr[ed] his interests over those of [an unnamed] Customer" by placing orders that could have moved the Gold Fixing price below the strike price that would have triggered a payment by Barclays to the customer under a digital options contract the customer had purchased from Barclays. (Ex. 10 (U.K. Financial Conduct Authority, *Final Notice to Barclays Bank plc*, May 23, 2014), at ¶ 2.9.) Barclays did not admit the allegations, and the FCA noted that Barclays did not "engage[] in deliberate or reckless misconduct." (*Id.* ¶ 6.9.) After the final notice in the Barclays settlement, David Bailey, the FCA's Head of Markets Infrastructure and Policy, testified to the Treasury Committee of the U.K. House of Commons that he had seen no clear evidence of collusion among the London Gold Fixing banks. (*See* Ex. 11 (House of Commons Treasury Committee, *Oral Evidence: Manipulation of Benchmarks*, HC 491, July 2, 2014, *available at* http://data.parliament.uk/writtenevidence/committeeevidence.svc/ evidencedocument/treasury-committee/manipulation-of-benchmarks/oral/11200.html), at Q7.)

In November 2014, the Swiss Financial Market Supervisory Authority ("FINMA") alleged that UBS engaged in "conduct against the interests of [its] own clients,"

such as improperly sharing information about client orders and "front running" clients.  (*See* Ex.

12 (FINMA, *Foreign exchange trading at UBS AG:  investigation conducted by FINMA*, Nov.

12, 2014, http://www.finma.ch/e/aktuell/Documents/ubs-fx-bericht-20141112-e.pdf

("FINMA")), ¶ 3.3.3.)  FINMA's allegation that UBS committed misconduct "in precious metals

trading" (SAC ¶¶ 19, 234) did not reference gold.  (Ex. 12 (FINMA), ¶ 3.3.3.)

> **Saxo Bank Orders.**  Plaintiffs allege that on one trading day, August 23, 2010

(also a day on which no plaintiff traded (*see* SAC App'x B)), five orders were entered into a

trading platform of the Danish bank Saxo Bank.  (SAC ¶ 245.)  The quotes allegedly were within

thirty cents of the PM Fixing price established later that day.  (SAC ¶¶ 247.)  Plaintiffs do not

allege that these quotes were entered by any defendant.

## ARGUMENT

> Federal courts require "fact pleading," *Peter F. Gaito Architecture*, *LLC* v.

*Simone Dev. Corp.*, No. 08-6056, 2009 WL 5865686, at *4 (S.D.N.Y. May 22, 2009), *aff'd*, 602

F.3d 57 (2d Cir. 2010), which means that, to survive a motion to dismiss, a complaint must set

forth "sufficient *factual* matter" to plausibly "show[]" plaintiffs' entitlement to relief.  *Ashcroft*

v. *Iqbal*, 556 U.S. 662, 678-79 (2009) (emphasis added).  Courts "examine only the well-pleaded

factual allegations."  *Brown* v. *Lower Brule Cmty. Dev. Enter.*, *LLC*, No. 13-7544, 2014 WL

5508645, at *3 (S.D.N.Y. Oct. 31, 2014).  "[L]egal conclusions, deductions or opinions couched

as factual allegations" are ignored, *Mason* v. *Am. Tobacco Co.*, 346 F.3d 36, 39 (2d Cir. 2003)

(citation and internal quotation marks omitted), as are "naked assertion[s] devoid of further

factual enhancement," *Iqbal*, 556 U.S. at 678  (alteration in original) (internal quotation marks

omitted) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007)), and allegations

couched in "vague" or "general" terms, *Laydon* v. *Mizuho Bank, Ltd.*, No. 12-3419, 2014 WL 1280464, at *3 (S.D.N.Y. Mar. 28, 2014) (citation and internal quotation marks omitted).

To avoid dismissal, plaintiffs' well-pleaded factual allegations must "raise a reasonable expectation that discovery will reveal evidence" of plaintiffs' claim, *Twombly*, 550 U.S. at 556, such that it is not unfair to expose defendants to the "enormous," *id.* at 559, and "asymmetric costs" of discovery that can lead to "settlement extortion," *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan* v. *Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 719 (2d Cir. 2013) (internal quotation marks omitted) (quoting *Am. Bank* v. *City of Menasha*, 627 F.3d 261, 266 (7th Cir. 2010)).  Allegations merely "consistent" with misconduct, or that support only a "suspicion" or "possibility" of misconduct, are not enough.  *Twombly*, 550 U.S. at 555, 557.  Determining whether the factual allegations are enough "to justify discovery," *AstraZeneca AB* v. *Mylan Labs., Inc.*, No. 00-6749, 2010 WL 2079722, at *6 n.6 (S.D.N.Y. May 19, 2010), *aff'd sub nom. In re Omeprazole Patent Litig.*, 412 F. App'x 297 (Fed. Cir. 2011), is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679.

## I.   THE COURT CANNOT CREDIT THE OPINIONS OF EXPERTS OR ALLEGATIONS COPIED FROM REGULATORY SETTLEMENTS.

### A.   The Court Cannot Consider Opinions of Experts at the Pleading Stage.

Lacking any direct evidence of manipulation or conspiracy, plaintiffs rely heavily on "statistical studies" prepared by "experts."  These experts allegedly found that prices moved downward 70% of the time at the PM Fixing, with an average movement of 0.04%.  (SAC ¶¶ 117, 142, 181-182.)  Based on these purported "statistical analyses," plaintiffs' experts opine that:

- "absent manipulation" or "absent collusion," gold prices should go up approximately 50% of the time and down 50% of the time (SAC ¶¶ 120, 124, 126-127, 132, 146, 168, 178, 180);

- the pricing patterns for gold are "anomalous" and indicative of manipulation (SAC ¶¶ 10, 21, 117-157, 194, 258-267);

- alleged correlations in certain price quotes are indicative of collusion among defendants (SAC ¶¶ 11-13, 245-249, 251-257, 259-267);

- various alternative explanations for the pricing patterns are "implausible" (SAC ¶¶ 157, 164-193); and

- on certain days, "the market's behavior around the PM Fixing was significantly different from that in other times during the same day" (SAC ¶ 158) and "suspicious" (SAC ¶¶ 149 n.30, 227).

These assertions are supported by nothing but the say-so of plaintiffs and their "experts."

Plaintiffs' wholesale reliance on the assertions of their "experts'" violates a cardinal rule of pleading:  a court cannot rely on mere "opinions couched as factual allegations" on a motion to dismiss.  *Mason*, 346 F.3d at 39 (citations and internal quotation marks omitted). "[C]onsidering expert opinions at the pleading stage" is "inappropriate," *Bros.* v. *Saag*, No. 13-466, 2014 WL 838890, at *6 (N.D. Ala. Mar. 4, 2014) (emphasis omitted), because courts cannot meaningfully assess statistical evidence without "a deposition . . . and a subsequent *Daubert* hearing," a "ruling on the expert's qualifications," and decisions on "a myriad of complex evidentiary issues not generally capable of resolution at the pleading stage." *DeMarco* v. *Depotech Corp.*, 149 F. Supp. 2d 1212, 1221 (S.D. Cal. 2001); *Fin. Acquisition Partners LP* v. *Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006); *see also In re Viropharma, Inc.*, *Sec. Litig.*, No. 02-1627, 2003 WL 1824914, at *2 (E.D. Pa. Apr. 7, 2003).

Accepting the *ipse dixit* of experts, in lieu of facts, denies the importance of the trial court's gatekeeping function and could allow meritless claims to proceed on the basis of statistical claims that have not been subject to proper adversarial testing. *See, e.g., Kumho Tire*

*Co.* v. *Carmichael*, 526 U.S. 137, 141, 149 (1999); *Daubert* v. *Merrell Dow Pharmaceuticals*, *Inc.*, 509 U.S. 579, 589 (1993).  Any statistical analysis is necessarily based on assumptions and opinions of the expert who prepared that analysis—and courts frequently reject such analyses when based on faulty assumptions.  *See*, *e.g.*, *Reed Constr. Data Inc.* v. *McGraw-Hill Cos.*, *Inc.*, 49 F. Supp. 3d 385, 400-07 (S.D.N.Y. 2014); *see also Gen. Elec. Corp.* v. *Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing . . . requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").  But at the pleading stage, there is no way for the Court to evaluate these assumptions and to put the statistical analysis into proper context. *Cf. City of Royal Oak Ret. Sys.* v. *Juniper Networks*, *Inc.*, No. 11-04003, 2013 WL 2156358, at *7 (N.D. Cal. May 17, 2013) (disregarding expert opinion at the pleading stage).

This case illustrates these concerns.  Plaintiffs describe the "expert" opinions in summary terms, without providing defendants or the Court the data on which those opinions are based, the assumptions their "experts" made, or the methodology applied.  Plaintiffs offer only vague generalities, such as the assertion that their experts used "multiple, complex processes of extraction [and] cross-referencing" (SAC ¶ 250)—but without disclosing the "processes" used or the data "extract[ed]."  There are good reasons to question the reliability of plaintiffs' data.  Spot gold is traded over the counter, not on an exchange, so there is no reliable public data about actual trades.  (SAC ¶¶ 94, 253 n.60, 258, 260.)  Plaintiffs may be using some combination of subscription services and private platforms—without analyzing that data in a reliable way— running a risk that plaintiffs' analysis could result in years of unnecessary litigation and millions in costs searching for data to support speculative and ill-conceived theories.[7]  The fact that

---

[7]         Subscription services like Bloomberg or Reuters allow market participants to post "informational" price quotes to advertise prices they are offering.  These quotes are mere one-

(*footnote continued*)

plaintiffs attempt to hide their analysis behind a curtain—and even cherry-pick data to make their allegations seem stronger (*see supra* note 3)—only underscores these concerns.

Tellingly, after receiving defendants' first motion to dismiss, plaintiffs scrubbed their complaint of every reference to purported "*expert* consultants."  (*See*, *e.g.*, CAC ¶¶ 18, 95, 97, 103, 112, 123-125, 128-129, 132, 166, 179 (emphasis added).)  But regardless of whether plaintiffs label their paid advisers as "experts" or "consultants," the Court cannot rely at this stage on the untested "conclusions," undisclosed "methodologies," and self-serving "f[i]nd[ings]" of these hired guns.  (SAC ¶¶ 158, 161, 168, 251-252, 254, 256.)

Even if the Court were to consider these improper allegations, they would not save the plaintiffs' deficient claims.  There are several "obvious alternative explanation[s]" for the pricing data alleged.  *Twombly*, 550 U.S. at 567-68.  As noted above (*supra* p. 9), because the Gold Fixing is one of the most liquid times of the day (CAC ¶ 145), it consistently attracts large institutional sellers (*i.e.*, miners and refiners).  To the extent that buyers are more dispersed or buying interest varies from day to day based on market sentiment, Gold Fixing members might

_____

(*footnote continued*)

sided *offers* that cannot be executed electronically through the system (counterparties who wish to trade must call the poster), and do not reflect actual trades.  Because trading takes place over the telephone, the quotes are not necessarily updated at regular intervals.  The data from these sources thus must be analyzed with great care in order to draw appropriate inferences, and should not be the basis of a pleading in a complex case where errors in the plaintiffs' analysis cannot be challenged.  *See* SEC Release No. 56224, 2007 WL 2577427, at * 3 & nn.16-17 (Aug. 8, 2007); SEC Release No. 49849, 2004 WL 1573934, at *17 n.33 (June 10, 2004) ("[T]he gold spot price is indicative only, constructed using a variety of sources to compile a spot price that is intended to represent a theoretical quote.").

Plaintiffs' misuse of this data is apparent in many places, including their discussion of "price impact per quote."  (SAC ¶¶ 186-189.)  Attempting to divine the average "impact" of each quote at different times of day is not meaningful when the quote data is merely informational and there is no demonstrated correlation between the number of quotes per minute and the volume being traded.  (SAC ¶ 175 (number of quotes per minute rarely above eight or below six during business hours in London).)

find that there are more days on which sell orders outmatch buy orders than the other way around (resulting in downward pricing pressure).

Plaintiffs assert that securities and futures markets do not exhibit downward pricing pressure at particular times of day, like gold does.  (SAC ¶ 180.)  But that merely shows that commodities spot markets with once- or twice-daily fixing events exhibit different pricing behavior than markets where trading is continuous, without a comparable benchmarking event. Plaintiffs offer no reason that it is somehow "anomalous"—as opposed to just "different"—for gold prices to go down at the time of the PM Fixing.[8]

Plaintiffs cannot now repudiate their own allegations in the first amended complaint that the PM Fixing is "one of the most liquid times of the day for gold trading."  (CAC ¶ 145.)  Amending a complaint "does not make [the allegations in the original complaint] any less an admission of the party."  *Andrews* v. *Metro N. Commuter R.R. Co.*, 882 F.2d 705, 707 (2d Cir. 1989); *see also Colliton* v. *Cravath, Swaine & Moore LLP*, No. 08-0400, 2008 WL 4386764, at *6 (S.D.N.Y. Sept. 24, 2008).  That plaintiffs and their paid "experts" are so quick to reverse a central allegation of their previous pleading only confirms that these untested opinions should be given no weight.

There is also no reason to infer that the absence of downward price movements in 2013 is evidence of the anomalous nature of the movements in other years.  As shown above

---

[8]    Downward movements also are not in conflict with the "random walk" or "semi-efficient market" hypothesis (SAC ¶ 180), which is neither universally accepted by academics nor empirically supported across all financial markets.  The "random walk" research was not based on commodities spot markets with auction-based daily fixings—and the author of *A Random Walk Down Wall Street* (which popularized the random walk hypothesis) has noted that "pricing irregularities and predictable patterns" do occur even in the stock market.  Burton G. Malkiel, *The Efficient Market Hypothesis and Its Critics*, CEPS Working Paper No. 91, at 33 (Apr. 2003), *available at* http://www.princeton.edu/ceps/workingpapers/91malkiel.pdf.

(p. 10), that benchmarks were being investigated was publicly known two years earlier.

Moreover, in every other year from 2001 to 2014, gold increased in value in U.S. dollar terms.

(Ex. 6, (Bloomberg Historic PM Fixing Data, Years 2000-2014); SAC ¶ 110.)  Only in 2013 did

gold fall—and then precipitously, tumbling 27% in one year.  (SAC ¶ 110; Ex. 6, (Bloomberg

Historic PM Fixing Data, Years 2000-2014).)  This leads to an understandable and plausible

alternative explanation.   In the face of rapidly tumbling prices in 2013, it is not surprising that

sellers might try to spread out their sales or sell earlier in the day in the hopes of avoiding further

price declines.

      **B.**     **Allegations of Investigations and Settlements are Immaterial as a Matter of Law and Should Be Stricken.**

        Plaintiffs try to salvage their threadbare complaint through allegations that

regulators have investigated and settled with banks over allegations of benchmark manipulation.

(SAC ¶¶ 19-20, 234-235, 277-308.)  But those allegations are irrelevant as plaintiffs do not

allege that any regulator has found evidence of a price-fixing or manipulation conspiracy.

        In the Second Circuit, allegations about regulatory settlements are immaterial as a

matter of law and should be stricken, *Gotlin* v. *Lederman*, 367 F. Supp. 2d 349, 363 (E.D.N.Y.

2005), because such settlements are "not the result of an actual adjudication of any of the issues."

*Lipsky* v. *Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976); *see In re Platinum &*

*Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 593-94 (S.D.N.Y. 2011).

        Allegations that an investigation is pending also "carries no weight in pleading,"

*In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007),

because "the mere occurrence of [an] investigation is equally consistent with Defendants'

innocence."  *Superior Offshore Int'l, Inc.* v. *Bristow Grp. Inc.*, 738 F. Supp. 2d 505, 517 (D. Del.

2010); *see also Footbridge Ltd.* v. *Countrywide Home Loans, Inc.*, No. 09-4050, 2010 WL

3790810, at *5 (S.D.N.Y. Sept. 28, 2010) ("strik[ing] . . . allegations . . . based on pleadings, settlements, and government investigations"); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 218 F.R.D. 76, 78-79 (S.D.N.Y. 2003).  That the Court can give no weight to investigations is underscored by plaintiffs' admission that two investigations they cited "were each recently closed."  (SAC ¶ 277 n.69; *cf.* Ex. 13 (Shane Strowmatt & Nicholas Comfort, *German Probe Finds No Signs of Manipulation in Gold Market*, Bloomberg (Jan. 26, 2015), *available at* http://www.bloomberg.com/news/2015-01-26/german-regulator-found-no-signs-of-gold-price-manipulation.html).)  Plaintiffs do not allege that the investigations found evidence of collusion.

   Even if the Court could consider these investigations (SAC ¶¶ 234-235, 283-308), the vast majority are irrelevant because they do not involve (i) any Gold Fixing member, and/or (ii) gold.  *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) (rejecting argument that "'if it happened there, it could have happened here'").  The two regulatory resolutions involving Barclays and UBS are irrelevant for the additional reason that they related to alleged conflicts of interest in the banks' unilateral transactional dealings with certain clients—not a multi-bank price-fixing conspiracy, as plaintiffs allege here.  (SAC ¶¶ 283-291, 302.)  No plaintiff is alleged to have been a client of any defendant, and none therefore has standing to complain about "conflicts of interest."  (SAC ¶ 285, 302.)

## II. PLAINTIFFS FAIL TO PLEAD AN ANTITRUST CONSPIRACY.

   To state a claim under Section 1 of the Sherman Act, plaintiffs must allege facts showing that defendants conspired to unreasonably restrain trade.  *See Twombly*, 550 U.S. at 556-57.  In antitrust cases, where the enormous costs of discovery allow plaintiffs "to extort large settlements even where [they] do[] not have much of a case," *Kendall* v. *Visa USA, Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008), mere "conclusory allegation[s] of agreement at some

unidentified point," or a "suspicion" or "possibility" of agreement, are not enough.  *Twombly*,

550 U.S. at 557.  The complaint must contain "enough fact[ual matter] to support the inference

that a conspiracy actually existed."  *Mayor & City Council of Balt., Md.* v. *Citigroup, Inc.*, 709

F.3d 129, 136 (2d Cir. 2013).  "[I]t is only by taking care to require allegations that reach the

level suggesting conspiracy that we can hope to avoid the potentially enormous expense" of

litigation in cases where there is no "reasonable expectation that discovery will reveal evidence

of illegal agreement."  *Twombly*, 550 U.S. at 556, 559.

   As shown below, plaintiffs fail to allege any "direct evidence" of an illegal

agreement (*infra* Section II.A), or "circumstantial facts supporting the inference that a conspiracy

existed" (*infra* Section II.B); *Citigroup*, 709 F.3d at 136; and because their claims are too

remote, plaintiffs lack standing to bring antitrust claims at all (*infra* Section II.C).

  **A.**  **Plaintiffs Fail To Allege Direct Evidence of an Agreement To Manipulate the London Gold Fixing.**

   Direct evidence of a conspiracy is "evidence that is explicit and requires no

inferences to establish the proposition or conclusion being asserted."  *Burtch* v. *Milberg Factors,*

*Inc.*, 662 F.3d 212, 225 (3d Cir. 2011) (internal quotation marks omitted).  The "paradigmatic

example" is a "'recorded phone call in which two competitors agreed to fix prices at a certain

level.'"  *In re Foreign Exch. Benchmark Rates Antitrust Litig.* ("*FX*"), No. 13-7789, 2015 WL

363894, at *6 (S.D.N.Y. Jan. 28, 2015) (quoting *Citigroup*, 709 F.3d at 136).

   Complaints can, and often do, include such evidence.  For example, in *FX*, the

court found that the complaint "contain[ed] specific allegations of chat room participants

congratulating each other about the manipulation of the Fix," and of defendants using chat rooms

named "The Cartel" and "The Mafia."  2015 WL 363894, at *6.  In Euroyen TIBOR and Yen-

LIBOR, the complaint quoted hundreds of instant message conversations between traders, in

which the traders allegedly agreed to manipulate Euroyen TIBOR rates and Yen-LIBOR rates. Second Am. Class Action Compl. App'x., *Laydon* v. *Mizhuo Bank*, *Ltd.*, No. 12-3419, 2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014), ECF No. 150-9.

        The complaint here offers nothing of the sort.  It does not contain any "smoking gun," *Citigroup*, 709 F.3d at 136, that would directly establish an "actual agreement," *Twombly*, 550 U.S. at 564.  It does not describe any "actual, verbalized communication" among defendants, *In re Platinum*, 828 F. Supp. 2d at 597, let alone "specific communications between the Defendants about any specific plan to cause artificial prices."  *In re Commodity Exch.*, *Inc.*, *Silver Futures & Options Trading Litig.* ("*In re Silver I*"), No. 11-2213, 2012 WL 6700236, at *11 (S.D.N.Y. Dec. 21, 2012), *aff'd*, 560 F. App'x. 84 (2d Cir. 2014).  The complaint does not identify any individual who allegedly conspired with others at other banks.  *See Twombly*, 550 U.S. at 565 n.10 (complaint dismissed where it furnished "no clue" as to which of the defendants' "legions" of employees entered into the alleged agreement).

        Plaintiffs also do not allege that the defendants, "*in their individual capacities*, consciously committed themselves to a common scheme."  *AD/SAT*, *Div. of Skylight*, *Inc.* v. *Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999) (emphasis added).  "Generic pleading, alleging misconduct against defendants without specifics as to the role each played in the alleged conspiracy, was specifically rejected by *Twombly*."  *Total Benefits Planning Agency*, *Inc.* v. *Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436 (6th Cir. 2008).  "Plaintiffs cannot escape their burden of alleging that each defendant participated in or agreed to join the conspiracy by using the term 'defendants' to apply to numerous parties without any specific allegations as to [each]."  *Jung* v. *Ass'n of Am. Med. Colls.*, 300 F. Supp. 2d 119, 163 (D.D.C. 2004).

Plaintiffs here rely on precisely such allegations, describing concerted activity in "general terms without any specification of any particular activities by any particular defendant." *In re Elevator*, 502 F.3d at 50 (internal quotation marks omitted).  Plaintiffs plead that "Defendants"—applying this generic label without any further specification—"colluded around" the PM Fixing (SAC ¶ 6), "employed" various "collusive and manipulating techniques" "to create downward pressure in the market" (SAC ¶ 157), "used chat rooms, instant messages, phone calls, proprietary trading venues and platforms, and e-mails to coordinate among themselves" (SAC ¶ 237), and "engaged in similar practices" to the "closely analogous context" of foreign exchange trading (SAC ¶ 240), including the oft-recycled laundry list of "front running," "spoofing," "wash sales," and "jamming" (SAC ¶ 8 n.2).  But these allegations do not suggest any *agreement* among the defendants, lack any animating factual detail, and are devoid of descriptions of "specific wrongful acts of specific defendants."  *In re Parcel Tanker Shipping Servs. Antitrust Litig.*, 541 F. Supp. 2d 487, at 491 (D. Conn. 2008).  They are "nothing more than a list of theoretical possibilities, which one could postulate without knowing any facts whatever."  *In re Elevator*, 502 F.3d at 50-51 (internal quotation marks omitted).  Such allegations "furnish[] no clue as to which of the [defendants] (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place."  *Twombly*, 550 U.S. at 565 n.10.

**B.      Plaintiffs Fail To Allege Parallel Conduct and Circumstantial Evidence that Plausibly Suggests an Agreement To Manipulate the London Gold Fixing.**

Lacking direct evidence, plaintiffs ask the Court to infer an agreement from allegations of parallel conduct and other circumstantial evidence.  Taken alone, "parallel conduct does not suggest conspiracy."  *Twombly*, 550 U.S. at 557.  While "consistent with conspiracy," parallel conduct is "just as much in line with a wide swath of rational and competitive business

strategy unilaterally prompted by common perceptions of the market." *Id.* at 554; *Citigroup*, 709 F.3d at 137; *In re Elevator*, 502 F.3d at 51.  Plaintiffs thus cannot rely on parallel conduct alone, but must also allege facts—commonly known as "plus factors"—that place the parallel conduct in a "a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557; *Citigroup*, 709 F.3d at 137.  Plaintiffs fall well short of this burden.  They fail to allege either parallel conduct or additional facts that would support a plausible inference of conspiracy.

>    **1.**    **Plaintiffs' Allegations of Parallel Conduct Do Not Support a Plausible Inference of Conspiracy.**

As shown above (Section I.A), the Court cannot consider conclusory assertions by Plaintiffs' consultants "that (a) Defendants were the ones moving the market down, and (b) they were doing so in unison" (SAC ¶ 251 (emphasis omitted)).

Plaintiffs also fail to allege any factual matter showing parallel conduct.  Plaintiffs admit they lack facts about the prices at which defendants transacted.  (*See* SAC ¶¶ 250, 253 n.60.)  They nevertheless allege defendants' price quotes (i) were clustered closer together than price quotes of others, and (ii) were 0.007% lower, on average, than quotes of others (0.00007 in decimal terms).  (SAC ¶¶ 252-254, 261, 263, 266-267.)  But as shown above (*see supra* p. 11), these assertions are supported only by the conclusory assertions of plaintiffs' experts, not actual facts—and plaintiffs do not address "obvious alternative explanation[s]" for their experts' observations.  *Twombly*, 550 U.S. at 567.

Member Banks could attract a different client mix than others (for example, miners and refiners might prefer to sell through Fixing members), and Fixing members could develop a unique perspective on the market by virtue of their client mix.  More generally, the fact that one group of market participants has prices clustered slightly closer together than others

is, at best, a weak showing of parallel conduct.  It would hardly be surprising to learn that the price of a particular product at big-box stores like Target or Wal-Mart cluster close together, while prices for the same product at other retailers vary more widely.  Even while trying (but ultimately failing) to explain away alternative explanations for the downward price movements at the PM Fixing (SAC ¶¶ 164-193), plaintiffs did not allege (even in a summary fashion) that their experts excluded innocent explanations for the "clustering" of defendants' price quotes.

### 2. Plaintiffs' Alleged Plus Factors Do Not Support a Plausible Inference of Conspiracy.

Plaintiffs try to bolster their weak claims of parallel conduct with rumors of investigations and yet more assertions of their experts, which add nothing (*see supra* Part I). When those allegations are stripped away, plaintiffs only offer assertions that defendants had a supposed motive and opportunity to conspire, which falls far short of providing the "factual enhancement" needed to "nudge[] [plaintiffs'] claims across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 557, 569.

**Common Motive.**  Plaintiffs try to salvage their conspiracy claims by asserting that defendants had a "common" motive to manipulate the PM Fixing.  But despite posing a series of hypothetical possibilities, plaintiffs fail to allege that defendants "had a 'rational economic motive' to [manipulate the gold market] *jointly*, as opposed to going it alone."  *Ross* v. *Am. Express Co.*, 35 F. Supp. 3d 407, 442 (S.D.N.Y. 2014) (emphasis added); *see also Citigroup*, 709 F.3d at 138-39.  Plaintiffs claim that defendants had short COMEX futures positions that would increase in value from manipulation (SAC ¶¶ 209-216) and then assert that "a lone Fixing Bank Defendant" would not have manipulated the Gold Fixing alone because "a 'free rider' problem would have existed."  (SAC ¶ 196.)  Specifically, a bank that single-handedly manipulated the Gold Fixing would incur all of the "risk[s] and cost[s]" of

implementing the manipulation at the Fixing—but would "ced[e]" the benefit of the manipulation "to the other banks" that did not participate in the manipulation.  (SAC ¶ 196.)

But plaintiffs offer little more than their own say-so to support their theory.  (SAC ¶¶ 195-201.)  Plaintiffs have not alleged that any of the defendants, much less each of them, had a net short overall position in gold (including physical and all derivatives, both over-the-counter and COMEX).  (*See infra* Part. III.A.1.)  While plaintiffs allege—"[o]n information and belief"—that "each Defendant bank" had at least 200 COMEX futures contracts (long and short), plaintiffs offer no facts about the relative size of defendants' positions that would support plaintiffs' free-rider theory.  (SAC ¶ 212.)  One Fixing member could have "COMEX short positions of hundreds of thousands of contracts" (SAC ¶ 216) and the others could have 200 long contracts each.  Under plaintiffs' theory, the bank with the large short position would have an incentive to act unilaterally because it would capture all of the purported benefits itself.  Plaintiffs also allege no facts suggesting that any defendant acted contrary to its unilateral self-interest.  *See Burtch*, 662 F.3d at 227; *Apex Oil Co.* v. *DiMauro*, 822 F.2d 246, 254 (2d Cir. 1987).  Plaintiffs' allegations of a common motive thus amount to little more than "conclusory," "unsupported" speculation about mere possibilities, which the Court cannot credit.  *In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*, 997 F. Supp. 2d 526, 538 (N.D. Tex. 2014); *In re Elevator*, 502 F.3d at 51; *Citigroup*, 709 F.3d at 137.  Trying to plead an antitrust conspiracy by pointing to potential "free-rider" problems is self-defeating in any event.  If participants can "free ride" on others, the economics of the conspiracy do not work.  *See Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) .

**Opportunity.**  Plaintiffs likewise cannot overcome the absence of facts plausibly showing "motive" by attempting to convert the "structural design" of the Gold Fixing into a

series of "'plus' factors" that suggest an antitrust conspiracy. (*See* SAC ¶¶ 268-276.) All of the "'plus' factors" plaintiffs assert boil down to a single allegation: that the structure of the Gold Fixing provided defendants with an "opportunity" to manipulate the Gold Fixing. (SAC ¶ 269; *see* SAC ¶¶ 4-5, 12, 83, 105, 244, 270-271, 273-274.) But the "opportunity to conspire . . . does not by itself plausibly support an inference of [a defendant's] participation in [an] alleged conspiracy." *Hinds Cnty., Miss.* v. *Wachovia Bank, N.A.*, 708 F. Supp. 2d 348, 359 (S.D.N.Y. 2010) (citing *Capital Imaging Assocs., P.C.* v. *Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 545 (2d Cir. 1993)); *see also H. L. Moore Drug Exch.* v. *Eli Lilly & Co.*, 662 F.2d 935, 941 (2d Cir. 1981) ("'[A] mere showing of close relations or frequent meetings between the alleged conspirators . . . will not sustain a plaintiff's burden absent evidence which would permit the inference that these close ties led to an illegal agreement.'" (quoting *Oreck Corp.* v. *Whirlpool Corp.*, 639 F.2d 75, 79 (2d Cir. 1980))). This principle is particularly relevant here, where plaintiffs do not allege that participation in the Fixing was itself unlawful and cannot seriously contend that there was anything suspicious about Fixing members communicating daily. Indeed, the same process was in place for nearly a century and was fully known to the market.

**Saxo Bank's Trading Platform.** Plaintiffs' allegations about orders placed through Saxo Bank are particularly conjectural. Around 3 a.m. London time on August 23, 2010, someone using Saxo Bank software (plaintiffs do not say who) placed five orders to buy gold futures at prices a few dollars below the then-prevailing price. (SAC ¶¶ 245-249.) The London Gold Fixing occurred 12 hours later, and the Fixing price turned out to be within thirty cents of the price of the orders someone had placed at 3 a.m. (SAC ¶ 247.) There are no facts suggesting that any defendant had anything to do with these late-night orders. Plaintiffs bizarrely contend that these five orders must have been "a signaling mechanism, whereby

Defendants and co-conspirators indicated the price to which they intended to manipulate the Fixing." (SAC ¶ 246.) But even if one thought that defendants were conspiring, it is not plausible to presume, as plaintiffs do, that members of an illegal price-fixing ring would post their conspiratorial communications on a publicly accessible online trading platform. (And if they did do so, why would it happen just once—with no allegation of any similar signaling at any other time in the decade-long conspiracy? (SAC ¶ 245; *see also* SAC ¶¶ 246-249).) Notably, these allegations seem to have been copied-and-pasted from a prior complaint: Essentially the same allegations were advanced—and soundly rejected—in *In re Silver I*, 2012 WL 6700236, at *7, 18. That plaintiffs recycle such discredited allegations only highlights the weakness of their pleading.[9]

C.     **Plaintiffs Lack Antitrust Standing.**

Plaintiffs' antitrust claims fail for the additional reason that they are not the "proper party to bring a private antitrust action." *Associated Gen. Contractors of Cal., Inc.* v. *Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983). "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Id.* at 534 (internal quotation marks omitted) (quoting *Hawaii* v. *Standard Oil Co.*, 405 U.S. 251, 263 n.14 (1972)). "While any antitrust violation disrupts the

---

[9]     Plaintiffs' claim also lacks the character of more compelling allegations plaintiffs have made in past antitrust cases. Plaintiffs do not allege that the price-fixing conspiracy had "actual adverse effect[s] on competition," *Elecs. Commc'ns Corp.* v. *Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 244 (2d Cir. 1997), such as lower gold output, *Mooney* v. *AXA Advisors, LLC*, 19 F. Supp. 3d 486, 502 (S.D.N.Y. 2014), or decreases in the quality of gold, *Virgin Atl. Airways Ltd.* v. *British Airways PLC*, 257 F.3d 256, 264 (2d Cir. 2001). Plaintiffs also do not allege any facts showing that the defendants erected barriers to competition, *CDC Techs., Inc.* v. *IDEXX Labs., Inc.*, 186 F.3d 74, 80 (2d Cir. 1999), or that they had market power, *Time Warner Cable Inc.* v. *FCC*, 729 F.3d 137, 163 (2d Cir. 2013) ("[A] market share below 50% is rarely evidence of monopoly power . . . ." (internal quotation marks omitted) (quoting *Tops Mkts., Inc.* v. *Quality Mkts., Inc.*, 142 F.3d 90, 98 (2d Cir.1998)).

competitive economy to some extent and creates entirely foreseeable ripples of injury which may be shown to reach individual employees, stockholders, or consumers, it has long been held that not all of these have the requisite standing to sue for treble damages . . . ." *Billy Baxter*, *Inc.* v. *Coca-Cola Co.*, 431 F.2d 183, 187 (2d Cir. 1970).

The Second Circuit has identified four relevant considerations to assess whether a particular plaintiff can assert a damages claim under the antitrust laws:

> (1) the directness or indirectness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries.

*Gatt Commc'ns.*, *Inc.* v. *PMC Assocs.*, *LLC*, 711 F.3d 68, 78 (2d Cir. 2013) (internal quotation marks omitted).  This is not "a multifactor balancing test."  *Lexmark Int'l*, *Inc.* v. *Static Control Components*, *Inc.*, 134 S. Ct. 1377, 1391-92 (2014).  Instead, the "directness or indirectness of the asserted injury" and the "proximity or remoteness of the party to the alleged injurious conduct" is a requirement that "must be met in every case," not a "mere factor[] to be weighed in a balance."  *Id.* at 1392.

Plaintiffs are, at best, indirect sellers who cannot satisfy the "directness" requirement.  (*Infra* Section II.C.1.)  Plaintiffs would fare no better even if it were necessary to reach the other factors.  (*Infra* Section II.C.2.)

### 1.    Plaintiffs' Claims Are Too Indirect To Support Standing.

Plaintiffs cannot satisfy the directness requirement because they do not allege that they bought or sold gold from or to any defendant.[10]  (*See* SAC ¶¶ 29-56.)  In cases alleging

---

[10]    Plaintiffs allege that the defendants "entered directly into gold spot, forward, option and Gold ETF share transactions with members of the Class." (SAC ¶¶ 59, 61, 63, 65, 67).  The

(*footnote continued*)

anticompetitive conduct in the market for a physical good, the Supreme Court has "held that as a general rule, . . . only direct purchasers of [the] monopolized product[]" have antitrust standing. *In re Pub. Offering Antitrust Litig.*, No. 98-7890, 2004 WL 350696, at *5 (S.D.N.Y. Feb. 25, 2004); *Ill. Brick Co.* v. *Illinois*, 431 U.S. 720, 729 (1977).  "[T]he rule of *Illinois Brick* precludes an antitrust action by a seller who alleges price-fixing by a defendant with whom he has not dealt directly."  *Zinser* v. *Cont'l Grain Co.*, 660 F.2d 754, 761 (10th Cir. 1981).[11]

This rule is fatal to plaintiffs' claims—which are even more attenuated than other indirect purchaser claims that the Supreme Court has rejected.  Plaintiffs do not even contend that they sold gold or gold derivatives to a defendant *indirectly* (*e.g.*, by selling to an intermediary).  Plaintiffs allege simply that anticompetitive conduct on the Gold Fixing "affect[ed]" the worldwide price of gold—causing buyers of gold worldwide to pay lower prices, even those buyers who were not part of the conspiracy and who lowered their prices under the price "umbrella" of the alleged conspirators.  (SAC ¶¶ 105-115, 324.)

One court recently observed that it was aware of "no court in the Second Circuit which has recognized this [umbrella liability] theory of recovery."  *Allen* v. *Dairy Farmers of Am., Inc.*, No. 09-230, 2014 WL 2610613, at *27 (D. Vt. June 11, 2014) (plaintiffs lacked antitrust standing where they sold milk to non-conspirators—rather than to defendants—at prices

---

(*footnote continued*)
"class action allegation adds nothing to the standing inquiry since the named plaintiffs must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Carver* v. *City of New York*, 621 F.3d 221, 228 n.6 (2d Cir. 2010) (quoting *Doe* v. *Blum*, 729 F.2d 186, 190 n.4 (2d Cir. 1984)) (internal quotation marks omitted).

[11]     The same principles apply to claims by sellers alleging that defendants reduced the price. *See Weyerhaeuser Co.* v. *Ross-Simmons Hardwood Lumber Co., Inc.*, 549 U.S. 312, 320 (2007) (addressing so-called "buyer's monopoly" by purchasers holding "monopsony power"); *Todd* v. *Exxon Corp.*, 275 F.3d 191, 201 (2d Cir. 2001).

allegedly suppressed by defendants' anticompetitive conduct).  Numerous courts, "using the nuanced antitrust analysis outlined in *Associated General Contractors*, ha[ve] found against allowing 'umbrella' standing to plaintiffs."  *Antoine L. Garabet, M.D., Inc.* v. *Autonomous Techs. Corp.*, 116 F. Supp. 2d 1159, 1168-69 (C.D. Cal. 2000); *Ocean View Capital, Inc.* v. *Sumitomo Corp. of Am.*, No. 98-4067, 1999 WL 1201701, at \*7 (S.D.N.Y. Dec. 15, 1999); *Gross* v. *New Balance Athletic Shoe, Inc.*, 955 F. Supp. 242, 246-47 (S.D.N.Y. 1997).

In *Ocean View*, the plaintiff pursued an umbrella theory, alleging that the defendants conspired to enter into a series of unusual copper purchase contracts, which artificially "inflated the price of copper generally."  1999 WL 1201701, at \*7.  The court noted that "[h]arm from general price increases . . . is not actionable" and held that the plaintiff lacked standing because it "[did] not allege that it purchased copper *from* [*defendants*]."  *Id.* at \*7 (emphasis added).  In *Gross*, the court likewise held that plaintiffs could not sue for purchases made from retailers who were not members of the conspiracy.  *See* 955 F. Supp. at 246-47.

### 2.    The Other Antitrust Standing Factors Also Support Dismissal.

Although the indirectness of plaintiffs' claim is dispositive, the other factors considered in this Circuit confirm that plaintiffs are not entitled to pursue their antitrust claims.

**Alternative Plaintiffs.**  In determining whether a particular plaintiff is the "efficient enforcer" who should have standing, *Gatt*, 711 F.3d at 78, courts consider "the existence of other parties that have been more directly harmed[] to determine whether a party is the proper plaintiff."  *Cargill, Inc.* v. *Monfort of Colo., Inc.*, 479 U.S. 104, 111 n.6 (1986); *see also Associated Gen. Contractors*, 459 U.S. at 541-42, 545-46.  In this case, there are more "direct[ly]" injured plaintiffs who can "vindicate the public interest in antitrust enforcement." *Associated Gen. Contractors*, 459 U.S. at 541-42; *see also Ocean View*, 1999 WL 1201701, at

*7 ("there are more direct victims than plaintiff"—who purchased only from non-conspirators—"such as those who purchased [] directly from the defendants").[12]

        **Speculative Nature of Injury.**  Plaintiffs' damages claim is also too speculative to confer antitrust standing.  *Associated Gen. Contractors*, 459 U.S. at 542.  In *Laydon*, the court dismissed plaintiff's claim as speculative because the court could not "hypothesize the impact of [allegedly manipulated Euroyen TIBOR and Yen-LIBOR benchmarks] on the perceptions of the market participants whose activities would have influenced the prices of Euroyen TIBOR futures contracts."  2014 WL 1280464, at *10.  To assess plaintiff's injury, the court would have had to analyze a "complicated series of market interactions" involving countless market players and how they reacted to LIBOR and TIBOR price signals—a task that risked miring the court in "hopeless speculation."  *Reading Indus., Inc.* v. *Kennecott Copper Corp.*, 631 F.2d 10, 13 (2d Cir. 1980); *Laydon*, 2014 WL 1280464, at *10.  The same risk exists here.  The Court would have to determine whether the London Gold Fixing reverberated worldwide and caused other market participants (without any  relationship to defendants) to lower the prices at which they were willing to buy.  "[C]ountless . . . market variables [other than the conspiracy] could have intervened to affect [those] pricing decisions."  *Reading*, 631 F.2d at 13-14.  "The outcome of any attempt to ascertain what price the defendants' competitors would have charged had there not been a conspiracy would at the very least be highly conjectural." *Mid-W. Paper Prods. Co.* v. *Cont'l Grp., Inc.*, 596 F.2d 573, 584 (3d Cir. 1979).  This speculative undertaking would be

---

[12]      In *Laydon*, the court dismissed antitrust claims even though there was no better-situated plaintiff.  *See* 2014 WL 1280464, at *9-10.  LIBOR and TIBOR, unlike physical gold, are not physical commodities, so there were no plaintiffs that could have directly purchased or sold them.  That this additional factor is present here underscores that plaintiffs' claim to antitrust standing in this case is even weaker than the claim rejected in *Laydon*.

unnecessary for better-situated plaintiffs, who actually sold gold directly to the defendants.  *Cf.*

*In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 404 (S.D.N.Y. 2011).

       **Apportionment of Damages.**  Finally, any attempt to allocate damages to these

plaintiffs would create "the danger of duplicative recovery should any [better-situated plaintiffs]

. . . bring damage suits of their own."  *Autonomous Techs.*, 116 F. Supp. 2d at 1170.  For

example, plaintiffs who invested in gold ETFs did not own gold; rather, they owned an interest in

an ETF, which in turn owned gold.  (*See* Ex. 2 (SPDR Gold Trust Prospectus, Apr. 26, 2012, at

1); *In re TVIX Sec. Litig.*, 25 F. Supp. 3d 444, 446 n.1 (S.D.N.Y. 2014), *aff'd sub nom. Elite

Aviation LLC* v. *Credit Suisse AG*, 588 F. App'x 37 (2d Cir. 2014).  Plaintiffs who owned gold

ETFs thus suffered injuries (the loss of the value of their ETF investments) that duplicate, or at

least overlap with, injuries suffered more directly by the ETF itself (the loss of the value of the

ETF's gold investment).  The ETF is a more proximate victim, and permitting recovery for its

investors would risk duplicative recovery if the ETF brought a suit of its own.  *See In re Digital*,

812 F. Supp. 2d at 404.[13]

---

[13]    Plaintiffs do not allege an injury in fact.  (*See infra* Section III.E.)  Plaintiffs also fail to allege an *antitrust* injury because, even assuming an injury in fact, "[p]laintiffs' injury would have resulted from defendants' misrepresentation," not "from any anticompetitive aspect of defendants' conduct."  *In re LIBOR I*, 935 F. Supp. at 688.

    Plaintiffs allege that defendants intentionally set the Gold Fixing at a rate that "*understated* demand" (SAC ¶ 244 (emphasis added)) and "depriv[ed] [plaintiffs] of the benefit of *accurate* gold benchmark prices reflecting *true* market conditions" (SAC ¶ 352 (emphases added)).  Even if understating demand injects false information into the marketplace, it "does not violate the antitrust laws" unless that defendants "constrain[ed] others to follow" their inaccurate prices.  *Lawline* v. *Am. Bar Ass'n*, 956 F.2d 1378, 1383 (7th Cir. 1992) (internal quotation marks omitted).  Without any allegations that the members of the price-fixing conspiracy actually paid lower prices to plaintiffs (or that lower prices paid by the conspirators were passed on to plaintiffs through the supply chain), plaintiffs allege injuries that "resulted from [defendants'] misrepresentation, not from harm to competition."  *In re LIBOR I,* 935 F. Supp. 2d at 692.

III.    **PLAINTIFFS FAIL TO STATE A CLAIM FOR VIOLATION OF THE CEA.**

Plaintiffs assert two primary types of claims under the CEA:  a price manipulation claim under CEA Section 9(a)(2), 7 U.S.C. §13(a)(2) (Claim Two, SAC ¶¶ 356-360), and manipulative device claims under CEA Section 6(c)(1), 7 U.S.C. § 9(1), and CFTC Rule 180.1, 17 C.F.R. § 180.1 (Claims Three and Four, SAC ¶¶ 361-369).  Because these claims are all premised on allegations that defendants "created [a] *false impression*" about supply and demand for gold, *In re Crude Oil Commodity Litig.*, No. 06-6677, 2007 WL 1946553, at *5 (S.D.N.Y. June 28, 2007), plaintiffs' claims "sound in fraud and thus must be pled with particularity" under Rule 9(b).  *In re LIBOR I*, 935 F. Supp. 2d at 714; *cf. In re Amaranth Natural Gas Commodities Litig.* ("*In re Amaranth I*"), 587 F. Supp. 2d 513, 535 (S.D.N.Y. 2008) (any "complaint that alleges manipulation of commodities prices must satisfy Rule 9(b)[]"), *aff'd on other grounds*, 730 F.3d 170 (2d Cir. 2013).  This heightened pleading rule is designed to deter weak claims, and prevent plaintiffs from using the "long and expensive discovery process" as a "fishing expedition[]" or a means of extorting an unwarranted settlement.  *Johnson ex rel. United States* v. *Univ. of Rochester Med. Ctr.*, 686 F. Supp. 2d 259, 267 (W.D.N.Y. 2010), *appeal dismissed*, 642 F.3d 121 (2d Cir. 2011) (internal quotation marks omitted).

A.    **Plaintiffs Do Not Allege Facts Giving Rise to a Strong Inference of Scienter.**

Scienter is a required element in any CEA claim.  *In re Amaranth Natural Gas Commodities Litig.* ("*In re Amaranth III*"), 730 F.3d 170, 183 (2d Cir. 2013) ("There is . . . no manipulation without intent to cause artificial prices.").  "[I]n relation to commodities fraud . . . Rule 9(b) imposes a significant burden on allegations of scienter."  *In re Amaranth Natural Gas Commodities Litig.* ("*In re Amaranth II*"), 612 F. Supp. 2d 376, 383 (S.D.N.Y. 2009), *aff'd on other grounds*, 730 F.3d 170 (2d Cir. 2013).  "[P]laintiffs must . . . allege facts that 'give rise to a *strong inference* of scienter.'"  *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*In re*

*LIBOR III*"), 27 F. Supp. 3d 447, 468 (S.D.N.Y. 2014) (quoting *In re Amaranth II*, 612 F. Supp.

2d at 384); *see also In re LIBOR I*, 935 F. Supp. 2d at 714 (same); *In re Crude Oil*, 2007 WL

1946553, at *8.  "[T]he factual allegations in the complaint must give rise to" an inference of

scienter that is "at least as compelling as any opposing inference one could draw from the facts

alleged."  *In re Amaranth I*, 587 F. Supp. 2d at 535-36 (internal quotation marks omitted).  To

meet this burden, plaintiffs must allege particularized facts either (a) showing that defendants

had a motive and opportunity to manipulate, or (b) constituting strong circumstantial evidence of

conscious misbehavior or recklessness.[14]  Plaintiffs have failed to do either.

### 1.    Plaintiffs Do Not Allege Defendants Had Motive To Commit Manipulation.

Plaintiffs attempted to plead that defendants had a "motive" to manipulate the

price of gold downwards because defendants had short futures positions on COMEX, which

would rise in value if the price of gold went down.  (SAC ¶¶ 142, 209-210.)  As defendants

pointed out in the first motion to dismiss (*see* Def. Mem. Supp. Mot. Dismiss 18-22, ECF No.

36), this speculative theory suffered from numerous flaws:

---

[14]    *See In re Amaranth II*, 612 F. Supp. 2d at 383.  Although scienter is defined slightly differently under the price manipulation statute and the manipulative device rule, the ultimate pleading burden is essentially the same.  Scienter under the price manipulation statute means "the purpose or conscious object of causing or [a]ffecting a price . . . in the market that did not reflect the legitimate forces of supply and demand."  *In re Commodity Exch., Inc. Silver Futures & Options Trading Litig.* ("*In re Silver II*"), 560 F. App'x. 84, 87 (2d Cir. 2014) (alteration in original) (quoting *CFTC* v. *Parnon Energy, Inc.*, 875 F. Supp. 2d 233, 249 (S.D.N.Y. 2012)).  Scienter under the manipulative device rule incorporates the definition of "recklessness" used in Rule 10b-5 securities fraud cases.  *Prohibition on the Employment, or Attempted Employment, of Manipulative Devices and Prohibition on Price Manipulation*, 76 Fed. Reg. at 41404.  A strong inference of scienter under either provision requires motive and opportunity or strong circumstantial evidence of conscious misbehavior or recklessness.  *In re Amaranth II*, 612 F. Supp. 2d at 383 (price manipulation statute); *see Kalnit* v. *Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (describing securities fraud "recklessness" standard).

- *First*, "an inference of intent cannot be drawn from the mere fact that [defendant] had a strong short position," because every significant market participant has some trading position that conceivably could increase in value as a result of manipulation.  *In re Silver II*, 560 F. App'x at 86; *In re Crude Oil*, 2007 WL 1946553, at *8 (a "generalized [profit] motive" is "insufficient to show intent" because it "could be imputed to any corporation with a large market presence in any commodity market").

- *Second*, given that gold prices nearly quadrupled during the Class Period (SAC ¶ 110), if defendants really did have "a significant net short gold position during all or most of the Class Period," they would have incurred enormous losses—not profits.  (SAC ¶ 210.)

- *Third*, the claim that defendants had a short position in gold was based on mere speculation in any event, unsupported by well-pleaded facts.  Plaintiffs alleged that "aggregate" CFTC data (SAC ¶ 212)—which do not identify any bank's position or even whether the bank was long or short—showed that non-U.S. banks as a whole were "short" on COMEX.[15]  But those "aggregate" data ignore many gold investments other than COMEX futures and options.  (SAC ¶¶ 97-102, 341.) To note just one example, plaintiffs alleged that defendants have large derivative positions (SAC ¶ 208) but do not specify whether these are long or short; a long derivatives portfolio could easily offset a short futures portfolio, rendering the overall portfolio price neutral.

Judge Buchwald rejected a similar theory in *LIBOR*, concluding that "it is implausible that all defendants would maintain parallel trading positions in the Eurodollar futures market across the Class Period."  *In re LIBOR III*, 27 F. Supp. 3d at 469.[16]

After defendants pointed out these deficiencies in the initial amended complaint (*see* Def. Mem. Supp. Mot. Dismiss 18-22, ECF No. 36), plaintiffs amended again, adding the conjecture that defendants could profit even if their positions were hedged.  Plaintiffs do not dispute that, if defendants hedged their portfolios, they would incur losses on long positions that would offset any profits defendants received from short positions.  But plaintiffs speculate that

---

[15]    Bloomberg data on the net COMEX positions of "Defendants and other LBMA Banks" (SAC ¶¶ 214-215) is even more speculative.  There are at least *90* LBMA members.  (SAC ¶ 87.)

[16]    Judge Buchwald sustained the allegations in LIBOR only on the theory that submitting banks were motivated by reputational concerns and the desire to appear financially stable, *see In re LIBOR III*, 27 F. Supp. 3d at 468-70—a theory that is not and cannot be alleged here.

defendants could have structured their positions to benefit from slight differences in the timing of cash flows.  (SAC ¶¶ 218-221.)

This theory is nothing but a hypothesis, lacking any factual support—and one that borders on absurd.  Plaintiffs do not allege that defendants' long positions were in fact held in a way that allowed them to defer losses.  To the contrary, the complaint shows that many positions, like Fixing price-linked derivatives, could result in immediate or short-term cash losses.  (SAC ¶¶ 9, 105.)  Defendants also allegedly offered to buy or sell gold to clients at a price based on the Fixing price.  (*See* Ex. 2 (SPDR Gold Trust Prospectus, Apr. 26, 2012), at 16.)  If the Fixing price is artificially low, sophisticated clients could buy up the cheap gold— imposing losses on the defendants who sell gold for less than it is worth.[17]

Nor would any margin payments be reaped from short positions on days when prices recovered to pre-Fixing levels before the COMEX futures were settled (which is when margin is calculated) (which, plaintiffs allege, often occurred (SAC ¶ 142)).  In addition, even on days where margin payments could be generated by downward movements, the 0.04% decline plaintiffs allege would result in only trivial margin payments, even on a huge position.  The near-zero short term interest rates that prevailed for much of the Class Period make fanciful the suggestion that a decade-long, multi-bank conspiracy would be premised on such small potential gains:  Banks could borrow as much money as they wanted at rates below 0.2% for several years

---

[17]     Indeed, the CFTC has suggested that persistent price suppression in a precious metals spot market is implausible because "any artificially low prices could not persist for long." (Ex. 14 (CFTC, Letter from Michael Gorham to Silver Investor, at 5 (May 14, 2004)), *available at* http://www.cftc.gov/files/opa/press04/opasilverletter.pdf.)  "Because there is unrestricted access to the market, many knowledgeable and well-capitalized traders would readily buy any [precious metal] offered at artificially low prices [and] would quickly cause the price to rise to its appropriate level."  (*Id.*)  The CFTC's past decisions and opinions "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance."  *Skidmore* v. *Swift*, 323 U.S. 134, 140 (1944).

during the alleged Class Period.  *See* Board of Governors of the Federal Reserve System,

Selected Interest Rates (Daily), http://www.federalreserve.gov/releases/h15/data.htm (choose

Federal Funds, Annual).  Even an "enormous" short position equaling *150 tons* of gold (SAC

¶ 216) likely would result in an annual cash-flow gain of less than *$5,000* at interbank rates.[18]

       Resorting to even more speculative theories, plaintiffs allege that, even if the bank

defendants had no motive to manipulate the PM Fixing, individual traders and departments might

be responsible for different positions, such that individual traders could be motivated to

manipulate contrary to the bank's overall economic interests.  (SAC ¶ 224.)  But this too is only

a hypothetical possibility.  Plaintiffs do not actually allege that different units at any of the

defendant banks were responsible for the long and short positions.  Such generalized allegations

"are not factually sufficient to 'nudge' the Complaint 'across the line' between . . . possibility . . .

[and] plausibility."  *In re Silver I*, 2012 WL 6700236, at *11.[19]

       Finally, lacking any facts to support their specious claim of "motive," plaintiffs

fall back on the general assertion that notwithstanding any "defendant's individual interest"

(SAC ¶ 198; *see also* SAC ¶ 233), the banks could have benefitted from a market manipulation

---

[18]     Plaintiffs allege that defendants and other LBMA members sometimes had "COMEX short positions of . . . the equivalent of 150-500 tons of gold."  A position of 150 tons (4.8 million ounces) would be worth $5.52 billion at the alleged price of $1,150 per ounce. (SAC ¶ 216.)  When that position is manipulated downward by 0.04% (SAC ¶ 142), defendants allegedly would earn $2.2 million on the short positions.  They ultimately would incur a loss of the same amount on their long positions.  If defendants earned interest on the $2.2 million at a federal funds rate of 0.2% (or a similar interbank rate) for a year, defendants would earn just $4,416 (even assuming, implausibly, that interest is earned for a full year rather than the shorter period between a downward price movement and the time the price rebounded, when defendants have to repay the original $2.2 million and could no longer earn interest on it).

[19]     Plaintiffs also assert that defendants "impact[ed] the cash flows for Fix price-linked derivatives."  (SAC ¶ 105; *see also* SAC ¶ 14.)  Plaintiffs have no standing to pursue this, as no named plaintiff alleges it transacted in price-linked derivatives.  (*See* SAC ¶¶ 29-56; *supra* note 10.)

conspiracy by using their foreknowledge of the Fixing price to enter into positions that would be beneficial in light of the group's planned future manipulation agenda.  According to plaintiffs, the banks could buy gold when it was cheap (because of defendants' manipulation) (SAC ¶ 230), then sell when it was not cheap, trigger stop-loss orders and margin calls whenever it suited their interests to do so (SAC ¶ 232), and otherwise incur trading profits in any number of ways.

These generalized and speculative assertions are the pleading equivalent of a white flag.  Plaintiffs have abandoned any attempt to tie their theories to allegations of fact.  This theory has nothing to do with plaintiffs' claim that "each bank had a significant net short gold position."  (SAC ¶ 210.)  Nor does it require "downward" price movements; they could just as easily be upward price movements or a jigsaw pattern.  Plaintiffs are claiming no more than that—somehow—the defendants would find a way to profit.  Such a theory does not suffice, because plaintiffs could make that claim in any case.  *In re Crude Oil*, 2007 WL 1946553, at *8.  With nothing but speculation about defendants' positions, plaintiffs fall far short of "creat[ing] a strong inference . . . [of] the requisite scienter."  *Prime Mover Capital Partners*, *L.P.* v. *Elixir Gaming Techs.*, *Inc.*, 793 F. Supp. 2d 651, 678 (S.D.N.Y. 2011) (citation and internal quotation marks omitted).

### 2. Plaintiffs Do Not Allege Conscious Misbehavior or Recklessness.

As noted earlier, plaintiffs also do not allege conscious misbehavior or recklessness—which contrasts with the complaints in past benchmark manipulation cases, in which courts deemed well-pleaded complaints with far more detailed allegations of conscious misconduct.  For example:

- In a case involving Euroyen TIBOR and Yen-LIBOR, the court denied a motion to dismiss plaintiffs' manipulation claim based on "overwhelming factual content" in the complaint, including "direct evidence [of scienter] from certain Defendants' communications."  *Laydon*, 2014 WL 1280464, at *6.

- In the U.S. dollar LIBOR case, the court permitted trading-motivated claims of manipulation to proceed on the basis of specific alleged communications evincing an intent to manipulate LIBOR. *In re LIBOR III*, 27 F. Supp. 3d at 462-63.

- In *CFTC* v. *Amaranth Advisors, LLC*, 554 F. Supp. 2d 523, 532-33 (S.D.N.Y. 2008), the complaint included numerous communications such as instant messages.

- In *Parnon Energy, Inc.*, 875 F. Supp. 2d at 250, the CFTC's complaint set forth "multiple communications," evidencing defendants' intentions.

Plaintiffs' threadbare complaint stands in stark contrast to the detailed allegations made in such cases. Here, there are no facts alleged that could support a finding of conscious misbehavior or recklessness on the part of each defendant. *See In re Silver II*, 560 F. App'x at 87 (affirming dismissal where plaintiffs did not "allege any specific facts indicative of an intent to affect prices similar to those that have been found sufficient in comparable CEA actions").

**B.     Plaintiffs Fail To Allege the Remaining Elements of Price Manipulation.**

Plaintiffs fare no better with the remaining elements of their price manipulation claim. To plead price manipulation (Claim Two), plaintiffs must allege, in addition to scienter, that: (1) an artificial price existed; (2) defendants caused the artificial price; and (3) defendants had the ability to influence market prices. *In re Amaranth III*, 730 F.3d at 183.

**1.     Plaintiffs Fail To Allege the Existence of Artificial Prices.**

Plaintiffs do not allege facts showing that gold prices were "artificial." "Artificial prices are those prices that do not reflect the forces of supply and demand in the market or do not otherwise comport with contemporaneous prices in comparable markets." *In re Silver I*, 2012 WL 6700236, at *12. "When determining if artificial prices exist, a court may consider the underlying commodity's normal market forces, historical prices, supply and demand factors, price spreads, and also the cash market for the commodity at issue." *Id.*; *see also In re Ind. Farm*

*Bureau Coop. Ass'n Inc.*, No. 75-14, 1982 WL 30249, at *4 n.2 (CFTC Dec. 17, 1982) ("[T]he focus should not be as much on the ultimate price, as on the nature of the factors causing it.").

Plaintiffs do not allege that prices on the purportedly manipulated market, the Gold Fixing, did "not . . . comport with contemporaneous prices in comparable markets." *In re Silver I*, 2012 WL 6700236, at *12. Plaintiffs in fact allege the opposite, asserting that "the correlation between spot and futures prices from 2001-2013 is 99.9%" (SAC ¶ 108), that the "downwards spike around the time of the PM fixing" appeared in both spot and COMEX prices (SAC ¶ 109), and that the ETF prices also "move[d] in unison" with the Gold Fixing (SAC ¶ 110). That prices simultaneously moved the same way in the spot, COMEX, and ETF markets suggests, if anything, that real market forces—not manipulation by defendants—created the downward price pressure at the PM Fixing. Plaintiffs offer no facts suggesting that such downward movements were inconsistent with "the forces of supply and demand in the market." *In re Silver I*, 2012 WL 6700236, at *12.

Plaintiffs also do not allege, aside from purely conclusory statements, that the artificial prices persisted beyond the PM Fixing window. (*See*, *e.g.*, SAC ¶ 327-328.) Plaintiffs' own pleading shows that the artificial prices did not "persist" even a few hours after the Fixing. Plaintiffs' charts show that prices returned to pre-PM Fixing levels well before daily cash settlement of COMEX futures contracts at 1:30 pm New York time. (SAC ¶ 109.)

## 2. Plaintiffs Fail To Allege That Defendants Caused Artificial Prices.

Plaintiffs also do not allege any facts showing that defendants were "the proximate cause of [any] price artificiality." *In re Silver I*, 2012 WL 6700236, at *16. Plaintiffs allege that defendants caused artificial prices because "prices went down during the PM Fixing" (SAC ¶ 123), and defendants "persistent[ly]" quoted prices that were, on average, 0.007% lower than the prices quoted by others in the market. (SAC ¶ 263.) But plaintiffs allege no "specific

conduct" by which any defendant took steps that caused prices to be *artificial*. *In re Silver I*, 2012 WL 6700236, at *17. Merely quoting prices that were, on average, 0.007% lower than prevailing prices on the market is not unlawful, and plaintiffs allege no facts—as distinct from their conclusory say-so—suggesting that such quotes caused market prices to become artificial. Plaintiffs offer mere "speculation on the basis of sheer possibility." *In re Silver I*, 2012 WL 6700236, at *16. "[W]ithout corroborating factual allegations as to" causation, plaintiffs' "impermissible speculation" does not satisfy their pleading burden. *Id.*[20]

### 3.  Plaintiffs Fail To Allege That Defendants Had the Ability To Influence Prices.

Plaintiffs also fail to allege that defendants had the ability to influence prices. Where, as here (SAC ¶¶ 11-13, 157, 276, 317-319, 322), "the complaint alleges [a price manipulation claim by] collective action," plaintiffs must establish a conspiracy in order to demonstrate defendants' ability to influence prices. *Apex Oil*, 822 F.2d at 261. Plaintiffs themselves allege that the purported manipulation could only "be the result of joint action," because "[n]o market participant acting alone would" have the ability to profitably influence the market. (SAC ¶ 195.)

As shown above (*supra* Section II.A-B), plaintiffs have failed to allege facts plausibly showing the existence of a conspiracy. Plaintiffs thus fail to show that defendants had the requisite collective ability to influence prices. *Cf. Apex Oil*, 822 F.2d at 261.

---

[20]    The FCA settlement with Barclays (*supra* p. 15) does not support (and, if anything, undermines) any inference that defendants caused artificial prices. The FCA specifically concluded that the "drop in the price of August COMEX Gold Futures" was "caused by significant selling . . . *independent of Barclays and Mr. Plunkett.*" (Ex. 10 (U.K. Financial Conduct Authority, *Final Notice to Barclays Bank plc*, May 23, 2014), ¶ 4.12 (emphasis added).)

C.    **Plaintiffs Fail To Plead Their Manipulative Device Claims with Particularity.**

Plaintiffs also fail to plead the elements of their manipulative device claims under CFTC Rule 180.1.  (Claims Three and Four, SAC ¶¶ 361-369.)  Promulgated after the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act"), Rule 180.1 is modeled on SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.  *See* CFTC, *Prohibition on the Employment*, *or Attempted Employment*, *of Manipulative and Deceptive Devices and Prohibition on Price Manipulation*, 76 Fed. Reg. at 41399.  The CFTC explained that Rule 180.1 should be interpreted in accordance with "the substantial body of judicial precedent applying the comparable language of SEC Rule 10b-5."  *Id.*

Rule 180.1 thus requires plaintiffs to allege, at a minimum, (1) a manipulative act, (2) scienter, (3) reliance, (4) economic loss, and (5) loss causation.  *See generally Dura Pharm.*, *Inc.* v. *Broudo*, 544 U.S. 336, 341-42 (2005); *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007).  Plaintiffs have not alleged any manipulative conduct (*supra* Section III.A.2, III.B), scienter (*supra* Section III.A), economic loss (*infra* Section III.E), or loss causation (*supra* Section III.B.2; *infra* Section III.E).  Plaintiffs also do not allege actual reliance, nor do they allege any public misstatements that could support a fraud-on-the-market presumption of reliance.  *See Stoneridge Inv. Partners*, *LLC* v. *Scientific-Atlanta*, *Inc.*, 552 U.S. 148, 159 (2008).  Plaintiffs' manipulative device claims therefore should be dismissed.

Claim Four also must be dismissed insofar as it is based on pre-August 15, 2011 conduct.  Rule 180.1 did not become effective until August 15, 2011 and has no retroactive effect.  *In re Amaranth III*, 730 F.3d at 173 n.1.  Recognizing that Rule 180.1 does not apply retroactively, plaintiffs limited Claim Three to alleged "misconduct, from August 15, 2011 through June 30, 2013."  (SAC ¶ 362.)  Inexplicably, they did not incorporate the same limitation into Claim Four (SAC ¶ 367), but there is no basis for distinguishing between the two claims.

**D.     Plaintiffs Fail To Allege Principal-Agent or Aiding and Abetting Liability.**

Plaintiffs' principal-agent (Claim Five, SAC ¶¶ 370-372) and aiding-and-abetting claims (Claim Six, SAC ¶¶ 373-375) fail for the same reasons the primary CEA claims do.  *See*, *e.g.*, *In re Silver II*, 560 F. App'x at 87; *In re Platinum*, 828 F. Supp. 2d at 599-600.  The aiding-and-abetting claim also fails because plaintiffs do not allege with particularity that any defendant "associate[d] [itself] with [a manipulative] venture, . . . participate[d] in it as in something that he wishe[d] to bring about, [and] . . . s[ought] by his action to make it succeed."  *In re Amaranth III*, 730 F.3d at 182 (internal quotation marks omitted).  And the principal-agent claim also fails because plaintiffs do not allege "that [any] principal manifested an intent to grant [an] agent authority [or] the agent agreed."  *In re Amaranth I*, 587 F. Supp. 2d at 546 (citations and internal quotation marks omitted).

**E.     Plaintiffs Lack Standing Under the CEA Because They Do Not Allege Actual Damages.**

Even if they had alleged the elements of a CEA claim, plaintiffs lack standing to bring such claims because they do not allege actual damages.  "Under section 22(a) of the CEA, a plaintiff has standing to bring a commodities manipulation action only if he has suffered 'actual damages' as a result of defendant's manipulation."  *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*In re LIBOR II*"), 962 F. Supp. 2d 606, 620 (S.D.N.Y. 2013) (quoting 7 U.S.C. § 25(a)(1)); *see also Ping He (Hai Nam) Co.*, *Ltd.* v. *Nonferrous Metals (USA) Inc.*, 22 F. Supp. 2d 94, 107 (S.D.N.Y. 1998), *vacated in part on other grounds*, 187 F.R.D. 121 (S.D.N.Y. 1999); *S&A Farms*, *Inc.* v. *Farms.com*, *Inc.*, 678 F.3d 949, 954 (8th Cir. 2012).  To plead actual damages where, as here, plaintiffs' claim is that defendants engaged in "isolated (though repeated) manipulative activity," plaintiffs must allege both (1) "that they engaged in a transaction at a time during which prices were artificial as a result of defendants' alleged . . .

manipulative conduct," and (2) "that the artificiality was adverse to their position." *In re LIBOR II*, 962 F. Supp. 2d at 622; *cf. In re Energy Transfer Partners Natural Gas Litig.*, No. 07-3349, 2009 WL 2633781, at *9-11 (S.D. Tex. Aug. 26, 2009).

      Plaintiffs allege no such facts.  After defendants pointed out this deficiency (see Def. Mem. Supp. Mot. Dismiss 44-45, ECF No. 36), plaintiffs amended their complaint to allege a significantly different theory:  that the effects of manipulation persisted beyond the Fixing window.  (*See* SAC ¶¶ 122 n.25, 177, 222, 326, 328.)  But this new theory is in tension with plaintiffs' earlier admission that there is no "statistically significant" evidence that "persons trading gold futures at times *other than* the PM Fixing" suffered injuries.  (CAC ¶ 109.)  The notion that defendants were suppressing gold prices on a "persistent" basis is also implausible given that the price of gold nearly quadrupled during the period of alleged manipulation.  (SAC ¶ 110.)  And even taking this theory as true, plaintiffs do not allege that they traded in the time period after the Fixing window during which artificial prices allegedly "persisted."  Plaintiffs thus fail to allege that they ever "engaged in a transaction *at a time* during which prices were artificial." *In re LIBOR II*, 962 F. Supp. 2d at 622 (emphasis added).[21]

## IV.    PLAINTIFFS FAIL TO STATE A CLAIM FOR UNJUST ENRICHMENT.

      Plaintiffs' unjust enrichment claim (Claim Seven) also must be dismissed.  Unjust enrichment is not "a catchall cause of action to be used when others fail." *Corsello* v. *Verizon N.Y.*, *Inc.*, 18 N.Y.3d 777, 790 (N.Y. 2012).  Such claims are permitted "only in unusual situations when, though the defendant has not breached a contract nor committed a recognized

---

[21]    Plaintiffs also fail to allege when they purchased their gold investments.  If they bought when prices were artificially low, plaintiffs could have benefitted from the alleged manipulation—which would preclude them from alleging, as they must to plead actual injury, that the "artificiality was adverse to their position." *In re LIBOR II*, 962 F. Supp. 2d at 622.

tort, circumstances create an equitable obligation running from the defendant to the plaintiff."
*Id*. This requires a "relationship" between the parties that is not "too attenuated." *Georgia Malone & Co.* v. *Rieder*, 19 N.Y.3d 511, 516 (2012) (internal quotation marks omitted).

Plaintiffs here do not allege that they had any relevant relationship with any defendant. This alone requires dismissal. *See*, *e.g.*, *id.* (dismissing unjust enrichment claim for failure to allege a requisite relationship); *Laydon*, 2014 WL 1280464, at *13-14 (same); *In re LIBOR I*, 935 F. Supp. 2d at 737-38 (same); *In re Amaranth I*, 587 F. Supp. 2d at 547 (same).

Plaintiffs also do not allege that they bestowed any benefit to which defendants were not entitled. *See Bazak Int'l Corp.* v. *Tarrant Apparel Grp.*, 347 F. Supp. 2d 1, 4 (S.D.N.Y. 2004). Plaintiffs' conclusory assertions (SAC ¶¶ 29-56, 376-379) "that Bank Defendants financially benefited from the . . . manipulation . . . fail to satisfy Plaintiff's pleading burden." *Laydon*, 2014 WL 1280464, at *13 (citation and internal quotation marks omitted).[22]

## CONCLUSION

For the foregoing reasons, the SAC should be dismissed with prejudice.

---

[22]   Plaintiffs' claims should be dismissed entirely, but if any proceed, claims arising out of conduct prior to the applicable statute of limitations should be dismissed. *See* 7 U.S.C. § 25(c) (two-year inquiry notice period for CEA); 15 U.S.C. § 15b (four-year period for antitrust); N.Y. C.P.L.R. § 214(3) (three-year period for unjust enrichment claim seeking money damages). The facts on which plaintiffs' claims are principally based (such as the "structural design" of the Fixing and downward price movements) have been in the public domain for years. Plaintiffs fail to show that they "could not have reasonably learned" of these facts earlier. *Masters* v. *Wilhelmina Model Agency, Inc.*, No. 02-491, 2003 WL 1990262, at *2 (S.D.N.Y. Apr. 29, 2003).

Plaintiffs also fail to allege fraudulent concealment with particularity. *Hinds Cnty., Miss.* v. *Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 520-22 (S.D.N.Y. 2009) (no fraudulent concealment where plaintiffs failed to specify, with particularity, the date on which they discovered their claim and the "due diligence" they performed to investigate their claim); *In re Magnetic Audiotape Antitrust Litig.*, No. 99-1580, 2002 WL 975678, at *3 (S.D.N.Y. May 9, 2002) (allegation that plaintiffs discovered their claim "shortly before April 1999" was unacceptably "vague").

Dated:  April 30, 2015
         New York, New York

Respectfully submitted,

/s/ Stephen Ehrenberg
Stephen Ehrenberg
Kenneth M. Raisler (of counsel)
John J. Hughes, III
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004
ehrenbergs@sullcrom.com
raislerk@sullcrom.com
hughesj@sullcrom.com
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Attorneys for Defendant The Bank of Nova
Scotia and Liaison Defense Counsel*


/s/ Michael S. Feldberg
Michael S. Feldberg
Todd S. Fishman
Brian Fitzpatrick
ALLEN & OVERY LLP
1221 Avenue of Americas
New York, NY  10020
michael.feldberg@allenovery.com
todd.fishman@allenovery.com
brian.fitzpatrick@allenovery.com
Telephone:  (212) 610-6300
Facsimile:  (212) 610-6399

John F. Terzaken
1101 New York Avenue NW
Washington, DC  20005
john.terzaken@allenovery.com
Telephone:  (202) 683-3877
Facsimile:  (202) 683-3999


*Attorneys for Defendant Barclays Bank plc*

/s/ Marc J. Gottridge
Marc J. Gottridge
Dennis H. Tracey, III
DeNae M. Thomas
HOGAN LOVELLS US LLP
875 Third Avenue
New York, NY  10022
marc.gottridge@hoganlovells.com
dennis.tracey@hoganlovells.com
denae.thomas@hoganlovells.com
Telephone:  (212) 918-3000
Facsimile:  (212) 918-3100

*Attorneys for Defendant Société Générale*


/s/ Michael Lacovara
Michael Lacovara
Leah Friedman
Scott Eisman
FRESHFIELDS BRUCKHAUS DERINGER
LLP
601 Lexington Avenue, 31st Floor
New York, NY  10022
michael.lacovara@freshfields.com
leah.friedman@freshfields.com
scott.eisman@freshfields.com
Telephone:  (212) 277-4000
Facsimile:  (212) 277-4001

*Attorneys for Defendant HSBC Bank plc*

/s/ Joseph J. Bial
Joseph J. Bial
Charles F. Rule
Gregory G. Mocek
Amy Wilkie Ray
CADWALADER, WICKERSHAM & TAFT LLP
700 6th Street NW
Washington, DC  20001
joseph.bial@cwt.com
rick.rule@cwt.com
gregory.mocek@cwt.com
amy.ray@cwt.com
Telephone:  (202) 862-2200
Facsimile:  (202) 862-2400

Peter Joseph Isajiw
One World Financial Center
New York, NY  10281
peter.isajiw@cwt.com
Telephone:  (212) 504-6000
Facsimile:  (212) 504-6666

*Attorneys for Defendant Deutsche Bank AG*