**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE:<br><br>COMMODITY EXCHANGE, INC., GOLD FUTURES AND OPTIONS TRADING LITIGATION<br><br>*This Document Relates To All Actions* | Case Nos.: 14-MD-2548 (VEC)<br>14-MC-2548 (VEC)<br><br>**ORAL ARGUMENT REQUESTED** |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS THE SECOND CONSOLIDATED AMENDED CLASS-ACTION COMPLAINT

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

ARGUMENT ......................................................................................................3

I.     PLAINTIFFS HAVE PLAUSIBLY PLED A CONSPIRACY .......................................3

     A.    Defendants Mischaracterize the Task Before the Court .............................3

     B.    The Behavior of Prices—Including *Defendants'* Prices—Confirm
          Defendants Were Manipulating The Price of Gold as a Group ...........................5

          1.    Gold prices were uniquely suppressed around the PM Fixing ..................5

          2.    Defendants' methodological critiques and counter-explanations do
               nothing to seriously question the Complaint's plausibility........................6

          3.    Defendants have been shown to be behind the artificial movements .......10

          4.    Defendants' suggestion that the Second Amended Complaint
               contradicts prior ones is baseless ............................................................11

          5.    Factual allegations that use advanced math are still factual
               allegations ........................................................................................13

     C.    The Structure of the Fixing Not Only Shows the Who, What, When, and
          How, but Demonstrates Defendants' *Unique* Opportunity to Conspire ...............15

     D.    Defendants Were Motivated by the Spoils that Came with Control.....................18

          1.    The Complaint plausibly alleges Defendants were motivated by
               their "short" derivatives positions...........................................................18

          2.    Defendants were motivated *even if* the Court accepts the
               hypothetical that their "short" derivatives positions were offset ..............20

     E.    The Presence of Pending and Related Investigations and Admissions
           Provide Valid Additional Support .........................................................23

          1.    Investigations into precious-metals activities logically relate to the
               plausibility of the conspiracy alleged .......................................................23

          2.    Investigations into other activities logically relate to the
               plausibility of the conspiracy alleged .......................................................24

          3.    The Court need not strike these relevant allegations ...............................26

II.    PLAINTIFFS HAVE "ANTITRUST STANDING"........................................................28

A.  Antitrust Standing Does Not Require Physical Privity, Particularly for Trading on Exchanges.............................................................................29

B.  The Remaining Factors Demonstrate Plaintiffs' Standing ...................................34

C.  Plaintiffs' Harms Arose From Defendants' Anticompetitive Acts......................36

III.  PLAINTIFFS ALLEGE INJURY-IN-FACT ....................................................................36

IV.  PLAINTIFFS HAVE PLAUSIBLY PLED CEA VIOLATIONS ....................................40

A.  Plaintiffs Have Plausibly Pled Claims for Market Manipulation ........................40

1.  Defendants could not have "only" "negligently" entered into an illegal conspiracy to act as a trading bloc ...................................................40

2.  Plaintiffs establish the remaining elements of price manipulation ...........43

B.  Plaintiffs Have Also Pled Manipulative Device Claims.......................................44

C.  Plaintiffs Adequately Allege Secondary Liability ...............................................46

V.  PLAINTIFFS HAVE PLAUSIBLY PLED CLAIMS FOR UNJUST ENRICHMENT ...................................................................................................................46

VI.  ALL OF PLAINTIFFS' CLAIMS ARE TIMELY ...........................................................47

A.  Defendants Have Failed to Show "Inquiry Notice" Began for CEA Claims ........47

B.  The Antitrust Claims are Timely Because of Defendants' Concealment .............48

CONCLUSION..................................................................................................................50

# TABLE OF AUTHORITIES

**Page**

## Cases

*AD/SAT, Div. of Skylight v. Assoc. Press*,
  181 F.3d 216 (2d Cir. 1999) ................................................................... 17

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) ..................................................................... 45

*In re Activision Secs. Litig.*,
  621 F. Supp. 415 (N.D. Cal. 1985) ......................................................... 47

*Adair v. England*,
  183 F. Supp. 2d 31 (D.D.C. 2002) .......................................................... 14

*AdvanceMe, Inc. v. Lenders Int'l*,
  2011 WL 6425488 (S.D.N.Y. Dec. 19, 2011) ......................................... 26

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
  2010 WL 10947344 (E.D.N.Y. Sept. 22, 2010) ...................................... 49

*Allen v. Dairy Farmers of Am., Inc.*,
  2014 WL 2610613 (D. Vt. June 11, 2014) .............................................. 33

*Allstate Ins. Co. v. Credit Suisse Sec. (USA) LLC*,
  986 N.Y.S.2d 864 (N.Y. Sup. Ct. 2014) ................................................. 14

*In re Aluminum Warehousing Antitrust Litig.*,
  2015 WL 1378946 (S.D.N.Y. Mar. 26, 2015) ................................ 28, 30, 32, 34

*Alves v. Harvard Pilgrim Health Care Inc.*,
  204 F. Supp. 2d 198 (D. Mass. 2002) ..................................................... 47

*In re Amaranth Natural Gas Commodities Litig. ("Amaranth I")*,
  587 F. Supp. 2d 513 (S.D.N.Y. 2008) .............................. 42, 43, 44, 46

*In re Amaranth Natural Gas Commodities Litig. ("Amaranth III")*,
  269 F.R.D. 366 (S.D.N.Y. 2010) ............................................................ 38

*In re Amaranth Natural Gas Commodities Litig. ("Amaranth IV")*,
  730 F.3d 170 (2d Cir. 2013) ................................................................... 40

*Anderson News, LLC. v. Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012) ............................................................ 3, 19

*Antoine L. Garabet, M.D., Inc. v. Autonomous Techs. Corp.*,
  116 F. Supp. 2d 1159 (C.D. Cal. 2000) .................................................. 33

*Apex Oil Co. v. DiMauro*,
  822 F.2d 246 (2d Cir. 1987) ................................................................... 19

*In re Auto. Parts Antitrust Litig.*,
  50 F. Supp. 3d 869 (E.D. Mich. 2014)................................................................26

*BPP Ill., LLC v. The Royal Bank of Scotland Grp. PLC*,
  2013 WL 6003701 (S.D.N.Y. Nov. 13, 2013)....................................................47

*BPP Ill., LLC v. The Royal Bank of Scotland Grp. PLC*,
  2015 WL 2215004 (2d Cir. May 13, 2015) ........................................................47

*Barker v. FSC Sec. Corp.*,
  133 F.R.D. 548 (W.D. Ark. 1989) .....................................................................47

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
  851 F. Supp. 2d 746 (S.D.N.Y. 2012) ...............................................................27

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ..............................................................................................3

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
  603 F.2d 263 (2d Cir. 1979) ...............................................................................48

*Blue Shield of Vir. v. McCready*,
  457 U.S. 465 (1982)...............................................................................29, 30, 35

*Bros. v. Saag*,
  2014 WL 838890 (N.D. Ala. Mar. 4, 2014) .......................................................15

*Burtch v. Milberg Factors, Inc.*,
  662 F.3d 212 (3d Cir. 2011)................................................................................19

*CFTC v. Amaranth Advisors*,
  554 F. Supp. 2d 523 (S.D.N.Y. 2008) ...............................................................40

*CFTC v. Parnon Energy Inc.*,
  875 F. Supp. 2d 233 (S.D.N.Y. 2012) ..........................................................42, 43

*CFTC v. Wilson*,
  27 F. Supp. 3d 517 (S.D.N.Y. 2014)............................................................40, 45

*Cambridge Place Inv. Mgmt. v. Morgan Stanley & Co.*,
  2012 WL 5351233 (Mass. Sup. Ct. Sept. 28, 2012) ..........................................14

*Capital Ventures Int'l v. J.P. Morgan Mortg. Acq. Corp.*,
  2013 WL 535320 (D. Mass. Feb. 13, 2013) .......................................................14

*Catalano, Inc. v. Target Sales, Inc.*,
  446 U.S. 643 (1980)............................................................................................33

*Chem. Bank & Trust Co. v. Reynaud*,
  270 N.Y.S. 301 (Sup. Ct. 1933)..........................................................................48

*City of Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974)................................................................................49

iv

*City of L.A. v. Bank of Am. Corp.*,
   2014 WL 2770083 (C.D. Cal. Jun. 12, 2014) .................................................................14

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
   2013 WL 2156358 (N.D. Cal. May 17, 2013) .................................................................15

*Cohen v. S.A.C. Trading Corp.*,
   711 F.3d 353 (2d Cir. 2013) .......................................................................................48

*Colo. Cross-Disability Coalition v. Abercrombie & Fitch Co.*,
   2013 WL 856510 (D. Colo. 2013) ...............................................................................47

*In re Commodity Exch., Inc., Silver Futures & Options Trading Litig. ("Silver I")*,
   2012 WL 6700236 (S.D.N.Y. Dec. 21, 2012) ...........................................................18, 43

*In re Commodity Exch., Inc. Silver Futures & Options Trading Litig. ("Silver II")*,
   560 F. App'x. 84 (2d Cir. 2014) .................................................................................43

*Conmar Corp. v. Mitsui & Co. (U.S.A.)*,
   858 F.2d 499 (9th Cir. 1988) .....................................................................................50

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
   370 U.S. 690 (1962) ....................................................................................................3

*In re Copper Antitrust Litig.*,
   2000 WL 34230131 (W.D. Wis. 2000) ...............................................................30, 32, 33

*In re Copper Antitrust Litig.*,
   98 F. Supp. 2d 1039 (W.D. Wis. 2000) .......................................................................33

*In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.*,
   932 F. Supp. 2d 1095 (C.D. Cal. 2013) .......................................................................14

*In re Credit Default Swaps Antitrust Litig.*,
   2014 WL 4379112 (S.D.N.Y. 2014) .......................................................................48, 49

*In re Crude Oil Commodities Litig.*,
   2007 WL 1946553 (S.D.N.Y. Jun. 28, 2007) ...............................................................40

*In re Crude Oil Commodity Futures Litig.*,
   913 F. Supp. 2d 41 (S.D.N.Y. 2012) .....................................................................30, 32

*In re Currency Conversion Fee Antitrust Litig.*,
   2012 WL 401113 (S.D.N.Y. Feb. 8, 2012) ....................................................................3

*In re DDAVP Direct Purchaser Antitrust Litig.*,
   585 F.3d 677 (2d Cir. 2009) .......................................................................................34

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993) .................................................................................................2, 14

*DeMarco v. Depotech Corp.*,
   149 F. Supp. 2d 1212 (S.D. Cal. 2001) ...................................................................14, 15

*Denney v. Deutsche Bank AG*,
    443 F.3d 253 (2d Cir. 2006) ................................................................. 39

*In re Digital Music Antitrust Litig.*,
    812 F. Supp. 2d 390 (S.D.N.Y. 2011) .............................................. 34, 35

*DNAML Pty, Ltd. v. Apple Inc.*,
    25 F. Supp. 3d 422 (S.D.N.Y. 2014) ....................................................... 28

*Dover v. British Airways, PLC (UK)*,
    2014 WL 317845 (E.D.N.Y. Jan. 14, 2014) .......................................... 14

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005) ............................................................................... 45

*In re Elec. Books Antitrust Litig.*,
    859 F. Supp. 2d 671 (S.D.N.Y. 2012) ................................................ 6, 16

*In re Elevator Antitrust Litig.*,
    2006 WL 1470994 (S.D.N.Y. May 30, 2006) ....................................... 18

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2007) ............................................................... 18, 24

*In re Energy Transfer Partners Natural Gas Litig.*,
    2009 WL 2633781 (S.D. Tex. Aug. 26, 2009) ...................................... 37

*Fallick v. Nationwide Mut. Ins. Co.*,
    162 F.3d 410 (6th Cir. 1998) ................................................................. 47

*Fed. Hous. Fin. Ag. v. UBS Am., Inc.*,
    858 F. Supp. 2d 306 (S.D.N.Y. 2012) ................................................... 14

*Fin. Acq. Partners LP v. Blackwell*,
    440 F.3d 278 (5th Cir. 2006) ................................................................. 15

*Fin. Guar. Ins. Co. v. Putnam Advisory Co.*,
    783 F.3d 395 (2d Cir. 2015) .................................................................. 36

*In re Flash Memory Antitrust Litig.*,
    643 F. Supp. 2d 1133 (N.D. Cal. 2009) ................................................ 26

*In re Foreign Exch. Benchmark Rates Antitrust Litig.* ("*FX*"),
    2015 WL 363894 (S.D.N.Y. Jan. 28, 2015) ................................... passim

*Gatt Communications v. PMC Assoc.*,
    711 F.3d 68 (2d Cir. 2013) .................................................................... 34

*Gen. Elec. Corp. v. Joiner*,
    522 U.S. 136 (1997) ............................................................................... 14

*Gotlin v. Lederman*,
    367 F. Supp. 2d 349 (E.D.N.Y. 2005) .................................................. 26

*In re Graphics Processing Units Antitrust Litig.*,
    527 F. Supp. 2d 1011 (N.D. Cal. 2007) ...................................................28

*Gross v. New Balance Athletic Shoe, Inc.*,
    955 F. Supp. 242 (S.D.N.Y. 1997) .......................................................33

*Grosser v. Commodity Exch., Inc.*,
    639 F. Supp. 1293 (S.D.N.Y. 1986)..................................................29, 30

*H. L. Moore Drug Exch. v. Eli Lilly & Co.*,
    662 F.2d 935 (2d Cir. 1981) ...............................................................18

*HSH Nordbank AG v. RBS Holdings USA Inc.*,
    2015 WL 1307189 (S.D.N.Y. Mar. 23, 2015) .........................................27

*In re High Fructose Corn Syrup Antitrust Litig.*,
    295 F.3d 651 (7th Cir. 2002) ..............................................................16

*Hinds Cnty., Miss. v. Wachovia Bank N.A.*,
    700 F. Supp. 2d 378 (S.D.N.Y. 2010).............................................17, 48

*Hinds Cnty., Miss. v. Wachovia Bank N.A.*,
    620 F. Supp. 2d 499 (S.D.N.Y. 2009).....................................................50

*Hinds Cnty., Miss.. v. Wachovia Bank, N.A.*,
    708 F. Supp. 2d 348 (S.D.N.Y. 2010).....................................................18

*Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*,
    253 F. Supp. 2d 262 (D. Conn. 2003) ..............................................29, 32

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977).......................................................29, 30, 31, 33

*In re Issuer Plaintiff IPO Antitrust Litig.*,
    2004 WL 487222 (S.D.N.Y. Mar. 12, 2004) ............................................49

*Jung v. Assoc. of American Medical Colleges*,
    300 F. Supp. 2d 119 (D.D.C. 2004) ...............................................17, 18

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997)............................................................................48

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
    232 F.3d 979 (9th Cir. 2000) .........................................................28, 32

*Koch v. Christie's Int'l PLC*,
    699 F.3d 141 (2d Cir. 2012)...................................................................48

*Kohen v. Pac. Inv. Mgmt. Co. LLC*,
    244 F.R.D. 469 (N.D. Ill. 2007)............................................................38

*Kramer v. Time Warner Inc.*,
    937 F.2d 767 (2d Cir. 1991)...................................................................22

*Kumho Tire Co. v. Carmichael,*
526 U.S. 137 (1999) ...............................................................................................14

*La Mar v. H&B Novelty & Loan Co.,*
489 F.2d 461 (9th Cir. 1973) ............................................................................46, 47

*Lawline v. Am. Bar Assoc.,*
956 F.2d 1378 (7th Cir. 1992) ................................................................................36

*Laydon v. Mizuho Bank, Ltd.,*
2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014) ........................................................35

*In re Libor-Based Fin. Instruments Antitrust Litig. ("Libor I"),*
935 F. Supp. 2d 666 (S.D.N.Y. 2013) ......................................14, 26, 36, 38, 41

*In re Libor-Based Fin. Instruments Antitrust Litig. ("Libor II"),*
962 F. Supp. 2d 606 (S.D.N.Y. 2013) ..............................................................39, 44

*In re Libor-Based Fin. Instruments Antitrust Litig. ("Libor III"),*
27 F. Supp. 3d 447 (S.D.N.Y. 2014) ................................................................39, 42

*In re Linerboard Antitrust Litig.,*
305 F.3d 145 (3d Cir. 2002) ....................................................................................30

*Lipsky v. Commonwealth United Corp.,*
551 F.2d 887 (2d Cir. 1976) ....................................................................................27

*Loeb Indus., Inc. v. Sumitomo Corp.,*
306 F.3d 469 (7th Cir. 2002) ...........................................................28, 30, 32, 33, 34

*In re Magnetic Audiotape Antitrust Litig.,*
2002 WL 975678 (S.D.N.Y. May 9, 2002) .............................................................50

*Mahon v. Ticor Title Ins. Co.,*
683 F.3d 59 (2d Cir. 2012) ......................................................................................47

*Mason v. American Tobacco Co.,*
346 F.3d 36 (2d Cir. 2003) ......................................................................................15

*Mass. Mut. Life Ins. Co. v. Res. Funding Co.,*
843 F. Supp. 2d 191 (D. Mass. 2012) ......................................................................14

*Masters v. Wilhelmina Model Ag., Inc.,*
2003 WL 1990262 (S.D.N.Y. Apr. 29, 2003) .........................................................50

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
475 U.S. 574 (1986) ................................................................................................20

*Mayor & City Council of Balt., Md. v. Citigroup, Inc.,*
709 F.3d 129 (2d Cir. 2013) ..........................................................................4, 16, 19

*In re Mercedes-Benz Antitrust Litig.,*
157 F. Supp. 2d 355 (D.N.J. 2001) .........................................................................49

*Mid-West Paper Prods. Co. v. Cont'l Grp.*,
  596 F.2d 573 (3d Cir. 1979) ........................................................................31, 35

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
  693 F.3d 145 (2d Cir. 2012) ...................................................................................47

*In re Nasdaq Market-Makers Antitrust Litig.*,
  894 F. Supp. 703 (S.D.N.Y. 1995) ...........................................................................3

*In re Natural Gas Commodity Litig.*,
  337 F. Supp. 2d 498 (S.D.N.Y. 2004) ...............................................................46, 49

*In re Natural Gas Commodity Litig.*,
  358 F. Supp. 2d 336 (S.D.N.Y. 2005) ...............................................................41, 45

*In re OSB Antitrust Litig.*,
  2007 WL 2253419 (E.D. Pa. Aug. 3, 2007) ...........................................................17

*In re OSG Secs. Litig.*,
  12 F. Supp. 3d 619 (S.D.N.Y. 2014) ......................................................................27

*Ocean View Cap. v. Sumitomo Corp. of Am.*,
  1999 WL 1201701 (S.D.N.Y. 1997) ..................................................................32, 33

*In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*,
  997 F. Supp. 2d 526 (N.D. Tex. 2014) ...................................................................19

*In re Parcel Tanker Shipping Services Antitrust Litig.*,
  541 F. Supp. 2d 487 (D. Conn. 2008) .....................................................................18

*Payton v. Cnty. of Kane*,
  308 F.3d 673 (7th Cir. 2002) ..................................................................................47

*In re Petroleum Prods. Antitrust Litig.*,
  691 F.2d 1335 (9th Cir. 1982) ................................................................................31

*In re Platinum & Palladium Commodities Litig.*,
  828 F. Supp. 2d 588 (S.D.N.Y. 2011) .....................................................................18

*Pollock v. Citrus Assocs. of N.Y. Cotton Exch., Inc.*,
  512 F. Supp. 711 (S.D.N.Y. 1981) ..........................................................................32

*In re Pool Prods. Distribution Market Antitrust Litig.*,
  988 F. Supp. 2d 696 (E.D. La. 2013) ............................................................4, 15, 26

*Precision Assocs. v. Panalpina World Transp. (Holding) Ltd.*,
  2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011) ...................................................17, 26, 49

*Prudential Ins. Co. of Am. v. Credit Suisse Sec. (USA) LLC*,
  2013 WL 5467093 (D.N.J. Sept. 30, 2013) .............................................................14

*In re Pub. Offering Antitrust Litig.*,
  2004 WL 350696 (S.D.N.Y. Feb. 25, 2004) ............................................................30

*Reading Indus., Inc. v. Kennecott Copper Corp.*,
    631 F.2d 10 (2d Cir. 1980)................................................................28, 35

*Reed Constr. Data Inc. v. McGraw-Hill Cos.*,
    49 F. Supp. 3d 385 (S.D.N.Y. 2014)....................................................14

*Ross v. Am. Express Co.*,
    35 F. Supp. 3d 407 (S.D.N.Y. 2014)....................................................19

*Ross v. Bank of Am., N.A. (USA)*,
    524 F.3d 217 (2d Cir. 2008)..............................................................36, 39

*S.E.C. v. Wyly*,
    788 F. Supp. 2d 92 (S.D.N.Y. 2011)....................................................50

*Shoemake v. Mansfield City Sch. Dist. Bd. of Educ.*,
    2014 WL 6603875 (N.D. Oh. Nov. 20, 2014) ....................................14

*Skidmore v. Swift*,
    323 U.S. 134 (1944)..............................................................................24

*Schenker AG v. Societe Air France*,
    2015 WL 1951422 (S.D.N.Y. Apr. 23, 2015)......................................49

*Starr v. Sony BMG Music Ent.*,
    592 F.3d 314 (2d. Cir. 2010)..............................................4, 15, 23, 26

*State of N.Y. v. Hendrickson Bros.*,
    840 F.2d 1065 (2d Cir. 1988)..............................................................49

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
    552 U.S. 148 (2008)..............................................................................45

*In re Sugar Indus. Antitrust Litig.*,
    579 F.2d 13 (3d Cir. 1978)..................................................................30

*Superior Offshore Int'l v. Bristow Group*,
    738 F. Supp. 2d 505 (D. Del. 2010).....................................................28

*Tenneco, Inc. v. F.T.C.*,
    689 F.2d 346 (2d Cir. 1982)..................................................................4

*In re Text Messaging Antitrust Litig.*,
    630 F.3d 622 (7th Cir. 2010)................................................................16

*Three Crown Ltd. P'ship v. Salomon Bros., Inc.*,
    1995 WL 422467 (S.D.N.Y. July 14, 1995) ........................................30

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001)................................................................16

*Tot. Ben. Planning Ag., Inc. v. Anthem Blue Cross & Blue Shield*,
    552 F.3d 430 (6th Cir. 2008) ..............................................................17

*Transnor (Bermuda) Ltd. v. BP N. Am. Petroleum,*
    666 F. Supp. 581 (S.D.N.Y. 1987) ............................................................29

*U.S. v. Andreas,*
    216 F.3d 645 (7th Cir. 2000) ...................................................................26

*U.S. v. Socony-Vacuum Oil Co.,*
    310 U.S. 150 (1940) ............................................................................28, 36

*U.S. v. Stop & Shop Cos.,*
    1984 WL 3196 (D. Conn. Nov. 9, 1984) ................................................33

*UIn re Viropharma, Inc., Secs. Litig.,*
    2003 WL 1824914 (E.D. Pa. Apr. 7, 2003) ...........................................15

*Watseka Farmers Grain Coop. v. FC Stone Grp.,*
    2006 WL 3743112 (C.D. Ill. Dec. 15, 2006) .........................................48

*Zinser v. Cont'l Grain Co.,*
    660 F.2d 754 (10th Cir. 1981) .................................................................30

*In re Zoran Corp. Deriv. Litig.,*
    511 F. Supp. 2d 986 (N.D. Cal. 2007) ....................................................14

## Statutes & Rules

7 U.S.C. § 2(a)(1)(B) ......................................................................................46

7 U.S.C. § 6c(a)(5) ..........................................................................................44

7 U.S.C. § 9 .....................................................................................................45

7 U.S.C. § 13 ...................................................................................................45

76 Fed. Reg. 41398-01 ....................................................................................40

78 Fed. Reg. 31890 .........................................................................................44

78 Fed. Reg. 31896 .........................................................................................44

CFTC Rule 180.1 .......................................................................................45, 46

Fed. R. Civ. Proc. 8(a) ...................................................................................40

Fed. R. Civ. Proc. 9(b) ..............................................................................40, 41

Fed. R. Civ. Proc. 10(c) ............................................................................14, 15

Fed. R. Civ. Proc. 12(b)(6) ..............................................................................3

Fed. R. Civ. Proc. 12(f) ..................................................................................27

Fed. R. Evid. 201 ............................................................................................22

## <u>PRELIMINARY STATEMENT</u>

This case involves the manipulation of prices for gold, with levers being pulled around 10 a.m. New York time.  Defendants chose this time to act because that was when an anachronistic process known as the "Gold Fixing" occurred,[1] where the Fixing Bank Defendants met in secret, then announced the "Fix" price for gold.[2]  The Complaint explains how the exact type of actors (competitors) routinely met in the exact way (in secret) to exchange the exact type of information (real-time prices) that sets off the law's alarm bells.  No statute authorized these meetings.  No regulation exempted them from the reach of antitrust law.  Defendants' attempts to portray the Complaint as lacking in details as to the mechanics of the conspiracy are thus, for many reasons, unavailing.  The Complaint links Defendants together far more than courts ordinarily encounter.  *See also generally, e.g.*, SAC App. C (summarizing economic, structural, and other evidence).

It is now clear, given the continuing flood of reports and plea deals (which continue to this day) that the banking industry's benchmarking practices were wholly corrupt.  Sadly, it would be surprising to find that the benchmark that could be most *easily* corrupted—*i.e.*, the one where the banks have simply met in secret to set prices—managed to remain "honest."  To the contrary, no matter how the data is sliced, the conclusion is the same:  prices were being manipulated.  Prices for gold in all its various forms (gold futures, physical gold, gold Exchange Traded Funds ("ETFs"), etc.) moved in ways that defy logic and settled economic principles.  Prices went down around the PM Fixing *and only around the PM Fixing* when prices for gold

---

[1]   The Fixing process was supposed to involve Defendants meeting twice daily to conduct a competitive auction for gold.  Dkt. No. 44 ("SAC" or the "Complaint") ¶ 1.  The process began with the spot price for gold.  *Id.* ¶ 315.  From there, a competitive auction was supposed to take place.  *Id.* ¶ 316.

[2]   Defendants posit that that the Fix is "one of many prices for gold."  Dkt. No. 74 ("Br.") at 8.  This understates the impact of Defendants' manipulation.  A survey found that 83% of respondents based at least some trading on the Fix, with nearly 70% doing so *every day*.  SAC ¶ 107.  Many types of contracts expressly incorporate the Fix.  *Id.* ¶¶ 3, 286.  Defendants also ignore that the impact of the Fix, and Defendants' attempts to manipulate it, cut across differences in the absolute value of gold when sold in various forms.  *Multiple* analyses confirm the correlations between prices for spot gold, the London PM Fix, futures contracts, and ETFs.  *Id.* ¶¶ 108-14, 309-11.

otherwise were trending up.  This impossible, multi-year pattern broke only when regulators turned their gaze to gold practices.

Defendants ask the Court to blind itself to these realities, asking that large portions of the Complaint be struck.  *See* Dkt. No. 74 ("Br.") at 17-23.  But the pleading stage is no place for a *Daubert*-style inquisition into "expert" work.  Rather, the Court must accept as true the *factual* allegations that prices were behaving in the anomalous ways described in the Complaint—*i.e.*, the *fact* that prices consistently went down *only* around the PM Fixing, the *fact* that Defendants were "bunched" in their prices around the PM Fixing, at a point lower than other market participants, *the fact* that these anomalies abated in 2013, and so on.  This is so even if a non-lawyer consultant performed the advanced math necessary to uncover these facts.

Defendants next try to distract by accusing the "experts" of "flip-flopping."  *See, e.g.*, Br. at 1.  The centerpiece of this (improper and tangential) credibility attack is the charge that a previous allegation claiming the PM Fixing occurred at "one of the most liquid times of day" is the "opposite" of the added allegation that the PM Fixing was not wholly "unique" in this regard. *Id.* at 10.  On its face, there is no contradiction.  If something is "one of" a category, it is by definition not "unique."  It is an undeniable truth that the PM Fixing was not the *only* time of day when the market was "liquid," or even "highly" so.  Defendants' attempts to question the veracity of Plaintiffs and those working for them are not well-founded, or well-taken.

That Defendants chose to make such *Daubert* arguments the focus of their motion only serves as a tacit admission as to the persuasiveness of the Complaint's allegations.  Indeed, once such distractions are put aside, Defendants have little of relevance to say.  Defendants instead spin hypotheticals that they say help portray certain subsets of facts in a non-nefarious light— maybe it was the financial crises; maybe the gold market doesn't follow basic economic

principles; maybe buyers irrationally shunned transacting around 10 a.m.; etc.  As with Defendants' request for the Court to strike "expert" facts, such arguments are improper attempts to turn this into a motion for summary judgment.  No counter-explanation seriously calls into question the *plausibility* of Plaintiffs' allegations that the numerous pricing anomalies, coinciding with the time Defendants were meeting in secret, were the result of a conspiracy.

## ARGUMENT

## I.   PLAINTIFFS HAVE PLAUSIBLY PLED A CONSPIRACY

### A.   Defendants Mischaracterize the Task Before the Court

A complaint must only contain "enough factual matter (taken as true) to suggest that an agreement was made." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  This standard "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of an illegal agreement." *Id*. In the analysis, "[t]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962); *see also In re Currency Conversion Fee Antitrust Litig.*, 2012 WL 401113, at *8 (S.D.N.Y. Feb. 8, 2012).

Defendants repeatedly proffer "alternative explanations" for certain facts.  But "[t]he choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Anderson News, LLC. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012); *In re Nasdaq Market-Makers Antitrust Litig.*, 894 F. Supp. 703, 714 (S.D.N.Y. 1995) (counter-explanations "out of place in a motion to dismiss").

Defendants posit the Complaint lacks details, almost a bizarre contention on its face. *E.g.*, Br. at 1.  This is not a case where the plaintiff struggles to even explain how competitors managed to share information.  Defendants cannot deny that meetings to set prices were

3

conducted, in secret, *nearly every trading day*.  To the extent Defendants mean instead to refer to the narrower point that *specific emails* have not been quoted, courts routinely recognize that a "smoking gun" is rare "especially at the pleading stage."  *Mayor & City Council of Balt., Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013).[3]

"Plausibility" can be shown with "direct" or "circumstantial" facts.  Br. at 23-24.  To the extent Defendants mean to denigrate the latter, such is unavailing, as circumstantial evidence is "the lifeblood of antitrust law."  *Tenneco, Inc. v. F.T.C.*, 689 F.2d 346, 361 (2d Cir. 1982).  Thus, though Plaintiffs believe facts such as Fixing Bank Defendants' *daily* meetings and the damning record created by their "bunching" of prices are sufficiently "direct," it is of no moment if instead they are labeled "circumstantial."[4]  The Complaint plausibly establishes, however the facts are categorized, that (a) Defendants were acting in parallel by "banging the close" and engaging in other activities that drove prices down around the PM Fixing, and (b) this was done pursuant to an agreement, as evidenced by such facts as above, as well as those regarding the fact that the "bunched" below-market prices were against self-interest absent a conspiracy, the fact such abnormal behaviors abated when regulators began probing gold prices, and other facts summarized below.

---

[3]   Defendants also argue that this case "lacks the character of more compelling allegations" from other cases because the Complaint does not allege "lower gold output," "decreases in the quality of gold," or "barriers to entry."  Br. at 31 n.9.  But price fixing is *the* primary evil the antitrust laws are aimed at preventing, and, as discussed in Section II below, the tools used to achieve it are irrelevant.

[4]   Nor does it matter what "plus factors" one fact or another are placed into—such lists "are neither exhaustive nor exclusive, but rather illustrative of the type of circumstances which, when combined with parallel behavior, might permit a jury to infer the existence of an agreement."  *Citigroup*, 709 F.3d at 136 n.6.  *See also, e.g.*, *Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 323 (2d Cir. 2010); *In re Pool Prods. Distr. Market Antitrust Litig.*, 988 F. Supp. 2d 696, 711 (E.D. La. Dec. 2013).

**B.**     **The Behavior of Prices—Including *Defendants'* Prices—Confirm Defendants Were Manipulating The Price of Gold as a Group**

**1.     Gold prices were uniquely suppressed around the PM Fixing**

Prices around the PM Fixing demonstrate, to a statistically certain degree, unique behavioral patterns:  (1) until 2013, prices for gold, unlike at other times of day and in other markets, consistently went down around the PM Fixing, SAC ¶¶ 120-25; (2) prices went down around the PM Fixing even when prices were trending up, *id.* ¶¶ 126-31; (3) prices around the PM Fixing were disproportionately among the most extreme for the day—but only on the low end, *id.* ¶¶ 132-35; (4) tracking the minute-by-minute changes for prices across *entire years* reveals a consistent downward spike around the PM Fixing, not present at any other time of day (even the AM Fixing), *id.* ¶¶ 136-41 & App. D, E; (5) a tracking of futures prices found that *only* around the PM Fixing were prices *consistently* moving downward, *id.* ¶¶ 141-43; (6) the incidence of downward spikes around the PM Fixing was *four times* larger than by random chance, and much larger than what was observed at the AM Fixing, *id.* ¶¶ 145-47; (7) the minute with the most severe negative movement was disproportionately likely to occur around the PM Fixing, *id.* ¶¶ 145-54 & App. F, G; (8) zooming in on individual days illustrates the presence of downward spikes around the PM Fixing, *id.* ¶¶ 155-57 & App. H; (9) price movements were more correlated with Defendants' "short" positions, than with overall price trends, *id.* ¶ 170; (10) similar price spikes did not occur even at other liquid times of day, *id.* ¶¶ 175-76; (11) prices in other markets, at other liquid times of day, did not show such patterns, *id.* ¶¶ 180-85; (12) contrary to expectations, prices moved *more* for each quote around the PM Fixing, *id.* ¶¶ 187-88; and (13) these patterns shifted whenever the timing of the PM Fixing moved, *id.* ¶¶ 190-93.[5]

---

[5]   The Complaint also refers to the practice of coordinating activity through outlier quotes on trading platforms, that *just so happened* to predict the eventual Fixing price.  SAC ¶¶ 245-48.  Against the larger background of facts presented by the Complaint, this is but another piece of buttressing evidence that Defendants

These pricing facts—drawn from pricing data across *every* trading day—are used to support the allegation that the conspiracy suppressed prices on every day. *Id.* ¶ 124 n.26.[6]  The pricing behaviors are so extreme, consistent, and unnatural, that they well-support the allegation that prices were the result of manipulation. *Id.* ¶ 118.[7]

## 2.    Defendants' methodological critiques and counter-explanations do nothing to seriously question the Complaint's plausibility

Defendants' attempts to explain away—in (improper) summary-judgment-like fashion—this robust matrix of confluent facts regarding unnatural price movements are all unavailing.

*First*, Defendants note there is no "citation" for the principle that markets tend to move randomly.  Br. at 8-9.  This relates to the fact that gold prices around the PM Fixing went down far more often than they went up.  SAC ¶¶ 120-25.  Even if the "random walk" expectation did not comport with common-sense (which it does), and was not a well-recognized economic principle (which it is), the Complaint demonstrates its soundness by showing that the expectation of roughly equal up and down periods holds true for *numerous* markets—including that for gold, *except* around the PM Fixing.  *Id.* ¶¶ 121-22, 180.  Even if *that* were not the case, the Complaint provides many additional studies, outlined above, that are not based on the "random walk" presumption—including a study that compares the direction of the PM Fixing to the day's pricing trend, rather than a presumption of an equal split.  *See, e.g.*, *id.* ¶¶ 126-31.[8]

manipulated the Fix.  Contrary to Defendants' assertion that this was "copied and pasted" from the *Silver* case, the data is drawn from the market for gold and thus is directly relevant to this case.  *Id.* ¶ 247.

[6]    But the Complaint went further by specifically calling out days that, even without the benefit of discovery, already can be identified as having been the subject of manipulation.  SAC ¶¶ 158-63 (describing methodologies), App. A (listing days), App. B (matching identified days with Plaintiff transactions).

[7]    The London Gold Market Fixing Ltd. is a proper defendant because it was controlled by the Fixing Bank Defendants and was their central tool in the conspiracy.  *See* LGMF Opp., filed concurrently herewith.  As such, it shared "a unity of purpose [and] a common design and understanding" in effectuating the conspiracy and also shares liability.  *See, e.g.*, *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 690 (S.D.N.Y. 2012).

[8]    Going outside the pleadings, Defendants assert that the literature that "popularize[d]" the theory focused on stock markets.  Br. at 21 n.8.  That Defendants admit the theory is "popular" confirms the irrelevancy of their assertion the theory is "not *universally* accepted," an impossibly high standard for a social science and one that is incompatible with the "plausibility" standard governing the pleading stage.  In any event, that some studies focused

*Second*, Defendants argue there are "temporal mismatches" with the data, labeling this "cherry picking" as part of their attack on the credibility of "expert" allegations.  Br. at 9 n.3, 19-20.  This derives from the inclusion of the allegation that "an average of 70% [of days saw prices drop around the PM Fixing] from 2001 through 2012," even though the class begins in 2004 and *partially* extends into 2013.  SAC ¶ 182.  But providing data from *additional* years (2001-2003) is the *opposite* of "cherry picking."  And the "early" data is relevant because the longer an abnormality has persisted, the less likely it was the result of chance and thus the more likely it is to be the result of an artificial force, *i.e.*, manipulation.  The Complaint hides nothing—it includes data for "only" the class period, too.  *See, e.g.*, SAC ¶ 123.  That the Complaint additionally summarized that the "average" for 2001-2012 was 70%, rather than alleging it was 67% for 2004-2013, is of no moment.

*Third*, citing to allegations made by other plaintiffs, Defendants posit that the "phenomenon of downward price movements . . . may not be unique."  Br. at 9.  Defendants thus suggest it is proper to accept the allegations in those other complaints—except the allegations that blame Defendants for price-fixing there, too.  And Defendants' logic depends on the faulty assumption that such large institutions could only be manipulating one market at a time.

*Fourth*, Defendants leap from the supposition that the PM Fixing occurred at a highly liquid time of day, to conclude this means that the Fixing "attracts significant selling pressure."  Br. at 9, 20-21.  One does not follow from the other.  Sellers come to the market *because that is where buyers are*, and vice-versa.  SAC ¶ 173.  A systemic increase in sellers at a given time of day would attract profit-seeking buyers, meaning spikes should not consistently be in one

---

on stock markets does not mean the theory does not hold true elsewhere.  Indeed, as summarized above, the Complaint *shows* it holds outside of the stock market—including in the market for gold, just not around the PM Fixing.  Finally, Defendants note that the literature they selected "noted" that "pricing irregularities do occur."  *Id.*  But this is not a case about *an* irregularity, it is about *twelve years* of them.  Thus, again, Defendants methodological attacks, even if procedurally proper, fail on their own merits.

direction.[9]  Defendants' presumption that sellers *but not buyers* would be attracted to a "liquid" time of day not only fails the common-sense test, but also is undermined by the fact that prices at *other* times of heightened liquidity (for gold *and* other investments) do *not* demonstrate *disproportionately downward* spikes.  *See, e.g.*, SAC ¶¶ 121-22, 180.

Realizing such comparisons destroy their weakly-stated counter-hypothetical as to the cause of the spikes, Defendants attack the methodology behind them.  Br. at 10 n.4, 19-20 n.7, 21.  As an initial matter, the fact the PM Fixing shows unnatural price spikes renders the claim plausible, period.  That Defendants are inviting the Court into *methodological* disputes over *secondary* data (*i.e.*, liquidity-comparison data whose relevance is just to rebut Defendants' improper counter-hypothetical that liquidity explains all) is testament to how far Defendants need the Court stray beyond the plausibility question.  The challenges are also meritless.

Defendants suggest that there is something unique *about a fixing*—but that is belied by the fact that similar movements do *not* appear when other fixings took place.  *See* SAC ¶¶ 145-54, 187-89.  Defendants also question how "liquidity" was measured for purposes of comparison within the gold market.[10]  They thus seem to presume that something of import turns on whether relative liquidity is measured with exact precision and/or whether the PM Fixing is the first, second, or third-most liquid time of day.  In fact, that is irrelevant.  Rather, the only point of the studies is to show that the market for gold is *also* "highly" liquid at *other* times of day, and thus

---

[9]  Defendants' only attempt to rebut this logic is to reference the fact that the Fixing was "originally established to help gold mining houses sell all their gold."  Br. at 9.  But that also means the Fixing was 'originally established to help buyers buy all the miners' gold.'  And regardless of the initial intent of the Fixing itself, this case involves price movements in the wider market, *i.e.*, not just within the transactions literally carried out in the wood-paneled room one-hundred years ago.

[10]  Specifically, Defendants argue that one methodology looked at futures volume—but, the spikes appear in the futures market as well so it makes sense to analyze liquidity there, too.  Defendants attack studies into the spot market for only tracking number of quotes—not, the size of the transactions (which is not publicly available), and thus liquidity.  But the number of transactions and liquidity are logically correlated—as confirmed by the fact that the PM Fixing, which Plaintiffs and Defendants agree is a highly liquid time of day, routinely sees an activity spike even when looking at "only" the number of quotes.

liquidity cannot explain downward spikes, which *only* appear around the PM Fixing.  Defendants cannot dispute the (common-sense) factual allegations that the market is "highly" liquid at times of day other than around the PM Fixing *as well*.

*Fifth*, signs of artificiality abated in 2013.  SAC ¶¶ 10, 21, 124, 253-57.  This abatement suspiciously coincided with the first government investigations focused on manipulation of the Gold Fixing.  *Id.* ¶¶ 10, 21, 124, 253-57, 277-303.  Defendants suggest that the more important change was that the market experienced a downturn in 2013.  Br. at 11, 21-22.  This has it backwards.  Prices around the PM Fixing went down *less often* in the "down" market of 2013, than they did in the previous "up" years.  Why would sellers be content to sell at the PM Fixing when prices were consistently among the *worst times of the day* (2001-2012) to sell but then consciously *avoid* doing so when that pattern abated (2013)?  Defendants' suggestion that this is a natural state of affairs is counterintuitive, to say the least.[11]

*Sixth*, Defendants assert that a *subset* of the pricing sources that are publicly available only involve "offers" and "advertisements," versus closed transactions.  Br. at 19-20 n.7.  But the mere fact quotes are not "executed" transactions does not explain why they would consistently spike down, absent a conspiracy, around the PM Fixing.  And this argument ignores that many of the studies in the Complaint showed the same signs of spikes in *executed* transactions.  And the notion that every available source of pricing data shows downward spikes, but the supposedly unknowable "true" price *maybe* went the other way, is absurd.

As seen above, Defendants' attempts to undermine the *facts* of how prices moved are unavailing, as is their assertion that "liquidity" and *downward* spikes go hand-in-hand.  The fact

---

[11]   That *one* study included in the Complaint shows data from 2014 that is suspicious, far from establishes that "gold prices stabilized in 2014 . . . and downward price movements in the Gold Fixing resumed."  Br. at 11.  Defendants also argue that 2013 "was not a watershed year for the investigation of financial benchmarks" because the initial investigations of Libor manipulation began in 2011.  Br. at 10 n.4.  But it was not until later still that regulators turned their attention to gold.  SAC ¶¶ 277-83.

that prices were acting in unnatural ways thus must be accepted as true, and must be seen as strong support for the claim that prices were being manipulated.

### 3. Defendants have been shown to be behind the artificial movements

As discussed in the Sections that follow, Defendants were uniquely well-positioned to cause, then profit from, price manipulation around the PM Fixing. But pricing data itself provides another link to *Defendants*, specifically. Price movements around the PM Fixing were found to be uniquely correlated to Defendants' futures portfolios. SAC ¶¶ 170-71. Indeed, there were *more* downward spikes on days when Defendants' short positions would benefit *to an even greater extent*. *Id.* ¶¶ 225-27. More damningly, Defendants' prices were "bunched" *together—at levels lower than the market*. *Id.* ¶¶ 252-57. Defendants were also disproportionately responsible for providing the biggest quote drop. *Id.* ¶¶ 255-57. Pricing data thus shows that Defendants were both (a) acting together, *and* (b) responsible for dragging the market downward. Notably, these anomalies abated in 2013. *Id.* In other words, as soon as *Defendants* reduced their practice of providing as a group "low" prices, the downward spikes abated.

Defendants try to explain their "bunching" by saying they have a "unique perspective" about prices.[12] The notion that uniqueness explains *acting the same* is facially questionable. That aside, the data does not just show that Defendants were bunched together, but were bunched together *low*. Defendants fail to explain why their supposedly "unique perspective" would repeatedly lead them to each conclude that prices should be *lower* around the PM Fixing. Defendants also fail to explain why this "unique perspective" changed in 2013.[13]

---

[12] Defendants note that Plaintiffs "do not allege that there are no legitimate reasons that defendants' price quotes would be 'clustered together.'" Br. at 12. Especially at the pleading stage, it is not Plaintiffs' burden to *disprove* every possible non-collusive explanation for facts. Nor is the failure to attach a "no legitimate counter-explanation" disclaimer to every allegation properly viewed as a concession that the fact being alleged is irrelevant.

[13] Defendants' related analogy to the "bunching" of prices between Target and Wal-Mart, versus a group of mom-and-pop stores, Br. at 27-28, also fails because Target and Wal-Mart have lower prices due to economies of scale. That has nothing to do with this case. Further, consumers generally cannot buy from Target and sell to Wal-

Defendants next feign ignorance about how these "bunching" facts were uncovered.  Br. at 11.  As to "which defendants" are implicated, the "clustering" chart and the "biggest drop" allegations are clearly labeled as including data on *all* the Bank Defendants.  *See* SAC ¶¶ 253, 258.  The chart comparing averages is labeled as the "Fixing Bank Defendants."  *Id.* ¶ 257.  As to the "methodology," to identify the relative amount of "bunching," the Complaint explains the "coefficient of variation" was calculated—a simple process of measuring the difference from one data point to the average of the group.  *See id.* ¶ 253.[14]  To determine if the Bank Defendants were bunched "low," the Complaint (a) compared the average prices amongst the Fixing Bank Defendants to the average prices of everyone else, *id.* ¶ 257, and (b) compared how often a Bank Defendant was responsible for the biggest downward quote drop, *id.* ¶ 258.

As to what "data" was used, the Complaint explains that over 846,000 "spot" quotes were obtained, from the forty-five minute window around the PM Fixing.  SAC ¶ 250.  Defendants claim that the fact that matching quotes to their source was a "complex" process renders the entire exercise null and void.  Br. at 11, 19.  But that the quotes were Defendants' is a factual allegation that must be accepted as true.  This is so even though the data source did not openly publicize that within its stream is a cell that allows the originator of a quote to be identified, and thus discovery of these facts required some expertise a regular investor may not have.

### 4. Defendants' suggestion that the Second Amended Complaint contradicts prior ones is baseless

Defendants try to poison the well by asserting that "[i]n response to defendants' motion, plaintiffs and their experts dutifully reversed course" on a "central" allegation.  Br. at 10; *see*

---

Mart to make a profit.  Essentially anyone can buy and sell gold from anyone else, and thus all prices naturally converge.  Defendants' analogy also presumes that Defendants in fact attract a different set of "customers" than other market participants—even though non-Defendants include many other large financial institutions, and even though all market participants would be incentivized to transact at the best prices in this highly liquid market.

[14]  *See generally, e.g.*, http://www.investopedia.com/terms/c/coefficientofvariation.asp.

*also id.* at 1, 2, 21.  The supposedly "reversed" or "deleted" older allegation said that the PM

Fixing occurred at "one of the most liquid" times of day.  *Id.* at 1, 10.  As discussed in Section

I.B.2 above, Plaintiffs in no way try to run away from that fact.  Rather, the Second Amended

Complaint merely adds to the picture by clarifying that it was not the *only* "highly" liquid time of

day.  SAC ¶ 175-76.  The Second Amended Complaint's emphasis that *other* times of day are

highly liquid *as well* is thus in no way the "opposite" of anything alleged before.[15]

Defendants also allege the Second Amended Complaint "contradicts" earlier ones where

it alleges that prices "often did not" rebound "quickly."  Br. at 5, 10 (referring to SAC ¶ 177).

This "contradiction" is again illusory.  The prior complaint did not allege prices *always*

recovered *quickly*, which would be the "opposite" of the current allegation.  To the contrary, it

merely alleged that prices "sometimes partially recovered."  Dkt. No. 27 ("AC") ¶ 122.  Indeed,

confirming that Plaintiffs are not running away from their prior allegations, the *same exact chart*

showing a partial, eventual "recovery" on that day still appears.  *See* SAC ¶ 156.

Defendants relatedly posit that the notion that the adverse effects of suppression lingered

beyond a few minutes is in "tension" with the "earlier admission that there is no . . . evidence

that 'persons trading gold futures at times *other than* the PM fixing' suffered injuries."  Br. at 48

(citing AC ¶ 109); *see also id.* at 3.  But the "suffered injuries" language is *not* a quote from

Plaintiffs, but rather is an inappropriate invention of Defendants.  The suggestion Plaintiffs have

changed course is thus, again, false.  *Both* complaints discuss the same "returns" analysis.  *See*

AC ¶ 108, SAC ¶ 142.  The Second Amended Complaint merely added, in anticipation of

Defendants' argument here, the explanation that the "returns" analysis is not the same as one for

---

[15]  Put another way, by definition, being "one of" something means there are others of a similar nature.  On its face, there could not be anything "contradictory" in later alleging the thing is not "unique."  The original allegation that the PM Fixing was "one of the most liquid" was therefore not a concession that (a) it was *the most* liquid, or that (b) there are no other times of day that are *even comparable*.

"injury." *See* SAC ¶¶ 122 n.25, 143 n.29.  Rather, "returns" is a statistical concept that measured what would have been the percentage gain or loss if someone bought one minute and sold five minutes later, on a repeat basis, every minute, every day.  That academic exercise found that it was only around the PM Fixing that prices were consistently *moving* down.[16]  That says nothing, however, about how long they *stayed* down, and as a result, this "returns" analysis is *not* in "tension" with the notion that even those that sold outside the Fixing window were harmed.[17]

### 5.   Factual allegations that use advanced math are still factual allegations

Defendants ask to strike a large amount of this data as "expert opinions" that "cannot be considered at the pleading stage."  Br. at 17-20.  No law or logic supports this request.

*First*, Defendants' suggestion that the Court should have "concerns" about reliability is unfounded.  Br. at 19.  As seen in Sections I.B.1-3 above, the data, methodologies, and "assumptions" are described clearly, and are not subject to serious question.  As seen in Section I.B.2, Defendants' "cherry picking" rhetoric is misplaced; Defendants' "support" for the charge is to assert that the Complaint is somehow faulty for providing *too much* data.  And as seen in Section I.B.4, Defendants' charge that the "experts" "revers[ed] course," Br. at 21, is false.

*Second*, Defendants act as though this is the first time a complaint included statistical allegations where the math was done by a non-lawyer consultant or "expert."  It obviously is not.  For instance, in cases alleging misrepresentations in connection with mortgage-backed securities, plaintiffs often alleged, and courts then relied on with little fanfare, facts based on everything from a full "re-underwriting" of loan files, to statistical analysis of property records, tax records,

---

[16]   That is, prices could be "flat" at $100 between 3:55 and 4:00 p.m. and thus show *five-minute* "returns" (in statistical parlance) of zero.  But *both* of those prices could still be suppressed, as compared to where prices would have been but for the downward spike occurring earlier in the day from $105 to $100.  An investor that sold at 4:00 p.m. thus would be harmed by $5, regardless of the lack of *further* movement down since 3:55 p.m.

[17]   Defendants' final example of supposed backtracking is that the Second Amended Complaint uses the term "consultant" more often than "expert."  Br. at 20.  Plaintiffs have never hid that they used non-lawyers to perform the math required to present pricing data in usable form to the Court.  The label used is irrelevant.

credit reports, and other databases.[18]  All of those analyses were done—as here—by consulting "experts."[19]

      *Third*, the cases cited by Defendants only confirm their request to strike is improper. Many of the cases cited do not relate to pleading standards at all.  Rather, those decisions concern a court's "gate keeping function" with respect to expert testimony at the *summary judgment or trial* stage.[20]  As seen in the citations above, courts routinely rely on "expert" statistical analysis in upholding claims at the pleading stage—often expressly declining the invitation to subject such analyses to summary-judgment-like testing.[21]

      The few pleading-stage cases Defendants cite relate to the narrow procedural question of whether a physically separate affidavit is "part of the pleading" for purposes of Rule 10(c).  For instance, in *DeMarco v. Depotech Corp.*, 149 F. Supp. 2d 1212 (S.D. Cal. 2001), the court held

---

      [18]   *See, e.g.*, *Prudential Ins. Co. of Am. v. Credit Suisse Sec. (USA) LLC*, 2013 WL 5467093, at *7-9 (D.N.J. Sept. 30, 2013); *Capital Ventures Int'l v. J.P. Morgan Mortg. Acq. Corp.*, 2013 WL 535320, at *3-5 (D. Mass. Feb. 13, 2013); *In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.*, 932 F. Supp. 2d 1095, 1110 (C.D. Cal. 2013); *Mass. Mut. Life Ins. Co. v. Res. Funding Co.*, 843 F. Supp. 2d 191, 202-04 (D. Mass. 2012); *Fed. Hous. Fin. Ag. v. UBS Am., Inc.*, 858 F. Supp. 2d 306, 332 (S.D.N.Y. 2012); *Allstate Ins. Co. v. Credit Suisse Sec. (USA) LLC*, 986 N.Y.S.2d 864 (N.Y. Sup. Ct. 2014); *Cambridge Place Inv. Mgmt. v. Morgan Stanley & Co.*, 2012 WL 5351233, at *16-18 (Mass. Sup. Ct. Sept. 28, 2012).

      [19]   By way of another example, Libor (an interest-rate benchmark) was shown to have been continually suppressed through such "expert" analyses as comparing whether the banks' rates were "bunched," and comparing how Libor compared to other data.  *See, e.g.*, *In re Libor-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 679-80, 715-17 (S.D.N.Y. 2013) ("*Libor I*").  The analyses performed and relied upon there—assembling pricing information and looking for trends—are no different in kind from those performed here.  While that court dismissed the antitrust claims for lack of "standing," it upheld other claims (such as those under the Commodity Exchange Act) in reliance on the "expert" showing that Libor was suppressed.  There are innumerable other examples of statistical analyses forming the basis of well-pled complaints.  *See, e.g.*, *Dover v. British Airways, PLC (UK)*, 2014 WL 317845, at *2 (E.D.N.Y.  Jan. 14, 2014) (plaintiff's statistical analysis of fuel prices "is a factual allegation that the Court must credit"); *Shoemake v. Mansfield City Sch. Dist. Bd. of Educ.*, 2014 WL 6603875, at *23 (N.D. Oh. Nov. 20, 2014) (relying on statistical analysis, noting that plaintiff "need not set forth his entire statistical theory in the Complaint"); *City of L.A. v. Bank of Am. Corp.*, 2014 WL 2770083, at *1, 11 (C.D. Cal. Jun. 12, 2014) (relying on regression analysis and statistical evidence of foreclosure rates); *In re Zoran Corp. Deriv. Litig.*, 511 F. Supp. 2d 986, 1003-04 (N.D. Cal. 2007) (relying on statistical analysis of options granting practices).

      [20]   *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (trial); *Gen. Elec. Corp. v. Joiner*, 522 U.S. 136, 146 (1997) (summary judgment); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993) (same); *Reed Constr. Data Inc. v. McGraw-Hill Cos.*, 49 F. Supp. 3d 385, 400-07 (S.D.N.Y. 2014) (same).

      [21]   *See, e.g.*, *Mass. Mut.*, 843 F. Supp. 2d at 202-04 ("arguments regarding the methodological flaws of [plaintiff's model] are premature at the motion to dismiss stage"); *Adair v. England*, 183 F. Supp. 2d 31, 57 (D.D.C. 2002) ("[D]efendants, in proffering their various protestations to the plaintiffs' statistics, seem to have forgotten that . . . the court [at motion to dismiss stage] must accept the plaintiffs' well-pleaded allegations as true.").

that an expert report attached as an exhibit could not be considered.  Neither *DeMarco* and its progeny,[22] nor Rule 10(c), say anything of striking factual allegations *made within the four corners of a complaint*, as Defendants are seeking to do here.

Even if Plaintiffs were relying on an expert affidavit external to the Complaint (which they are not), Defendants' blunderbuss request would *still* be improper.  The cases cited by Defendants make plain that courts *do* consider *factual* portions even of external "expert" materials.[23]  However, Defendants do not just want the Court to use its own judgment in determining whether the facts show a plausible claim.  They want the Court to strike the *fact* prices went down around the PM Fixing more often than up, the *fact* prices around the PM Fixing were often among the lowest prices of the day, the *fact* Defendants' prices were "bunched", etc.  Defendants' demand is thus *far* wider than even their (inapposite) cases support.

**C.      The Structure of the Fixing Not Only Shows the Who, What, When, and How, but Demonstrates Defendants' *Unique* Opportunity to Conspire**

Courts have recognized that many "plus factors" relate to the structure of a given industry.  *See, e.g.*, *Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 323-24 (2d. Cir. 2010); *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 988 F. Supp. 2d 696, 711 (E.D. La. 2013).  Many of these factors are present here, including that:  (1) the Fixing process involved the direct exchange of *current* pricing information; (2) this exchange took place between a few large members of the market; (3) the communications were private; (4) these communications had a direct impact on Defendants' transactions; (5) Defendants were able to easily police adherence to the conspiracy;

---

[22]  *See In re Viropharma, Inc., Secs. Litig.*, 2003 WL 1824914, at *2 (E.D. Pa. Apr. 7, 2003) (plaintiffs' submission of a separate expert report at the pleading stage was improper because the "expert report is not a pleading"); *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 2013 WL 2156358, at *7 (N.D. Cal. May 17, 2013) (declining to consider a separate expert affidavit on a motion to dismiss).  In *Mason v. American Tobacco Co.*, 346 F.3d 36 (2d Cir. 2003), no expert opinion or statistical analysis was even at issue; the issue was just an allegation about the legal scope of a statute, which is not factual.

[23]  *See Fin. Acq. Partners LP v. Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006) (striking "the expert's conclusions (opinions)" in a separate report, but considering the "factual portions" of the report); *Bros. v. Saag*, 2014 WL 838890, at *6 (N.D. Ala. Mar. 4, 2014) (denying motion to strike factual statements in a report).

and (6) the Fixing was carried out with *no* independent oversight. *See, e.g.*, SAC ¶¶ 268-76; *see also id.* App. C (summary of evidence). Defendants try to downplay these facts by "boiling them down" to the generic assertion that Defendants had an *opportunity* to conspire. Br. at 29-30. But these are the type of structural features that are routinely cited as making antitrust violations more likely, *i.e.*, plausible.[24]

Indeed, through the unique, anachronistic Fixing, the Complaint explains how, far more often than perhaps any plaintiff ever could (daily), the types of communications (current and future prices) occurred among the group of actors (horizontal competitors) in the way (in secret)[25] the law is particularly sensitive too. That these communications occurred under the guise of the Fixing does not make them any less damning—there was no statutory provision allowing these meetings to occur, and no antitrust exemption exists for them.

Defendants demand quotes from specific calls and emails. Br. at 24-25. The mere fact that *some* (very small minority) of plaintiffs "can" provide such details, *id.* at 8, 26—after government investigations have been completed and supporting materials made public (which has not yet happened here, as investigations are just in the "early stage," SAC ¶ 278 n.70)—in no way makes it a prerequisite for Plaintiffs to do so. To the contrary, courts routinely recognize that "smoking gun" evidence is not required at the pleading stage. *Citigroup*, 709 F.3d at 136; *see also In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 681 (S.D.N.Y. 2012). This is particularly appropriate in this case, as the Complaint explains that the "paradigmatic . . .

---

[24] *See, e.g.*, *Todd v. Exxon Corp.*, 275 F.3d 191, 211-13 (2d Cir. 2001); *see also In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) (allegations prices exchanged relevant at pleading stage); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 654-55 (7th Cir. 2002) (noting as relevant all "evidence that the structure of the market was such as to make secret price fixing feasible"); R. Blair and D. Sokol, *The Oxford Handbook of International Antitrust Economics*, Antitrust Corporate Governance and Compliance (2015).

[25] Defendants go outside the pleadings to suggest that the Fixing Bank Defendants "could" communicate with traders (selectively telling them whatever they wanted), who then "could" communicate with clients (selectively telling them whatever they wanted). These weakly stated theories of possible, *selective* disclosure do not trump the Complaint's allegations that the Fixing was a secretive process that Defendants controlled. *See* SAC ¶¶ 80-85.

recorded phone call," Br. at 24, is likely lacking not only because there has been no discovery or governmental release yet, but because Defendants *chose to not keep records*.  SAC ¶¶ 80-84; *see also id.* ¶¶ 22, 85.

Defendants' attempts to downplay the relevance of their daily meetings is not saved with citation to cases holding that the actions of a trade association are not automatically imputed to all of its members, or that a "hub and spoke" conspiracy requires agreements between the "spokes."[26]  Unlike in those settings, the structure of the Fixing process is not being used to impute liability across entities that remained ignorant of each other.  Rather, because the Fixing involved the Fixing Bank Defendants *undeniably* meeting every day, the structural allegations necessarily describe the who, what, when, where, and how of the core of the conspiracy.

Defendants assert terms like "Fixing Bank Defendants" are too vague.  Br. at 25.  But the Complaint uses such terms where appropriate to do so, *i.e.*, where the allegations are plainly meant to apply to every entity within that definition.  It is appropriate to do so because the described group of defendants *all did the same thing*, such as when the "Fixing Bank Defendants" are alleged to have met daily.  Complaints need not "be detailed with overt acts by each defendant."  *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378, 394 (S.D.N.Y. 2010).[27]  Defendants cite to *Jung v. Association of American Medical Colleges*, 300 F. Supp. 2d 119 (D.D.C. 2004).  But *Jung* involved students alleging an employment conspiracy among universities, medical schools, foundations, hospitals, health systems, medical centers, and others.  *Id.* at 125.  Among the nigh-universal group of alleged co-conspirators, a "governing

---

[26]  *See Tot. Ben. Planning Ag., Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436 (6th Cir. 2008) (hub and spoke conspiracy defective because no agreements identified between competitors); *AD/SAT, Div. of Skylight v. Assoc. Press*, 181 F.3d 216, 234 (2d Cir. 1999) (actions of trade association not imputed to members).

[27]  *See also Precision Assocs. v. Panalpina World Transp. (Holding) Ltd.*, 2011 WL 7053807, at *13 (E.D.N.Y. Jan. 4, 2011), *r&r adopted* (Aug. 13, 2012) (rejecting defendants' objection "to the use of the term 'defendants' or to defined groups"); *In re OSB Antitrust Litig.*, 2007 WL 2253419, at *5 (E.D. Pa. Aug. 3, 2007) ("Antitrust conspiracy allegations need not be detailed defendant by defendant.").

17

sponsor" defendant was dismissed because the complaint did not even explain what that label meant, let alone what such an entity did wrong. *Id.* at 163. In contrast here, it is clear that each Bank Defendant is charged with acting as a member of a trading bloc around the Fixing.[28]

Finally, Defendants argue that a plaintiff cannot rely *wholly* on the opportunity to conspire. Br. at 30. But as seen throughout this Section I, that is not this case.[29]

### D.   Defendants Were Motivated by the Spoils that Came with Control

#### 1.   The Complaint plausibly alleges Defendants were motivated by their "short" derivatives positions

Defendants had significant net "short" positions in gold derivatives, and thus benefitted when prices were suppressed. *Id.* ¶¶ 209-16. Defendants complain that the sources cited do not break out the data by bank. Br. at 12, 39. But the CFTC's data includes *all* banks with positions of over 200 contracts. Given that *all* of these Defendants had huge commodity derivatives positions, SAC ¶ 205, and that many were for gold, *id.* ¶ 206, the factual allegation that *these Defendants* held huge net-short positions is amply supported, and must be accepted as true.

Trying to leverage the secrecy surrounding their actual holdings, *id.* ¶ 203, Defendants attack the "net short" data by positing that maybe one bank vacuumed up "hundreds of thousands of [short] contracts" while the others only had 200 long contracts. Br. at 29. In that situation,

---

[28] In *In re Platinum & Palladium Commodities Litigation*, 828 F. Supp. 2d 588, 597 (S.D.N.Y. 2011), also cited by Defendants, the court dismissed the claim because the "convoluted allegations of a conspiracy fail to allege the union of independent centers of decision-making." And in *In re Commodity Exchange, Inc., Silver Futures & Options Trading Litigation*, 2012 WL 6700236, at *11 (S.D.N.Y. Dec. 21, 2012), a *single* bank was alleged to have manipulated the market through its ordinary trading activities. Here, by contrast, the "center of decision-making" (the London Gold Fixing) could not be more apparent. Similarly unavailing are *In re Elevator Antitrust Litigation*, 502 F.3d 47, 50-51 (2d Cir. 2007), and *In re Parcel Tanker Shipping Services Antitrust Litigation*, 541 F. Supp. 2d 487, 491-92 (D. Conn. 2008), as those complaints failed to allege *any* particular acts by *any* defendants. Indeed, the district court in *In re Elevator* found just *four paragraphs* as constituting the entirety of the supposed evidence of a worldwide conspiracy. *See In re Elevator Antitrust Litig.*, 2006 WL 1470994, at *2 (S.D.N.Y. May 30, 2006).

[29] In *Hinds County, Mississippi v. Wachovia Bank, N.A.*, 708 F. Supp. 2d 348, 359 (S.D.N.Y. 2010), cited by Defendants here, the court *upheld* the claims against the parties to a manipulative agreement, and only dismissed the claim against the single defendant who later assumed the agreement but was not involved in its negotiation. And the court in *H. L. Moore Drug Exchange v. Eli Lilly & Co.*, 662 F.2d 935, 941 (2d Cir. 1981) found, *after a jury verdict*, that there was insufficient proof of a price-fixing conspiracy between competing manufacturers.

Defendants' posit, the CFTC data would still show an aggregate "short" position, but in fact it would have only been in *one* bank's interest to drive prices down "unilaterally." *Id.* Such an absurd counter-hypothetical does not show the Complaint to be implausible. *See generally, e.g.*, *Anderson News*, 680 F.3d at 185.

But Defendants' suggestion that such a hypothetical bank would be hyper-motivated to "unilaterally" suppress prices also misses the mark because the Complaint alleges that it was too difficult, costly, and risky for any actor to alone move prices so consistently. SAC ¶¶ 195-98. Defendants' label these allegations conclusory, Br. at 29, but it is not clear what needs to be said given the nature of the markets and risks at issue. *See In re Foreign Exchange Benchmark Rates Antitrust Litig.*, 2015 WL 363894, at *8 (S.D.N.Y. Jan. 28, 2015) ("*FX*") ("[A]bsent collusion and information about other Defendants' trading positions, the risk of manipulating the Fix was too high . . . The logic is at least facially simple and intuitive."). For the same reason, Defendants' claim that the Complaint's motive allegations only show a "unilateral" interest in suppressed prices, Br. at 28, misses the mark. *Ross v. American Express Co.*, 35 F. Supp. 3d 407 (S.D.N.Y. 2014) (appeal pending), cited by Defendants, has nothing to do with the efficacy of allegations that it was *practically impossible* to *consistently* go it alone. Rather, the court in *Ross* narrowly found the claim unavailing only after discovery consisting of an "ocean of documents" and "hundreds of depositions," *and* a full trial. *Id.* at 413.[30]

---

[30] Defendants' other citations are similarly irrelevant to the question of the efficacy of Plaintiffs' allegations here, in that none deal with situations where the supposedly 'unilateral' interest is alleged to have been impossible to carry out absent a conspiracy. *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 254 (2d Cir. 1987), like *Ross*, is facially inapposite, as the court there was assessing a pile of evidence *at the summary judgment phase*. In *Citigroup*, the motive allegations "almost exclusively" related to the joint desire to *support* the market, whereas the supposed antitrust violation was in *exiting* the market. 709 F.3d at 137-39. In *In re Online Travel Co. (OTC) Hotel Booking Antitrust Litigation*, 997 F. Supp. 2d 526, 538 (N.D. Tex. 2014), unlike here, the motive allegations were found to be conclusory in that all they said was that hotels and online hotel retailers benefitted from the elimination of price competition. Finally, in *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 227 (3d Cir. 2011), the desire of each market participant to maintain its regional dominance was consistent with individual motives, but again the case had nothing to do with a situation where putting that desire into action was practically impossible if done alone.

Related to motivation, Defendants argue that "[i]f participants can 'free ride' on others, the economics of the conspiracy do not work." Br. at 29.[31] This only demonstrates the plausibility of the Complaint. Here, participants *could not* free ride and realize the benefits of the PM Fixing long-term. SAC ¶ 196. The daily Fixing process meant that any refusal to go along with the setting of low prices would have *immediately* been apparent. And, again, it would have been far too costly and risky for any one participant to be causing off-market movements so consistently. Thus, the *persistence* of the abnormalities itself confirms there was a conspiracy.

### 2. Defendants were motivated *even if* the Court accepts the hypothetical that their "short" derivatives positions were offset

Defendants next argue that the focus on gold *futures* presents an incomplete picture, as businesses "can use" such positions "to hedge their market risk," and so a hypothetical bank could be "price neutral.'" Br. at 6. Reference to hypothetical "encouragement" to have a particular portfolio should not be allowed to trump the Complaint's allegations showing that Defendants had large short futures positions that would have benefitted from gold price suppression. SAC ¶¶ 209-16. This is not only because it would be improper to do so at the pleading stage, but also because Defendants' logic is unavailing.

*First*, the hypothetical whereby the banks were each perfectly "balanced" does not actually demonstrate there was no motive. Defendants mislead by asserting that "Plaintiffs do not dispute that, if defendants hedged their portfolios, they would incur losses on long positions that would offset any profits." Br. at 39. The Complaint explains that even a balanced portfolio containing "long" physical gold and "short" futures benefitted from price suppression—because

---

[31] *Matsushita Electrical Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), oddly cited by Defendants here, has nothing to do with "free riders." Rather, on *summary judgment* the conspiracy claim there was rejected because the theory required defendants to sustain implausibly large losses, and defendants never dominated the television market. Here, the Complaint explains how the losses incurred in moving the market—especially when borne across a group rather than one participant—were far outweighed by the many ways the banks can and did profit from knowledge of an upcoming price spike. *See* SAC ¶¶ 228-33.

gold futures are marked-to-market daily, requiring daily cash margin payments by the side the market has moved "against" as of a particular time of day.  SAC ¶¶ 217-21.  These immediate gains would not, as Defendants assert, been wiped out by a "loss of the same amount on their long positions."  Br. at 41 n.18.  This is because physical gold can be held throughout a price spike, and thus be ultimately unaffected even as cash comes in the door via the futures desk.[32]

Defendants relatedly assert they would have benefitted a "trivial" amount this way.  Br. at 14, 40-41.  Defendants' flawed, presumption-intensive, outside-the-record academic exercise[33] cannot trump the Complaint's allegations regarding suppression-benefits that just happen to align with the exact type of *futures*-short-heavy portfolios Defendants had.

*Second*, the Complaint explains other ways to monetize knowledge of an upcoming price spike.  *See* SAC ¶¶ 228-33.  Suppression gave Defendants the opportunity to buy *more* physical gold cheaper.  *Id.* ¶¶ 219, 230.  Defendants were also major participants in the market for derivatives whose payments are expressly tied to the PM Fixing price.  *Id.* ¶ 231.[34]  Defendants also held "digital options" and other instruments requiring the Defendant to act or not act, based on whether the price of gold crossed a specific threshold.  *Id.* ¶ 232.  These and other contracts could be easily entered into (or exited) on more-favorable terms if one party (but not the other) knows when price spikes are coming.  To distract from these other sources of motive (and profit), Defendants cite to explanatory allegations to cast the Complaint as only referring to what

---

[32]  Defendants also argue that in a period of increasing prices they still would have been *paying* margin.  Br. at 14.  But paying less is just as much as a benefit as receiving more.  SAC ¶ 221 n.42.

[33]  For instance, Defendants presume that "0.04%" is the total extent of their suppression, but that is just the *average* across the years *that can be identified pre-discovery*.  On many days, the downward spikes were much bigger, but the "average" reduced by other days when prices went up.  Discovery will likely show much more suppression than what can be separated out from market noise based on public data.  Defendants also presume profits would be calculated based on a 0.2% discount interest rate, even though businesses calculate profit based on much higher figures (like the banks' 12% cost of equity).  Defendants also make the calculation based on only a 48,000 "net short" futures contracts even though the data shows that bank participation was as high as 260,200 "net short" contracts.  And of course Defendants' math presumes that every other position held by the bank was a "long" one, and that Defendants did not move to profit from their foreknowledge in any other way.

[34]  Defendants assert Plaintiffs do not have "standing" to assert claims on such contracts.  Br. at 41 n.19.  But that does not mean the presence of those contracts is irrelevant on the question of motive to price-fix.

"could" have been done to profit. Br. at 3, 13-14. But the Complaint makes clear that Defendants "can *and did*" profit by using these tools. SAC ¶¶ 228-32. Even that aside, it is Defendants who are asserting that it is *impossible* for a (hypothetically) "balanced" bank to profit from price movements. Allegations demonstrating the obvious—that *anyone* with knowledge a price spike is coming could do so, *regardless* of where they began the day—directly answer that charge, and thus validly support the plausibility of the claims.

*Third*, another reason even a bank with a perfectly balanced gold position cannot be said to have no motive to conspire is because this presumes the bank was acting as a monolithic whole. In fact, the banks have organized themselves such that their agents' individual incentives may not perfectly align with the bigger picture of the banks' entire portfolio. SAC ¶ 224. A trader interested in futures may thus not be held back by what may or may not happen to a physical gold trader elsewhere in the bank. Plaintiffs' allegations here are well-founded. Indeed, Barclays' New York swap desk was recently found to have manipulated interest-rate benchmarks specifically to profit off of contracts it had with Barclays' London desk. *See In the Matter of Barclays PLC*, Order Instituting Proceedings, CFTC Docket No. 15-25 ("Barclays ISDAfix Order"), at 7.[35] Traders were thus not manipulating a benchmark *not caring* about the impact on other divisions within the same bank, but *specifically to profit* at their expense.

*Fourth*, Defendants posit that if prices were "low," market actors would swoop in and impose losses on those that sold gold for less than what it is worth. Br. at 40. That there was substantial risk and cost involved in trying to *routinely* move the market confirms,[36] rather than undermines, the Complaint. It means there was a cost to Defendants' bunched-up, lower-than-

---

[35] The Court can consider the Barclays ISDAfix Order in its "plausibility" analysis, because what the order says is not subject to reasonable dispute and thus can be taken judicial notice of. *See, e.g.*, Fed. R. Evid. 201; *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991). Indeed, as discussed in Section I.E.3 below, the *Libor* and *FX* courts have relied on indistinguishable such orders in their plausibility analyses.

[36] Defendants could also on occasion cancel or offset the transactions. *See* Br. at 19 n.7; SAC ¶¶ 242, 288.

the-market activity around the Fix, *i.e.*, it was against their self-interest.  Only within the

confines of a conspiracy, where the costs would be shared and the control and thus predictability

cemented, would there be sufficiently reliable and repeat upside to make such acts worthwhile.

> **E.**    **The Presence of Pending and Related Investigations and Admissions Provide Valid Additional Support**

>> **1.**    **Investigations into precious-metals activities logically relate to the plausibility of the conspiracy alleged**

Barclays' Precious Metals Desk, according to the U.K. Financial Conduct Authority

("FCA"), failed to create adequate controls regarding the Fixing, failed to adequately train its

employees regarding the appropriateness of conduct in relation to the Fixing, failed to adequately

monitor traders' activity around the Fixing, and failed to manage conflicts of interest around the

Fixing.  SAC ¶¶ 283-84.  The investigation stemmed from a finding that a Barclays trader tried

to "bang the close," entering into off-market transactions in the lead-up to the Fixing specifically

in order to impact the Fix price.  *Id.* ¶¶ 286-91.  Over and above the fact these allegations help

show the possibility of profiting from movements in the Fix, they show that Barclays

systematically failed to police its own activities.[37]  That the pricing data on a day of *now-*

*explicitly known* manipulation, looks a lot like other days where manipulation is alleged, *id.* ¶¶

156, 290, also buttresses the plausibility of the Complaint's allegation of wider Fixing problems.

More generally, Defendants are still subject to regulatory probes.  *Id.* ¶¶ 277-82.

Prosecutors are "scrutinizing the price-setting process for gold," targeting *all* of the Defendant

Banks.  *Id.* ¶ 278.  The day after BaFin announced that allegations of manipulation of precious

---

[37]    That the FCA's Final Notice focused on manipulative conduct by a single trader does not undermine the Complaint.  That investigation concluded in early 2014—well before the LBMA overhauled the Fixing process and the DOJ and CFTC investigations began to look for wider problems.  Defendants try to spin the investigation as a positive thing for them by also improperly citing testimony nowhere mentioned in the Complaint, that an official supposedly said he had not seen certain evidence.  Br. at 15.  But that an official was purportedly not aware of something he did not go looking for is a *non sequitur*.  Defendants also claim to be exonerated by the fact that inquiries by certain regulators have been closed.  Br. at 14, 23.  *But see, e.g., Starr*, 592 F.3d at 325 (rejecting the argument that dismissal warranted even where DOJ investigation "found no evidence of conspiracy").

metals markets were "particularly serious," Deutsche Bank announced its withdrawal from the

Fixing process. *Id.* ¶¶ 22, 279.  Other Defendants are conducting internal investigations into the

Fixing. *Id.* ¶ 280.  In November 2014, in response to this review, a third-party administrator was

finally appointed. *Id.* ¶¶ 22, 85.  Recent reports (that the Court can take notice of) indicate that

the DOJ is continuing to look into "possible collusion" in the gold market, and Barclays has

eliminated several high-profile employees responsible for gold investments.[38]  These are specific

facts that demonstrate the seriousness with which regulators and Defendants are taking the

situation.  In other words, they are facts that help demonstrate the Complaint's plausibility.[39]

### 2.   Investigations into other activities logically relate to the plausibility of the conspiracy alleged

As for facts regarding "other" benchmarking scandals, unlike those at issue in the case

cited by Defendants, the Complaint does not rest on the logic of "if it happened there, it could

have happened here."[40]  Rather, as seen throughout this Section I, the Complaint provides a

robust set of facts in its own right.  The *additional* allegations regarding "other" scandals provide

valid context and support.  For instance, in the Libor context, Defendants Barclays and UBS

admitted in 2012 to manipulating a key interest-rate benchmark, including by way of collusion

between their respective traders.  SAC ¶ 233.  In the currency-exchange markets, the CFTC and

---

[38]   *See* Keri Geiger and Matthew Leising, *Treasuries Collusion Said to Be Hunted in New Wave of Probes*, Bloomberg (Jun. 10, 2015) (available at http://www.bloomberg.com/news/articles/2015-06-10/treasuries-collusion-said-to-be-hunted-in-next-wave-of-probes); Clara Denina, *Barclays Global Head of Metals Whitehead Leaves Bank*, Reuters (Apr. 20, 2015) (available at http://www.reuters.com/article/2015/04/20/moves-barclays-whitehead-idUSL5N0XH23H20150420).

[39]   Defendants suggest dismissal is a *fait accompli* here because the CFTC wrote an earlier letter about allegations of manipulation in the silver market.  Br. at 40 n.17.  This is *yet another* improper attempt to go outside the Complaint.  Further, the letter has nothing to do with gold or the Gold Fixing.  And it has nothing to do with the power of banks controlling such a process to cause spikes at a particular time of day.  An agency's letter explaining how it was responding to different concerns, raised on different theories, in a different market, is far, far afield from the court's deference to an administrator's suggestion to use a "flexible solution" to help implement the Fair Labor Standards Act.  *See Skidmore v. Swift*, 323 U.S. 134, 140 (1944) (cited by Defendants).

[40]   The plaintiffs in *In re Elevator* alleged their U.S. conspiracy claims were rendered plausible by regulatory investigations in Europe.  The court disagreed because plaintiffs offered no allegations that the U.S. and European markets, market participants, or market conduct were linked.  502 F.3d at 52.

24

other regulators found in November 2014 that Defendants HSBC and UBS colluded to manipulate the price of other benchmarks.  *Id.* ¶ 235.[41]

Whether it be interest-rate derivatives or currencies, banks seem just as likely to have "diverse" positions as they purportedly are with respect to gold.  Yet, banks found sufficient common ground to form a conspiracy to manipulate benchmarks there.  The currency and interest-rate markets are all full of other "sophisticated clients" that would "impose losses" on defendants when they attempted to "bang the close."  Yet, banks found sufficient upside to make those conspiracies worthwhile.  Defendants downplay the issues of inter-division rivalries within a bank.  Yet, Barclays was found to have been moving a benchmark specifically so one desk would "win" over the other.  These allegations also place the "tools of the trade" alleged to be used here (banging the close, front running, etc.) directly into Defendants' *known* "toolbox."  *Id*. ¶¶ 236-240.  In fact, it was the *same individuals* at UBS who used these tools of manipulation in the foreign exchange context that *also* ran its gold trading desk.  *Id*. ¶ 241.[42]

Put another way, Defendants repeatedly argue that what is alleged to have occurred here would simply make no sense in the real world.  That what is alleged to occur here, has in fact occurred in several similar settings, destroys that supposition.

---

[41]   Investigations into Defendants' many types of misconduct are still ongoing.  As discussed previously, Barclays was recently fined $115 million for manipulating ISDAfix, a benchmark interest rate.  *See Barclays ISDAfix Order.*  And Deutsche Bank is the latest Defendant to admit to colluding to manipulate Libor.  *See, e.g.*, *In the Matter of Deutsche Bank AG*, CFTC Docket No. 15-20, Order Instituting Proceedings (Apr. 23, 2015).  Barclays, Citi, JPMorgan, RBS, and UBS were recently fined $3 billion, and pled guilty to *criminal* conspiracy charges for manipulation of foreign exchange rates.  *See U.S. v. Barclays PLC*, Plea Agreement (D. Conn. May 20, 2015); *U.S. v. Citicorp*, Plea Agreement (D. Conn. May 20, 2015); *U.S. v. JPMorgan Chase & Co.*, Plea Agreement (D. Conn. May 20, 2015); *U.S. v. The Royal Bank of Scotland PLC*, Plea Agreement (D. Conn. May 20, 2015); *U.S. v. UBS AG*, Plea Agreement (D. Conn. May 20, 2015); *In the Matter of Barclays Bank PLC*, CFTC Docket No. 15-24, Order Instituting Proceedings (May 20, 2015).

[42]   Defendants complain that the Swiss Financial Market Supervisory Authority's ("FINMA") report did not specifically use the word "gold."  Br. at 15-16, 23.  But the report concerns misconduct by UBS's "precious metals trading division" as a whole—which Defendants do not dispute naturally *includes gold.*

### 3.      The Court need not strike these relevant allegations

Defendants vaguely ask that all "investigations and settlement" allegations be stricken. Br. at 22-23.  Such a broad request cannot be squared with the fact that the Second Circuit has itself cited favorably allegations regarding the fact that "defendants' price-fixing is the subject of a pending investigation," *Starr*, 592 F.3d at 324,[43] and courts routinely list "involvement in other conspiracies" as a "plus factor," *In re Pool Prods.*, 988 F. Supp. 2d at 711.[44]  Unsurprisingly, then, the court in *FX* relied extensively on many of the *exact same* settlement materials cited here in finding that the benchmarking conspiracy there was well-pled.  2015 WL 363894, at *6-7.  So, too, have the courts handling the *Libor* benchmarking scandals expressly relied on indistinguishable regulatory developments.  *See In re Libor-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 681 (S.D.N.Y. 2013) ("*Libor I*").  This makes sense:  particularly where an antitrust complaint is already robust in its own right (as is the case here), courts should not blind themselves to *anything* that provides context and thus bears on the question of whether the observed facts are innocent or nefarious.

This case could thus hardly be less like *Gotlin v. Lederman*, 367 F. Supp. 2d 349 (E.D.N.Y. 2005), Defendants' lead citation.  Br. at 22.  There, in a false-advertising case, the plaintiff *admitted* that the only purpose of the allegations that were struck were to "reveal . . . unflattering things" about defendants, and *admitted* they were not "pertinent to defendants' alleged misrepresentations."  *Id.* at 363.  In contrast, as explained in Sections I.E.1-2 above,

---

[43]      *See also, e.g.*, *Precision Assoc.*, 2011 WL 7053807, at *21 (considering favorably fact that Department of Justice was pursuing actions against certain defendants); *In re Auto. Parts Antitrust Litig.*, 50 F. Supp. 3d 869, 881-82 (E.D. Mich. 2014) (considering ongoing investigations by regulators); *see also generally AdvanceMe, Inc. v. Lenders Int'l.*, 2011 WL 6425488, at *2 (S.D.N.Y. Dec. 19, 2011) (denying motion to strike allegations of other complaints filed against defendant).

[44]      *See also, e.g.*, *U.S. v. Andreas*, 216 F.3d 645, 664-65 (7th Cir. 2000) (evidence concerning a prior conspiracy may be relevant and admissible); *In re Auto. Parts*, 50 F. Supp. 3d at 881-82 (investigations and guilty pleas in similar markets supported an inference of conspiracy); *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1149 (N.D. Cal. 2009) (proof of a similar conspiracy may create an inference strengthening the existence of another conspiracy in a related market).

Plaintiffs are not including allegations to "unflatter" Defendants; they cite them because they logically undermine Defendants' assertions this conspiracy would never happen in the real world.

Nor does *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir. 1976) support Defendants' vague request with respect to "regulatory" allegations.  The Second Circuit there emphasized that courts "should not tamper with pleadings unless there is strong reason to do so" and made clear its ruling was based on "the facts of this case."  *Id.* at 893.  The facts of that case were narrow, and thus so was its holding.  It is true, as courts have admitted since, that "some courts in this district have stretched the holding in *Lipsky*."  *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 768 n.24 (S.D.N.Y. 2012).  But the better-reasoned courts that have expressly addressed the issue[45] recognize that "[n]either Circuit precedent nor logic supports such an absolute rule" as Defendants propose.  *Id.*; *HSH Nordbank AG v. RBS Holdings USA Inc.*, 2015 WL 1307189, at *4 (S.D.N.Y. Mar. 23, 2015) (same); *see also In re OSG Secs. Litig.*, 12 F. Supp. 3d 619-21 (S.D.N.Y. 2014).  Because the facts of *Lipsky* have nothing to do with those here,[46] and all the "regulatory" allegations logically support the plausibility of Plaintiffs' allegations here, none should be stricken.

Defendants next take aim at "investigation" allegations, arguing that the mere fact one is pending "carries no weight."  Br. at 22.  But Defendants again stretch the cases they cite too far.

---

[45]   As seen above, often courts take into account such allegations without controversy.

[46]   *Lipsky* had nothing to do with what constitutes a valid "plus factor" for pleading an antitrust claim. There, the plaintiff entered into a contract whereby his stock in one company was transferred to defendants, in exchange for stock of a defendant.  551 F.2d at 890.  Defendants were obligated to use "best efforts" to register the stock supplied by the defendant and held by the plaintiff.  *Id.*  The plaintiff's complaint referred to the fact that the SEC had objected to the defendants' registration statement.  *Id.* at 891.  The registration statement was objectionable, however, for reasons that did *not* relate to whether the defendant used its "best efforts" to market the securities.  *Id.*  The Second Circuit found that the SEC's separate complaint, that led to a consent judgment against the defendant, was thus immaterial to the "best efforts" issue, but remanded the case to allow for an amendment and a Rule 12(f) ruling that was "construed strictly against striking" portions of the complaint.  *Id.* at 894.  Notably, and further undermining Defendants' suggestion of a bright-line rule barring all of the allegations here, the Second Circuit wondered what the big deal was, because testimony and documents and even the "SEC's opinion" were still on the table, even if the SEC complaint itself could not be stapled to plaintiff's complaint.  *Id.*

27

In *In re Graphics Processing Units Antitrust Litigation*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007), the scope of the secretive grand jury investigation at issue was "pure speculation." Similarly, other than to say that subpoenas had been served regarding "possible antitrust violations among helicopter service providers in the Gulf of Mexico" the plaintiff in *Superior Offshore International v. Bristow Group*, 738 F. Supp. 2d 505, 516 (D. Del. 2010) provided "no other facts" about the pending investigation.  Here, as discussed in Sections I.E.1-2 above, the Complaint explains how the "scope" of each "investigation" is tied to this case.

## II.    PLAINTIFFS HAVE "ANTITRUST STANDING"

Although there are multiple layers to the standing inquiry, Defendants focus on the question of whether Plaintiffs' injury is sufficiently "direct."  Br. at 32.  This "ultimately tests [] whether there is a legally sufficient causal relationship between the alleged violation and the alleged injury."  *See Reading Indus., Inc. v. Kennecott Copper Corp.*, 631 F.2d 10 (2d Cir. 1980); *see also DNAML Pty, Ltd. v. Apple Inc.*, 25 F. Supp. 3d 422, 430 (S.D.N.Y. 2014) (noting that the "directness" inquiry is "essentially a proximate cause analysis").  These tests are applied according to the unique facts of each case because "the machinery employed by a combination for price-fixing is immaterial."  *U.S. v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940).

Simply put, as expounded upon below, Plaintiffs sold gold, and so were harmed when gold prices were suppressed.  They thus easily meet the "directness" requirement no matter how many different ways Defendants try to parse it.  *See generally, e.g.*, *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 481, 487-89 (7th Cir. 2002) (antitrust laws apply to purchasers and sellers; plaintiffs had standing where prices allegedly "move[d] in lockstep" with manipulated futures prices); *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987-89 (9th Cir. 2000) (milk sellers had antitrust standing to pursue claims alleging manipulation of bulk cheese auction prices, which in turn affected the mandated minimum price for milk); *In re*

*Aluminum Warehousing Antitrust Litig.*, 2015 WL 1378946, at *13-14 (S.D.N.Y. Mar. 26, 2015) (purchasers of aluminum alleging conspiracy to fix Platts Midwest Premium benchmark price had standing); *FX*, 2015 WL 363894, at *2, 10-12 (finding standing in currency-exchange benchmark case); *Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*, 253 F. Supp. 2d 262, 273-74 (D. Conn. 2003) (purchasers of milk had standing where it was shown to be a "a causal link between the CME butter price and the wholesale price of milk, cream, and butter").[47]

## A.  Antitrust Standing Does Not Require Physical Privity, Particularly for Trading on Exchanges

In their motion, Defendants take an overly mechanical approach to antitrust standing that ignores the realities of the alleged scheme and the law on antitrust injury.  Indeed, trillions of dollars' worth of transactions (not just in gold, but for stock, commodities, and innumerable other types of financial investments and contracts) are executed through exchanges.  Defendants' prophylactic "privity-only" rule would thus place a large portion of the nation's economy wholly outside the bounds of the antitrust laws, because in an exchange *nobody* is in privity with anyone other than the (mechanical) central clearinghouse entity (who acts as the buyer to every seller and the seller to every buyer, undertaking no price risk itself).  No law or logic supports such a sweeping grant of *de facto* immunity.

Defendants first misread *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) to suggest that privity is a bright-line requirement for standing.  Br. at 32-33.  It is not.  As the Supreme Court recognized in *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982), a single antitrust conspiracy may inflict different injuries, and thus even those with no direct relationship to the

---

[47]  *See also Transnor (Bermuda) Ltd. v. BP N. Am. Petroleum*, 666 F. Supp. 581, 582-83 (S.D.N.Y. 1987) (purchaser of Brent crude cargo had standing where defendants "manipulate[d] the Brent market to establish trading prices at lower levels"); *Grosser v. Commodity Exch., Inc.*, 639 F. Supp. 1293, 1296, 1317-21 (S.D.N.Y. 1986) (investor in silver futures had standing where defendants "engaged in a conspiracy to artificially increase the price of refined silver and silver futures contracts").

defendants may have claims.  *Id.* at 468-75.  *See also Loeb*, 306 F.3d at 481 ("*Illinois Brick* does

not stand for the proposition, as the defendants would seem to have it, that a defendant cannot be

sued under the antitrust laws by any plaintiff to whom it does not sell.").  *Illinois Brick* simply

aims to prevent ***duplicative recovery***, such as what might occur if a contractor and a property

owner that paid to have a structure built could *both* sue for a single "overcharge" in the price of

bricks bought by the contractor from a defendant.  *See In re Linerboard Antitrust Litig.*, 305 F.3d

145, 159 (3d Cir. 2002) (discussing *In re Sugar Indus. Antitrust Litig.*, 579 F.2d 13, 17 (3d Cir.

1978)).  In other words, it bars downstream buyers from claiming that they were damaged when

a price increase for a good was "passed on" from manufacturer to retailer to customer.  Where

plaintiffs are not relying on such a theory, *Illinois Brick* is irrelevant.[48]

Given this, it is unsurprising that courts routinely recognize that plaintiffs suffering direct

injury in an impacted portion of a market have antitrust standing, notwithstanding their lack of

personal connection to the defendants.[49]  So it is here.  Plaintiffs sold gold investments, at

artificially suppressed prices.  SAC ¶¶ 29-56.  Other than with respect to the small portion of the

class relating to ETFs, specifically—dismissal of which, though improper as discussed further

below, would not impact this case's progression into the merits—Defendants do not and cannot

---

[48]    The cases cited by Defendants merely applied *Illinois Brick* to that intended fact-set—*i.e.*, where multi-step supply chains presented "problems of duplicative liability."  *See Zinser v. Cont'l Grain Co.*, 660 F.2d 754, 761 (10th Cir. 1981) (dealing with distribution chain for grain); *In re Pub. Offering Antitrust Litig.*, 2004 WL 350696, at *5-6 (S.D.N.Y. Feb. 25, 2004) (purchasers of securities did not have standing for increased underwriting fees, which had been paid by the issuers of the securities, who were also suing for the overcharge).

[49]    *See, e.g.*, *McCready*, 457 U.S. at 468-75 (employee had parallel antitrust standing to employer that purchased health plan due to scheme between plan provider and psychiatrists to increase costs for visiting a psychologist); *Loeb*, 306 F.3d at 481 (purchasers of physical copper products had antitrust standing to bring claims against defendants who conspired to manipulate the price of copper futures, despite no direct dealing); *Aluminum*, 2015 WL 1378946, at *13-14 (same, for victims of aluminum benchmark fixing scheme); *In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 57 (S.D.N.Y. 2012) (same, for traders in crude oil futures market, based in part on actions take in the physical crude oil market); *In re Copper Antitrust Litig.*, 2000 WL 34230131, at *17-18 (W.D. Wis. 2000) ("important difference" from *Illinois Brick* where purchasers of copper were alleging that all prices were impacted, not that they were "passed on" through a supply chain); *Three Crown Ltd. P'ship v. Salomon Bros., Inc.*, 1995 WL 422467, at *6 (S.D.N.Y. July 14, 1995) (standing, for victims of conspiratorial "short squeeze" of company stock); *Grosser*, 639 F. Supp. at 1320-21 (same, for futures traders in silver market).

claim that recognizing Plaintiffs' claims would result in duplicative recovery the same way allowing both the initial and downstream purchaser of the same physical brick might. Thus, neither *Illinois Brick*'s holding nor its policy considerations are in any way implicated here.

Defendants next imply that the only way out of *Illinois Brick* is the doctrine of "umbrella liability," which Defendants then proceed to argue should not be applied here. Br. at 33-34. But that is a false dichotomy. As seen in the citations above, courts routinely find standing, despite a lack of privity, and despite *Illinois Brick*, regardless of the viability of so-called "umbrella liability" theories on certain facts.

An "umbrella" theory of liability presumes that the alleged conspiracy created a "price umbrella" under which defendants' non-conspirator competitors (often, in the retail-sales setting) were able—but not necessarily compelled—to raise their own prices to the plaintiffs. *See, e.g.*, *In re Petroleum Prods. Antitrust Litig.*, 691 F.2d 1335, 1338-39 (9th Cir. 1982). Those courts that discount "umbrella liability" cases do so not because of some rigid privity-only "rule" that must be maintained, but because on the facts before them damages would either be duplicative or too speculative. *See id.*; *Mid-West Paper Prods. Co. v. Cont'l Grp.*, 596 F.2d 573, 584-86 (3d Cir. 1979). This is because determining what an innocent shoe retailer would have charged for shoes if not for the fact the retailer across town was selling shoes at an artificial price is difficult. But in the highly liquid, real-time, faceless, multi-lateral, highly efficient market for gold investments, simply put, the price of gold is the price of gold, no matter how it is 'translated' by the market into various instruments for investing in it. The Complaint establishes that to be the case through extensive analyses showing near-perfect 1:1 correlation in price movements across many different outlets. SAC ¶¶ 4-6, 97-115, 309-28.

Injury stemming from a scheme that *necessarily* impacts *market-wide* pricing falls

outside the "umbrella liability" line of cases, because such injuries do not present concerns about

whether non-conspirators would actually have acted differently but-for the conspiracy.  Because

the entire market moves together, everyone's prices are impacted in identical ways.  *See Pollock*

*v. Citrus Assocs. of N.Y. Cotton Exch., Inc.*, 512 F. Supp. 711, 719 n.9 (S.D.N.Y. 1981)

(distinguishing between umbrella liability, where "[a] price fixing arrangement allows a

relatively small seller to raise its price to the level protected by the price 'umbrella,'" and

manipulation of a futures market, where "the price throughout the market allegedly rose as a

result of the defendants' activities").  As the Seventh Circuit in *Loeb* summarized:

> The defendants object to the possibility that they might be held responsible for
> higher copper prices throughout the physical market, rather than just for the sales
> they made.  If this were an ordinary cartel case, in which cartel members A and B
> sell to customers X and Y, and then non-cartel member firm C makes sales at or
> near the enhanced cartel price to customer Z, the question arises whether A and B
> are liable to Z for the overcharges it paid . . . Here, however, we have a
> conspiracy to rig prices for the entire physical market, accomplished through
> manipulation of the Comex futures market.  A[] possible analogy might be to
> rigging product standards, which affects everyone who tries to participate in a
> particular product market.  In [such a] case, the defendants who manipulated the
> standards cannot be heard to complain that they should be immune from damages
> for a product they did not sell.

*Loeb*, 306 F.3d at 484; *see In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 57

(S.D.N.Y. 2012) (antitrust standing established by the "close relationship" between markets).[50]

Defendants in response rely primarily on an order from another copper case, *Ocean View*

*Capital v. Sumitomo Corp. of America*, 1999 WL 1201701 (S.D.N.Y. 1997).  ***But Defendants***

***fail to mention that they are citing to an order from a court that lacked power over the dispute.***

*See In re Copper Antitrust Litig.*, 2000 WL 34230131, at *15 (W.D. Wis. 2000) (noting that the

opinion cited by Defendants here was "ineffectual," even between the parties to that case).  Nor

---

[50] *See also, e.g., Knevelbaard*, 232 F.3d at 987-89; *Aluminum*, 2015 WL 1378946, at *13-14; *FX*, 2015
WL 363894, at *2, 10-12; *Ice Cream Liquidation*, 253 F. Supp. 2d at 272-74.

do they inform the Court that ***the decision <u>actually</u> governing that dispute found standing well-pled***, explicitly rejecting the attempt to shoehorn all non-privity fact patterns into the same *Illinois Brick*/"umbrella liability" dichotomy urged by Defendants here.  *See id.* (plaintiffs in physical copper market had standing for acts in "exchange contract" market, even absent privity, where prices were related); *In re Copper Antitrust Litig. (Ocean View Cap. v. Sumitomo Corp. of Am.)*, 98 F. Supp. 2d 1039, 1051-53 (W.D. Wis. 2000) (allegations of a "relationship" between prices sufficed to confer standing).  Defendants' citation to an order that never had legal effect, and was later effectively reversed, is highly misleading, and lacks candor.[51]

In short, by showing the 1:1 correlation between spot, futures, ETFs, and the Fixing in terms of price movements, SAC ¶¶ 4-6, 105-15, 309-28, Plaintiffs have well demonstrated this is just like the situation where Defendants rigged an "entire physical market" and/or a "product standard," *Loeb*, 306 F.3d at 484, and shares nothing with the "umbrella liability" cases cited by Defendants.[52]  Because here it has been shown prices for all market participants immediately moved in line with the conspiracy's movement, regardless of privity, there is simply no reason to dismiss the claim either as being duplicative (*Illinois Brick*), or as being too speculative ("umbrella liability").

---

[51]  In any event, in the original *Ocean View*, the (court without power) found that the plaintiff "conceded" that the cash copper price was "not solely dependent" on the futures price.  1999 WL 1201701, at *4.  As an initial matter, there is no qualification here as to Plaintiffs' allegations that prices move together across the various outlets for gold.  Even that aside, antitrust law has long recognized that even manipulating a "component" of price is still actionable price-fixing.  *See Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 645-49 (1980) (holding it was *per se* illegal to collude on "inseparable part[s] of the price"); *U.S. v. Stop & Shop Cos.*, 1984 WL 3196, at *1 (D. Conn. Nov. 9, 1984) (same, for price "component").

[52]  *See Allen v. Dairy Farmers of Am., Inc.*, 2014 WL 2610613, at *27-28 (D. Vt. June 11, 2014) (on *summary judgment*, a response to a questionnaire where one market participant expressed an "opinion" about the "need to keep [] competitive" was found to be unpersuasive to show sales with non-defendants were impacted by the conspiracy); *Antoine L. Garabet, M.D., Inc. v. Autonomous Techs. Corp.*, 116 F. Supp. 2d 1159, 1162-64, 1167-69 (C.D. Cal. 2000) (on *summary judgment*, no standing where there was a "substantial risk of duplicative recovery" and plaintiffs were "only tangentially affected"; operators of laser eye surgery clinics could not bring suit challenging merger of two equipment companies, where the clinics were not customers of the merging companies); *Gross v. New Balance Athletic Shoe, Inc.*, 955 F. Supp. 242, 243-44 (S.D.N.Y. 1997) (alleged vertical price restraint conspiracy between manufacturer and some shoe retailers was not shown to have non-speculative impact on prices for shoes sold by non-participating shoe retailers).

**B.**     **The Remaining Factors Demonstrate Plaintiffs' Standing**

The remainder of Defendants' antitrust standing arguments pay lip service to the other

factors of *Gatt Communications v. PMC Associates*, 711 F.3d 68, 76 (2d Cir. 2013).

Defendants argue that there are more "directly" injured plaintiffs than the putative class

members.  Br. at 34-35.  This is merely a rehash of Defendants' view that privity is dispositive of

antitrust standing.  As discussed above, it is not.  Only Plaintiffs were injured—there is no

"supply chain" with some relevant earlier participant that has a duplicative claim, and the harm

flowed directly to Plaintiffs regardless of who they sold to—and thus they and only they have a

claim to the damages they seek.  *See also Aluminum*, 2015 WL 1378946, at *15 (stating that the

efficient enforcer inquiry is focused on who "suffered the alleged injuries . . . it is not concerned

with which market participants are most proximate to the allegedly unlawful conduct itself"); *see

also In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688-89 (2d Cir. 2009)

(holding that the proper standing inquiry is whether plaintiff is "*an* entity most motivated by self-

interest, not *the* entity most motivated by self-interest" regardless of whether there are other

plaintiffs who could also assert antitrust claims).  Indeed, to allow only those who directly

contracted with Defendants to state a claim would leave wide swaths of their victims—including

(because such transactions are done through an exchange) the *entirety* of the futures market—

without a remedy.

Defendants next argue that Plaintiffs' injuries are "speculative."  Br. at 35-36.  This is,

again, derivative of Defendants' (improper) "privity only" view of the law.  Plaintiffs' damages

are not speculative even absent a "contract" with Defendants, because the Complaint alleges that

all relevant prices moved together, as confirmed by numerous analyses.  *See, e.g.*, SAC ¶¶ 105-

15, 309-11.  As in *Loeb*, 306 F.3d at 476, and other cases discussed above, allegations that

markets move together suffice even absent privity.  Indeed, the court in *In re Digital Music*

34

*Antitrust Litigation*, 812 F. Supp. 2d 390, 401-02 (S.D.N.Y. 2011), cited by Defendants, specifically recognized that "[a]llegations of this type of linkage are important."[53]  The plausibility of the "linkage" allegations here, supported by case-specific analysis, is not called into question by *Reading Industries*.  There, the court *on summary judgment* dealt with a "bizarre" theory whereby a conspiracy to keep prices *low* caused prices elsewhere to be *high*.  631 F.2d at 11.[54]  Here, of course, Plaintiffs allege that the *downward* spikes in gold prices caused *downward* spikes in gold prices, regardless of privity.  The other cases cited by Defendants similarly do little to call into question, at the pleading stage, Plaintiffs' claim they were damaged despite a lack of privity.[55]

Finally, Defendants claim that there is an "apportionment" issue, but only identify one (very narrow) "problem."  Specifically, Defendants hypothesize that ETFs themselves, as well as holders of shares in the ETFs, may both claim to be damaged by movements in the price for gold.  Br. at 36.  Notably, even if "ETF" investors are (improperly) carved out and dismissed due to "apportionment" problem, this case would still proceed on the merits as this is a small portion of a much larger set of investments, by Plaintiffs and the class.  But even as to ETFs specifically, the potential for "overlap" is immaterial at this stage.  *See McCready*, 457 U.S. at 468-75.  This is particularly true because the risk is likely largely illusory.  The Funds themselves would only

---

[53]   The court in *Digital Music* only dismissed the claims there because plaintiffs provided only "*ipse dixit*" that a conspiracy regarding "internet music" impacted physical CDs.  812 F. Supp. 2d at 402.

[54]   Specifically, the theory in *Reading* was that buyers of the artificially "cheap" refined copper had "savings" in their pocket—money that allegedly could have been spent to "bid up" prices on other things.  631 F.2d at 12.  Plaintiffs' case here, of course, has nothing to do with market participants that benefitted from one conspiracy using their spoils to distort the amount of cash flowing into other markets.

[55]   Defendants cite to *Laydon v. Mizuho Bank, Ltd.*, 2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014).  But there, the plaintiff there tried to state a claim based on "a complicated series of market interactions involving countless market players and how they reacted to Libor and Tibor price signals," pointing to "manipulation of one benchmark that led to a loss to him on contracts linked to an entirely separate benchmark."  *Id.* at *9.  Here, there is just one benchmark (the Gold Fixing) and one thing underlying all investments (gold).  Defendants also cite to *Mid-West Paper*, 596 F.2d at 584, but that case involved (on summary judgment) claims for damages for shopping bags sold by non-conspiring manufacturers were found to be too speculative.  The tie between prices of competing shopping-bag makers has nothing to do with how prices in the market for gold operate.

have standing if they *sold gold* at manipulated prices—but ETFs by their nature *buy and hold* gold.[56]  This all presents a factual issue that, at best, affects the damages and/or summary judgment phase of this case.  *See Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 222 (2d Cir. 2008) (noting that potential factual reductions in damages do not negate antitrust standing).

### C.    Plaintiffs' Harms Arose From Defendants' Anticompetitive Acts

Citing *Libor I*, Defendants posit that there is no antitrust injury because Plaintiffs' harms did not arise out of "any anticompetitive misconduct."  Br. at 36 n.13.  Given the "argument" is buried in a footnote, this assertion is unsurprisingly without merit.  In *Libor I*, the interest-rate benchmark at issue was set by a "poll" of banks.  935 F. Supp. 2d at 677-79.  According to *Libor I*, there was no "competition" in responding to the poll, and thus nothing "anticompetitive" about lying in response to it.  *Id.* at 688.[57]  Defendants here, in contrast, acted as a trading bloc in real-world transactions.  *See, e.g.*, SAC ¶¶ 6-10.  The court in *FX* properly recognized that *Libor I* is facially irrelevant where banks manipulate prices through actual market activity, rather than mere "poll" responses.  2015 WL 363894, at *11.[58]

## III.    PLAINTIFFS ALLEGE INJURY-IN-FACT

Defendants argue that Plaintiffs have not pled "injury in fact."  Br. at 36 n.13, 47-48.  The Second Circuit recently confirmed that plaintiffs need only "provide a defendant with some indication of the loss and the causal connection."  *Fin. Guar. Ins. Co. v. Putnam Advisory Co.*,

---

[56]   *See, e.g.*, SPDR Gold Trust, Annual Report (Form 10-K), at 28 (Nov. 25, 2014), *available at* http://www.spdrgoldshares.com/media/GLD/file/10-K_11_25_14.pdf (trustee does not "actively manage" gold).

[57]   Plaintiffs also respectfully believe *Libor I* was wrongly decided, and note it is currently on appeal to the Second Circuit.  Among other things, the court erred by concluding that a supposed lack of competition in a benchmark rate-setting process means that its coordinated hijacking cannot lead to an antitrust violation.  But the "machinery" used to price-fix is irrelevant.  *Socony*, 310 U.S. at 223.  *See, e.g.*, Joint Brief for Plaintiffs-Appellants, Case No. 13-3565-cv(L), Dkt. No. 342 (2d Cir. May 20, 2015).

[58]   Defendants also cite *Lawline v. American Bar Association*, 956 F.2d 1378, 1383-84 (7th Cir. 1992) for the proposition that "inject[ing] false information into the marketplace . . . does not violate the antitrust laws[.]"  Br. at 36 n.13.  But *Lawline* was not a price-fixing case at all—rather, it concerned ethical rules promulgated by bar associations.  And, as discussed above, unlike *Libor*, this is not a case about false "poll" responses.

783 F.3d 395, 404 (2d Cir. 2015).  The Complaint here plainly does just that—it alleges that Plaintiffs sold gold investments, and so were harmed by price suppression.  SAC ¶¶ 29-56.

The court in *FX* heard, and properly rejected, arguments that plaintiffs need to do more. Indeed, the causation issues in FX were *even more* complex than in this case.  *FX* involves a conspiracy that changed direction from day to day—here, the direction was consistent.[59]  *FX* involved a conspiracy that spanned multiple currencies—here, there is only gold.  The bank defendants in *FX* argued that the plaintiffs failed to show they were damaged because the plaintiff had to "match" the "right" time, direction, currency, and rate to show net harm.  The court in *FX*, as this Court should do, rejected that argument:

> Plaintiffs have demonstrated that they have a concrete stake in the present action. Each named Plaintiff claims that it was injured by having to pay supra-competitive prices as a result of Defendants' manipulation of the Fix . . . .
>
> Defendants' argument based on injury in fact, like their argument based on plausibility, ultimately amounts to a demand for specifics that are not required, and that Plaintiffs could not be reasonably expected to know, at the pleading stage.  Discovery may show that, for particular transactions, some Plaintiffs benefited instead of being harmed by the manipulation of the Fix, but the fact that an injury may be outweighed by other benefits . . . does not negate standing.

2015 WL 363894, at *9-10.  Plaintiffs' pleading burden thus would have been well-met even if the Complaint simply posited that Plaintiffs transacted in gold investments and were harmed by Defendants' acts.  But the Complaint goes further.  It specifically identifies days when manipulation occurred *and* matches those with days when Plaintiffs transacted.  SAC App. A, B.[60]  And, unlike in *FX*, the "direction" here is also clearly pled—Defendants consistently pushed prices down; Plaintiffs here were all sellers.  SAC ¶¶ 7-10, 29-56, 116-19.

---

[59]  *See FX*, Case No. 13-cv-07789, Dkt. No. 172 (S.D.N.Y. Mar. 31, 2014) ("FX Amended Complaint"), available at 2014 WL 1493022, ¶¶ 103, 108 (on multi-directional conspiracy), 51-52, 89-90 (on multiple currencies).

[60]  This distinguishes this case from *In re Energy Transfer Partners Natural Gas Litigation*, 2009 WL 2633781, at *11 (S.D. Tex. Aug. 26, 2009), also cited by Defendants.  The price index at issue there was only published once a month, and the plaintiffs did not allege they transacted around then.

Defendants contend that the Complaint needs to go *even further*, by showing what *minute of the day* each transaction occurred, versus what *minute of the day* the effects of Defendants' suppression abated.  Br. at 48.  This is derivative of Defendants' charge that the Complaint's allegations that the impact of suppression lasted beyond the Fixing window are contradicted by or in "tension with" prior allegations.  Br. at 3, 48.  As discussed above in Section I.B.4, they are not.  More generally, in any setting, determining the *exact minute* when an act of manipulation abated would be the type of information that "Plaintiffs could not be reasonably expected to know, at the pleading stage."  *FX*, 2015 WL 363894, at *9-10; *see also Libor I*, 935 F. Supp. 2d at 718-19.  But this is particularly inappropriate here, given this is not just one act, but a continuous campaign over many years, *see* SAC ¶¶ 327-28, making it all the more plausible that the market did not shake off Defendants' malfeasance after a few minutes.[61]

Defendants posit that the Complaint does not allege that Plaintiffs transacted during a period of suppressed prices.  Br. at 48.  Not so.  It alleges Plaintiffs were harmed when they sold gold investments "at artificial prices proximately caused by Defendants' unlawful manipulation," *i.e.*, they in fact transacted during the period when the results of the suppression was still being felt in the market.  SAC ¶¶ 29-56.  None of Defendants' arguments make it proper for the Court to nonetheless presume that the impact of Defendants' repeated acts of suppression fully abated before Plaintiffs transacted in *every one* of their thousands of transactions.  Defendants first note that prices for gold were going up overall during many years.  Br. at 48.  But just because prices were going up, does not mean they would not have been higher absent Defendants' collusion.  Defendants relatedly refer to a chart allegedly showing that in the aggregate prices "returned to

---

[61]  Indeed, where Plaintiffs allege consistent distortion, injury is presumed.  *See In re Amaranth Natural Gas Commodities Litig.* ("*Amaranth III*"), 269 F.R.D. 366, 379-80 (S.D.N.Y. 2010) ("because plaintiffs transacted as artificial prices, injury may be presumed"); *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 244 F.R.D. 469, 475-76 (N.D. Ill. 2007) *aff'd*, 571 F.3d 672 (7th Cir. 2009) ("Plaintiffs allege that defendants' conduct manipulated the price of the June Contract . . . [t]herefore the Court is satisfied that all members of the class have suffered injury.").

pre-Fixing levels" at 1:30 p.m.  Br. at 44.  As an initial matter, Defendants are looking at the

wrong data, and over-extrapolating from there.[62]  Even if that were not the case, just because

prices eventually returned to "pre-Fixing" levels in an "up" market, does not mean prices would

not have been *even higher* than "pre-Fixing levels," much sooner, but-for the suppression.  And

even then, Defendants seem to presume that all of Plaintiffs' thousands of transactions occurred

after 1:30 p.m.

Notably, requiring a *minute-by-minute* breakdown of both the impact of Defendants'

wrongdoing and Plaintiffs' transactions would go far beyond even the cases Defendants cite.  In

*Libor II*, the courts' reference to "at a time" referred to the identification of *days*, not minutes.

*See In re Libor-Based Fin. Instruments Antitrust Litig.*, 962 F. Supp. 2d 606, 618 (S.D.N.Y.

2013).  And the *Libor* court required 'day-matching' only where plaintiffs were relying on a

small list of days of up-or-down, trader-based, intermittent manipulation revealed by plea deals,

which left open the possibility that Libor was "true" on the days the plaintiffs transacted.  *In re

Libor-Based Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 461 (S.D.N.Y. 2014) ("*Libor

III*").  Where the plaintiffs were instead alleging *systemic suppression*—as Plaintiffs here are

doing—no such "matching" was required to state a claim.  *Libor II*, 962 F. Supp. 2d at 622.

Finally, Defendants posit that *maybe* Plaintiffs were not harmed, *if* they bought when

prices were suppressed more than when they sold.  Br. at 48.  But the *FX* court recognized, on

indistinguishable facts, that the fact that "an injury may be outweighed by other benefits . . . does

not negate standing" at the pleading stage.  2015 WL 363894, at *9-10 (citing *Ross*, 524 F.3d at

222); *see also Denney v. Deutsche Bank AG*, 443 F.3d 253, 265 (2d Cir. 2006).  In any event, the

far-fetched hypothetical that every single one of *thousands* of Plaintiffs' transactions was a

---

[62]   The chart cited by Defendants presents an aggregate of all years and all days, and thus the data is being pulled 'up' by days when prices overall were going up.  *See* SAC ¶ 109.  When the analysis is refined by year, and just on days when price spikes occur, it becomes clear that the acts of identified suppression linger.  *Id.* ¶¶ 138-40.

"winner" because of uneven levels of manipulation on buy and sell dates, as to completely

negate their standing, does not seriously call into question Plaintiffs' allegations of harm.

## IV.   PLAINTIFFS HAVE PLAUSIBLY PLED CEA VIOLATIONS

### A.   Plaintiffs Have Plausibly Pled Claims for Market Manipulation

#### 1.   Defendants could not have "only" "negligently" entered into an illegal conspiracy to act as a trading bloc

##### (a)   Rule 9(b) does not apply

Defendants assert that "any" Commodity Exchange Act ("CEA") claim is subject to Rule

9(b).  Br. at 37.  But "fraud is not a necessary element of a market manipulation claim."  *CFTC*

*v. Wilson*, 27 F. Supp. 3d 517, 532 (S.D.N.Y. 2014).  A "case-by-case" approach is therefore

required.  *Id.*  Much of what Defendants did wrong involved manipulative trading strategies, *e.g.*,

"banging the close."  Even rigging the Fixing "auction" is more akin to such activities than a

misrepresentation.  Thus, Plaintiffs' claims are not governed by any "heightened standards."  *See*

*id.* (allegations that defendant used a trading strategy centered on the timing of trades did *not*

sound in fraud).[63]

##### (b)   Even if scienter is required, it has been adequately pled

*Even if* Rule 9(b) is applicable,[64] the Complaint well-meets it.  As an initial matter,

pleading standards are often relaxed in this context, specifically, because market manipulation

---

[63]  *See also, e.g.*, *In re Amaranth Natural Gas Commodities Litig.* ("*Amaranth IV*"), 730 F.3d 170, 181 n.11 (2d Cir. 2013); *CFTC v. Amaranth Advisors*, 554 F. Supp. 2d 523, 530 (S.D.N.Y. 2008) (applying the "liberal pleading standards under Rule 8(a)" to CEA manipulation claim).  In *In re Crude Oil Commodities Litigation*, 2007 WL 1946553, at *2 (S.D.N.Y. Jun. 28, 2007), cited by Defendants, the plaintiff admitted the case was about a "false impression," and the underlying acts involved fraud-like practices not relevant here, such as "talking up" supposed supply needs, and "representing to market participants and regulators" false claims about storage levels.

[64]  Federal Rule of Civil Procedure 9(b) makes clear "conditions of a person's mind may be alleged generally."  This counsels against overly strict application of the Second Circuit's so-called "strong inference" rule.  As for the Private Securities Litigation Reform Act ("PSLRA"), the CFTC merely has noted that:  "*To account for the differences between the securities markets and the derivatives markets, the Commission will be guided, but not controlled, by* the substantial body of judicial precedent applying the comparable language of SEC Rule 10b-5."  76 Fed. Reg. 41398-01, at 41399 (emphasized language omitted from Defendants' brief).  That does not mean the separate *statutory* "strong inference" standard for scienter, a creation of Congress in the PSLRA for 1934 Act

claims often "involve facts solely within the defendants' knowledge." *Libor I*, 935 F. Supp. 2d at 714; *see also In re Natural Gas Commodity Litig.*, 358 F. Supp. 2d 336, 343-44 (S.D.N.Y. 2005) ("Plaintiffs must satisfy the flexible Rule 9(b) standard that other courts in this District have found applicable to market manipulation claims, rather than the more generic standard applicable to allegations of fraudulent statements.").

Defendants begin by repeating the argument that the allegations of motive and opportunity do not make sense. Br. at 38-42. As discussed in Section I above, this is not a generic complaint brought against a random group of market participants. Rather, it is brought against the large banks that literally controlled a key price discovery and fixing process. And it is brought against Bank Defendants that are shown to happen to have been invested in just the right way to profit most cleanly from downward spikes in the price of gold.

But more importantly, Defendants' attempt to treat this like a securities fraud case misses the forest for the trees. This is not a case about whether an inaccurate representation about future profits was fraudulently made, or was an innocent mistake. As discussed in Section I, the Complaint establishes that prices were being driven down, unnaturally, by Defendants' actions— including by pushing through transactions that were below-market, and by rigging the PM Fixing "auction" to ratify then magnify the results of such market movements. This occurred, daily, for *years*. One cannot *mistakenly* drag the market lower, day after day, year after year, at the exact same point in time. One cannot *accidentally* rig an auction. One cannot *innocently* form a conspiracy to act a trading bloc with your supposed competitors. By their very nature, the complained-of acts could not have been done unintentionally.

---

claims, specifically, may be properly imported into the CEA, for which Congress has not similarly ratcheted up plaintiffs' pleading burdens beyond Rule 9(b), even for claims that sound in fraud (which Plaintiffs' here do not).

Defendants nowhere address this logic.  Rather, they merely cite to three cases where the plaintiff (thanks to government releases, which have not yet occurred here) happened to be able to quote from specific documents.  Br. at 42-43.  Accordingly, Defendants' entire "recklessness" argument is to again suggest that "smoking gun" documents are necessary to state a claim.  But courts have made repeatedly clear that "proof of intent will most often be circumstantial in nature, manipulative intent must normally be shown inferentially from the conduct of the accused."  *E.g.*, *CFTC v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 249 (S.D.N.Y. 2012).

Defendants try to preemptively distinguish *Libor III*, directing the Court to its reference to "reputational" motives not present here.  Br. at 39 n.16.  But the *Libor* court upheld the CEA claims for the separate reasons that:  (a) the banks "consciously misbehaved by submitting artificial Libor quotes;" and (b) the "'danger' of submitting artificial Libor quotes—the manipulation of the price of Eurodollar futures contracts—was . . . so obvious that they must have been aware of it."  *Libor III*, 27 F. Supp. 3d at 470.  Like in *Libor*, the Complaint here establishes that Defendants "misbehaved" in ways that do not happen accidentally—just as one does not accidentally suppress Libor submissions on a daily basis for years, so too Defendant Banks cannot have accidentally "banged the close" on a routine basis or mistakenly rigged the Fixing auction.[65]  As in *Libor*, Defendants undeniably understood rigging prices around the Fixing would impact gold futures.  As in *Libor*, the CEA claim should thus be upheld based on the persuasive allegations of systemic abuses of the PM Fixing processes.

Defendants cite to *In re Amaranth Natural Gas Commodities Litig.* ("*Amaranth I*"), 587 F. Supp. 2d 513 (S.D.N.Y. 2008), but that case supports Plaintiffs' position here.  The court there

---

[65]  Defendants are likely to try to distract by referring back to the question of whether the price spikes were caused by "hedging."  *But see* Section I above.  In any event, at most that just goes to the plausibility of the allegations Defendants were conspiring in the first place.  It does not advance the issue of whether, assuming the Complaint establishes a conspiracy, it also necessarily satisfies the "scienter" element of CEA claims.

held: "While the sale of a large number of futures is not inherently manipulative, allegations that a defendant repeatedly sold large numbers of futures just before the close of settlement periods are sufficient to allege commodities manipulation." *Id.* at 535.  This case—involving *thousands* of days of activities, all pushing prices down, clearly falls into the latter category.[66]

### 2.    Plaintiffs establish the remaining elements of price manipulation

Defendants contend that Count Two (for price manipulation) fails not just for lack of scienter (*but see* Section V.A.1 above), but also for failing to adequately plead that Defendants caused prices to be artificial.  As with scienter, Defendants' arguments are little more than a rehash of their failed attacks on the plausibility of the conspiracy.  *See* Section I above.

Prices that do not reflect the forces of supply and demand are "artificial."  *In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.*, 2012 WL 6700236, at *12 (S.D.N.Y. Dec. 21, 2012) ("*Silver I*"); *see also Parnon*, 875 F. Supp. 2d at 246 (manipulation is "implicitly an artificial stimulus" that "distorts" prices by "prevent[ing] the determination of prices by free competition alone").  As seen in Section I.B above, study after study shows prices for gold acting in unnatural ways around the PM Fixing—unnatural compared to other times of day, unnatural compared to the AM Fixing, unnatural compared to widely accepted economic principles, unnatural compared to other similar markets, and even unnatural compared to gold prices around the PM Fixing once investigators began looking into gold.  Defendants' only response is to note that Plaintiffs did not compare the price of gold in one "gold market" to another "gold market."  Br. at 44.  But it does, by comparing prices for gold at one point in time, to another point in time (*i.e.*, spikes only occurred around the PM Fixing).  In any event, that

---

[66]    Defendants' citation to *In re Commodity Exchange, Inc. Silver Futures & Options Trading Litigation* 560 F. App'x. 84, 86 (2d Cir. 2014) ("*Silver II*") is also unavailing.  Again, the *Silver* cases did not concern a trade bloc that rigged a benchmark rate, but rather a *single* bank's ordinary trading activities.  Thus, the court's holding that the bank's power as a market *participant* was not "by itself" sufficient is of no moment.  For the reasons set forth above and in Section I, neither do the Complaint's allegations of manipulative trading activities resemble those that the *Silver II* court found "conclusory and speculative."

comparing the same prices for the same good in various outlets is *one* way other plaintiffs have shown price artificiality, does not mean plaintiffs cannot show artificial prices another way, as is also done here.  To hold as much would perversely provide immunity for *larger* acts of manipulation.

Defendants claim that the Complaint does not establish *these Defendants* could or did cause the artificial prices.  Br. at 44-45.  This fails for the reasons set forth in Section I above.

Defendants turn to posit that "merely quoting prices" is "not unlawful."  Br. at 45.  But the Defendant Banks here were not just "quoting prices."  Moreover, unlike the conduct at issue in *Libor* ("false" poll answers), where CEA claims were upheld, much of the conduct here *is expressly prohibited* by the Act.  *See* ¶¶ 8 n.2, 294, 318; 7 U.S.C. § 6c(a)(5); 78 Fed. Reg. 31890, 31896.  Indeed, "banging the close" to rig a benchmark was recently found by the CFTC to be a violation of numerous sections of the CEA.  *See* Barclays ISDAfix Order at 13-18; *see also Amaranth I*, 587 F. Supp. 2d at 535 (large sales done close to settlement constituted acts of manipulation).  Even if it were nonetheless presumed to be legal to "unilaterally" move markets to artificially move a benchmark, that would *still* not justify dismissal.  Defendants do not and cannot claim it to be "not unlawful" for a *group* of banks to act *together* to do so.

Finally, Defendants argue that Plaintiffs have failed to establish standing under the CEA. Br. at 47.  The only basis for such assertion, however, is the argument that Plaintiffs have not shown "actual damages," *i.e.*, they have not shown injury-in-fact.[67]  *But see* Section III above.

### B.  Plaintiffs Have Also Pled Manipulative Device Claims

The same misdeeds that triggered Defendants' liability for manipulation (Count Two) similarly triggered their liability for use of a manipulative device (Count Three) and false

---

[67]  *See generally, e.g.*, *Libor II*, 962 F. Supp. 2d at 619 ("The term 'actual damages' has been applied by courts in a straightforward manner to require a showing of actual injury caused by the violation.").

reporting (Count Four).  Defendants primarily repeat arguments regarding the plausibility of the

misdeeds they are being charged with, and Plaintiffs' purported lack of standing.  *See* Br. at 46.

These arguments all fail, as discussed above.  Defendants in fact make only two arguments

specific to these Counts.

Defendants' first argument as to these Counts is to summarily assert that Plaintiffs fail to

allege personal "reliance."  *Id.*  However, reliance is not an element of a CEA claim, even for

manipulative device and false-reporting claims.  Reliance nowhere appears in the CEA as an

element, *see* 7 U.S.C. §§ 9, 13, and Defendants cite to no court that has judicially created one.

Instead, Defendants cite to inapposite cases discussing the requirement for *securities fraud*.[68]

Defendants' remaining argument is that Count Four (false reporting) needs to be

dismissed with respect to actions occurring before August 15, 2011, as that is when Rule 180.1

became effective.  Br. at 46.  However, Section 9(a)(2) of the CEA, 7 U.S.C. § 13(a)(2),

expressly prohibits false reporting, and does so today just as it did prior to the enactment of

Dodd-Frank.  *Compare, e.g.*, 7 U.S.C. § 13(a)(2) (2009) with 7 U.S.C. § 13(a)(2) (2014)

(*identical* language except for the addition of "or of any swap" in the latter).  Unsurprisingly,

many decisions recognize pre-Dodd-Frank false reporting as actionable under the CEA.  *See,*

*e.g.*, *In re Natural Gas*, 358 F. Supp. 2d at 344-45.  Accordingly, Claim Four can validly extend

to acts before the passage of Rule 180.1.  Indeed, the CFTC imposed "false reporting" sanctions

on Barclays for acts beginning in *January 2007*.  *See* Barclays ISDAfix Order, at 13.

---

[68]    *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005) (discussing the PSLRA's economic loss
and loss causation requirements); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007)
(discussing securities fraud claims); *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 159
(2008) (discussing the reliance in securities fraud actions).  As discussed above (at note 64), a general statement that
the Commission would be "guided, but not controlled by" case law under the federal securities laws does not justify
judicially creating *entirely new elements*.  *See generally Wilson*, 27 F. Supp. 3d at 531-32 (applying the long-
standing standards for CEA manipulation claims, without any reliance requirement).

C.     **Plaintiffs Adequately Allege Secondary Liability**

Defendants assert that Counts Five and Six (for "secondary" liability) fail for the same reasons the "primary" claims do (no artificiality, etc.).  Br. at 47.  But as above, Plaintiffs' claims are well-pled.  Defendants add only that Plaintiffs have not satisfied the elements of Count Five (principal-agent liability).  Br. at 47.  But an allegation (*see* SAC ¶ 57) that wrongdoers "were acting within the scope of their employment . . . . suffices[.]"  *See Amaranth I*, 587 F. Supp. 2d at 546.  CEA Section 2(a)(1)(B) codifies "a variant of the common law principle of respondeat superior," thus making a principal "'strictly liable"  *In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498, 515 (S.D.N.Y. 2004).

**V.     PLAINTIFFS HAVE PLAUSIBLY PLED CLAIMS FOR UNJUST ENRICHMENT**

Defendants argue that the unjust enrichment claims should be dismissed because Plaintiffs "do not allege that they have any relevant relationship with any defendant," or that "they bestowed any benefit to which defendants were not entitled."  Br. at 49.  However, the unjust enrichment claim is *expressly limited* to transactions "in which a Defendant or its affiliate was in a direct or quasi-contractual relationship with a Class Member."  SAC ¶ 377.

To the extent Defendants' argument is that the *named* Plaintiffs do not allege direct transactions, it is immaterial because "class representatives may be able to sue defendants who did not injure any of them directly by employing the 'juridical link' doctrine."  Newberg on Class Actions § 2:5 (5th Ed.).  The general rule that named plaintiffs must have been personally harmed with respect to each claim "does not embrace situations in which all injuries are the result of a conspiracy or concerted schemes between the defendants at whose hands the class suffered injury.  Nor is it intended to apply in instances in which all defendants are juridically related in a manner that suggests a single resolution of the dispute would be expeditious."  *La*

*Mar v. H&B Novelty & Loan Co.*, 489 F.2d 461, 464 (9th Cir. 1973).[69]  *All* of the injuries

suffered by *all* class members were the result of the *same* conspiracy.  This is thus precisely the

circumstance where "a single resolution of the dispute would be expeditious."  *Id.* at 466.

## VI.   ALL OF PLAINTIFFS' CLAIMS ARE TIMELY

### A.   Defendants Have Failed to Show "Inquiry Notice" Began for CEA Claims

The first complaint in this consolidated action was filed on March 3, 2014, rendering

CEA claims relating to damages incurred after March 2, 2012 indisputably timely.[70]  But *all* of

the claims are timely.  Given how timeliness arguments have fared in other benchmark cases

recently, it is no wonder Defendants put them in a footnote here.  The Second Circuit has

*overturned* dismissal of Libor-related claims on statute of limitations grounds.  *See BPP Ill., LLC*

*v. The Royal Bank of Scotland Grp. PLC*, 2015 WL 2215004 (2d Cir. May 13, 2015) (summary

order).  This, despite the fact that the district court there had before it *numerous* articles

performing the same statistical analyses used to state a claim.  *See BPP Ill.*, 2013 WL 6003701,

at *10 (S.D.N.Y. Nov. 13, 2013).  And the defendants in *FX* withdrew their timeliness challenges

following oral argument, at the court's prodding.  2015 WL 363894, at *4 n.8.

---

[69]   *See also, e.g.*, *Payton v. Cnty. of Kane*, 308 F.3d 673, 678-82 (7th Cir. 2002) (plaintiffs had standing even against other defendants because "these putative representatives were personally injured by the operation of the very same statute that caused the injuries to all other members of the proposed class); *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 423-24 (6th Cir. 1998) (plaintiff had standing to bring action on behalf of participants in *all* Nationwide Insurance ERISA plans because calculation methodology was common to all plans); *Colo. Cross-Disability Coalition v. Abercrombie & Fitch Co.*, 2013 WL 856510, *5 (D. Colo. 2013), *rev'd on other grounds*, 765 F.3d 1205 (10th Cir. 2014); *Alves v. Harvard Pilgrim Health Care Inc.*, 204 F. Supp. 2d 198, 205 (D. Mass. 2002); *Barker v. FSC Sec. Corp.*, 133 F.R.D. 548, 553-54 (W.D. Ark. 1989); *In re Activision Secs. Litig.*, 621 F. Supp. 415, 432 (N.D. Cal. 1985).  The Second Circuit has admittedly disagreed with *Payton*'s approach.  *See Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 64 (2d Cir. 2012).  But its willingness to liberalize concepts of "standing" beyond the simple notion of whether a plaintiff was injured in fact on that specific claim, on appropriate facts, is confirmed by its later decision, *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 164 (2d Cir. 2012), where it allowed a class-action to proceed even as to securities offerings the named plaintiff did not personally invest in, where the transactions shared a "similar set of concerns."

[70]   That the conspiracy began earlier is irrelevant.  *See, e.g.*, *In re Libor-Based Fin. Inst. Antitrust Litig.*, 935 F. Supp. 2d 666, 712 (S.D.N.Y. 2013) ("[A] plaintiff cannot discover his injury until he has been injured").

Defendants fail to show a different result is required here.  For CEA claims, it is Defendants' burden to establish that Plaintiffs knew or through reasonable due diligence should have known of their injury.  *See, e.g.*, *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 148 (2d Cir. 2012).  This is an inherently fact-intensive inquiry.  *E.g.*, *Watseka Farmers Grain Coop. v. FC Stone Grp.*, 2006 WL 3743112, at *4 (C.D. Ill. Dec. 15, 2006).  The entirety of Defendants' (footnote, out of place) "argument" is that data regarding "downward price movements" have been "in the public domain for years."  Br. at 49 n.22.  The notion that the conspiracy was obvious in 2012 cannot be squared with reality.  If it was obvious that Defendants were rigging gold prices, the market for gold investments would have undergone quite a shock, and investigations launched.[71]  But the Fixing process did not change until late *2014*.  SAC ¶ 22, 85, 331.  Even that aside, price movements on a given day may be market noise.  Only when thousands of days of historical pricing data are analyzed did it become clear movements were statistically significant and continuous.  There was no reason for any reasonable investor to be undertaking such efforts in 2012.

**B.      The Antitrust Claims are Timely Because of Defendants' Concealment**

In the same conclusory footnote, Defendants posit that antitrust claims tied to "conduct prior to" March 2, 2010 are untimely.[72]  The question of fraudulent concealment is often not ripe for adjudication on the pleadings.  *See, e.g.*, *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378, 400 (S.D.N.Y. 2010).

---

[71]   *See generally Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 363 (2d Cir. 2013) ("hindsight" showing fraud "*could* have been discovered" does not show it "*would*" have on "reasonable inquiry"); *Chem. Bank & Trust Co. v. Reynaud*, 270 N.Y.S. 301, 304 (Sup. Ct. 1933) ("[I]f these published charges had in fact led careful and prudent investors to dispose of the bonds, the market would have gone to smash.").

[72]   Again, if by "arising out of conduct prior," Br. at 49 n.22, Defendants contend that damages incurred *after* the relevant cutoff are unavailable because Defendants' conspiracy began earlier, they are wrong.  *See, e.g.*, *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 295 (2d Cir. 1979); *In re Credit Default Swaps Antitrust Litig.*, 2014 WL 4379112, at *15 (S.D.N.Y. 2014).

Plaintiffs can show that the conspiracy was self-concealing, or that Defendants took affirmative acts of concealment.  *In re Issuer Plaintiff IPO Antitrust Litig.*, 2004 WL 487222, at *4 (S.D.N.Y. Mar. 12, 2004).  Price-fixing conspiracies like those here are inherently self-concealing.  *See State of N.Y. v. Hendrickson Bros.*, 840 F.2d 1065, 1083 (2d Cir. 1988).[73]  The court in *Precision Associates v. Panalpina World Transp. (Holding) Ltd.*, 2011 WL 7053807, at *51 (E.D.N.Y. Jan. 4, 2011), *r&r adopted* (Aug. 13, 2012), observed that while "some courts" nonetheless require more, even such additional burdens are satisfied by allegations (*see, e.g.*, SAC ¶¶ 1, 80, 83-84, 236-37, 240-41, 244, 271) that there were "private meetings" and "cover" used to obscure the true nature of defendants' behavior.[74]  As for affirmative acts, the Complaint alleges Defendants (i) represented that the Fixing was impartial and that prices reflected normal market forces, (ii) denied reports of manipulation, and (iii) maintained the secrecy of the Fixing process and their own sham trades and proprietary positions.  *E.g.*, SAC ¶ 334.[75]

As for Plaintiffs' lack of knowledge[76] and diligence, those elements have also been pled.  SAC ¶¶ 331-332.  As discussed above, the conspiracy was not in plain sight, but rather lurking in a mass of market data.  There was nothing reasonable investors would have been doing to cut through that market noise until much later.  In such settings, courts treat the diligence

---

[73]   *See also Credit Default Swaps*, 2014 WL 4379112, at *15-16 ("group boycott" inherently self-concealing, particularly where meetings held in secret); *In re Natural Gas*, 337 F. Supp. 2d at 513 (conduct was "self-concealing" where plaintiffs alleged that defendants engaged in manipulative trades and reported false trades).

[74]   *Compare, e.g.*, SAC ¶ 333 *with Hendrickson Bros.*, 840 F.2d at 1084 (conspiracy self-concealing where it was designed to endure and had to remain concealed to be successful) *and Precision Assoc.*, 2011 WL 7053807, at *51 (use of private communications and trade associations as cover characterized self-concealing conspiracy).

[75]   *See In re Air Cargo Shipping Servs. Antitrust Litig.*, 2010 WL 10947344, at *16 (E.D.N.Y. Sept. 22, 2010), *r&r adopted* (Nov. 1, 2010) (acts that "go beyond mere silence or a failure to 'own up'" constitute acts of affirmative concealment).  *See also Schenker AG v. Societe Air France*, 2015 WL 1951422, at *3-5 (S.D.N.Y. Apr. 23, 2015) (finding fraudulent concealment well-pled despite news reports of antitrust-related raids in the industry).

[76]   For the clock to run, a reasonable plaintiff must have "actual knowledge of the facts that comprise his cause of action or should have acquired such knowledge through the exercise of reasonable diligence."  *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 461 (2d Cir. 1974); *see also, e.g.*, *In re Mercedes-Benz Antitrust Litig.*, 157 F. Supp. 2d 355, 373 (D.N.J. 2001) (rejecting argument that "reasonably diligent" purchasers would have price-shopped to discover price-fixing).  Further, just as more than parallel conduct is needed to state a claim, so too is more than knowledge of parallel conduct needed to defeat one.  *Precision Assoc.*, 2011 WL 7053807, at *53.  Only when the patterns broke and investigations revealed was the nefariousness of the patterns reasonably revealed.

requirement as met merely by alleging the plaintiff remained ignorant.  *See In re Magnetic Audiotape Antitrust Litig.*, 2002 WL 975678, at *3 (S.D.N.Y. May 9, 2002) ("Without a tip-off . . . plaintiffs had no reason to exercise due diligence.").[77]

Defendants are not saved by citation to *Masters v. Wilhelmina Model Agency, Inc.*, 2003 WL 1990262, at *2 (S.D.N.Y. Apr. 29, 2003), where *any* consultation about the contracts at issue would have aroused suspicions, because the challenged terms were *facially* outside of the law.  It is against that background the court faulted the plaintiff for not explaining why they didn't act differently earlier.  *Id.*  Here, in contrast, Plaintiffs explained that the pricing data was not self-revealing of suspicion, given the need to tease out *years-long patterns* to determine if something was amiss.  Plaintiffs have also explained what differentiates 2010 from later years in terms of what reasonable investors would be doing—it was only later that reports and investigations into the manipulation of the Gold Fixing began to surface, and the pricing patterns broke.[78]

## CONCLUSION

For the reasons set forth above, Plaintiffs request that Defendants' Joint Motion be denied.[79]

DATED:  June 15, 2015

**BERGER & MONTAGUE, P.C.**                **QUINN EMANUEL URQUHART & SULLIVAN, LLP**

---

[77]   *See also, e.g.*, *Conmar Corp. v. Mitsui & Co. (U.S.A.)*, 858 F.2d 499, 504 (9th Cir. 1988) ("The requirement of diligence is only meaningful . . . when facts exist that would excite the inquiry of a reasonable person."); *S.E.C. v. Wyly*, 788 F. Supp. 2d 92, 111 (S.D.N.Y. 2011) (if fraud is concealed, a plaintiff logically cannot say more about diligence).

[78]   In *Hinds County, Mississippi v. Wachovia Bank N.A.*, 620 F. Supp 2d 499, 521 (S.D.N.Y. 2009), also cited by Defendants, a "significant [previously] hidden payment" was admitted to have been disclosed earlier, which should have aroused suspicions.  And in *In re Magnetic Audiotape*, the problem was that the plaintiff (like in *Masters*) failed to explain what changed, as to trigger discovery of the cause of action.  2002 WL 975678, at *3.

[79]   In the Court's discretion, if any other clarification is required for the Complaint, Plaintiffs request leave further to amend.

By: */s/ Merrill G. Davidoff*
Merrill G. Davidoff
Michael C. Dell'Angelo
Zachary D. Caplan
1622 Locust Street
Philadelphia, Pennsylvania 19103
Telephone:  (215) 875-3000
Fax:  (215) 875-4604
mdavidoff@bm.net
mdellangelo@bm.net
zcaplan@bm.net

By: */s/ Daniel L. Brockett*
Daniel L. Brockett
Daniel P. Cunningham
Steig D. Olson
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:  (212) 849-7000
Fax:  (212) 849-7100
danbrockett@quinnemanuel.com
danielcunningham@quinnemanuel.com
steigolson@quinnemanuel.com

Dale H. Oliver (*pro hac vice*)
Jeremy D. Andersen (*pro hac vice*)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:  (213) 443-3000
Fax:  (213) 443-3100
daleoliver@quinnemanuel.com
jeremyandersen@quinnemanuel.com

**Counsel for Plaintiffs and the Proposed Class**