**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE:<br><br>COMMODITY EXCHANGE, INC., GOLD FUTURES AND OPTIONS TRADING LITIGATION<br><br><br>*This Document Relates To All Actions* | Case Nos.:  14-MD-2548 (VEC)<br>14-MC-2548 (VEC)<br><br>**ORAL ARGUMENT REQUESTED** |

**PLAINTIFFS' OPPOSITION TO UBS'S MOTION TO DISMISS THE SECOND
CONSOLIDATED AMENDED CLASS-ACTION COMPLAINT**

## <u>TABLE OF CONTENTS</u>

I.  PLAINTIFFS HAVE PLAUSIBLY PLED THAT UBS WAS PART OF THE
    CONSPIRACY TO MANIPULATE GOLD PRICES ........................................................1

    A.  Only Slight Evidence is Needed to Link UBS as an Additional Member of
        the Well-Established Conspiracy.................................................................................1

    B.  The Complaint Contains Detailed UBS-Specific Allegations ................................2

    C.  UBS Is Not Immunized By the Fact it was Not a Member of the Fixing
        Panel........................................................................................................................4

    D.  UBS's Attacks on Isolated Allegations are Unavailing..........................................6

II. PLAINTIFFS HAVE PLED PLAUSIBLE CEA VIOLATIONS BY UBS .....................10

CONCLUSION..............................................................................................................................10

# **TABLE OF AUTHORITIES**

**Page**

## **Cases**

*In re Aluminum Warehousing Antitrust Litig.*,
   2015 WL 1378946 (S.D.N.Y. Mar. 26, 2015) ........................................................5

*Anderson News, LLC. v. Am. Media, Inc.*,
   680 F.3d 162 (2d Cir. 2012) ..................................................................................8

*Apex Oil Co. v. DiMauro*,
   822 F.2d 246 (2d Cir. 1987) ..................................................................................1

*Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*,
   620 F.2d 1360 (9th Cir. 1980) ...............................................................................5

*In re Currency Conversion Fee Antitrust Litig.*,
   2012 WL 401113 (S.D.N.Y. Feb. 8, 2012) ............................................................1

*In re Elec. Books Antitrust Litig.*,
   859 F. Supp. 2d 671 (S.D.N.Y. 2012) ...................................................................5

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
   2015 WL 363894 (S.D.N.Y. Jan. 28, 2015) ..........................................................4

*In re High-Tech Employee Antitrust Litig.*,
   856 F. Supp. 2d 1103 (N.D. Cal. 2012) .................................................................1

*Lipsky v. Commonwealth United Corp.*,
   551 F.2d 887 (2d Cir. 1976) ..................................................................................7

*Minpeco, S.A. v. Conticommodity Servs., Inc.*,
   673 F. Supp. 684 (S.D.N.Y. 1987) ........................................................................1

*Vandervelde v. Put & Call Brokers & Dealers Ass'n*,
   344 F. Supp. 118 (S.D.N.Y. 1972) ........................................................................1

Plaintiffs respectfully submit this memorandum in opposition to the motion to dismiss filed by UBS AG and UBS Securities LLC ("UBS") (Dkt. Nos. 71-72) ("UBS Br.").  A discussion of the Fixing process generally and evidence of the broad conspiracy to move prices downward around the Fixing window appears in Plaintiffs' Opposition to Defendants' Joint Motion to Dismiss ("Joint Opp."), filed concurrently herewith.

**I.     PLAINTIFFS HAVE PLAUSIBLY PLED THAT UBS WAS PART OF THE CONSPIRACY TO MANIPULATE GOLD PRICES**

> **A.     Only Slight Evidence is Needed to Link UBS as an Additional Member of the Well-Established Conspiracy**

As discussed in Section I of the Joint Opposition, the Complaint need only "plausibly" plead a claim.  Courts in this District have long recognized that "[o]nce a conspiracy is shown, only slight evidence is needed to link another defendant with it."  *In re Currency Conversion Fee Antitrust Litig.*, 2012 WL 401113, at *4 (S.D.N.Y. Feb. 8, 2012) (citing *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 257 (2d Cir. 1987)); *Minpeco, S.A. v. Conticommodity Servs., Inc.*, 673 F. Supp. 684, 688 (S.D.N.Y. 1987); *Vandervelde v. Put & Call Brokers & Dealers Ass'n*, 344 F. Supp. 118, 154-55 (S.D.N.Y. 1972).

UBS urges the Court to break its conduct into "three clusters" and examine each in isolation.  *See* UBS Br. at 4-9.  The premise of this argument is wrong—the Complaint alleges far more as to UBS than the "three clusters" of information.  But UBS's approach is also legally flawed.  "[P]laintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each."  *Currency Conversion*, 2012 WL 401113, at *8.  When evaluated as a whole, the Complaint more than plausibly demonstrates that UBS had "the means, the motive, and the opportunity" to manipulate prices in concert with the Fixing Bank Defendants.  *In re High-Tech Employee Antitrust Litig.*, 856 F. Supp. 2d 1103, 1118 (N.D. Cal. 2012).

1

### B.     The Complaint Contains Detailed UBS-Specific Allegations

UBS is a leading bullion bank; it holds itself out as "a leading provider of physical and derivative precious metal products."  *See* Dkt. No. 44 ("SAC" or "Complaint") ¶¶ 70-71.  UBS is one of only five full market making members of The London Bullion Market Association, and one of only six clearing members of London Precious Metal Clearing Ltd.  *Id.* ¶¶ 90-91.  But its activities are not limited to being a market maker.  Rather, like the other Bank Defendants, UBS has its own large proprietary (*i.e.*, fully discretionary and clearly for-profit) investments in gold, including by engaging in trading in the physical gold market, on COMEX, in gold derivatives, and in shares of gold ETFs.  *Id.* ¶¶ 70, 207.  Like the other Bank Defendants, UBS is alleged to have utilized its "leading" position in the gold market to collude and profit, *id.* ¶¶ 9, 11, 14-16, 105, 167, 197-98, 203-33, particularly because of its huge short futures positions, *id.* ¶¶ 170-71.

UBS's precious metals and foreign exchange ("FX") businesses are closely integrated—indeed, precious metals is a unit within UBS's FX desk.  *Id.* ¶¶ 241, 300.  Thus, it is unsurprising that inappropriate and manipulative conduct discovered in UBS's FX practices has been found to infect their precious metals business as well.  *Id.* ¶¶ 295-303.  At the end of September 2013, attempting to seek "first-mover" antitrust immunity and likely hoping to avoid revocation of earlier Libor settlements,[1] UBS informed various regulators that an internal investigation had uncovered possible signs of manipulation, collusion, and other abusive market conduct in UBS's FX business.  *Id.* ¶ 295.  Switzerland's financial regulator, FINMA, initiated enforcement proceedings against UBS on the grounds of suspected market abuse in FX trading.  *Id.* ¶ 296.  In

---

[1]   In 2012, UBS settled charges that it had *led* a "vast conspiracy" to rig Libor.  *See* SAC ¶¶ 18, 233.  Under the terms of UBS's settlements with U.S. regulators, UBS was required to turn over all information relating to market manipulation and was also required to refrain from manipulating markets.  However, the DOJ subsequently found UBS's conduct so egregious that it revoked UBS's Libor non-prosecution agreement after UBS admitted to manipulating markets outside of the Libor contexts.  *See* Karen Freifeld, *Major banks admit guilt in Forex probe, fined $6 billion*, Reuters (May 20, 2015), *available at* http://www.reuters.com/article/2015/05/20/us-banks-forex-settlement-idUSKBN0O50CQ20150520.

January 2014, the head of UBS's gold desk in Zurich was placed on leave for unspecified

reasons, and in May 2014, UBS disclosed that it had widened its internal investigation to include

its precious metals business.  *Id.* ¶¶ 295, 297.

At the end of 2014, FINMA issued a final report finding "serious misconduct" by UBS,

including by way of "collusion."  *Id.* ¶¶ 19, 234, 237, 301, 308.  FINMA's CEO stated that it

had "seen clear attempts to manipulate fixings in the precious metals markets."  *Id.* ¶¶ 19, 234,

301, 308.  UBS's manipulation in precious metals was found by FINMA to be similar to its

manipulation of FX rates.[2]  *Id.* ¶¶ 19, 237, 239-41, 299, 301-02.  FINMA also noted problems

with UBS's proprietary precious metals trading and that managers who had responsibility for

overseeing metals traders tolerated or even engaged in manipulative conduct.  *Id.* ¶¶ 302-03, 339.

At the beginning of 2015, UBS was reported to be among the banks (including the Fixing

Bank Defendants) who are under investigation by the DOJ Antitrust Division and the CFTC for

manipulating gold prices.  *Id.* ¶¶ 20, 278.[3]  In March 2015, following the demise of the

traditional Fixing—and in recognition of UBS's dominant market position in the gold market

and close ties to the Fixing Bank Defendants—UBS joined the Fixing Bank Defendants as one of

the banks that sets the new LBMA gold price.[4]

An analysis of available pricing data confirms UBS acted along with the Fixing Bank

Defendants to move gold prices down.  For instance, UBS's quotes were "bunched" together

---

[2]  These practices included:  (i) sharing information on order books with third parties: (ii) sharing "flow information" with third parties; (iii) sharing client names with third parties; (iv) front running; and (v) triggering stop loss orders.  SAC ¶ 301.  These are the same tactics UBS and the Fixing Bank Defendants used here.  *Id.* ¶¶ 8, 232, 267, 318.

[3]  The FINMA, DOJ, and CFTC investigations into market manipulation by UBS in precious metals are representative of a larger pattern of inappropriate conduct and lax oversight including four criminal matters in recent years involving Libor manipulation, municipal bond bid-rigging, tax evasion, and FX manipulation.  *See, e.g.*, David McLaughlin and Greg Farrell, *UBS's 'Godfather of Leniency' Made One Offer the Fraud Cops Refused*, Bloomberg (May 22, 2015), *available at* http://www.bloomberg.com/news/articles/2015-05-22/ubs-s-godfather-of-leniency-made-one-offer-fraud-cops-refused.

[4]  *See* Jan Harvey, *Goldman, UBS join ex-'fixing' banks for new LBMA gold price*, Reuters (Mar. 20, 2015), *available at* http://www.reuters.com/article/2015/03/20/us-gold-fix-idUSKBN0MG0YF20150320.

with the Fixing Bank Defendants, but *not* with other market participants, on days when the price of gold was driven down.  *Id.* ¶¶ 252-53; *see also* Joint Opp. Section I.B.3 (discussing "bunching" analysis).  As with the Fixing Bank Defendants, this anomaly abated in 2013.  SAC ¶¶ 252-54.  UBS was also, along with the Fixing Bank Defendants, disproportionately responsible for quotes that represented the biggest drop from prior quotes.  *Id.* ¶ 258.  In addition, the Complaint demonstrates how UBS specifically, along with Fixing Bank Defendants, was leading gold prices downward.  *See id.* ¶¶ 261-62 (on September 1, 2011, UBS and HSBC—who have a history of colluding together, *id.* ¶¶ 235, 237—provided below-market quotes just prior to the start of the PM Fixing), 266 (on January 25, 2006, May 31, 2012, and February 13, 2013, UBS is similarly shown to be responsible for leading downward push around PM Fixing), App. I (providing additional similar charts, including those that identify UBS specifically, for many other days).

### C.    UBS Is Not Immunized By the Fact it was Not a Member of the Fixing Panel

The Complaint alleges that UBS (a) had the same knowledge as the other conspirators as to the direction of prices, SAC ¶¶ 237, 252-54, and (b) carried out affirmative steps in furtherance of the conspiracy, *id.* ¶¶ 238-39, 242, 245-49, 260-61, 266.  UBS engages in a series of semantic twists to nonetheless suggest the Complaint somehow inadvertently concedes UBS's innocence.  UBS Br. at 3-4.  It does not.

For instance, UBS focuses on allegations referring to the Fixing Panel Banks' "control over" the Fix auction itself, while UBS was not a panel bank.  UBS Br. at 3-4.  But that UBS did not sit on the panel does not mean it did not have a role to play in the conspiracy—by using its huge portfolio to help "bang the close" and thereby move markets around the PM Fixing.  SAC ¶¶ 8, 232, 267, 318.  *See generally In re Foreign Exchange Benchmark Rates Antitrust Litig.*, 2015 WL 363894, at *2-3 (S.D.N.Y. Jan. 28, 2015) ("*FX*") (describing tactics that banks used to

manipulate the WM/Reuters fix despite the fact that banks were not directly involved in setting the fix).  UBS's argument ignores the fact that, "participation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability, for each conspirator may be performing different tasks to bring about the desired result."  *Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1367 (9th Cir. 1980); *see also In re Aluminum Warehousing Antitrust Litig.*, 2015 WL 1378946, at *6 (S.D.N.Y. Mar. 26, 2015) (denying motion to dismiss Sherman Act conspiracy claim where defendants "were not all doing the same thing but were united in obtaining benefits from their combined endeavors"); *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 690 (S.D.N.Y. 2012) (that a company was "involved in only a portion" of a conspiracy "does not undermine the existence of the conspiracy itself or [that company's] role as a participant").

UBS argues that its lack of a seat on the panel negates any suggestion it had a motive to manipulate prices, because only those in the know would have "foreknowledge that a price spike was coming."  UBS Br. at 3-4.  But the Complaint alleges UBS *was* in the know, as a member of the conspiracy.  SAC ¶ 118, 237, 252-54.  UBS's circular argument (that if it didn't know, it couldn't have benefitted) does nothing to show that UBS was not part of the conspiracy and equally knowledgeable as to what was occurring, regardless of whether it held a panel seat.

Finally, UBS takes summary allegations from an appendix referring to the fact that general "market participants" were left unaware of the scheme, to again suggest the Complaint concedes UBS was left in the dark.  UBS Br. at 4.  But again, the Complaint clearly alleges UBS to have been in-the-know.  SAC ¶¶ 118, 237, 252-54.  That the Complaint did not paste the phrase "except UBS" into general descriptions of the market's ignorance, does not mean Plaintiffs accidentally conceded UBS's ignorance.

D.    **UBS's Attacks on Isolated Allegations are Unavailing**

The above facts provide far more than "slight" evidence linking UBS to the price-fixing conspiracy.  It is notably *im*plausible that UBS, a major player in the gold market which is alleged to have similar "short" futures positions in gold, and whose "precious metals" desk has been found to be manipulating financial benchmarks, *just so happened* to be providing price quotes "bunched" around those of members of the established conspiracy, and *just so happened* to often be leading a downward trend.  UBS's never fully grapples—as it must—with the persuasive value of these facts in linking it to the established conspiracy.  Its attempts to divide-and-conquer also each fail on their own merits.

*First*, UBS posits that as a "market maker" it would have no motive to conspire, because market makers are required to buy and sell physical gold to satisfy orders.  UBS Br. at 5-6.  As an initial matter, Plaintiffs of course do not argue that the mere role as market maker renders UBS liable.  Market maker allegations are included as valid background to further confirm UBS's outsized role in the gold market, and thus further explain why it would be an attractive conspiracy partner.  But being a "market maker" that carried with it certain obligations does *not* mean UBS was restrained from investing on its own account—far from it.  The Complaint plainly alleges UBS had extensive, for profit, proprietary activities outside of its role as market maker.  SAC ¶¶ 70-71, 90-91, 207.  Plaintiffs' theory is thus not that UBS was profiting due to its market-making activities, but by way of its own *proprietary* investments.  Accordingly, being a market maker does not distinguish UBS from any of the other Fixing Bank Defendants in terms of its freedom to—and allegations it actually did—profit from artificial movements in the price for gold.

*Second*, UBS argues that the damning conclusions of investigations into its benchmarking, and even more specifically its "precious metals" manipulations, need be wholly

6

ignored because UBS was not convicted (yet).  UBS Br. at 6.  As set forth in the Joint

Opposition, Section I.E, courts have routinely rejected the notion that *Lipsky v. Commonwealth*

*United Corp.*, 551 F.2d 887 (2d Cir. 1976) requires courts to blind themselves to the logical

relevance of investigatory revelations as a "plus factor" in assessing the plausibility of a

conspiracy claim.  Indeed, as also noted in the Joint Opposition, the court in *FX* explicitly relied

on facts revealed and contained in these "settlements and penalties" materials in finding it

plausible that the banks, including *the same unit within UBS* as is at issue here, conspired to rig

currency-exchange rates.  2015 WL 363894, at *3.

     *Third*, UBS tries to dance around the damning regulatory findings about corruption

within its "precious metals" operations.  For instance, UBS argues that statements confirming

that governmental investigations discovered "clear attempts to manipulate prices in the precious

metals markets" does "not even mention gold."  UBS Br. at 7.  UBS was found to be

manipulating "precious metals."  The Complaint establishes gold—a precious metal—was being

manipulated.  It also alleges that UBS placed its head of its *gold desk* on leave.  SAC ¶ 297.

Notably, though UBS of course well-knows the scope of the investigations, it conspicuously

stops short here of *actually asserting* that gold was bizarrely not among the "precious metals"

whose processes were investigated and found to be wanting.

     UBS continues its semantics exercise by observing that "manipulate has many meanings"

and hypothesizes that maybe UBS *only* manipulated gold prices *unilaterally*.  UBS Br. at 7.  But

this interpretation of the regulatory findings make no sense.  The FINMA report clearly

references UBS "sharing" information.  FINMA Report, at 3.3.3.  And the Complaint establishes

UBS was acting the same way ("bunching" prices) in the same direction (down) at the same time

(around the Fixing) as the Fixing Bank Defendants.  And the Complaint explains that it would be

far too costly and risky for *any* market participant to try to move the market alone on so consistent of a basis as the data reveals occurred.  *See, e.g.*, SAC ¶¶ 195-98; Joint Opp. Section I.D.1.  *Ipse dixit* that *maybe* UBS was "only" manipulating prices unilaterally, the same way the other Fixing Bank Defendants have been shown to be doing jointly, thus for many reasons falls far short of showing the FINMA allegations to be irrelevant, or the Complaint to be implausible.  *See Anderson News, LLC. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012) ("The choice between . . . plausible inferences . . . is one for the factfinder.").

Relatedly, UBS observes that FINMA did not specifically say that the third parties UBS shared information with were the Fixing Bank Defendants.  UBS Br. at 6-7.  This, again, does little to call into question the plausibility of the Complaint.  The Fixing Bank Defendants would be the most obvious choice, given their dominant position in the market for gold.  Even if that were not the case, the Complaint ties UBS to the other Defendants, specifically, by showing UBS's prices were "bunched" with theirs.  SAC ¶¶ 248-49, 261-62, 266-67, App. I.

UBS's final attempt to put distance between the FINMA facts and this case is to argue that statements by FINMA's CEO (Mr. Branson) about findings of corruption in precious metals did not "name UBS."  UBS Br. at 7.  But the comments that Plaintiffs reference in their Complaint occurred during a teleconference held *on the same day* as the release of FINMA report regarding UBS's misconduct in precious metals trading.  There can be no serious doubt that Mr. Branson was referring to that report, and thus to UBS.  *See* SAC ¶ 19, fn 5.[5]

*Fourth*, UBS asserts that the FINMA report "focused mainly on conduct in the foreign exchange market."  Br. at 6.  But regardless of its "focus," as summarized above, the

---

[5]  UBS goes so far as to argue that the conspiracy alleged here is "inconsistent" with what regulators found.  Br. at 7.  But the mere fact FINMA did not expressly call out 10 a.m. (New York time) as a time of day when UBS was manipulating prices for "precious metals" is hardly a talisman of innocence.  There is simply nothing "inconsistent" with findings of rampant corruption and greed within UBS's currency exchange and precious metals unit, and the allegation that such corruption extended to the period around the PM Fixing.

investigation also uncovered corruption within UBS's "precious metals"—*i.e.*, gold—activities. Even apart from that *direct* tie to this case, as explained in the Joint Opposition, Section I.E, investigatory findings into "other" benchmarking scandals provide relevant support to the claims made here.  Specifically, that benchmark after benchmark has been shown to have been corrupted—by the same tools, and by the same participants (*and even the same organizational unit*) as at issue here—undermines UBS's arguments that the benchmarking conspiracy as alleged is not plausible.

*Sixth*, UBS posits that the Complaint does not provide *enough* examples of UBS driving prices downward around the Fix to raise an inference of a conspiracy.  UBS Br. at 8.  But that UBS was repeatedly seen doing so provides valid additional support "linking" them to the conspiracy.  Indeed, contrary to the claim UBS is only linked to "0.5%" of the conspiracy period, the Complaint includes data across *100%* of it.  To avoid having to address that multi-year dataset, separate from the "11 days" used to visually depict UBS's practices, UBS improperly presumes that the Complaint places UBS in the category of the non-bunched "'other market actors' (such as UBS)."  UBS Br. at 8.  To the contrary, a study into "bunching" clearly includes UBS's quotes in the category that were bunched together alongside the Fixing Bank Defendants. SAC ¶¶ 252-53.  And the Complaint also included UBS's pricing activity, for the entire relevant period, alongside the Fixing Bank Defendants (not "other market participants") when analyzing whether Defendants were *disproportionately* responsible for the quote that represented the biggest drop from the prior one.  *Id.* ¶ 258.  Thus, UBS is linked to the conspiracy for the *entire class period*, not just "0.5%" of the time, and so its arguments about how the data could just be the result of sampling bias are facially misplaced.

## II.      **PLAINTIFFS HAVE PLED PLAUSIBLE CEA VIOLATIONS BY UBS**

UBS could not have been a member of the alleged price-fixing conspiracy, yet have managed to avoid running afoul of the Commodity Exchange Act ("CEA").  *See generally* Joint Opp. Section IV.  UBS does not appear to disagree, as its arguments about the CEA claims are expressly derivative of its view that the Complaint does not properly place them into the price-fixing conspiracy (*i.e.*, UBS is not shown to have done anything wrong, UBS is not shown to have acted knowingly, etc.).  UBS Br. at 9-10.  UBS's redundant CEA arguments thus fail for the reasons set forth above and in the Joint Opposition.

The only possible non-repetitive argument is UBS's suggestion that it cannot have had the "ability to influence" the "Gold Fix" because UBS was not on the Fixing panel.  *Id.* at 9-10.  But even this is redundant, in that it is the same sleight-of-hand discussed in Section I.C above. While the Fix provided Defendants a tool to magnify, ratify, and profit from their suppression scheme, this case is about gold prices.  The question is whether UBS had the ability to influence prices for gold.  A major participant in the market for gold like UBS could and did plainly do so, when acting in concert with the other Bank Defendants, regardless of whether it had a seat on the Fixing panel,[6] including by "banging the close" in the gold market around 10 a.m.

### **CONCLUSION**

For the reasons set forth above and in the Joint Opposition, Plaintiffs request that UBS's motion be denied.[7]

DATED:  June 15, 2015

---

[6]   UBS's conclusory argument that Plaintiffs' false reporting claim fails because "UBS was not a Gold Fix panel member," UBS Br. at 10 n.5, is irrelevant.  The Complaint plausibly alleges false reporting against UBS by alleging that all Defendants—including UBS—transmitted false, misleading, and inaccurate quotes that affected the price of gold, and did so with knowledge of the false, misleading, or inaccurate nature of the transmitted information.  SAC ¶ 368.

[7]   In the Court's discretion, if any other clarification is required for the Complaint, Plaintiffs request leave further to amend.

**BERGER & MONTAGUE, P.C.**

By: */s/ Merrill G. Davidoff*
Merrill G. Davidoff
Michael C. Dell'Angelo
Zachary D. Caplan
1622 Locust Street
Philadelphia, Pennsylvania 19103
Telephone:  (215) 875-3000
Fax:  (215) 875-4604
mdavidoff@bm.net
mdellangelo@bm.net
zcaplan@bm.net

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

By: */s/ Daniel L. Brockett*
Daniel L. Brockett
Daniel P. Cunningham
Steig D. Olson
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:  (212) 849-7000
Fax:  (212) 849-7100
danbrockett@quinnemanuel.com
danielcunningham@quinnemanuel.com
steigolson@quinnemanuel.com

Dale H. Oliver (*pro hac vice*)
Jeremy D. Andersen (*pro hac vice*)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:  (213) 443-3000
Fax: (213) 443-3100
daleoliver@quinnemanuel.com
jeremyandersen@quinnemanuel.com

***Counsel for Plaintiffs and the Proposed Class***