quinn emanuel trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 FAX (212) 849-7100



WRITER'S DIRECT DIAL NO.
(212) 849-7345

WRITER'S INTERNET ADDRESS
danbrockett@quinnemanuel.com

April 25, 2016

**VIA ECF**

Honorable Valerie E. Caproni
U.S. District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square, Room 240
New York, NY 10007

Re:   *In re: Commodity Exchange, Inc., Gold Futures and Options Trading Litig.*, 1:14-md-02548

Dear Judge Caproni:

On behalf of Plaintiffs, we respectfully request leave of Court to submit this letter as additional argument on certain of the issues raised by the Court during the April 20, 2016 oral argument on the Defendants' motion to dismiss. We also request that the Court allow certain additional information mentioned during the hearing to be part of the record for purposes of the motion to dismiss. This can be done either by allowing Plaintiffs formally to amend pursuant to Rule 15(a), or the Court can simply deem the information to be part of the Second Amended Complaint ("SAC"), as Judge Buchwald did in Libor and Judge Furman did in ISDAfix.[1]

*First*, in discussing the "bunching" data at paragraph 257 of the SAC, the Court observed that Defendants' quotes were clustered lower than the rest of the market on days when prices increased during the PM Fixing, as well as on days when prices decreased during the PM Fixing. Tr. at 99:23-105:3. The Court suggested that Defendants' low quotes on "up" days may cut against the argument that Defendants' low quotes on "down" days were the cause of the price declines on those down days. In so doing, the Court appeared to presume that it is our position

---

[1] *See Libor I*, 935 F.Supp.2d 666, 681 (S.D.N.Y. 2013) (considering information from government settlements as part of the complaints); *Alaska Electrical Pension Fund v. Bank of America, N.A.*, 14-cv-7126, Dkt. No. 191-2 (S.D.N.Y. May 22, 2015) (permitting plaintiffs to reference CFTC Order not included in the complaint).

quinn emanuel urquhart & sullivan, llp

LOS ANGELES | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | LONDON | TOKYO | MANNHEIM | MOSCOW | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS

that the "up" days were "clean"—*i.e.*, that Defendants were *not* manipulating gold prices on the days that prices increased during the PM Fixing.

To be clear, we have not conceded that there are any "clean" days in the Class Period during which no manipulation occurred, and our class definition is not limited to the days listed in the appendices to the SAC. *See* SAC ¶¶ 322 (alleging that the manipulation of gold prices "occurred *at least* on the days set out in Appendix A"), 341 (defining the class to include *all* sales throughout the 2004 to 2013 Class Period). Rather, we preliminarily identified days that stood out even more against the market noise to further bolster—though unnecessary at the pleading stage—Plaintiffs' injury-in-fact allegations. On days that prices rose during the PM Fixing, a surge of demand over supply may have prevented Defendants from dragging the price below pre-Fixing levels. But that does not mean Defendants did not still conspire to prevent prices from rising *even higher*, which is just as much an act of price suppression as forcing prices below pre-Fixing levels.

That Defendants' conspiracy extended to "up" days is evidenced by the fact that price increases during the PM Fixing were far less extreme than price decreases during the PM Fixing. *See* SAC ¶135. It is also supported by the charts noted by Defendants, Tr. at 40:7-18, in SAC Appendix E showing that prices often decreased before the PM Fixing on days that prices increased during the Fixing. Those pre-Fixing downward price movements are entirely consistent with Defendants colluding to prevent prices from rising even higher during the Fixing. Accordingly, that the pink bar in paragraph 257 shows Defendants' quotes bunched low on days when prices went up during the PM Fixing does not contradict the allegation that Defendants were responsible for suppressing prices. Rather, it merely indicates that Defendants' attempts to manipulate prices on "up" days were not as successful.

*Second*, the Court asked at the hearing whether the theory of "random walk" holds true for other commodities markets, including during benchmarking windows.[2] Tr. at 57:7-58:18. Paragraphs 180 and 183 of the SAC show that the expectation of roughly equal up and down price movements holds true for gold futures prices during the COMEX Settlement window, which is when benchmark prices are set in the gold futures market. Paragraph 180 shows that random walk also holds true in other commodities markets at many times of day. For example, the data shows that prices for crude oil futures and natural gas futures prices increased roughly just as often as they decreased during (i) the five-minute period at the start of the gold PM Fixing, (ii) the five-minute period after the NYMEX market open, and (iii) the five-minute period before the NYMEX market close. Yet the Court still questioned the relevance of that data because they do not involve a process similar to the London Gold Fixing, and do not measure when benchmark prices are set in those markets.

In an effort to address the Court's concern, we looked further at the behavior of prices in the commodities markets *at the time when benchmarks are set in those markets*, which are called the CME Settlement windows. Notably, the CME Settlement windows for crude oil and natural gas futures occur during the last two minutes before the NYMEX market close—*i.e.*, 2:28 p.m. to

---

[2] Apart from gold, we are aware of only three other markets where benchmark prices were allegedly fixed by major market participants: silver, platinum, and palladium. As the Court knows, these markets are all alleged to have been manipulated in pending cases and so none can be a relevant comparison for the London Gold Fix.

2

2:30 p.m., Eastern Time.  Thus, the data in paragraph 180 for the five-minute periods before the NYMEX close already encompasses the CME settlement windows.  Our additional studies focus *only* on the two-minute benchmark-setting periods.  Attached hereto as Exhibit A are charts showing the results of these studies.  As the Court can see, prices during the time of the benchmarks in the crude oil and natural gas futures markets were nearly equally distributed between "up" and "down" days.  These studies further confirm that the principle of random walk holds true in other commodities markets, even during the times when benchmark prices are being set in those markets.  We respectfully request the Court either deem these new charts to be part of the SAC, or allow us to formally amend pursuant to Rule 15(a).[3]

*Third*, the Court asked whether the asymmetrical price movements seen before and during the PM Fixing can be explained by individual Defendants "front-running" their client orders.  Tr. at 51:17-52:5, 54:10-17, 91:5-12.  There are many reasons why they cannot.  For one, if a single bank attempted to front-run based on its client orders alone, it would be taking a huge risk that the other banks would have client orders going in the opposite direction, which would wipe out any potential profit, or possibly lead to large losses.  The only way for a bank safely to profit from advance knowledge of its total client orders is to coordinate with the other fixing banks.  Thus, the fact that the downward price movements began *before* the PM Fixing is compelling evidence that Defendants were colluding in advance of the Fixing call.

Even if front-running could explain why prices are consistently seen to be moving before the PM Fixing, or why those price movements were large, it cannot explain why prices moved *consistently downward*.  That is because a bank seeking to profit from inside information would want to profit from both upward *and* downward price movements.  Defendants of course do not just see "sell" orders from their clients, but "buy" orders as well.  Further, they can observe the relative number of sell orders in comparison to expectations.  Accordingly, Defendants would inevitably have had many opportunities to profit from front-running by *buying* before the PM Fixing, as they would have had opportunities to sell before the PM Fixing.  That is clearly not the pattern shown by the asymmetrical downward movements here, and there is no reason to presume that Defendants chose to only front-run in one direction.

More basically, if individual banks were looking to profit from front-running, why would they not also not front-run the gold COMEX Settlement window?  It is anomalous, to say the least, why these completely linked markets, with over 99% price correlation, involving the same commodity, perform so differently at the times when benchmarks are set, but not at other times.

Defendants' assertion that the PM Fixing attracted selling pressure because that is when miners come to market is demonstrably incorrect.  A general increase in market activity is just as likely to draw buyers as it is to draw sellers.  *See* SAC ¶¶ 10, 76, 172-89.  More basically, mined gold comprises only a tiny portion of the overall market.  As seen in the attached Exhibit B, according to the Thompson-Reuters GFMS world gold survey for 2015, mined gold represents

---

[3] As requested by the Court, *see* Dkt. No. 128, at oral argument we explained in detail the sources of the pricing data included in the SAC.  The Court observed that some of this information is technically not in the SAC itself.  Tr. at 61:3-9.  We do not believe that this is required, but if the Court disagrees, we request that sourcing data too either be deemed part of the record, or the Court grant us leave to include it.

*only 0.5% of the total traded volume of gold overall.*  We mentioned this information at oral argument, Tr. at 91:13-93:24, and now respectfully request either leave to amend or a statement that it can be considered part of the record.

  ***Fourth***, the Court stated several times that it did not find it reasonable to infer from the CFTC's Bank Participation Reports that the bank Defendants were net short gold futures during the Class Period.  Tr. at 60:5-9, 66:4-68:10, 94:22-25.  Rather, the Court suggested it was at least equally plausible that the Defendant banks were all either neutral or long, and that the overall short positions were caused by the other banks in the aggregate data pool.  *Id*. at 66:24-67:2.

  As reflected in the charts at paragraphs 212 and 213 of the SAC, the 21 non-US banks with over 200 contracts—which indisputably include the Defendant banks—were net short for nearly the entire Class Period, often by wide margins.  During many years, the 21 reporting banks' overall positions were *over 80%* short, and in some years even exceeded *90%* short.  Also, throughout the Class Period, the Defendant banks were among the very largest players in the market.[4]  The sheer number of reported short positions, coupled with Defendants' prominence in the market, makes it *mathematically impossible* for Defendants to have all been neutral or long.[5]  Rather, if 21 banks are reported in the aggregate to hold net short positions of 80% to 90%, the plausible inference is that the six biggest players on that list are net short too.  It should be noted that this information (which is confidential to Defendants) will be readily available in the first wave of discovery, which we expect will confirm our allegation.

  Of course, we consent to Defendants having the opportunity to submit a letter in response to this letter and the new proposed charts.

---

  [4]  The Court also questioned the basis for this allegation.  Tr. at 66:8-15.  That the Defendant banks were the largest players in the market is demonstrated by the fact that they comprised six of only eleven LBMA official market makers, as of 2008.  Defendants' prominence in the market is further confirmed by their own promotional materials.  *See, e.g.*, HSBC Commodities (HSBC is "one of the world's largest precious metals custodians") (available at http://www.gbm.hsbc.com/solutions/ markets/commodities), ScotiaBank Precious Metals ("our precious and base metals division, is one of the world's largest dealers in precious metals") (available at http://www.scotiabank.com/ ca/en/0,,81,00.html), UBS Precious Metals ("We are a leading provider of physical and derivative precious metal products to a broad range of customers around the globe.")  (available at (https://www.ubs.com/global/en/investmentbank/institutions/ foreign-exchange/precious-metals.html).  We respectfully request either formal leave to amend to include this information in the SAC, or that the Court deem it part of the SAC.

  [5]  For instance, even if *all* of the 16 other reporting banks were *100%* short—which is highly implausible—the only way Defendants could have been net neutral while the reporting group as a whole was 90% short is if Defendants collectively comprised no more than 20% of the reporting positions.  However, that presumption is also highly implausible because, as discussed above, Defendants were the largest players in the market.  Even if the 21 reporting banks were all approximately equally situated in terms of reported volume—which is still unlikely—Defendants would collectively comprise 28.6% of the reported volume, which would make it *impossible* for Defendants to be neutral or long while the market as a whole was 90% short.

Respectfully submitted,


| | |
|---|---|
| /s/ Daniel L. Brockett | /s/ Merrill G. Davidoff |
| Daniel L. Brockett | Merrill G. Davidoff |
| QUINN EMANUEL URQUHART & SULLIVAN LLP | BERGER & MONTAGUE, P.C. |
| 51 Madison Ave., 22nd Floor | 1622 Locust Street |
| New York, NY 10010 | Philadelphia, PA 19103 |

cc: All Counsel of Record (via ECF)