## SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

*125 Broad Street*
*New York, NY 10004-2498*

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.
FRANKFURT • LONDON • PARIS
BEIJING • HONG KONG • TOKYO
MELBOURNE • SYDNEY

April 28, 2016

Via ECF

Hon. Valerie E. Caproni,
　United States District Judge,
　　Southern District of New York,
　　　Thurgood Marshall United States Courthouse,
　　　　40 Foley Square, Room 240,
　　　　　New York, New York  10007.

Re:　*In re Commodity Exchange, Inc., Gold Futures and Options Trading Litigation*, No. 14-md-2548 (VEC)

Dear Judge Caproni:

　　　I write on behalf of The Bank of Nova Scotia, and as Liaison Defense Counsel, on behalf of all defendants, to oppose plaintiffs' April 25, 2016 letter request to amend the Second Consolidated Amended Complaint ("SCAC"), or to deem new material submitted by plaintiffs after oral argument to be part of the operative complaint.

　　　Plaintiffs have already had three opportunities to submit a viable complaint, and they cannot show good cause for submitting yet another amendment "after the court-ordered deadline for amending." *Parker* v. *Columbia Pictures Indus.*, 204 F.3d 326, 339 (2d Cir. 2000). "[L]eave to amend a complaint should generally be denied" where, as here, "a motion to amend is filed solely in an attempt to prevent the Court from granting a motion to dismiss . . . particularly when the new [allegations] could have been raised earlier." *In re Commodity Exch., Inc. Silver Futures & Options Trading Litig.*, 2013 WL 1100770, at *6 (S.D.N.Y. Mar. 18, 2013) (internal quotation marks omitted).

　　　The allegations plaintiffs raise now could indeed have been raised earlier. The second complaint was filed on December 15, 2014, and defendants filed a motion to dismiss it on February 13, 2015. The third complaint (*i.e.*, the SCAC) was filed on March 16, 2015 and in that iteration of the complaint, plaintiffs added several allegations

-2-

to respond to arguments the defendants made in the first motion to dismiss.  For instance, in response to defendants' argument that there is nothing inherently suspicious about a directional bias in pricing in the context of a daily liquidity event (Defs.' 1st Mot. Dismiss 23), plaintiffs added allegations that there is no such directional bias in various stock and futures markets (SCAC ¶ 180).

The new allegations plaintiffs ask the Court to consider are simply more of the same, and could have been included in the SCAC.  For example, plaintiffs seek to add allegations with *more* examples of futures markets where there is no directional bias in pricing at certain times of day.  But these allegations are cumulative of allegations plaintiffs have already made—and there is no reason that plaintiffs could not have included in the SCAC all of the examples of futures markets with no directional bias they considered relevant.  As "the plaintiffs had ample notice of defects in their complaint and opportunity to cure them before the Court ruled on the motion to dismiss," leave to amend should be denied.  *In re Eaton Vance Mut. Funds Fee Litig.*, 403 F. Supp. 2d 310, 318 (S.D.N.Y. 2005).  Permitting further amendment would be prejudicial to defendants given that "the motions to dismiss were fully briefed and argued, at considerable expense."  *PI, Inc.* v. *Quality Prods., Inc.*, 907 F. Supp. 752, 765 (S.D.N.Y.1995).

"[L]eave to amend would be futile" in any event, particularly given that the "plaintiff[s] ha[ve] already had two bites at the apple and they have proven fruitless." *Treppel* v. *Biovail Corp.,* 2005 WL 2086339, at *12 (S.D.N.Y. Aug. 30, 2005).  The proposed amendments do not cure any of the deficiencies in the SCAC that the Court identified during more than four hours of oral argument on April 20, 2016.  If anything, plaintiffs' letter concedes several points that render their theory of collusion even more hopelessly speculative and implausible.

*First*, plaintiffs now contend that, even on "up" days, defendants tried to manipulate prices downward—but the attempt at manipulation supposedly failed because "a surge of demand over supply" prevented defendants from suppressing the price on those days.  (Pls.' Ltr. 2 (Apr. 25, 2016), ECF No. 135.)  But this assertion flatly contradicts plaintiffs' earlier theory that "Defendants controlled the levers to the market . . . such [that] returns [from manipulation] were essentially risk-free profits."  (SCAC ¶ 229.)  Now that plaintiffs concede that any attempt at manipulation could fail—and, in fact, did fail on numerous days—the allegations of motive are even weaker than they were in previous iterations of the complaint.  If buyers could submit "a surge of demand" in the face of declining prices, defendants would be taking significant, costly risks in any attempt to manipulate the market.  It is implausible that defendants would incur such risks and costs for, at best, a 0.04% downward movement.  Moreover, plaintiffs' new theory does not explain why "a surge of demand" materialized on some days but not others.  If the forces of supply and demand worked on the up days, why did they not also work on the down days?

-3-

*Second*, plaintiffs' new "random walk" allegations add nothing because none of these allegations show that downward price movements are "anomalous"—let alone indicative of the manipulation—in the context of a commodity spot market liquidity event. In previous iterations of the complaint, plaintiffs tried to show that downward price movements are anomalous by alleging that various futures and stock markets do not exhibit a pattern of downward price movements at particular times of day. Plaintiffs now extend those allegations to crude oil and natural gas futures; when oil and gas futures settle, prices allegedly go up and down in equal proportion. But those comparisons are irrelevant, because neither involves a spot market liquidity event like the London Gold Fixing. In fact, plaintiffs have previously alleged that prices *do* go up and down in equal proportion during the gold futures market settlement. (SCAC ¶¶ 170-171.) Thus, the new allegations about oil and gas do not even show that the gold market is different. Plaintiffs are still unable to identify even one commodity with a spot market liquidity event, like the London Gold Fixing, that does not exhibit downward price movements like those alleged in the complaint.

*Third*, plaintiffs' arguments concerning the downward movements prior to the Fixing call are based on a false premise. Plaintiffs pretend that the only two possibilities are that defendants (1) were profiting by illegally colluding, or (2) were profiting by illegally front-running client orders. Plaintiffs regard the second possibility as unlikely, so they argue it *must* be the case that defendants were illegally colluding prior to the Fixing. But plaintiffs ignore many other possibilities, including one the Court raised at argument. (Apr. 20, 2016, Oral Argument Tr. 52.) As the Court observed, on days where the Fix price was lower than the spot price prior to the Fixing, clients of the Fixing banks would have been net sellers. To the extent that Fixing banks received net sell orders from clients in advance of the Fixing, one would expect each bank independently to lower its price quotes to avoid buying more gold before the Fixing. Plaintiffs also ignore the fact that speculators can establish positions in advance of the Fixing based on their predictions of what the Fix price is likely to be.

Similarly, plaintiffs' allegations that mined gold is a small percentage of total trading volume in gold is simply comparing apples to oranges, as the Court noted. (Apr. 20, 2016, Oral Argument Tr. 93.) Plaintiffs included in their calculation the volume of trading in gold instruments other than physical gold (such as COMEX futures and other exchange-traded gold investments). The only relevant comparison is what percentage of the *physical gold traded on the London Gold Fixing* comes from producers such as miners or refiners. Plaintiffs include no allegations about that. And in any event, even a relatively small quantity of gold consistently offered by producers could lead to the miniscule 0.04% downward movement that allegedly occurred during the Fixing.

*Finally*, plaintiffs' attempt to rehabilitate their allegations regarding defendants' purported "net short" position on COMEX adds nothing. Under the data plaintiffs have presented, a single bank could have owned the entire short position on COMEX (perhaps to hedge long exposure elsewhere on that bank's books), with all of

the other reporting banks owning relatively small long positions.  Of course, ownership of the short positions on COMEX could also be distributed more evenly among the reporting banks—but from the factual allegations plaintiffs have made, one can only speculate as to which banks owned what position.  Even if the defendants *did* have net short positions on COMEX, moreover, that says nothing about defendants' overall exposure to gold.  Futures are used to hedge other exposure, so any position on COMEX could have been offset by other positions (such as long positions in physical gold).

For the foregoing reasons, Defendants respectfully submit that the Court should deny the letter motion for leave to amend.  To the extent that the Court considers plaintiffs' letter at all, the Court can properly rely on it to determine that any dismissal at this stage should be with prejudice.  After hours of argument in which the Court explicitly identified several deficiencies in the SCAC, the plaintiffs have proffered amendments that cure none of those defects.  Notably, plaintiffs are still speechless regarding a number of key defects, including their admission that downward price movements returned in 2014.  As plaintiffs' letter makes clear that any further leave to amend would be futile, the SCAC should be dismissed with prejudice.

                Respectfully submitted,

                */s/ Stephen Ehrenberg*

                Stephen Ehrenberg

cc:    Counsel of Record
       (via ECF)