**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE:

COMMODITY EXCHANGE, INC., GOLD
FUTURES AND OPTIONS TRADING
LITIGATION

*This Document Relates To All Actions*

Case No.:  14-MD-2548 (VEC)
                    14-MC-2548 (VEC)

## PLAINTIFFS' REPLY IN FURTHER SUPPORT OF MOTION FOR LEAVE TO FILE THIRD CONSOLIDATED AMENDED CLASS-ACTION COMPLAINT

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...........................................................................................1

ARGUMENT ...................................................................................................................3

I.      RULE 15 APPLIES TO PLAINTIFFS' MOTION ........................................................3

II.     LEAVE TO AMEND SHOULD BE GRANTED AS TO 2004 AND 2005 ......................4

      A.     Amendment Is Not Futile..........................................................................4

      B.     Plaintiffs Did Not Unduly Delay Or Act In Bad Faith .............................7

      C.     Amendment Would Not Be Unduly Prejudicial ........................................9

III.    LEAVE TO AMEND SHOULD BE GRANTED AS TO UBS................................10

      A.     Plaintiffs Are Not Asserting A New Theory Of The Case ....................10

      B.     Amendment Is Not Futile........................................................................11

      C.     Plaintiffs Did Not Unduly Delay Or Act In Bad Faith ...........................15

      D.     Amendment Would Not Be Unduly Prejudicial ......................................15

      E.     There Is No Need To Defer Consideration Of The Motion....................16

CONCLUSION...............................................................................................................18

## TABLE OF AUTHORITIES

**Page**

### CASES

*A.V. by Versace v. Gianni Versace S.p.A.*,
   87 F. Supp. 2d 281 (S.D.N.Y. 2000)................................................................ 16

*Allgaier v. Peterson*,
   2015 WL 5459808 (S.D.N.Y. Aug. 13, 2015) .................................................. 3

*Anderson News, LLC. v. Am. Media*,
   680 F.3d 162 (2d Cir. 2012) ...................................................................... 12, 13

*Associated Press v. U.S. Dep't of Defense*,
   395 F. Supp. 2d 17 (S.D.N.Y. 2005)................................................................. 5

*Beltz Travel Serv. v. Int'l Air Transp. Ass'n*,
   620 F.2d 1360 (9th Cir. 1980) ........................................................................ 11

*Cano v. DPNY, Inc.*,
   287 F.R.D. 251 (S.D.N.Y. 2012) ...................................................................... 6

*Case v. Clivilles*,
   2016 WL 5818577 (S.D.N.Y. Oct. 4, 2016) .............................................. 4, 5, 8

*City of New York v. Mickalis Pawn Shop, LLC*,
   645 F.3d 114 (2d Cir. 2011)............................................................................ 17

*County of Washington v. Counties of Warren & Washington Indus. Dev. Ag.*,
   2 F. App'x. 71 (2d Cir. 2001) ........................................................................... 5

*Cummins, Inc. v. New York Life Ins.*,
   2012 WL 3870308 (S.D.N.Y. Sept. 6, 2012)...................................................4

*Foman v. Davis*,
   371 U.S. 178 (1962)......................................................................................1, 3

*Hirsch Film Acq. Corp. v. Mechner*,
   1991 WL 45054 (S.D.N.Y. Mar. 25, 1991) ............................................... 10, 11

*In re Aluminum Warehousing Antitrust Litig.*,
   2016 WL 1629350 (S.D.N.Y. Apr. 25, 2016)............................................... 4, 8

*In re Aluminum Warehousing Antitrust Litig.*,
   No. 13-md-2481, Dkt. 1103 (S.D.N.Y. Nov. 30, 2016) ...................................5

*In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*,
   2016 WL 5794776 (S.D.N.Y. Oct. 3, 2016) ........................................... *passim*

*In re Elec. Books Antitrust Litig.*,
   859 F. Supp. 2d 671 (S.D.N.Y. 2012)............................................................. 11

*In re Foreign Exchange Benchmark Rates Antitrust Litig.*,
   2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016) ...................................................... 12

*In re Foreign Exchange Benchmark Rates Antitrust Litig.*,
   No. 13-cv-7789, Dkts. 297, 332 (S.D.N.Y.) ........................................................ 11

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
   273 F. Supp. 2d 351 (S.D.N.Y. 2003) ............................................................... 8, 9

*In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*,
   379 F. Supp. 2d 348 (S.D.N.Y. 2005) ................................................................ 16

*In re Processed Egg Products Antitrust Litig.*,
   902 F. Supp. 2d 704 (E.D. Pa. 2012) ................................................................. 11

*Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*,
   456 U.S. 694 (1982) .......................................................................................... 17

*Laydon v. Mizuho Bank, Ltd.*,
   2015 WL 1499185 (S.D.N.Y. Mar. 31, 2015) .................................................... 17

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
   797 F.3d 160 (2d Cir. 2015) ................................................................................ 9

*Parker v. Columbia Pictures Indus.*,
   204 F.3d 326 (2d Cir. 2000) ........................................................................... 4, 8

*Perez v. MVNBC Corp.*,
   2016 WL 6996179 (S.D.N.Y. Nov. 29, 2016) ...................................................... 8

*Permatex, Inc. v. Loctite Corp.*,
   2004 WL 1354253 (S.D.N.Y. June 17, 2004) ...................................................... 8

*Union Carbide Corp. v. Siemens Westinghouse Power Corp.*,
   2002 WL 31387269 (S.D.N.Y. Oct. 23, 2002) .................................................... 9

*Walden v. Fiore*,
   134 S. Ct. 1115 (2014) ...................................................................................... 18

*Waldman v. Palestine Liberation Organization*,
   835 F.3d 317 (2d Cir. 2016) ........................................................................ 17, 18

## RULES & OTHER AUTHORITIES

Fed. R. Civ. P. 15 ................................................................................... *passim*

Fed. R. Civ. P. 16 ................................................................................... *passim*

5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1391
   (2016) ................................................................................................................ 17

## PRELIMINARY STATEMENT

As discussed in Plaintiffs' Motion for Leave to Amend ("the Motion"), the proposed Third Amended Complaint ("TAC") sets forth a wide array of facts which, taken together, plausibly allege that Defendants' conspiracy extended to 2004 and 2005, and that UBS was an active participant in the conspiracy.[1]  Rather than engage with the totality of these detailed factual allegations, Defendants largely ignore the contents of the TAC while mischaracterizing Plaintiffs' diligent efforts in seeking leave to amend.

Indeed, Defendants devote much time to the question of what legal standard governs. But Rule 15 governs amended pleadings, and is the Rule this Court directed Plaintiffs to try to meet.  *See In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*, 2016 WL 5794776, at *33 (S.D.N.Y. Oct. 3, 2016) (the "Order").  Rule 16, Defendants' preferred alternative, cannot sensibly apply because it relates to amendments to modify scheduling orders—which does not exist yet.  But in any event, Defendants' arguments are a sideshow because the same facts showing Plaintiffs have met the *Foman v. Davis* elements of Rule 15 (not futile, not in bad faith, no undue delay, no undue prejudice) also show they have met the diligence and "good cause" requirements of Rule 16.  371 U.S. 178, 182 (1962).

Defendants take the governing standard gambit even further, arguing that the mere fact the TAC repeats allegations *also* contained in the Second Amended Complaint ("SAC") dictates that the Court should apply the law governing reconsideration motions.  But the Court's dismissal of the 2004 and 2005 claims does not mean every fact in the TAC was deemed irrelevant to the analysis—rather, it only meant that the SAC facts alone did not take Plaintiffs' claims *far enough* to cross the line of plausibility.  On this motion to amend, the Court *must* take

---

[1]  The TAC also includes CMD as an additional named Plaintiff, which Defendants do not challenge.  *See* TAC, ¶ 39; Mot. at 9.

1

into account the studies from the SAC concerning 2004 and 2005, as well as *additional* analyses in the TAC of 2004 and 2005, to assess whether their combined effect means that Plaintiffs have now done so.  Tellingly, Defendants say little about the results of most of the new analyses, which find anomalies just as significant as those the Court relied on in upholding the other years of the conspiracy.  Defendants' process-centric briefs thus do not call into doubt the Motion's conclusion that the total mix of factual allegations in the TAC now cross the line of plausibility.

        In yet another attempt to dodge the issue of whether the TAC plausibly pleads claims, Defendants deploy various arguments around the theme that these facts are coming in "too late," suggesting there is an undue delay or bad-faith problem here.  However, from the beginning of this case, Plaintiffs have alleged a conspiracy in 2004 and 2005, and included those years in their economic analyses.  In their multiple motions to dismiss and at oral argument, Defendants never singled these years out.  As soon as the Court determined the SAC did not plausibly plead "the existence of an antitrust conspiracy prior to 2006," *see* Order at *15, n.24, Plaintiffs took immediate action to bolster the allegations with additional studies focusing specifically on 2004 and 2005.

        The UBS-specific opposition fails for similar reasons.  UBS spends its entire motion attacking the straw-man proposition that Plaintiffs have abandoned their Fix-centric claim in favor of a broader active-all-day conspiracy, purportedly triggering a cascade of new considerations such as a new right to raise long-waived personal jurisdiction defense.  But the premise is simply false.  This case remains centered on Defendants' conspiracy to suppress gold prices around the PM Fixing.  That Plaintiffs have included chats between Deutsche Bank and UBS that do not *always* explicitly reference the Fix, does not change that fact.  All instances of improper sharing of information between UBS and the panel banks make it more plausible that

UBS's strikingly parallel behavior around the Fix was not the result of happenstance. The new allegations thus do not change course, but bolster Plaintiffs' continuing claim.

Defendants have failed to show that the proposed TAC raises any genuine issue of futility, bad faith, undue delay, or undue prejudice. *See, e.g.*, *Allgaier v. Peterson*, 2015 WL 5459808, at *4 (S.D.N.Y. Aug. 13, 2015) ("The burden of showing futility, bad faith, or undue prejudice" under Rule 15 as to warrant denial of leave to amend "is on the non-moving party."). As such, leave to amend should be granted.

## **ARGUMENT**

## I. **RULE 15 APPLIES TO PLAINTIFFS' MOTION**

Defendants argue at length that Rule 16's "good cause" standard, not the "more lenient" Rule 15 standard, applies to the Motion. *See* Dkt. 184 ("2004-05 Opp.") at 1-6; Dkt. 185 ("UBS Opp.") at 3, 8-10. This argument cannot be fairly reconciled with the Order, which makes no mention of Rule 16 but instead recites the language of Rule 15, cites cases applying Rule 15, and discusses the relevant considerations under Rule 15 (*i.e.*, the *Foman* factors of futility, bad faith, undue delay, and undue prejudice). *See* Order at *33. It also cannot be reconciled with the procedural posture of this case, as Rule 16 governs alterations of scheduling orders—but no such order has yet been entered in this litigation.[2]

In any event, Defendants have failed to identify any relevant distinction on the current record. As discussed in Plaintiffs' Motion and below, Rule 15 is readily satisfied because the proposed TAC plausibly re-pleads the dismissed claims, there is no credible assertion of undue delay or bad faith as Plaintiffs have merely added new facts to support the same claims they have

---

[2]   *See* Dkt. 188 at 2 (order by the Court stating that case schedules are to be proposed by March 1, 2017). The docket entry that Defendants deem a "scheduling order," *see* Dkt. 42, is merely an order reflecting Plaintiffs' rights under the Court's Individual Rule 3.E.i and Rule 15(a)(1)(B). *See* 2004-2005 Opp. at 5.

pursued since the beginning of the case, and a motion to amend before discovery has even begun is not unduly prejudicial to Defendants.  Under such circumstances, and unlike the cases Defendants rely upon,[3] "good cause" is easily established.  *See, e.g.*, *Cummins, Inc. v. New York Life Ins.*, 2012 WL 3870308, at *4 (S.D.N.Y. Sept. 6, 2012) (granting leave to amend where "discovery has not commenced and the case is still in the preliminary stages").

## II.     LEAVE TO AMEND SHOULD BE GRANTED AS TO 2004 AND 2005

### A.     Amendment Is Not Futile

As explained in the Motion (at 2-3, 6-8), for 2004 and 2005, the TAC breaks down many of the very studies the Court relied on in upholding the claims for the later period to more clearly allege how there is little difference between the data the Court relied on to uphold the later claims, and the data seen for the earlier years.  *See* TAC ¶¶ 320-31.  The TAC also supplements the two analyses in the SAC that were based on data for only 2007 to 2013.  *Id*. ¶¶ 332-40.  Finally, the TAC contains additional analyses that focus specifically on 2004 and 2005, which further confirm the conspiracy to suppress gold prices extended to those years.  *Id*. ¶¶ 341-48.

These new facts directly respond to the Court's concerns that some of Plaintiffs' prior studies left out 2004 and 2005, and some of the 2004 and 2005 charts were not as pronounced as for other years.  Defendants have no answer as to the substance of these new allegations.  Defendants are silent, for example, on the additional studies showing that statistically significant downward price spikes around the PM Fixing were just as frequent in 2004 and 2005, as they

---

[3]   *See Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340-41 (2d Cir. 2000) (leave to amend denied where plaintiff waited until summary judgment, long after the scheduled court-ordered deadlines to amend); *In re Aluminum Warehousing Antitrust Litig*., 2016 WL 1629350, at *1, 5 (S.D.N.Y. Apr. 25, 2016) (denying leave to amend where "the proposed amendments would . . . totally upend the existing schedule" because discovery  was "set to close" in "less than one month"); *Case v. Clivilles*, 2016 WL 5818577, at *3 (S.D.N.Y. Oct. 4, 2016) (denying leave to amend where plaintiff moved to amend only ten days before the summary judgment deadline).

were from 2006 to 2012.  *See id*. ¶ 342.  Defendants are similarly silent about the data showing

that downward price spikes around the PM Fixing were contrary to general market trends in

2004 and 2005, to an even greater degree than in many years from 2006 to 2012.  *See id*. ¶¶ 343-

45.  And Defendants say nothing about the additional "bunching" analyses showing that the

divergence between Defendants' quotes and the rest of the market was even greater in 2004 and

2005, than in 2006 to 2012.  *See id*. ¶¶ 346-48.  Having filled in the "gaps" and performed

additional analyses to confirm the presence of abnormalities in 2004 and 2005—just as

pronounced as in the allowed years—Defendants' various suggestions as to why the Motion

should nonetheless be deemed futile should be rejected.

        *First*, Defendants imply that the Court should ignore any allegation in the TAC that has a

parallel in the SAC, because to do otherwise would purportedly represent an instance of

"reconsideration."  *See* 2004-05 Opp. at 7-8.  That might be the case if the TAC relied *solely* on

allegations from the SAC.  But as summarized throughout the Motion and herein, the TAC adds

new supporting facts to the pre-existing allegations.  There is nothing "improper" about

considering the totality of *all* these facts—including the "old" studies from the SAC nor have

Defendants cited any cases that establish otherwise.[4]  Rather, it makes sense to do so, as the

Court's prior ruling that the pre-existing allegations were not *enough* does not mean the Court

ruled that the pre-existing allegations were *wholly irrelevant*.  The question before the Court  is

---

[4]  Cases, such as those cited by Defendants, that denied motions to amend where there
were no new facts do not call into question these common-sense conclusions.  *See County of
Washington v. Counties of Warren & Washington Indus. Dev. Ag.*, 2 F. App'x. 71, 75 (2d Cir.
2001) (denying leave to amend to add two new claims based on no new facts); *Case*, 2016 WL
58185777, at *4 (denying leave to amend "to add new claim based on the same facts"); *In re
Aluminum Warehousing Antitrust Litig.*, No. 13-md-2481, Dkt. 1103 (S.D.N.Y. Nov. 30, 2016)
(dismissing additional actions premised on the same allegations as related actions which were
previously dismissed); *Associated Press v. U.S. Dep't of Defense*, 395 F. Supp. 2d 17, 19
(S.D.N.Y. 2005) (denying motion for reconsideration based entirely on "rehashed" arguments,
and no new facts).

whether the prior *and new* allegations taken *together now* cross the line of plausibility—and this question separates the Motion from one for reconsideration.  *See, e.g.*, *Cano v. DPNY, Inc.*, 287 F.R.D. 251, 260 (S.D.N.Y. 2012) (stating that a motion to amend considers whether the allegations, "taken together . . . provide enough for the plaintiffs" to state a cause of action).

*Second*, Defendants criticize the TAC for not changing the studies of yearly intraday price changes, which the Court observed showed spikes around the Fixing in 2004, but less significant spikes in 2005.  *See* 2004-05 Opp. at 6; *see also* Order at *15 n.24.  As an initial matter, this confirms that downward spikes *were* seen in 2004.  That Plaintiffs did not "fix" those charts is unsurprising—the data show what they show, so there is no correcting to do.  The way Plaintiffs addressed the Court's concerns was to add, as discussed above, additional studies that show that, even if this one test did not itself show results striking enough to cross the line of plausibility, the combined effect of many tests showing anomalies in both 2004 and 2005 do.

*Third*, Defendants also posit that the TAC did not address the Court's concern, in that same footnote, *see* Order at *15 n.24, that the cumulative returns charts in the SAC only cover 2007 to 2013.  *See* 2004-05 Opp. at 6.  This is even more demonstrably false, as Plaintiffs have now extended those studies, using analogous data, to cover 2004 and 2005, and found nearly identical signs of price manipulation for those years.  *See id*. ¶¶ 332-40.  Defendants' claim that the TAC offers nothing more than a "regurgitation" of allegations from the SAC, *see* 2004-05 Opp. at 8, is false.

*Finally*, of all the new studies contained in the TAC (frequency of statistically significant spikes, breaking of price trends, additional "bunching" analyses, supplemental cumulative returns analyses), the only one Defendants address is the supplemental analysis of intraday returns.  *See* 2004-05 Opp. at 10-11.  This study responds to the Court's observation that the

SAC only started the data analysis for this study in 2007 by running the same analysis for 2004 and 2005 as well. *See* TAC ¶¶ 333-37. Defendants contend that certain differences between the daily price movements in 2004 and 2005 and the other years analyzed undermine the assertion that a conspiracy operated across both periods. *See* 2004-05 Opp. at 10-11. Specifically, Defendants observe that there are differences among (1) whether the largest negative price movements came in the ten minutes before or the ten minutes after the Fixing process began, (2) when the largest positive price movements occurred, and (3) how quickly prices recovered after the Fixing. *Id.* But none of this is relevant to the purpose of this study—and what Plaintiffs mean by the "patterns seen" in it—which is that there were unique negative price spikes around the time of the Fixing. Whether the steepest part of the drop came in the first or second half of the Fixing window is irrelevant—the point is that the spikes occurred, and were similarly steep, in all of the years analyzed.[5]

## B.   Plaintiffs Did Not Unduly Delay Or Act In Bad Faith

As explained in the Motion, Plaintiffs have diligently and vigorously pursued claims for 2004 and 2005 since the outset of this litigation. *See* Mot. at 2-4, 6-7, 10-11. Beginning with the very first complaints in this consolidated action, Plaintiffs have alleged a class period starting in January 2004. *See, e.g.*, *Maher v. Bank of Nova Scotia*, No. 14-cv-1459 (S.D.N.Y.), Dkt. 2 (Class Action Complaint) ¶ 73. In each of the consolidated amended complaints, Plaintiffs supported their allegations that the conspiracy included 2004 and 2005 with detailed factual allegations, including the full array of economic analyses that were brought to bear for the other years of the conspiracy. *See* Dkt. 27 (Consolidated Amended Class Complaint ("CAC")) ¶¶ 96-185; SAC ¶¶ 116-267.

---

[5]   Even less relevant to this price *suppression*-focused case are Defendants' observations about how quickly prices rebounded, and when positive price movements took places.

Defendants never even attempted to distinguish between 2004 and 2005 and other years of the alleged conspiracy in their motions to dismiss, or at oral argument on those motions.  *See* Dkt. 35-40 (Motions to Dismiss CAC); 71-77 (Motions to Dismiss SAC); 138 (Apr. 20, 2016 hearing transcript).  Therefore, Plaintiffs had no occasion to revisit the allegations for 2004 and 2005, specifically, until the Court held that those allegations were deficient in its Order.  Order at *15 n.24.  At that point, Plaintiffs immediately focused in on the shortfalls identified by the Court.  The resulting TAC, which includes many additional analyses of 2004 and 2005, and supplements the two analyses that originally did not cover those years, was filed just six weeks after the Order, in accordance with the schedule set by the Court.  Under these circumstances, there has been no undue delay or bad faith.  *See, e.g., Permatex, Inc. v. Loctite Corp.*, 2004 WL 1354253, at *3 (S.D.N.Y. June 17, 2004) (holding that amendment brought less than two months after learning relevant facts met good cause standard); *Perez v. MVNBC Corp.*, 2016 WL 6996179, at *5 (S.D.N.Y. Nov. 29, 2016) ("[F]or the same reasons Plaintiffs were diligent under the good cause standard of Rule 16, Plaintiffs easily meet the more liberal standard of Rules 15 and 21.").

By contrast, in the cases cited by Defendants, good cause was found to lacking because the plaintiff belatedly sought to assert *new* claims.  *See* 2004-05 Opp. at 4-7 (citing *Parker*, 204 F.3d at 340 (denying leave to amend to assert new cause of action); *Aluminium*, 2016 WL 1629350, at *5-7 (same); and *Case*, 2016 WL 5818577, at *4 (same)).  Or, a request to amend was denied because *the court* had already alerted the plaintiff of pleading deficiencies, and the plaintiff had previously failed to take timely action.  *See In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 273 F. Supp. 2d 351, 390-91 (S.D.N.Y. 2003) (denying leave to amend where plaintiff failed to heed "explicit [] instructions" by the court to correct its pleading).

Again, that is not this case.  Plaintiffs have asserted claims for 2004 and 2005 from the beginning, and bolstered those allegations immediately after the Court found that they were deficient.

Defendants' assertion that the data underlying the additional analyses in the TAC was "in existence for more than a decade" does not change the analysis.  *See* 2004-05 Opp. at 6, 8-9.  As the Court has recognized, the conspiracy was inherently self-concealing, and Plaintiffs had no reason to analyze the mass of market data in which it was buried until reports of regulatory investigations surfaced.  *See* Order at *27-28.  And as discussed above, that Plaintiffs did not find reason to re-slice the data with specific attention to 2004 and 2005 until the Court found fault in the many studies that had already been performed hardly reflects a lack of diligence.

At bottom, Defendants' arguments rest on an unfounded presumption that plaintiffs must predict and negate all possible pleading issues before they are even raised, or else have their claims be forever lost.  But if that were the law, then no post-dismissal amendment could ever be allowed—flying in the face of the Rules and decades of practice.  Curing deficiencies identified by the Court is permissible and Plaintiffs have done exactly that, in a timely and diligent manner. *See, e.g.*, *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (stating that an amendment with "the benefit of a ruling" is appropriate to allow a plaintiff "possible means of curing specific deficiencies"); *Union Carbide Corp. v. Siemens Westinghouse Power Corp.*, 2002 WL 31387269, at *4-5 (S.D.N.Y. Oct. 23, 2002) (granting amendment to allow party to cure pleading defect with additional factual allegations after court dismissed the claim).

### C.    Amendment Would Not Be Unduly Prejudicial

Finally, amendment as to 2004 and 2005 at this early juncture will cause no prejudice to Defendants because initial discovery has only just commenced and no scheduling order has been

entered as to class certification, summary judgment, or trial.  Defendants' bare-bones assertion

that they would be prejudiced here, apparently because courts disfavor amendments brought in

"bad faith," with "no explanation," *see* 2004-2005 Opp. at 9-10, misses the mark.  As discussed

in the Motion and above, the TAC is well-founded on facts regarding 2004 and 2005, which

were diligently developed by Plaintiffs in good faith and in direct response to the Court's

concerns.

### III.   LEAVE TO AMEND SHOULD BE GRANTED AS TO UBS

#### A.   Plaintiffs Are Not Asserting A New Theory Of The Case

UBS's entire opposition hinges on a straw-man argument that the TAC sets forth a

"brand new theory," premised on a generalized theory of spot market manipulation.  UBS Opp.

3.  That is, UBS asserts that Plaintiffs have now abandoned their Fix-centric claim, and then uses

this assertion to speculate about the prejudice it will suffer if such a new theory were allowed to

proceed.  But the premise of UBS's opposition is false.  The TAC remains centered on

Defendants' conspiracy to suppress gold prices around the PM Fixing.  *See, e.g.*, Mot. at 8 ("The

TAC also provides factual allegations that plausibly demonstrate that UBS—despite not being a

member of the Fixing panel itself—did not merely engage in parallel behavior, but itself

participated in the conspiracy to manipulate gold prices around the PM Fixing.").  That the TAC

quotes from chats between UBS and Fixing Bank Deutsche Bank that do not *always* explicitly

reference the Fix, does not change that fact.  As discussed below, these documented

conversations between competitors are proffered as circumstantial evidence that UBS's

strikingly parallel behavior around the Fixing was not the result of innocent random chance.[6]

---

[6]  If discovery and government investigations yield additional evidence confirming that
the conspiracy extended throughout the day, then that may properly become part of this case as
well.  *See, e.g.*, *Hirsch Film Acq. Corp. v. Mechner*, 1991 WL 45054, at *8 (S.D.N.Y. Mar. 25,
1991) (leave to amend granted so that "pleadings conform to the evidence" to reflect "the

B.     **Amendment Is Not Futile**

Plaintiffs have always argued that "UBS *was* in the know" despite not being a Fixing

Bank.  *See* Dkt. 83 at 5 (citing SAC ¶¶ 8, 232, 267, 318).[7]  Plaintiffs previously used economic

data to show that UBS's pricing behavior was sufficiently similar to the Fixing Bank Defendants

as to plausibly draw that conclusion.  Mot. at 2-3, 8.  The Court, however, determined that the

SAC merely alleged "that UBS engaged in parallel conduct by offering (along with the Fixing

Banks) below-market quotes that coincided with downward swings in the price of gold around

the PM Fixing."  Order at *30.  The Court noted that Plaintiffs failed to "identify a single

communication between UBS and the Fixing Banks suggestive of manipulative conduct."  *Id.*

The TAC seeks to remedy the concerns raised by the Court by setting forth chat

transcripts between UBS and Deutsche Bank that answer the Court's concerns that UBS's

parallel behavior might have been innocent.[8]  Having admitted that its traders engaged in

---

Federal Rules' general purposes that truth be ascertained and issues revolved on their merits");
*see also In re Foreign Exchange Benchmark Rates Antitrust Litig.*, No. 13-cv-7789, Dkts. 297,
332 (S.D.N.Y.) (granting plaintiffs leave to amend to include additional types of manipulation,
times of day, markets, and claims, "to conform allegations to evidence" obtained from settling
Defendants and government regulators).  But that is not an issue presently before the Court.

[7]  That UBS was not itself a Fixing Bank does not exonerate it from its participation in
the conspiracy.  *See, e.g.*, *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 690 (S.D.N.Y.
2012) (that a company was "involved in only a portion" of a conspiracy "does not undermine the
existence of the conspiracy itself or [that company's] role as a participant"); *In re Processed Egg
Products Antitrust Litig.*, 902 F. Supp. 2d 704, 715 n.11 (E.D. Pa. 2012) ("While a complaint
must allege that each individual defendant joined the conspiracy and played some role in it, it
need not allege that each defendant was involved in every aspect of the conspiracy."); *see also
Beltz Travel Serv. v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1367 (9th Cir. 1980) ("Participation
by each conspirator in every detail in the execution of the conspiracy is unnecessary [] for each
conspirator may be performing different tasks to bring about the desired result.").

[8]  As set forth in the SAC, Plaintiffs presented economic analyses demonstrating that
UBS's prices were closely clustered with the Fixing Banks' prices.  *See* SAC ¶¶ 250-54.
Building on this data, the TAC provides additional economic analyses to show just how low
UBS's prices went.  *See* TAC ¶¶ 354-57.  Far from asking this Court to reconsider issues related
to UBS's quoted prices, *see* UBS Opp. at 10 n.4, the TAC clarifies exactly how UBS used its
too-low transaction prices to drive the price of gold downward during the PM Fix.  And to the

"inappropriate and unprofessional" communications with traders at a competing bank concerning

the manipulation of gold prices, UBS cannot credibly argue that leave to amend should be denied

as futile.  *See* UBS Opp. at 2 ("[t]o be sure, some of the traders' language was inappropriate");

*id.* at 12-13 ("some of the language attributed to the UBS trader was inappropriate and

unprofessional").  This is because evidence of such inappropriate conduct corroborates that

"UBS *was* in the know," and readily places the economic analyses of UBS's pricing behavior

"'in a context that raises a suggestion of a preceding agreement.'"  Order at *30 (quoting

*Twombly*, 550 U.S. at 557).

    For example, the chat transcripts demonstrate that UBS and Deutsche Bank traders

exchanged stories about "trading on the fix" to "push prices," TAC ¶ 361, and they shared

customer information and executed coordinated trades to "push," "smack," and "whack" gold

prices around the time of the Fixing, *id.* at ¶¶ 11-12.  The chats also show that UBS coordinated

trading around the PM Fixing based on foreknowledge that the prices would drop at that time by

agreeing to wait to buy gold until after prices had dropped.  For example, when UBS and

Deutsche Bank believed that other market participants were attempting to increase the price of

gold, they took coordinated action to drive the price back down.  *Id.* at ¶¶ 366-67.  As UBS

traders acknowledged, UBS derived a great benefit from manipulating the Fix:  "we smashed it

good."  *Id.* at ¶ 363.[9]  When a trader at Deutsche Bank told his counterpart at UBS "im feeling

---

extent some of the new studies in the TAC overlap with existing studies in the SAC, when taken
together with the chat transcripts described above, these studies add to the total mix of
allegations which together plausibly plead a claim against UBS.  That some of the additional
economic data shows results similar to prior allegations is no basis to ignore those additional,
relevant facts.

    [9]  In some of chats, the traders discussed manipulation of both the gold and silver
markets.  That the one chat UBS cites, UBS Opp. at 7, may have included some overlapping
discussion of the Gold and Silver Fixings, does not undermine its relevance.

helpful to ubs today," the UBS trader then said "need to push this back lower," to which the Deutsche Bank trader replied "ok . . . lets do it." *Id.* at ¶ 365.

These chats corroborate the allegations that UBS took part in the conspiracy to manipulate Fix prices.  They plausibly demonstrate that the clustering of UBS's gold quotes driving the market downward were not the result of accidental parallel behavior but were the result of coordination with the other conspirators.  The relevance of this corroborating evidence is not even limited to those chats that mention the Fix.  Even chats that could be understood to relate to manipulation occurring at other times of day confirm that UBS was in near-constant communication with the Fixing Banks, and thus bolster the allegation that UBS was not acting alone around the time of the Fixing, either.  The chats relate to the *same* banks, using the *same* tactics, to manipulate the prices in the *same* market.

In suggesting otherwise, UBS ignores the well-recognized principle that documented communications about coordinated pricing conduct between competitors are highly probative of the existence of a conspiracy.  For instance, in *Forex*, the court found that inappropriate inter-bank chats produced by settling defendants and government regulators were compelling evidence of a conspiracy, even if those specific chats "themselves did not set spreads or fixes."  *In re Foreign Exchange Benchmark Rates Antitrust Litig.*, 2016 WL 5108131, at *4 (S.D.N.Y. Sept. 20, 2016).  That is because "the sharing of information between competitors constitutes circumstantial evidence of an antitrust conspiracy and is sufficient at the pleading stage."  *Id.*; *see also* Order at *16 (a "high level of interfirm communications" is a recognized plus factor in evaluating whether a complaint plausibly alleges an agreement).

In response, UBS observes that the chats Plaintiffs' "have chiefly relied [upon] was based [from a trader] in Singapore," who "operated eight hours ahead of London time."  UBS Opp. at

12.  That is irrelevant to the determination that UBS was engaged in activities concerning the manipulation of the PM Fixing.  Regardless of the time or location, these chats show coordination, foreknowledge, and active involvement to drive gold prices downward.  They also show open lines of communication between UBS and other banks, which were used to improperly share the exact type of information needed to coordinate trading activities.  At the very least, these chats establish that even those in *Asia* knew the Fix was being manipulated.  Indeed, in one chat cited in the TAC, the traders directly acknowledge that they understand what is going on over "*there*" with the PM Fix:

| Trader | Message |
|---|---|
| Deutsche Bank | speaking of fix i gotta do that when im there lol |
| UBS | its not rocket science |
| | |
| UBS | do ur guys see much fixing stuff there |
| Deutsche Bank | on the pm fix its decent actually |

*See* TAC ¶ 360.  This is not all surprising, given UBS's acknowledgement that its global trading operations were interlinked.  *See* UBS Opp. at 12 (discussing how a UBS trader in Singapore would need to "transfer respon-sibility [sic] to a UBS trader in Europe").

UBS next asks this Court to draw impermissible inferences against Plaintiffs by offering its own innocuous explanations for chats it elsewhere admits demonstrate unprofessional behavior.  For example, when Plaintiffs alleged that UBS and Deutsche Bank traders agreed to wait to buy gold until after prices had dropped at the PM Fixing, *see* TAC ¶ 362, UBS took that same chat transcript to argue the chat simply reflected a Deutsche Bank trader seeking "an opinion from the UBS trader," UBS Opp. at 11.  UBS's proposition is mere *ipse dixit* that seeks to undermine the requirement that the Court is required "accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff."  Order at *8; *see also Anderson News, LLC. v. Am. Media*, 680 F.3d 162, 187-90 (2d Cir. 2012) (vacating

14

dismissal where amended complaint alleged defendants made statements that "may plausibly be interpreted as evincing their [anticompetitive] agreement, and that "although an innocuous interpretation of the defendants' conduct may be plausible, that does not mean that the plaintiff's allegation that that conduct was culpable is not also plausible").

In short, the Court previously found the economic data to show parallel behavior by UBS, but it thought *something more* was needed to link UBS to the conspirators given UBS did not itself sit on the Fixing panel.  Plaintiffs have done so, by adding further studies confirming the all-too-suspicious nature of UBS's trading activities, but most pointedly by adding chat transcripts that directly demonstrate UBS and a Fixing Bank were regularly sharing the exact type of information that would make such parallel behavior possible.  And the referenced chats, obtained in just the first production by Deutsche Bank under its cooperation agreement, are no doubt just the tip of the iceberg.  The proposed amendment is not futile.

## C.    Plaintiffs Did Not Unduly Delay Or Act In Bad Faith

The new allegations in the TAC, which are primarily based off an initial set of chat transcripts produced by Deutsche Bank, could not have been previously alleged because they were only made available to Plaintiffs shortly before the Court issued its Order.  *See* Mot. at 11.[10] UBS's only argument against "good cause" is that Plaintiffs have unduly prejudiced UBS by changing the core theory of their case.  UBS Opp. at 10.  But as discussed above, because Plaintiffs' core claims against UBS remain the same, that argument falls flat.

## D.    Amendment Would Not Be Unduly Prejudicial

UBS asserts there will a parade of horribles from a case-management perspective if Plaintiffs are allowed to proceed with "tacked-on claims of alleged spot market order misconduct

---

[10]   And the additional economic analyses focusing specifically on UBS were—like those targeting 2004 and 2005—developed immediately after, and in direct response to, the Order.

against UBS" while proceeding "with the benchmark manipulation claim concerning the Fixing

Banks." *Id.* at 16.  But such speculation is unfounded because, as discussed above, Plaintiffs are

not asserting any "new" theories.[11]  Because the allegations in the TAC remain consistent with

those in the SAC, and because no discovery has commenced against UBS, UBS would not

experience any additional difficulty in defending this lawsuit.  *See, e.g., A.V. by Versace v.*

*Gianni Versace S.p.A.*, 87 F. Supp. 2d 281, 299 (S.D.N.Y. 2000) (no prejudice where no trial

date had been set, discovery was not completed, and claims against new defendants did "not

raise factual claims unrelated to the events [in the] original [] complaint").

### E.      There Is No Need To Defer Consideration Of The Motion

Contrary to UBS's assertion, adjudication should not be deferred merely because

"Plaintiffs have not provided UBS with the actual documents from Deutsche Bank."  UBS Opp.

at 17.  Of course, in almost *every* pleading-stage case, defendants are routinely asked to respond

to pleadings without "the documents" or "the evidence."  *See generally In re Methyl Tertiary*

*Butyl Ether (MTBE) Prod. Liab. Litig.*, 379 F. Supp. 2d 348, 367 (S.D.N.Y. 2005) (at the

pleading stage, the court's job is "merely to assess the legal feasibility of the complaint, not to

assay the weight of the evidence which might be offered in support thereof").  That is simply the

nature of the complaint stage of the proceedings.  UBS's request for special treatment is even

more absurd here, given the documents in question all reflect communications *by UBS*, and UBS

has demonstrated the ability to search its own system for its own documents.[12]

---

[11]    For the same reason, there is also no basis to revisit the Court's prior determination
that Plaintiffs had adequately alleged antitrust injury against all Defendants.  *See* Order at *9-11.

[12]    *See, e.g.*, Dec. 8, 2016 Hearing Tr. 62:8-13 ("[Counsel for UBS:] And that's of
concern to us, because while we can't see the documents that Deutsche produced, we have gone
and explored ourselves to see what chats we have that seem to be reflected in the complaint.
And when we did that, we identified chats that actually involve traders who were trading in
Singapore eight hours ahead of London.").

UBS also asks for deferral, warning that allowing an amendment would raise a need to engage in extended briefing over its purported personal jurisdiction defenses.  But such defenses are waived when not truly raised in a party's initial responsive pleading.  *See City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 134 (2d Cir. 2011); *see also* 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1391 (2016) (stating that under Rule 12(h), a personal jurisdiction defense is waived if it is "not included in a preliminary motion under Rule 12 as required by Rule 12(g)" or in "the responsive pleading or an amendment as of right to that pleading under Rule 15(a).")); *Laydon v. Mizuho Bank, Ltd.*, 2015 WL 1499185, at *5 (S.D.N.Y. Mar. 31, 2015) (noting the same principle).  A party also impliedly waives its personal jurisdiction defense by "submit[ting] to the jurisdiction of the court by appearance."  *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982).  Here, not only has UBS voluntarily appeared in court, but it has also never raised any personal jurisdiction defense in either its past responses or the Second Amended Complaint.

Seeking to avoid the obvious, UBS claims that "[m]any of the chats Plaintiffs now depict as central to their claims against UBS did not occur in, or concern transactions executed within, this District."  *See* UBS Opp. at 18.  That is irrelevant.  As Plaintiffs have alleged from the outset, this Court has jurisdiction over UBS because many of UBS's transactions in furtherance of the conspiracy, such as those occurring on COMEX, occurred *in the U.S.  See* SAC ¶¶ 24-28. Nothing in the TAC changes that.  *See* TAC ¶¶ 30-34.  Moreover, that *some* UBS traders in Asia may have also shared knowledge about and participated in the scheme does not and cannot change the jurisdictional analysis.

Doubling down on this last-ditch effort, UBS asserts that *Waldman v. Palestine Liberation Organization*, 835 F.3d 317 (2d Cir. 2016) presents a novel legal issue this Court has

yet to address.  UBS Opp. at 18 n.6.  But there is nothing in *Waldman* to suggest that the laws

relating to personal jurisdiction have changed or that this Court is now faced with new law that

provides UBS with a new defense.  To the contrary, *Waldman* principally relies on preexisting

law set forth in *Walden v. Fiore*, 134 S. Ct. 1115 (2014).

## <u>CONCLUSION</u>

For the reasons set forth above, and in Plaintiff's opening brief, Plaintiffs request that the

Court grant the motion for leave to file the proposed Third Consolidated Amended Class Action

Complaint.

DATED:   New York, New York
              December 20, 2016

**BERGER & MONTAGUE, P.C.**

By: */s/ Merrill G. Davidoff*
Merrill G. Davidoff
Martin I. Twersky
Michael C. Dell'Angelo
Zachary D. Caplan
1622 Locust Street
Philadelphia, Pennsylvania 19103
Telephone:  (215) 875-3000
Fax:  (215) 875-4604
mdavidoff@bm.net
mtwersky@bm.net
mdellangelo@bm.net
zcaplan@bm.net

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

By: */s/ Daniel L. Brockett*
Daniel L. Brockett
Daniel P. Cunningham
Steig D. Olson
Sami H. Rashid
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:  (212) 849-7000
Fax:  (212) 849-7100
danbrockett@quinnemanuel.com
danielcunningham@quinnemanuel.com
steigolson@quinnemanuel.com
samirashid@quinnemanuel.com

Jeremy D. Andersen (*pro hac vice*)
Chris R. Barker *(pro hac vice)*
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:  (213) 443-3000
Fax: (213) 443-3100
jeremyandersen@quinnemanuel.com
chrisbarker@quinnemanuel.com

*Counsel for Plaintiffs and the Proposed Class*