USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  6/8/2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X
IN RE:                                                       :
                                                             :            14-MD-2548 (VEC)
COMMODITY EXCHANGE, INC., GOLD                               :            14-MC-2548 (VEC)
FUTURES AND OPTIONS TRADING                                  :
LITIGATION                                                   :            MEMORANDUM ORDER
                                                             :
*This Document Relates to All Actions*                       :
------------------------------------------------------------- X

VALERIE CAPRONI, United States District Judge:

This multi-district litigation arises out of allegations that the defendants conspired to fix the price of physical gold and gold-denominated financial instruments. Until November 2014, the spot price of physical gold was determined in part through twice daily private auctions (the "Gold Fixing") conducted by certain of the defendants in this action: The Bank of Nova Scotia ("BNS"), Barclays Bank plc ("Barclays"), Deutsche Bank AG ("DB"), HSBC Bank plc ("HSBC"), and Société Générale SA ("SocGen") (collectively, the "Fixing Banks").[1] The Plaintiffs, investors in gold and gold-denominated financial instruments, allege that the afternoon private auction, known as the "PM Fixing," was a cover for a conspiracy to suppress the price of gold. They bring claims for price fixing and conspiracy under Section 1 of the Sherman Act, 15 U.S.C. § 1; for manipulation in violation of the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.*; employment of a manipulative or deceptive device in violation of the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.* and CFTC Rule 180.1(a), promulgated thereunder, 17 C.F.R. § 180.1(a);

---

[1] The Second Amended Complaint ("SAC") (Dkt. 44) names what appear to be the parent corporations of each of the Fixing Banks. Also named are U.S.-based affiliates of each, including ScotiaMocatta Depository (BNS), Barclays Capital Inc. (Barclays), Deutsche Bank Securities, Inc. (DB), HSBC Securities (USA) Inc. and HSBC Bank USA (both, HSBC), and Newedge USA, LLC (SocGen).

1

aiding and abetting and principal-agent liability under the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.*; and unjust enrichment under the common law.

On October 3, 2016, the Court granted in part and denied in part motions to dismiss the SAC filed by the Fixing Banks and their agent, Dkts. 73, 75, and granted UBS AG's ("UBS") motion to dismiss, Dkt. 71. *See In re Commodity Exch., Inc., Gold Futures and Options Trading Litig.*, 213 F. Supp. 3d 631 (S.D.N.Y. 2016) ("*Gold I*"). Before the Court is Plaintiffs' motion for leave to amend and to file a third amended complaint (as proposed, the "PTAC"). Dkt. 183. For the reasons that follow, Plaintiffs' motion for leave to amend is GRANTED.

## BACKGROUND

The Court assumes familiarity with the prior proceedings in this case and the Court's opinion in *Gold I*.[2] Since 1919, the Gold Fixing has been an integral price-setting mechanism for the spot price of physical gold. SAC ¶ 78. The auction was overseen by defendant London Gold Market Fixing Ltd. ("LGMF") and conducted, in recent years, telephonically by the five Fixing Banks. SAC ¶¶ 80-85. The market-clearing price in the auction (the "Fix Price") was published as a benchmark price for physical gold. SAC ¶¶ 76-77. Because of a near-perfect correlation between prices for physical gold and gold derivatives, Plaintiffs allege that the Fix Price also effectively set the market price for gold futures, options, and forwards. SAC ¶¶ 105-15.

The SAC alleges that the Fixing Banks used the PM Fixing to conceal a conspiracy to suppress gold prices. SAC ¶¶ 6, 9-12, 105. Plaintiffs and their consultants identified anomalous pricing behavior in the markets for physical gold and gold derivatives, which they allege supports their theory. From 2001 through 2012 (Plaintiffs' proposed class period), the spot price of gold decreased during the PM Fixing on between 60% and 80% of trading days, SAC ¶¶ 21,

---

[2] Unless defined otherwise, capitalized terms have the meaning ascribed to such terms in *Gold I*.

2

123-25, even though, it is alleged, an efficient market would be equally likely to move upwards or downwards on a given day. SAC ¶¶ 121-22. The PM Fixing also registered as one of the most volatile periods in the trading day, SAC ¶¶ 138, 149-53, a phenomenon not seen around the AM Fixing, SAC ¶ 146. Plaintiffs' analysis further shows that the downward movement in the price of physical gold consistently began in the minutes before the PM Fixing call began, evidence, according to Plaintiffs, of coordinated trading based on foreknowledge of the Fix Price. SAC ¶¶ 118, 138.

Plaintiffs also identified alleged patterns in the Defendants' price quotes, which, Plaintiffs contend, link them to the anomalous pricing behavior observed around the PM Fixing. According to Plaintiffs, Defendants consistently quoted similar (or "bunched"), below market prices around the PM Fixing, a trend that was more pronounced on so-called "down days," *i.e.*, on days when the Fix Price declined from the spot price at which gold was trading before the Fix Price was announced. SAC ¶¶ 202, 250-53, 255-58. On certain days identified by Plaintiffs, Defendants quoted prices that appeared to either cause or anticipate downward movement in the PM Fixing. SAC ¶¶ 261-67 & App'x. I. Plaintiffs also allege that Defendants employed manipulative trading tactics like "spoofing," "wash sales," and front-running client orders, in order to further manipulate the price of physical gold and gold-denominated assets before and during the PM Fixing. SAC ¶ 8 & n.2. Defendants supposedly benefited from this scheme by using their foreknowledge of the PM Fixing to make profitable trades in the physical gold and gold derivatives markets, trigger stop-loss orders, and time margin calls to accrue favorable cash flows. SAC ¶¶ 14, 230-32.

On October 3, 2016, the Court granted in part and denied in part the Fixing Banks' motion to dismiss the SAC. The Court concluded that Plaintiffs plausibly alleged that they had

suffered an antitrust injury and were efficient enforcers within the meaning of the antitrust laws, *Gold I*, 213 F. Supp. 3d at 653, 656-57, and that they plausibly alleged, "albeit barely," a conspiracy to suppress the PM Fix Price, *id.* at 659-660. "Because most of Plaintiffs' compelling facts, including those based on statistical analyses, are drawn from 2006 through 2012," the Court concluded that Plaintiffs had not plausibly alleged a conspiracy during the period from 2000 through 2005 and dismissed Plaintiffs' claims as to those years. *See id.* at 660 n.24; *see also id.* at 669 n.33.

The Court also granted UBS's motion to dismiss. UBS was not a fixing bank during the class period. As the Court explained, the SAC's only factual allegations relative to UBS were that UBS had also offered below-market quotes that coincided with downward movement in the price of gold before and during the PM Fixing. *Id.* at 678 (citing SAC ¶¶ 250-67). The Court found that Plaintiffs' allegations that UBS quoted prices that were "lower than market averages" were "simply inadequate to create a plausible inference of conspiracy." *Id.*

Plaintiffs move for leave to amend in order to cure the deficiencies in their statistical analysis with respect to the years 2004 and 2005 and to supplement their allegations as to UBS. The PTAC incorporates documents turned over by DB in connection with its settlement of the claims in this action (the "DB Cooperation Materials"). PTAC ¶ 7. The DB Cooperation Materials include chat messages between traders at DB and traders at UBS that appear to chronicle efforts to manipulate the markets for physical gold and gold derivatives, including through coordinated trading during periods of low liquidity, PTAC ¶¶ 364-65, and by sharing proprietary customer order information, PTAC ¶¶ 368-72.[3] Several of the chats appear to discuss efforts to manipulate the PM Fixing. *See* PTAC ¶¶ 360 (discussing instance when a

---

[3] At this stage, the Court assumes as true the allegations in the PTAC.

trader "pushed" too early while manipulating the Gold Fixing and ran out of "ammo"), 361 (discussing a trading loss sustained during the Fix because of a "miscomm," *i.e.*. a failed attempt at collusion), 363 (UBS "smashed it [the Fix] good"). Plaintiffs' revised statistical analysis shows that the anomalous pattern of "down days" identified in the SAC holds true for 2004 and 2005 as well. *See* PTAC ¶¶ 321-24.[4] Whereas the SAC included an analysis of returns on COMEX gold futures from 2007 through 2013, the PTAC expands this analysis using a combination of data to include 2004 and 2005 and shows that in those years there was also a statistically significant negative return at the time of the PM Fixing. *See* PTAC ¶¶ 332-40. Plaintiffs' "bunching" analysis – measured by comparing the variance in prices quoted by the Defendants to the variance in prices quoted by other market participants – also shows results in 2004-05 that are similar to the results in 2006-12. PTAC ¶¶ 346-48.

## DISCUSSION

Rule 15(a) of the Federal Rules of Civil Procedure provides that "[t]he court should freely give leave" to a party to amend its complaint "when justice so requires." Fed. R. Civ. P. 15(a)(2). "Leave may be denied 'for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party.'" *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 200 (2d Cir. 2007) (additional citations omitted)). "In determining what constitutes 'prejudice,' [courts] consider whether the assertion of the new claim would: (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993).

---

[4] Plaintiffs have entirely abandoned their theory that the conspiracy began as early as 2000.

A party seeking leave to amend after a deadline set in a scheduling order must show "good cause." *See Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000); Fed. R. Civ. P. 16(b)(4). "Good cause" is primarily a question of diligence. *Id.* The district court may, however, consider other relevant factors, including "whether allowing the amendment of the pleading at this stage of the litigation will prejudice defendants." *Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 244 (2d Cir. 2007); *see also Fresh Del Monte Produce, Inc. v. Del Monte Foods, Inc.*, 304 F.R.D. 170, 176 (S.D.N.Y. 2014) ("a district court has discretion to consider Rule 15(a) factors notwithstanding the failure to show good cause for violating a Rule 16(b) deadline").[5]

The Fixing Banks oppose Plaintiffs' motion to replead on the grounds that they have not shown "good cause" to amend their claims with respect to 2004 and 2005. Fixing Banks' Opp (Dkt. 184). They contend that Plaintiffs proposed amendment does not pass muster under Rule 16. Fixing Banks' Opp. at 6. According to the Fixing Banks, the PTAC relies on the same statistical allegations with respect to 2004 and 2005 as the Court previously rejected in *Gold I*. Fixing Banks' Opp. at 6-8. Moreover, the Fixing Banks claim, there is no good cause for Plaintiffs' delay in revising their analysis of these claims, which is based on data that has been publicly available for more than ten years. Fixing Banks' Opp. at 8-9.

While the Court shares the Defendants' obvious annoyance that Plaintiffs did not include all of their analyses for all relevant years in the SAC, in light of the relatively early stage of these proceedings, the close overlap in allegations between the SAC and PTAC, and the corresponding

---

[5] The Fixing Banks take the position that Rule 16 and the "good cause" standard apply because the Court previously set a deadline for Plaintiffs to file their Consolidated Amended Complaint and a deadline for Defendants to file their motions to dismiss the SAC. *See* Fixing Banks' Opp. at 2-3 (citing Order No. 4 (Dkt. 42)). Because the Fixing Banks have not shown any undue prejudice from the amendment, whether under Rule 15 or Rule 16, the Court would grant leave to amend, even if that order were construed to constitute a Rule 16(b) deadline. *See Kassner*, 496 F.3d at 245 (the Court can consider similar factors, including prejudice, under Rule 15 and Rule 16.).

absence of any prejudice to the Fixing Banks, the Court finds that leave to amend is appropriate. Plaintiffs can be fairly criticized for not undertaking a supplementary analysis of futures data for 2004 and 2005 before filing the SAC – given that they were undoubtedly aware that certain data relied on in the SAC was not available for those years. *See Parker*, 204 F.3d at 340 (diligence, or lack thereof, critical under Rule 16(b)); *see also State Trading Corp. of India, Ltd. v. Assuranceforeningen Skuld*, 921 F.2d 409, 418 (2d Cir. 1990) ("When the moving party has had an opportunity to assert the amendment earlier, but has waited until after judgment before requesting leave, a court may exercise its [Rule 15(a)] discretion more exactly."). Nonetheless, this fact alone is not grounds to deny leave to amend. The parties have engaged in only preliminary discovery of a narrow subset of documents and the preliminary document exchange was tailored to minimize the burden on the Fixing Banks by requiring production only of documents that had previously been disclosed to third-parties. *See* Dkt. 188 (providing for a limited exchange of documents). Plaintiffs' allegations with respect to 2004-2005 and later years overlap almost completely, which suggests that any additional burden in discovery will be *de minimis*. This is not an instance in which the parties have put a great deal of time and expense into discovery only for plaintiffs to make a last minute radical realignment in their allegations regarding the duration of the conspiracy or of their theory of liability. *See, e.g.*, *In re Aluminum Warehousing Antitrust Litig*. No. 13-MD-2481 (KBF), 2016 WL 1629350, at *6-7 (S.D.N.Y. Apr. 25, 2016) (denying leave to amend where plaintiffs belatedly shifted focus after substantial discovery). Finally, although the Fixing Banks address futility as an afterthought, the Court notes that the PTAC specifically addresses the inadequacies in the SAC identified by the Court. Plaintiffs' revised statistical analyses show that the PM Fixing trended downwards on an unusually large number of days, PTAC ¶¶ 321-24, 344-45, and that there were statistically

significant negative cumulative returns around the PM Fixing in 2004 and 2005, PTAC ¶¶ 336-40.[6]

UBS opposes amendment on the grounds that the PTAC unfairly raises a new theory of liability after more than two years of proceedings. UBS's Opp. (Dkt. 185) at 10. Whereas the SAC theorized that the Fixing Banks and UBS conspired to fix the PM Fixing Price – a so-called "benchmark" fixing case – UBS contends that the PTAC alleges more general manipulation of the physical and derivatives gold markets, untethered as to UBS from the Gold Fixing. UBS's Opp. at 10. UBS draws this inference from the content of the chat messages incorporated into the PTAC. UBS's Opp. at 10-13. These messages describe coordination in the gold markets and episodic instances of what is alleged to be attempts by traders to manipulate the Gold Fixing, but they do not reference directly a conspiracy to suppress the PM Fixing. To the extent the chats

---

[6] On April 26, 2017, counsel for the Fixing Banks identified two discrepancies in Plaintiffs' analysis, which the Fixing Banks contend are grounds to either dismiss the SAC or to permit the Fixing Banks to file another motion to dismiss. Dkt. 247. Specifically, the Fixing Banks uncovered a coding error in Plaintiffs' underpricing analysis that excluded market quotes from a substantial (and disputed) number of the Fixing Banks' subsidiaries during the relevant period. Correcting the sample, the Fixing Banks argue that there is no evidence that the Fixing Banks' underpricing dissipated in 2013, after the conspiracy supposedly ended. In addition, after reviewing Plaintiffs' data set, the Fixing Banks believe that the evidence Plaintiffs presented of Defendants' "bunching" quotes was misleading because Plaintiffs compared the correlation among the Defendants' quotes to the correlation among quotes from non-Defendant market participants on different days. Comparing "apples to apples," *i.e.*, running correlations of quotes from the two groups on the same days, the Fixing Banks assert that there is no statistically significant evidence of "bunching."

The fact that the adversarial process may reveal weaknesses in Plaintiffs' factual allegations is not cause for the Court to permit the Fixing Banks to file another motion to dismiss, nor is it a basis for the Court to refuse to grant leave to amend. It is telling that the Fixing Banks have not cited any authority for their unorthodox proposal. It is hard to imagine how discovery could function efficiently if defendants were free to insist upon another motion to dismiss every time they discovered weaknesses in the factual allegations of the complaint. That is true even if the Fixing Banks' proposed exception were limited to factual issues that could be fairly deemed to be "integrated" into the complaint. The interest in finality also weighs against the Fixing Banks' approach. Just as a litigation must eventually come to an end, stages in a litigation must also be put to rest. Defendants will have the opportunity to raise these issues at summary judgment. That said, to the extent Plaintiffs agree that Defendants have identified errors in their analysis, *see* Dkt. 248, they are directed to correct those errors *before* filing their Third Amended Complaint.

potentially bear on suppression of the PM Fixing, UBS argues that they are lacking in context and irrelevant.  UBS's Opp. at 12-13.

The Court is not persuaded that the PTAC presents a substantially revised theory of liability.[7]  Plaintiffs have consistently alleged that manipulation of the PM Fixing required collusive trading tactics in the spot and derivatives markets.  For example, the SAC (and the PTAC) alleged that "[t]ransactions that would move the market in the desired direction . . . would be grouped and timed for maximum effect around the Fixing, thus altering the starting price, . . . , and giving cover to an auction-rate that would otherwise have stood out like a sore thumb."  PTAC ¶ 10; *see also* PTAC ¶ 112 (Fix was a "ready-made forum for collusion" that would "appear to legitimatize artificial price movements" at the time when "manipulation would have the greatest impact.").  Consistently, Plaintiffs have alleged a variety of manipulative conduct intended to facilitate an artificially low PM Fixing Price.  *See* PTAC ¶¶ 244-47, 249 (methods of collusion included outside communication, netting-out orders, and transferring "ammo"), 250 (describing the PM Fixing as "another layer of control").  UBS's role in the conspiracy is also unchanged.  The SAC and the PTAC allege that UBS facilitated the conspiracy by providing air support to the conspirators: "A single actor could not and would not have attempted to move the market so consistently.  There would not have been enough 'ammo' to do so, and the risk (and cost) would have been too high."  PTAC ¶ 15.  In short, this is still a case that alleges benchmark fixing and UBS has not shown a prejudicial change in Plaintiffs' theory of liability.  Because UBS's other arguments proceed from the assumption that the PTAC

---

[7]    By comparison the Court agrees with UBS that the allegations in the third amended complaint filed in the parallel silver fixing class action do present a substantially revised theory of liability.  *See In re London Silver Fixing, Ltd. Antitrust Litig.* No. 14-MD-2573 (VEC) (proposed third amended complaint filed at Dkt. 180).  The differences are telling: the *Silver* PTAC includes a revised class definition and names a number of new defendants.  The PTAC in this case does not add new defendants or modify the class allegations.

presents a substantially revised theory of liability, *see* UBS's Opp. at 14-16, the Court need not address them further.

Plaintiffs' motion for leave to amend is GRANTED.  The Court wishes to make clear, however, that Plaintiffs should not assume that further amendments will be permitted absent a compelling showing of "good cause."  And, in particular, Plaintiffs should not assume that they will be permitted to refocus the case or add additional defendants at a later stage, especially if they aim to do so in reliance on DB Cooperation Materials already in Plaintiffs' possession.  *Cf. United States ex rel. Kester v. Novartis Pharm. Corp.*, No. 11-CV-8196 (CM), 2015 WL 1650767, at *7 (S.D.N.Y. Apr. 10, 2011) (denying leave to amend where plaintiffs waited to see whether their complaint could withstand a motion to dismiss as-written despite knowledge of additional allegations).

## CONCLUSION

Plaintiffs' Motion for Leave to Amend and File the PTAC is GRANTED.  Plaintiffs are directed to file the PTAC, as revised in accordance with footnote 6 *supra*, by **June 16, 2017**. Counsel are directed to confer and jointly propose a schedule for briefing on UBS's motion to dismiss.  The parties should submit their views to the Court by **June 23, 2017**.

**SO ORDERED.**

Date:  June 8, 2017
       New York, New York

_____
**VALERIE CAPRONI**
**United States District Judge**