UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

|  | : |  |
|---|---|---|
|  | : |  |
| IN RE: COMMODITY EXCHANGE, INC. | : | Case No. 14-MD-2548 (VEC) |
| GOLD FUTURES AND OPTIONS | : |  |
| TRADING LITIGATION | : | ECF CASE |
|  | : |  |
| This Document Relates To All Actions | : | ORAL ARGUMENT REQUESTED |
|  | : |  |

---------------------------------------------------------x


**MEMORANDUM OF LAW OF UBS AG AND UBS SECURITIES LLC
IN SUPPORT OF THEIR MOTIONS TO DISMISS THE THIRD AMENDED
COMPLAINT UNDER RULES 12(B)(2) AND 12(B)(6)**


GIBSON, DUNN & CRUTCHER LLP

200 Park Avenue
New York, NY  10166-0193
Phone: (212) 351-4000

1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Phone: (202) 955-8500


*Attorneys for Defendants
UBS AG and UBS Securities LLC*


September 11, 2017

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................ 1

SUMMARY OF ARGUMENT .......................................................................... 3

BACKGROUND ................................................................................................. 5

ARGUMENT ..................................................................................................... 10

I.      Plaintiffs Fail To State A Plausible Claim That UBS Conspired with the
        Fixing Banks to Manipulate the Gold Fix ........................................................ 10

        A.      The "Structural Design" of the Gold Fix Process Makes it Implausible
                That UBS Would Join, or be Asked to Join, any Conspiracy to
                Influence the Gold Fix. ......................................................................... 12

        B.      The Chats and Government Proceedings Do Not Give Rise To A
                Plausible Suggestion Of Conspiracy by UBS to Manipulate the Gold
                Fix. ........................................................................................................ 15

                1.      The Chats Concerning Trades Booked On Singapore Time Do
                        Not Support Plaintiffs' Allegations of Collusion With Respect
                        to The Gold Fixing At 3 P.M. In London. ................................... 16

                2.      Government Investigations Undercut The TAC's Claims In
                        Never Asserting That UBS Manipulated The Gold Or Any
                        Other Precious Metals Benchmark. ............................................ 18

        C.      The Purported Pricing Conduct Allegations Reflect Impermissible
                Group Pleading And Remain Inadequate. ............................................. 20

        D.      Plaintiffs Lack Antitrust Injury And Antitrust Standing Because UBS
                Could Not Have Been The Proximate Cause Of Harms Based On
                Suppressed Fix Prices. ......................................................................... 22

II.     Plaintiffs Lack Antitrust Standing To Recover For The Alleged Order
        Manipulation, And In Any Event They Fail To Allege A Plausible
        Overarching Conspiracy To Achieve Such Manipulation. ............................... 23

        A.      Plaintiffs Are Not Efficient Enforcers Of A Claim For Order
                Manipulation Because They Did Not Transact With UBS Or Any
                Fixing Bank. ......................................................................................... 24

        B.      The Order Manipulation Conspiracy Is Facially Implausible and
                Incoherent. ........................................................................................... 26

**TABLE OF CONTENTS** *(continued)*

Page

C.  Plaintiffs Have Not Met The FTAIA's Limitations As To Foreign Conduct. .................................................................................................. 28

III.  The CEA Claims Against UBS Should Be Dismissed. .................................................... 29

A.  The CEA Claims Against UBS Are Time Barred. ............................................... 30

B.  Plaintiffs Lack Actual Damages Necessary For CEA Standing. .......................... 31

C.  The CEA Claims Are Impermissibly Extraterritorial. ......................................... 32

D.  The TAC Fails To Plausibly Allege That UBS Manipulated The Gold Futures Market. ................................................................................................... 34

E.  The Manipulative Device Claims Also Fail Against UBS. .................................. 36

F.  Plaintiffs Fail to State a Claim Against UBS for Principal-Agent Liability or Aiding and Abetting Under the CEA. .................................................. 36

IV.  Plaintiffs Again Fail To State A Plausible Unjust Enrichment Claim. .............................. 37

V.  The TAC Fails To Allege That The Court Has Personal Jurisdiction Over UBS AG. ................................................................................................................... 37

CONCLUSION .............................................................................................................. 40

# TABLE OF AUTHORITIES

Page(s)

## Cases

*7 W. 57th St. Realty Co. v. Citigroup, Inc.*,
No. 13 Civ. 981, 2015 WL 1514539 (S.D.N.Y. Mar. 31, 2015) .............................................38

*AD/SAT, Div. of Skylight, Inc. v. Assoc. Press*,
181 F.3d 216 (2d Cir. 1999).............................................................................................10, 17

*In re Aluminum Warehousing Antitrust Litig.*,
833 F.3d 151 (2d Cir. 2016)......................................................................................................22

*Am. Tobacco Co. v. United States*,
328 U.S. 781 (1946)....................................................................................................................11

*In re Amaranth Nat. Gas Commodities Litig.*,
587 F. Supp. 2d 513 (S.D.N.Y. 2008) (“*Amaranth I*”) .........................................................29

*In re Amaranth Nat. Gas Commodities Litig.*,
730 F.3d 170 (2d Cir. 2013).............................................................................................34, 36

*In re Amaranth Natural Gas Commodities Litig.*,
612 F. Supp. 2d 376 (S.D.N.Y. 2009) (“*Amaranth II*”).......................................................37

*Apex Oil Co. v. DiMauro*,
822 F.2d 246 (2d Cir. 1987).....................................................................................................27

*Arista Records LLC v. Lime Grp. LLC*,
532 F. Supp. 2d 556 (S.D.N.Y. 2007)......................................................................................25

*Armstrong v. McAlpin*,
699 F.2d 79 (2d Cir. 1983).......................................................................................................30

*ASARCO LLC v. Goodwin*,
756 F.3d 191 (2d Cir. 2014).....................................................................................................30

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)......................................................................................................3, 10, 30

*Associated Gen. Contractors of Cal., Inc. v. Cal. St. Council of Carpenters*,
459 U.S. 519 (1983) (“*AGC*”).............................................................................................22, 25

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007).......................................................................................................29

*Atuahene v. City of Hartford*,
10 F. App'x 33 (2d Cir. 2001) ...................................................................................................21

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

*Beatty v. JP Morgan Chase & Co.* (*In re Commodity Exch., Inc. Silver Futures &
  Options Trading Litig.*),
  560 F. App'x 84 (2d Cir. 2014) ("*Silver II*") ...................................................35, 36

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .............................................................................3, 10, 13

*Bristol-Myers Squibb Co. v. Super. Ct. of Cal., S.F. Cnty.*,
  137 S. Ct. 1773 (2017) ("*BMS*") .....................................................................38

*Chevron Corp. v. Naranjo*,
  667 F.3d 232 (2d Cir. 2012) ............................................................................38

*In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*,
  213 F. Supp. 3d 631 (S.D.N.Y. 2016) ("*Gold Fix*") .......................1, 6, 12, 13, 16, 18, 19, 20,
                                                                            21, 22, 23, 24, 25, 29, 30, 31, 34, 36

*In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.*,
  2012 WL 6700236 (S.D.N.Y. Dec. 21, 2012) ("*Silver I*") ......................................35

*Corporación Mexicana De Mantenimiento Integral v. Pemex-Exploración Y
  Producción*,
  832 F.3d 92 (2d Cir. 2016) ..............................................................................39

*In re Crude Oil Commodity Litig.*,
  2007 WL 1946553 (S.D.N.Y. June 28, 2007) ...............................................29, 35

*Daimler AG v. Bauman*,
  134 S. Ct. 746 (2014) .....................................................................................37

*Daniel v. Am. Bd. of Emergency Med.*,
  428 F.3d 408 (2d Cir. 2005) ............................................................................24

*Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*,
  631 F.3d 42 (2d Cir. 2011) ..............................................................................37

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*,
  542 U.S. 155 (2004) .......................................................................................28

*Five Smiths, Inc. v. NFL Players Ass'n*,
  788 F. Supp. 1042 (D. Minn. 1992) ..................................................................27

*In re Foreign Exchange Benchmarks Antitrust Litig.*,
  74 F. Supp. 3d 581 (S.D.N.Y. 2015) ("*FOREX*") .................................................15

*FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*,
  16 Civ. 5263, 2017 WL 3600425 (S.D.N.Y. Aug. 18, 2017) .........................5, 38, 39

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*,
  711 F.3d 68 (2d Cir. 2013) ....................................................................22, 24, 25

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

*Gelboim v. Bank of Am. Corp.*,
    823 F.3d 759 (2d Cir. 2016)...............................................................25

*Gucci Am., Inc. v. Weixing Li*,
    768 F.3d 122 (2d Cir. 2014)...............................................................38

*Harry v. Total Gas & Power N. Am., Inc.*,
    15 Civ. 9689, 2017 WL 1134851 (S.D.N.Y. 2017)...............................2, 26, 33, 35

*Hawknet, Ltd. v. Overseas Shipping Agencies*,
    590 F.3d 87 (2d Cir. 2009)...............................................................39

*Hershey v. Energy Transfer Partners, L.P.*,
    610 F.3d 239 (5th Cir. 2010) ...............................................................33, 35

*Holzsager v. Valley Hosp.*,
    646 F.2d 792 (2d Cir. 1981)...............................................................39

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977)...............................................................24

*In re Intel Corp. Microprocessor Antitrust Litig.*,
    452 F. Supp. 2d 555 (D. Del. 2006)...............................................................29

*In re Iowa Ready-Mix Concrete Antitrust Litig.*,
    768 F. Supp. 2d 961 (N.D. Iowa 2011)...............................................................14, 28

*Laydon v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*,
    No. 12 Civ. 3419, 2017 WL 1113080 (S.D.N.Y. Mar. 10, 2017) ("*Laydon I*")...............5, 39

*Laydon v. Mizuho Bank, Ltd.*,
    No. 12 Civ. 3419, 2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014) ("*Laydon II*")...............36

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    134 S. Ct. 1377 (2014)...............................................................24

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    935 F. Supp. 2d 666 (S.D.N.Y. 2013) ("*LIBOR I*")...............................................30, 31

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    962 F. Supp. 2d 606 (S.D.N.Y. 2013) ("*LIBOR II*") ...............................................2, 26, 31, 32

*In re LIBOR-Based Financial Instruments Antitrust Litig.*,
    27 F. Supp. 3d 447 (S.D.N.Y. 2014) ("*LIBOR III*")...............................................2, 26, 27

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    No. 11 MDL 2262,
    2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015) ("*LIBOR IV*")...............................................30

## TABLE OF AUTHORITIES *(continued)*

Page(s)

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
No. 11-md-2262, 2016 WL 1558504 (S.D.N.Y. Apr. 14, 2016) ............................................ 15

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
No. 11-MD-2262, 2016 WL 7378980 (S.D.N.Y. Dec. 20, 2016) ("*LIBOR VI*") .............. 22, 25

*Lipsky v. Commonw. United Corp.*,
551 F.2d 887 (2d Cir. 1976) ................................................................................................ 19

*Livnat v. Palestinian Auth.*,
851 F.3d 45 (D.C. Cir. 2017) .............................................................................................. 38

*Loginovskaya v. Batratchenko*,
764 F.3d 266 (2d Cir. 2014) ................................................................................................ 33

*Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
797 F.3d 160 (2d Cir. 2015) ................................................................................................ 19

*Lotes Co. v. Hon Hai Precision Indus. Co.*,
753 F.3d 395 (2d Cir. 2014) ................................................................................................ 29

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ...................................................................................................... 14, 21

*Mayor & City Council of Balt., Md. v. Citigroup, Inc.*,
709 F.3d 129 (2d Cir. 2013) .......................................................................................... 10, 20

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
465 U.S. 752 (1984) ............................................................................................................ 11

*Morrison v. Nat'l Australia Bank Ltd.*,
561 U.S. 247 (2010) ............................................................................................................ 33

*In re Nat. Gas Commodity Litig.*,
358 F. Supp. 2d 336 (S.D.N.Y. 2005) ................................................................................. 29

*New Hampshire v. Maine*,
532 U.S. 742 (2001) ............................................................................................................ 23

*In re North Sea Brent Crude Oil Futures Litig. (North Sea Brent)*,
No. 13-md-2475, 2017 WL 2493135 (S.D.N.Y. June 8, 2017) ................................ 32, 33, 37

*Ochre LLC v. Rockwell Architecture Planning & Design, P.C.*,
2012 WL 6082387 (S.D.N.Y. Dec. 3, 2012),
*aff'd*, 530 F. App'x 19 (2d Cir. 2013 ................................................................................... 21

*Omni Capital Int'l Ltd. v. Rudolf Wolff & Co.*,
484 U.S. 97 (1987) .............................................................................................................. 38

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*,
    720 F.3d 490 (2d Cir. 2013)..................................................................38

*In re Optical Disk Drive Antitrust Litig.*,
    No. 3:10-md-2143, 2011 WL 3894376 (N.D. Cal. Aug. 3, 2011)....................26, 28

*Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*,
    763 F.3d 198 (2d Cir. 2014)..................................................................32

*Peay v. BellSouth Med. Assistance Plan*,
    205 F.3d 1206 (10th Cir. 2000) ..............................................................38

*In re Platinum & Palladium Commodities Litig.*,
    828 F. Supp. 2d 588 (S.D.N.Y. 2011)......................................................21

*In re Platinum & Palladium Fix Antitrust Litig.*,
    No. 14 Civ. 9391,
    2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017) ("*Platinum Fix*").............5, 22, 25, 26, 38, 39

*Prime Healthcare Servs., Inc. v. Serv. Employees Int'l Union*,
    2013 WL 3873074 (S.D. Cal. July 25, 2013),
    *aff'd*, 642 F. App'x 665 (9th Cir. 2016)...................................................28

*Republic of Panama v. BCCI Holdings (Lux.) S.A.*,
    119 F.3d 935 (11th Cir. 1997) ...............................................................38

*Rio Tinto PLC v. Vale S.A.*,
    No. 14 Civ. 3042, 2015 WL 7769534 (S.D.N.Y. Nov. 20, 2015) ..........................30

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)..................................................................30

*Ross v. Am. Exp. Co.*,
    35 F. Supp. 3d 407 (S.D.N.Y. 2014),
    *aff'd sub nom. Ross v. Citigroup, Inc.*, 630 F. App'x 79 (2d Cir. 2015) .................11

*Sears Petroleum & Trans. Corp. v. Ice Ban Am., Inc.*,
    217 F.R.D. 305 (N.D.N.Y. 2003)............................................................39

*Shak v. JPMorgan Chase & Co.*,
    156 F. Supp. 3d 462 (S.D.N.Y. 2016).......................................................37

*Simon v. KeySpan Corp.*,
    694 F.3d 196 (2d Cir. 2012)..................................................................24

*Sullivan v. Barclays PLC*,
    13 Civ. 2811, 2017 WL 685570 (S.D.N.Y. Feb. 21, 2017).........................5, 22, 38

*TheECheck.com, LLC v. NEMC Fin. Servs. Grp. Inc.*,
    No. 16 Civ. 8722, 2017 WL 2627912 (S.D.N.Y. June 16, 2017)...........................21

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

*Transhorn, Ltd. v. United Techs. Corp.* (*In re Elevator Antitrust Litig.*),
    502 F.3d 47 (2d Cir. 2007)..................................................................10, 18, 21

*In re Travel Agent Comm'n Antitrust Litig.*,
    583 F.3d 896 (6th Cir. 2009) ...........................................................................11

*United Magazine Co. v. Murdoch Magazines Distrib., Inc.*,
    146 F. Supp. 2d 385 (S.D.N.Y. 2001),
    *aff'd sub nom. United Magazine Co. v. Curtis Circulation Co.*,
    279 F. App'x 14 (2d Cir. 2008) ......................................................................14

*United States v. United States Gypsum Co.*,
    438 U.S. 422 (1978)........................................................................................27

*Venture Tech., Inc. v. Nat'l Fuel Gas Co.*,
    685 F.2d 41 (2d Cir. 1982)..............................................................................11

*Walden v. Fiore*,
    134 S. Ct. 1115 (2014)...............................................................................37, 38

*Waldman v. PLO*,
    835 F.3d 317 (2d Cir. 2016)......................................................................37, 38

*In re Zinc Antitrust Litig.*,
    155 F. Supp. 3d 337 (S.D.N.Y. 2016)......................................................14, 15, 21

**Statutes**

7 U.S.C. § 13(a)(2)....................................................................................................35

7 U.S.C. § 25(a)(1)....................................................................................................31

7 U.S.C. § 25(a)(1)(D)...............................................................................................33

7 U.S.C. § 25(c).........................................................................................................30

15 U.S.C. § 1.............................................................................................................10

15 U.S.C. § 6a...........................................................................................................28

15 U.S.C. § 6a(1).......................................................................................................29

15 U.S.C. § 6a(2).......................................................................................................29

15 U.S.C. § 22...........................................................................................................38

**Rules**

Fed. R. Civ. P. 9(b)...................................................................................................29

Fed. R. Civ. P. 12(g)(2).............................................................................................39

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

**Other Authorities**

5C Charles Alan Wright, et al., *Federal Practice & Procedure Civil* § 1388 (3d
   ed. updated 2016)....................................................................................................39

Gov.UK, *When do the clocks change? at* https://www.gov.uk/when-do-the-
   clocks-change (last visited Aug. 12, 2017)...............................................................9

## INTRODUCTION

This putative class action alleges that an exclusive auction process in the United Kingdom—the Gold Fixing at 3 P.M. London time—was the basis of an alleged conspiracy to suppress the "*benchmark price* for gold," and that such "downward suppression" led Plaintiffs to sell gold and gold derivatives at "artificially lower" levels.  Third Amend. Compl. ("TAC") ¶¶ 165, 376, 392 (emphasis original).  But, as this Court recognized in previously dismissing Plaintiffs' claims against UBS AG and UBS Securities LLC (together, "UBS"), UBS "never participated in" the Gold Fixing with the Fixing Banks (Bank of Nova Scotia, Barclays, HSBC, Société Générale, and Deutsche Bank).  *In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*, 213 F. Supp. 3d 631, 678 (S.D.N.Y. 2016) ("*Gold Fix*").  UBS, accordingly, lacks the crucial characteristics that the Fixing Banks allegedly possessed and exploited in executing the conspiracy: "control over" the Gold Fixing (TAC ¶¶ 208, 386; *see* TAC ¶ 236) and "foreknowledge" of its level and direction (TAC ¶¶ 5, 236).  Because of its exclusion from the auction process, UBS did not, unlike the Fixing Banks, "control[] a key factor in the pricing of Plaintiffs' Gold Investments throughout the Class Period"; have "foreknowledge of downward price swings [that] enabled [the Fixing Banks] to profit from a variety of Fix Price-dependent gold-related investments"; and was not poised to "conspire[] artificially to suppress the Fix Price, causing Plaintiffs to suffer losses on their Gold Investments."  *See Gold Fix*, 213 F. Supp. 3d at 644, 662-63, 666.

Plaintiffs now attempt to compensate for the deficiencies in their prior allegations against UBS.  But the best they can do is quote fragments of "chats," chiefly between a single employee at UBS and a single employee at Deutsche Bank, both of whom were trading in the *Singapore* precious metals markets.  Plaintiffs contend that the bilateral chats reflect communications indicating an array of "coordinated . . . trading activities" (TAC ¶ 359), which somehow suggest

that UBS engaged in an overarching conspiracy with the Fixing Banks.  But the chat fragments cannot bear the weight Plaintiffs place upon them.  The chats were produced to the government by Deutsche Bank.  But no government proceeding, whether involving Deutsche Bank, UBS or anyone else, has *ever* resulted in a finding that UBS manipulated the Gold Fix.  And it is easy to see why.  Not a single one of the chats shows Deutsche Bank conveying to UBS foreknowledge of the Gold Fixing outcome on any particular date, let alone sharing control of the auction results.  Instead, they show discussions of unilateral trading strategies that, at most, suggest "episodic" coordination between these two traders.  Any such spot market order manipulation, moreover, was "varying in direction" and could have moved the price of gold *up or down*.[1]  The chats, accordingly, cannot support the contention that UBS participated in an alleged conspiracy with the Fixing Banks to drive the Fix downward.

Moreover, by excising the time "stamps" on the individual messages within the chats in the TAC, Plaintiffs tellingly omit key time and associated location information in the chats.  And it is clear why they did so, because the time stamps confirm that the discussions quoted cannot possibly have materially affected the Gold Fixing ***at 3 P.M. London time***.  Nor do the chats suggest that the traders were engaged in trades that could have materially affected the market in London.  Quite the contrary:  The time stamps—which Plaintiffs selectively omitted from the TAC (but which are now before the Court through the Declaration of Eric J. Stock, filed today[2])—confirm that the UBS trader was trading and "chatting" during Singapore business

---

[1]  For recent decisions by courts in this District distinguishing between episodic, varying-in-direction manipulation and persistent suppression of a benchmark, see *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 962 F. Supp. 2d 606, 620-22 (S.D.N.Y. 2013)*("LIBOR II")*; *In re LIBOR-Based Financial Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 460-61 (S.D.N.Y. 2014) ("*LIBOR III*"); *Harry v. Total Gas & Power N. Am., Inc.*, 15 Civ. 9689, 2017 WL 1134851, at \*9 & n.6 (S.D.N.Y. 2017).

[2]  Exhibit 1 to the Stock Declaration summarizes those chats quoted in the TAC which UBS was able to locate from its records, including the time stamps.  The chat excerpts are also attached as exhibits to the Stock Declaration.

hours.  Depending on the time of year, Singapore is either seven or eight hours ahead of London time:  When it was 3 P.M. in London, it was 10 P.M. or 11 P.M. in Singapore, well after the close of business.  Indeed, many of the chats heavily relied upon by Plaintiffs in the TAC occurred in the morning business hours in Singapore, in other words, between midnight and 3 *A.M.* in London.  Plaintiffs have failed to plead facts that address this temporal gap or even attempt to explain how Singapore trades by UBS—never a fixing panel member—could have materially affected the London-based Gold Fix benchmark, or even the prices paid by anyone other than UBS's own counterparties or customers.  And Plaintiffs do not claim to be UBS's counterparties.

## SUMMARY OF ARGUMENT

Plaintiffs' new allegations cannot avert dismissal of the TAC's claims against UBS under Section 1 of the Sherman Act, 15 U.S.C. § 1 (Claim One), the Commodity Exchange Act ("CEA") (Claims Two–Six), or the common law of unjust enrichment (Claim Seven).  Whatever the fate of Plaintiffs' theories as to the Fixing Banks, once again as to UBS, all of Plaintiffs' claims fail under Rule 12(b)(6), as interpreted in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009):

*Antitrust*.  *First*, as to benchmark manipulation:  Plaintiffs fail to plausibly allege an overarching conspiracy between UBS and the Fixing Banks to drive the Gold Fix price downward.  UBS had no role in the auctions, and none of the chats provides evidence that it came to play such a role, or even that the Fixing Banks had a motive to assign UBS such a role.  And given UBS's lack of control over the benchmark, UBS cannot have been the proximate cause of Plaintiffs' benchmark-dependent injuries, depriving them of antitrust standing as to UBS.  *Second*, as to alleged order manipulation:  The chats at most show episodic activity capable of moving the spot price of gold, or gold derivatives, up *or* down at particular times.  But

Plaintiffs lack antitrust standing to recover damages for those up-or-down moves.  They do not allege they transacted *directly* with UBS, and are therefore, at most, indirect purchasers and not efficient enforcers of the federal antitrust laws.  Moreover, the isolated misconduct discussed by a single UBS trader and a single Deutsche Bank trader in Singapore does not plausibly suggest that UBS conspired with the Fixing Banks in London to engage in an overarching spot market order manipulation scheme over the Class Period.  *Third*, the Sherman Act claim is barred under the Foreign Trade Antitrust Improvements Act ("FTAIA") because Plaintiffs fail to allege a "direct, substantial, and reasonably foreseeable effect" on U.S. commerce or that Plaintiffs' claims arise from any such effect.

*CEA*.  *First*, the claims are untimely under the CEA's two-year statute of limitations. Plaintiffs were on inquiry notice of those claims no later than November 12, 2014, when FINMA issued its Report concerning UBS and asserted that traders at UBS's precious metals desk had engaged in certain spot market misconduct—yet Plaintiffs did not accuse UBS of order-based manipulation purportedly affecting Plaintiffs until more than two years afterward, in the TAC. *Second*, Plaintiffs lack statutory standing under the CEA because UBS did not control the Gold Fix benchmark, so Plaintiffs have not pleaded actual damages stemming from UBS's conduct. *Third*, the CEA claims are impermissibly extraterritorial, because Plaintiffs have not alleged links in the causal nexus between the Singapore-booked trades described in the chat fragments and any domestic mispricing of gold or gold derivatives.  *Fourth*, Plaintiffs fail to allege the required elements of market manipulation or manipulative device claims at all, including the specific intent element of market manipulation (much less with the specificity Rule 9(b) requires), because their allegations are predicated on suppression of the Gold Fix, which UBS could not have supervised or directed.  *Fifth*, the secondary liability theories (principal-agent and

aiding and abetting) are unavailing because the primary CEA claims are deficient and because the secondary claims are inadequately alleged in any event.

   *Unjust enrichment*.  The common law unjust enrichment theory is time-barred, and, in any event, Plaintiffs allege no direct dealings between themselves and UBS.

   *Lack of personal jurisdiction*:  Separately, as to UBS AG, which is incorporated and headquartered in Switzerland, Plaintiffs have not met their burden to plead specific personal jurisdiction by alleging suit related conduct by UBS AG substantially connecting it to this forum. And because UBS AG had no previous opportunity to contest Plaintiffs' allegations based on the chat fragments, it did not forfeit this separate grounds for Rule 12(b)(2) dismissal.  As to UBS AG, then, the Court should therefore follow the weight of authority demonstrated by numerous recent decisions in this District that have dismissed antitrust claims against foreign bank defendants based on lack of personal jurisdiction in cases involving foreign financial benchmarks.  Under those decisions, in-forum trading, marketing, or other business activities not causally connected to the claims asserted do not show "purposeful availment," and alleged manipulation of foreign benchmarks (let alone order manipulation abroad with no effect on a benchmark) is not considered conduct "expressly aimed" at the United States.[3]

## BACKGROUND

   **1.  The Gold Fix.**  Plaintiffs assert that their sales prices were depressed by alleged manipulation of the widely-used reference price or benchmark for gold pricing, the PM Gold Fix. That benchmark is determined through an exclusive conference call at 3:00 p.m. (London time)

---

[3]  *See FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, 16 Civ. 5263, 2017 WL 3600425, at *5, 7 (S.D.N.Y. Aug. 18, 2017); *In re Platinum & Palladium Fix Antitrust Litig.*, No. 14 Civ. 9391, 2017 WL 1169626, at *44-45 (S.D.N.Y. Mar. 28, 2017) ("*Platinum Fix*"); *Laydon v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*, No. 12 Civ. 3419, 2017 WL 1113080, at *4-6 (S.D.N.Y. Mar. 10, 2017) ("*Laydon II*"); *Sullivan v. Barclays PLC*, 13 Civ. 2811, 2017 WL 685570, at *44-45 (S.D.N.Y. Feb. 21, 2017).

involving an auction among the five Fixing Banks.  TAC ¶¶ 1, 388-91.  Plaintiffs operated gold mines, and sold physical gold, Gold Exchange Traded Funds ("ETFs"), and gold futures contracts on the Commodity Exchange, Inc. ("COMEX").  TAC ¶¶ 35-63.  Plaintiffs assert that "Defendants' scheme to *fix the benchmark price* at artificially suppressed levels directly and immediately impacted the market for Gold Investments," TAC ¶ 377 (emphasis added), and that Plaintiffs thus "received lower sales prices than they would have received in a competitive market free of Defendants' collusive and manipulative conduct."  TAC ¶ 389.

     **2.  The Court's Reasoning That Advance Knowledge And Control Of The Gold Fix Are The Linchpin Of Plaintiffs' Claims.**  The Gold Fix is central to Plaintiffs' allegations, and this Court already recognized as much.  In considering whether the Second Amended Complaint ("SAC") plausibly alleged a benchmark manipulation conspiracy against the Fixing Banks, this Court found that "[a]t the heart of Plaintiffs' Complaint is the theory that the Fixing Banks, by virtue of their overt but non-public interactions in connection with the daily Gold Fixing, were uniquely positioned to effectively 'name their own' Fix Price and thereby to gain an unfair advantage."  *Gold Fix*, 213 F. Supp. 3d at 644.  "[C]ontrol" and "foreknowledge," this Court noted, were central to Plaintiffs' alleged claims in the SAC.  *Id.* at 647.  And this Court found the "theory of [conspiratorial] motive based on the Fixing Banks' foreknowledge of the Fix Price [to be] marginally persuasive" for Rule 12(b)(6) purposes.  *Id.* at 664.  By contrast, this Court dismissed the claims in the SAC against UBS because, as the Court recognized, UBS "was not a Fixing Bank and never participated in the PM [Gold] Fixing."  *Id.* at 678.  The Court reasoned that "Plaintiffs fail[ed] to allege that UBS caused Plaintiffs' injuries, whether acting separately or in concert with the Fixing Banks."  *Id.*  This Court rejected purported "circumstantial evidence" based on allegations about UBS's quoting of what Plaintiffs called below-average quotes in the

spot market for physical gold, combined with assertions from government investigations into separate markets, to support Plaintiffs' antitrust or CEA claims against UBS.  *Id.*

3.  **New Allegations As To UBS.**  The TAC makes largely the same allegations as the SAC, but adds descriptions of fragments of communications, or "chats," that the Plaintiffs received through settlement with Deutsche Bank.  Plaintiffs again allege that UBS conspired with the Fixing Banks to suppress gold prices through manipulation of the Gold Fix.  TAC ¶ 358. They allege that UBS engaged in collusive misconduct with the Fixing Banks as to orders in the spot market, and thereby "manipulate[d] gold prices during the Class Period." TAC ¶ 359.

▪ *Alleged Benchmark Manipulation*:  With respect to the alleged manipulation of the Gold Fix, "control" and "foreknowledge" of the Gold Fix remain critical to the conduct Plaintiffs say resulted in "artificially lowered prices" and "suppression of the gold benchmark."  TAC ¶ 122; *see* TAC ¶¶ 5, 6, 13, 18-19, 125, 174, 208, 236, 276-78.  The TAC repeats the description of how the Fixing Banks exerted "exclusive" control over the Fixing auction process.  TAC ¶ 208.  The Fixing Banks administered the Fixing themselves, TAC ¶ 91, in "private," TAC ¶ 90, and no records of communications "were kept as a matter of course."  TAC ¶ 91.  The TAC alleges that the Fixing Banks used the PM Fixing to "ensure prices moved the direction they wanted, when they wanted."  TAC ¶ 6.  Plaintiffs also maintain that the Fixing Banks used "[f]oreknowledge as to an upcoming spike in the price of gold," to "profit, in many different outlets for Gold Investments."  TAC ¶ 112.  According to Plaintiffs, all Defendants "profited off of foreknowledge that a price spike was coming" regardless of their "overall stake in gold." TAC ¶ 236.  Plaintiffs assert that "because Defendants controlled the levers to the market and had established their reliability, such returns were essentially risk-free profits."  TAC ¶ 236. While Plaintiffs now contend "UBS understood, participated in and benefited from the collusive

activities," TAC ¶ 11, the TAC does not explain how the Fixing Banks stood to benefit from sharing their exclusive control and foreknowledge over the Fix with UBS.

To support the allegation that UBS somehow conspired with the Fixing Banks, Plaintiffs offer undisclosed analysis by unidentified experts purporting to show that the various banks' spot price quotes, including those of UBS, were "clustered together" "around" the time of the PM Fixing.  TAC ¶ 350.  Plaintiffs attempt to show that UBS "submitted quotes substantially lower than the quotes" it had submitted "minutes" earlier on 11 particular trading days.  In each instance, Plaintiffs attempt to show UBS's pricing behavior in tandem with other banks.  *See* TAC ¶¶ 255-56, 268, 273, & App. *I.*

Plaintiffs also assert that communications taken from cooperation materials Deutsche Bank shared with its regulators[4] demonstrate that UBS "coordinated" with Fixing Banks "around the time of the PM Fixing."  TAC ¶ 360.  In those chats, the UBS trader chiefly quoted described losses seen around the time of the PM Gold Fix, or made passing references to the Fix.  *See* TAC ¶¶ 360 ("i've seen fixings go real wrong before"), 361 ("did i tell u i saw a 300k loss on fixing before too"), 362 ("i would just wait for 4pm / and go home / that's my new plan.").

▪ ***Alleged Order Manipulation***:  The TAC also contains allegations concerning the spot price of gold.  TAC ¶¶ 359, 364, 368.  But Plaintiffs do not show that any purported UBS conduct caused actual movements of the Gold Fix.  Plaintiffs also do not connect allegations of order manipulation in the spot or related futures markets to any transactions actually executed by UBS, or involving any named plaintiff.

---

[4] *See* Agreement, ¶ 4(A)(iv) (executed Sept. 6, 2016; filed Oct. 17, 2016), Dkt. 156-1 ("Deutsche Bank agrees to produce all . . . documents that Deutsche Bank has previously produced to government regulators or government investigators relating to the conduct alleged in the Action").

The TAC describes several trading strategies alleged to have been used.  For example: "Front running" means trading in the bank's positions before customer orders to take advantage of the market's resulting move after placing the client's orders.  "[S]poofing" means placing false orders that were never executed, and "wash sales" mean placing large orders and quickly cancelling them.  TAC ¶ 10 n.4.  No quoted chat shows UBS traders claiming to have altered the Gold Fix.  Plaintiffs nonetheless assert that the phrase "smash[] *it*," TAC ¶ 363 (emphasis added), as used in one chat should be understood to mean "smashed the Fix" instead of meaning "push" or "whack," which are terms for situations when, after a trade, the spot market price moves in a particular direction.  *See* TAC ¶¶ 364 ("w[h]ack" and "push"), 365 ("push"); *cf.* TAC ¶ 369 (UBS trader said he "pushed *up* gold") (emphasis added).  This chat, moreover, relates to the silver market, *not* the gold market.[5]  Plaintiffs also allege that chats between the UBS and Deutsche Bank trader "similarly" involve discussion of the "4 p.m. Fixing."  But the PM Fixing is at 3 P.M. in London, not 4 P.M.  TAC ¶¶ 362-63.

Plaintiffs do not allege the locations of the UBS and Deutsche Bank traders whose chats they quote.  Plaintiffs do incorporate resolutions of CFTC and U.S. DOJ proceedings against one former Deutsche Bank trader in the Asia-Pacific region.  The TAC's version of the chat fragments omit time stamps, which clarify that the UBS trader on whose chats Plaintiffs chiefly rely was trading on Singapore hours during the relevant period.[6]  Singapore is either seven hours

---

[5]  The chat containing the term "smash" also is quoted at greater length in Paragraph 311 of the *Silver Fix* Third Amended Complaint pending before this Court, and the more complete quotation in that complaint shows that the context of the discussion is the silver market, *not* the gold market.  *Compare* TAC ¶ 361 (describing April 1, 2011 chat in which UBS trader told Deutsche Bank's trader "i saw a 300k loss on a fixing before" because of "pushing too early"), *with Silver Fix* TAC ¶ 308 (quoting same chat as allegedly concerning Silver Fix).

[6]  The TAC's omitted time stamps are presented to the Court in the exhibits to the Stock Declaration.  Stock Decl. ¶¶ 3-5.  The time stamps appear in Universal Time Coordinated ("UTC"), which is equivalent to Greenwich Mean Time, the time observed in London from approximately October to March, while from March to October, the time in London (known as British Summer Time) is one hour ahead of UTC.  *See* https://www.timeanddate.com/worldclock/timezone/utc/.

ahead of London time (when the United Kingdom observes daylight savings time, from March to

October) or eight hours ahead (during the rest of the year).[7]  Thus, the UBS trader operated seven

or eight hours ahead of London time—when it was 3 P.M. in London, it was 10 or 11 P.M. in

Singapore, after the close of business.  And at the beginning of the day in London, the UBS

trader in Singapore transferred trading responsibility to a UBS trader in Europe.

## ARGUMENT

## I.  Plaintiffs Fail To State A Plausible Claim That UBS Conspired with the Fixing Banks to Manipulate the Gold Fix.

The TAC does not plausibly allege that UBS conspired with the Fixing Banks to

manipulate the Gold Fix.  To satisfy Rule 12(b)(6), the complaint must demonstrate "more than a

sheer possibility that a defendant has acted unlawfully" by alleging facts, not legal conclusions,

from which the court could "draw the reasonable inference that the defendant is liable for the

misconduct alleged."  *Iqbal*, 556 U.S. at 678.  In particular, to state a claim under Section 1 of

the Sherman Act, 15 U.S.C. § 1, the complaint must allege "enough factual matter (taken as true)

to suggest that an agreement was made" that unreasonably restrained trade.  *Twombly*, 550 U.S.

at 556; *see Mayor & City Council of Balt., Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir.

2013) (plaintiffs must plead "enough facts to support the inference that a conspiracy actually

existed").  "[I]t is not enough to make allegations of an antitrust conspiracy that are consistent

with an unlawful agreement."  *Transhorn, Ltd. v. United Techs. Corp.* (*In re Elevator Antitrust

Litig.*), 502 F.3d 47, 50 (2d Cir. 2007).  Instead, the complaint must either (i) "assert direct

evidence that the defendants entered into an agreement in violation of the antitrust laws," or (ii)

---

[7]  *See* Gov.UK, *When do the clocks change? at* https://www.gov.uk/when-do-the-clocks-change (last visited Aug. 12, 2017).

"present circumstantial facts supporting the inference that a conspiracy existed." *Citigroup*, 709 F.3d at 136.

Plaintiffs bear the burden of showing that each defendant, "*in their individual capacities*, consciously committed themselves to a common scheme designed to achieve an unlawful objective." *AD/SAT, Div. of Skylight, Inc. v. Assoc. Press*, 181 F.3d 216, 234 (2d Cir. 1999) (emphasis added); *see In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 905 (6th Cir. 2009). The allegations "must reveal 'a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.'" *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (quoting *Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946)).[8]

UBS was a non-Fixing Bank that did not determine the Gold Fix. It lacked structural capability to participate in a conspiracy to manipulate the benchmark. And Plaintiffs have *nothing* but speculation to contend otherwise, making their claim facially implausible. It is the Fixing Banks that held dominion over the Gold Fix because only they participated in the twice-daily auctions, including the one at 3 P.M. in London, which Plaintiffs depict as the critical "forum" for the collusion alleged. TAC ¶¶ 112, 208, 275. As this Court concluded in its October 2016 decision, the Fixing Banks were thereby empowered to exploit the auction process in the manner alleged. But the TAC does not plausibly allege that the Fixing Banks apportioned their advance knowledge and control of the benchmark to UBS. Plaintiffs allege no practical need or economic reason for the Fixing Banks to do so. Furthermore, despite Plaintiffs' harnessing of selectively quoted "chats" from materials Deutsche Bank produced to its

---

[8]  *See Ross v. Am. Exp. Co.*, 35 F. Supp. 3d 407, 437 (S.D.N.Y. 2014), *aff'd sub nom. Ross v. Citigroup, Inc.*, 630 F. App'x 79 (2d Cir. 2015); *see also Venture Tech., Inc. v. Nat'l Fuel Gas Co*., 685 F.2d 41, 47 (2d Cir. 1982) ("antitrust conspiracy" plaintiff "must show more than the existence of a climate in which such a conspiracy may have been formed").

government investigators, they describe no direct or circumstantial evidence of a conspiracy between the Fixing Banks and UBS to manipulate the Gold Fix.  Instead, all of their fragments at most describe alleged coordinated trading in the spot market with no showing that such trading could possibly have altered the Gold Fix—and other than bare legal conclusions, they offer no facts connecting the *order* manipulation with the suppression of the gold *benchmark*.  Simply put, Plaintiffs *cannot* establish that UBS ever had a role in determining the Gold Fix.

A.    **The "Structural Design" of the Gold Fix Process Makes it Implausible That UBS Would Join, or be Asked to Join, any Conspiracy to Influence the Gold Fix.**

The notion that UBS would be involved in a conspiracy to manipulate the Gold Fix is inherently implausible because of the structure of the fixing determination process itself. Exclusion of UBS from the auctions that determined the benchmark was part of "the structural design of the London Gold Fixing."  TAC ¶ 275.  That is a fundamental barrier to the plausibility of the theory that UBS agreed to "manipulate the PM Fixing" and cause "suppression of the gold benchmark."  TAC ¶ 122.  Plaintiffs make no allegations that overcome the fundamental barrier.

Pivotal to the conspiracy alleged, through which "the PM Fixing . . . was causing *downward spikes*" in gold prices (TAC ¶ 141), is "foreknowledge" (TAC ¶¶ 5, 18-20, 112, 205, 236, 352) and "control" (TAC ¶¶ 5, 79, 80, 208, 232, 250, 277, 386) of the Gold Fix, which UBS lacked given that UBS "*never participated* in the PM Fixing," *Gold Fix*, 213 F. Supp. 3d at 678 (emphasis added).  Instead, Plaintiffs aver that it was the Fixing Banks that had "complete control" of the auctions and the entity that administered them (TAC ¶¶ 80, 386) and that the "Fixing Banks . . . have direct control of the Fix price" (TAC App. *C*, No. 4(e)).[9]  Plaintiffs are equally crystal clear in the TAC:  "Only [the Fixing Banks] had a forum in which to hide their

---

[9]   Or, as Plaintiffs colorfully put it: "The Structure of the Fixing Not Only Shows the Who, What, When, and How, but Demonstrates Defendants' *Unique* Opportunity to Conspire."  Pls.' FRCP 12(b)(6) Opp'n 15 (filed June 15, 2015) (14 Civ. 2124, Dkt. 26) (emphasis in original).

collusion in plain sight—the daily Fixing conference, via the LGMF (over which the Fixing

Bank Defendants' exercised complete control).  But their control over the Fixing does not just

show the opportunity to manipulate prices around the Fixing, but the *exclusive* ability to do so."

TAC ¶ 208 (emphasis in original); *see also* TAC App. *C*, No. 3(n) ("The *exclusivity* of the

London Gold Fixing Panel enhances market power and stability of collusive agreements reached

*during the Fixing*") (emphases added).  So the injuries for which Plaintiffs seek relief, which

they allege resulted from "manipulat[ion] [of] the PM Fix price" that "set the price of gold at

artificially low levels," were alleged acts by the Fixing Banks "exclusive[ly]," even absent

involvement by UBS.  The result of that exclusivity is a stark disparity among the Defendants.

On one hand, "at the end of the day" the Fixing Banks could, "*regardless of* what the true

aggregate demands were . . . still act to set the Fix price *where they wanted*."  TAC ¶ 251.  On

the other hand, as an outsider to the PM Fixing, UBS had no such power:  Its order books were

*not* a source on which the auction was based, and UBS simply was not necessary to the alleged

conspiracy to manipulate the Gold Fix.  *See* TAC ¶¶ 79, 87-91 (describing Gold Fix auction

process); *Gold Fix*, 213 F. Supp. 3d at 642-43 (same).

       Prominently missing from the TAC is *nonconclusory* factual matter showing the Fixing

Banks had a practical reason to bring UBS into the benchmark manipulation conspiracy.  The

Fixing Banks stood to gain no economic benefit from endowing outsiders with the

"foreknowledge" and "control" critical to the alleged manipulation of the "startlingly unique"

Gold Fix (TAC ¶ 90), and doing so would have carried a gratuitous hazard by increasing the

likelihood of disclosure of the purported illegality.  *Cf.* TAC ¶ 203 (alleging that benchmark

manipulation by a Fixing Bank "[o]utside of the 'auction' . . . would have been too risky").  The

"obvious alternative explanation" for the supposed persistent suppression is that the Fixing

Banks exercised their "complete control" over the auction and its administration to their advantage, leaving UBS no function to perform in that alleged misconduct.  *See Twombly*, 550 U.S. at 567.  In other words, the broad-based conspiracy alleged between the Fixing Banks and UBS to suppress the benchmark "simply makes no economic sense."[10]

Moreover, even if Plaintiffs had plausibly described a practical or economic reason for the Fixing Banks to assign UBS a function in the benchmark manipulation scheme, Plaintiffs still would be required to allege the *means* through which such apportionment occurred.  That is especially so given that UBS did *not* participate in the "daily Fixing conference, via the LGMF," which Plaintiffs vividly portray as the "ready-made forum for collusion," in which the Fixing Banks hid their "collusion in plain sight."  TAC ¶¶ 112, 208.  But the TAC offers nothing other than speculation that such apportionment of knowledge or power occurred or that it occurred through any particular means.[11]

Because of the stark disparity between UBS's and the Fixing Banks' capability to manipulate the benchmark, this case resembles a decision last year dismissing a Section 1 conspiracy claim in the zinc market.  *See In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337 (S.D.N.Y. 2016).  The plaintiffs there failed to "plausibly explain why, given [two defendants'] alleged dominance in physical zinc, they needed outside conspirators to assist in the alleged anticompetitive scheme, or, why outside conspirators would want to assist them."  *Id.* at 345. That is, where one cluster of companies allegedly "occupied such a dominant position" in the

---

[10]   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see, e.g.*, *United Magazine Co. v. Murdoch Magazines Distrib., Inc.*, 146 F. Supp. 2d 385, 402 (S.D.N.Y. 2001), *aff'd sub nom. United Magazine Co. v. Curtis Circulation Co.*, 279 F. App'x 14 (2d Cir. 2008); *see also In re Iowa Ready-Mix Concrete Antitrust Litig.*, 768 F. Supp. 2d 961, 976 (N.D. Iowa 2011).

[11]   Any attempt to allege that UBS agreed to engage in spot transactions "around the Fixing" (TAC ¶ 10) to facilitate the Fixing Banks' pervasive suppression of the Fix at 3 P.M. *London* time is implausible, and moreover cannot be sustained by the chats quoted in the TAC.  As explained in the next section, those chats took place around *Singapore* business hours—many hours after the 3 P.M. Fix was already determined in London—and in any event show no collusion with respect to the Fix.

commodity market at issue, "it is hard to contemplate why" that cluster "would find it necessary or desirable to involve outside third parties in any plan to drive up the price" of the commodity, given that the cluster's "involve[ment]" of "unaffiliated entities" would not meaningfully add to the purported "anticompetitive scheme." *Id.* at 372.  It is likewise baffling here why the Fixing Banks "would find it necessary or desirable to involve" UBS in the alleged benchmark manipulation given their "dominance" of the benchmark.[12]  *Id.*

**B.    The Chats and Government Proceedings Do Not Give Rise To A Plausible Suggestion Of Conspiracy by UBS to Manipulate the Gold Fix.**

Because Plaintiffs are unable to square their theory that UBS joined a Gold Fix manipulation conspiracy with UBS's exclusion from the benchmark determination process, they prominently resort to distorting "chats" between a UBS trader and a Deutsche Bank trader, asserting that those communications nevertheless are "circumstantial evidence" of conspiracy. *See* Pls.' Reply on Lv. to Amend 10 (Dec. 20, 2016) (Dkt. 192).  But the selectively-quoted chat excerpts, culled from documents Deutsche Bank produced to its regulators, do not show that contrary to the "structural design," UBS had any role in suppressing the Gold Fix benchmark. TAC ¶¶ 122, 275.  At *most*, these chats could support a claim of episodic manipulation of gold *spot market* prices, either unilaterally or based on coordinated spot market trading between certain traders at UBS and Deutsche Bank.  And as explained below, even if such interpretation

---

[12]   The Gold Fix is dramatically different from the benchmarks in the foreign exchange market, to which the TAC strains to draw comparison.  *See* TAC ¶¶ 123, 248, 312.  The most prominent foreign exchange benchmarks alleged to have been manipulated, the WM/Reuters Closing Spot Rates, were "determined by the median price of *actual FX transactions* in the 30 seconds before and after 4 p.m. London time" drawn from "actual market prices from electronic communications networks that [the Defendants in the foreign exchange civil litigation] use to execute orders."  *In re Foreign Exchange Benchmarks Antitrust Litig.*, 74 F. Supp. 3d 581, 587 (S.D.N.Y. 2015) ("*FOREX*") (emphasis added).  But here, determination of the Gold Fix resulted from the auction process in which only the Fixing Banks participated:  The Gold Fix was not drawn from the "actual . . . transactions" executed by UBS or other companies outside the auction "forum."  *Cf. In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11-md-2262, 2016 WL 1558504, at *7 (S.D.N.Y. Apr. 14, 2016) (*FOREX* defendants "accomplished their purported scheme *by entering into FX transactions*") (emphasis original).

of the chats were plausible, Plaintiffs would have no antitrust standing to recover on such a claim.

For their part, the government investigations on which Plaintiffs have relied, even assuming they are permissibly considered at the pleadings stage, undermine rather than reinforce their mischaracterization of the chats as somehow relating to manipulation of the Gold Fix.

1.   **The Chats Concerning Trades Booked On Singapore Time Do Not Support Plaintiffs' Allegations of Collusion With Respect to The Gold Fixing At 3 P.M. In London.**

The Gold Fix was a widely known benchmark, and traders transacting on the gold market obviously had reason to discuss the Fix Price while trading in the spot market, given that "market participants rely on the Fix Price" and often "contract to transact at the Fix Price." *Gold Fix*, 213 F. Supp. 3d at 644. There is nothing illicit about referring to the Fix Price in this setting. And even the four chats quoted in fragmentary fashion in the TAC that contain references to fixes do not show that UBS conspired to manipulate the benchmark. *See* TAC ¶¶ 360-63.

To begin with, the time stamps specifying when the communications actually occurred refute the allegations that coordination between the UBS and Deutsche Bank traders could have materially affected the Gold Fixing at 3 P.M. London time. Instead, the UBS trader whose chats with a single Deutsche Bank trader are so central to the TAC traded on Singapore hours during the period in question. Indeed, most of the chats quoted in the TAC took place between midnight and 3 A.M. London time, which are morning trading hours in Singapore. *See* Stock Decl., Ex. 1.

For example, consider the Plaintiffs' allegation that a June 29, 2011 (Singapore time) chat depicts "coordinated trading *around the Fixing*" and that the traders "agreed to wait to buy gold until after the prices had dropped *at the 4 p.m. Fixing*." TAC ¶ 362 (emphases added). There was *no* relevant "4 p.m. Fixing"; the second Gold Fixing of the day was at 3 P.M. in

16

London.  But even apart from that basic error, the TAC ignores the clock:  When it was 3 P.M. in London, it was 10 P.M. in Singapore.  Yet no well-pleaded allegations show that trades conducted around Singapore business hours could have materially affected the Gold Fix determined on London time, whether by causing "suppression of the gold benchmark" (TAC ¶ 122) or otherwise.  Indeed, this chat took place just after 10 P.M. UTC, or 6 A.M. Singapore Standard Time.  *See* Stock Decl. Ex. 1, Reference 11.   Nor do Plaintiffs allege facts showing that the trader intended to influence the benchmark, *i.e.*, that through the trader's conduct, UBS "*consciously* committed [itself] to a common scheme" to manipulate the Gold Fix.  *AD/SAT*, 181 F.3d at 234 (emphasis added).

Furthermore, even apart from Plaintiffs' failure to account for the passage of time between Singapore-booked trading and the London auctions, no chat shows the Deutsche Bank trader imparted to the UBS trader any "foreknowledge" (TAC ¶¶ 5, 18-20, 112, 205, 236, 352) of the Gold Fix, let alone "control" (TAC ¶¶ 5, 79, 80, 208, 232, 250, 277, 386) of the benchmark. For example, in the June 29, 2011 chat, the last thing the Deutsche Bank trader says before the "wait for 4 pm" remark is a question ("gold should be higher then?"), namely a request for an opinion *from* the UBS trader, not a conveyance of information from "within" the PM Fixing. Indeed, contradicting Plaintiffs' averment that Gold Fix manipulation enabled the conspirators to enjoy "*riskless* profit" or "*risk-free* profits" (TAC ¶¶ 18, 236) (emphases in original), the chats show the UBS trader warning about the *high risk* of trading by someone who did *not* have advance knowledge.  Notably, in the February 28, 2011 chat, the UBS trader cautions that he has "seen fixings go *real wrong* before" because of "bad timing."  TAC ¶ 360 (emphasis added); *see also* TAC ¶ 361 (UBS trader said he "saw a 300k *loss* on a fixing") (emphasis added).  That the UBS trader warned about such losses flatly contradicts Plaintiffs' assertion that UBS somehow

acquired from Deutsche Bank the alleged "unique informational *advantages*" the Fixing Banks possessed.  TAC ¶ 278 (emphasis added); *see Gold Fix*, 213 F. Supp. 3d at 644 (Fixing Banks were "uniquely positioned" to "name" Fix Price).

Lacking even a single chat reflecting agreement by UBS to manipulate the gold benchmark, Plaintiffs are left to lean on a fragment of a chat about the *Silver Fix*, while straining to obscure the silver market context of that chat through heavy editing.  *Compare* TAC ¶ 363 (selectively quoting May 11, 2011 chat) *with* Third Amend. Compl. ¶ 311, *in In re London Silver Fixing, Ltd. Antitrust Litig.*, (No. 14-md-2573) (Dkt. 258) (filed June 16, 2017) (quoting May 11, 2011 chat and clarifying that discussion concerned silver market).  UBS addresses the substance of the Silver Fix chat in the Silver Fix motion to dismiss.  But given the voluminous Deutsche Bank cooperation materials produced, it is ironic that, to show UBS's participation in supposed conspiracies to pervasively suppress two *London-based* benchmarks, plaintiffs in *Silver Fix* and *Gold Fix* offer little better than a chat before *4 A.M. in London* between two individuals transacting in the Asian markets.  *See* Stock Decl. Ex. 1.  This chat has no value in this case.  No one believes (let alone plausibly alleges) that the gold and silver markets are the same, and dissolving the distinctions between separate alleged "market[s] for antitrust purposes" is not an acceptable method for pleading a Section 1 claim.  *See In re Elevator Antitrust Litig.*, 502 F.3d at 52 (rejecting notion that "if it happened there, it could have happened here").

### 2.    Government Investigations Undercut The TAC's Claims In Never Asserting That UBS Manipulated The Gold Or Any Other Precious Metals Benchmark.

The government investigations relied upon in the TAC further undermine the plausibility of Plaintiffs' contention that UBS joined a conspiracy to manipulate the Gold Fix.  But even

assuming, without deciding, that they are permissibly considered,[13] those unadjudicated assertions weaken rather than bolster Plaintiffs' conjecture.  The Deutsche Bank cooperation materials from which Plaintiffs obtained the chats quoted so heavily in the TAC are materials Deutsche Bank produced to its regulators.  But neither Deutsche Bank's regulators nor regulators of other banks *ever* have alleged concerted Gold Fix manipulation involving UBS.

That no government agency *ever* decided that UBS conspired to manipulate the Gold Fix is especially harmful to the plausibility of the conspiracy here because, as Plaintiffs otherwise have stressed, regulators know Gold Fix manipulation when they see it.  In particular, Plaintiffs have relied heavily on the United Kingdom Financial Conduct Authority's ("FCA") Gold Fix manipulation accusations stemming from the June 2012 conduct of a Barclays trader.  TAC ¶¶ 291-300.  The FCA "highlighted a particular instance in which a Barclays trader *purposefully drove down the Fix Price* by placing a large fictitious order that he did not intend to execute followed by a large sell order to avoid triggering a digital option contract that would have cost Barclays $3.9 million."  *Gold Fix*, 213 F. Supp. 3d at 649 (emphasis added).  Critically, the trader effectuated the changes in the Gold Fix by placing his order with Barclays' "*representative on the Gold Fixing*," which was "*incorporated* by Barclays' representative *into* Barclays' net position" during the PM Fixing.  FCA, *Final Notice to Barclays PLC* (No. 122702), ¶¶ 2.9, 4.13 (May 23, 2014) (emphases added).  The trader later "withdrew his entire sell order"; and that "resulted in Barclays' representative withdrawing Barclays' position" and altering the benchmark on that occasion.  *Id.* ¶ 4.16.  But UBS never had a "representative on the Gold Fixing," as it was not a Fixing Bank.  And the Deutsche Bank chats do not show that UBS

---

[13]   The unadjudicated assertions in such proceedings are immaterial as a matter of law to Plaintiffs' allegations, and the TAC's recitation of those assertions is properly disregarded.  *Lipsky v. Commonw. United Corp.*, 551 F.2d 887, 893-94 (2d Cir. 1976); *see Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 179-80 (2d Cir. 2015).

colluded with Deutsche Bank (or any other Fixing Bank) to effect a change in the benchmark.  In short, no foreign or domestic agency has ever relied on the chats or other evidence to assert that UBS conspired to manipulate the Gold Fix—even though they had access to millions of documents, including the very materials on which Plaintiffs rely.[14]

Likewise, the June 2017 government proceedings against one former Deutsche Bank trader do not describe collusion by UBS to alter the Gold Fix *at all*.  TAC ¶ 24; Pls.' Ltr. of June 5, 2017 (Dkt. 261).  He worked "in the Asia-Pacific region."  Plea Agmt. 3 (Dkt. 261-1).  No agency asserted that he violated antitrust laws.  Nor did they assert that there was a conspiracy between UBS and the Fixing Banks to suppress the Gold Fix.

## C. The Purported Pricing Conduct Allegations Reflect Impermissible Group Pleading And Remain Inadequate.

The remaining "circumstantial facts" in the TAC do not help Plaintiffs to allege a plausible claim that UBS participated in a Gold Fix manipulation conspiracy.  *See Citigroup*, 709 F.3d at 136-38; *Gold Fix*, 213 F. Supp. 3d at 678.  Plaintiffs again direct attention to the spot market trading activity on a miniscule 11 specified dates (out of a Class Period that spans thousands of trading days), as purported "instance[s]" of UBS alongside other banks, including the Fixing Banks, "driving" or "triggering" a "downward" movement of the gold price shortly "before the PM Fixing" window.  TAC ¶¶ 255-56, 268, 273; TAC App. *I*.  And they attempt to link that alleged pricing conduct to the chats, which they contend show that UBS and Deutsche Bank "coordinated their trading activities around the time of the PM Fixing."  TAC ¶ 360.  But Plaintiffs are unable to connect any actual trades by the UBS trader on *Singapore* hours to

---

[14]   For example, FINMA, despite having access to all of the chats UBS has filed with the Court today, never asserted in its report that UBS conspired with Deutsche Bank (or any Fixing Bank) to drive the Gold Fix downward. Indeed, the FINMA report, the authoritative compilation of the agency's assertions, instead concerned trading strategies that could only have affected spot transaction prices in the precious metals markets.

alteration of the benchmark determined at 3 P.M. in *London*.  So the chats lend no force to the "spot quote pricing behavior" allegations.

Plaintiffs also continue to pervasively describe UBS's conduct *in tandem with one* or more of the Fixing Banks.  *See, e.g.*, TAC ¶¶ 257, 260, 273.  That "lumping" is especially incoherent given that the TAC otherwise alleges that the Fixing Banks' quotes behaved differently from the purported quotes of "other market actors" (such as UBS).  *See* TAC ¶¶ 263 (Fixing Bank "prices were significantly more disjointed from other market actors"), 270 (Fixing Banks quoted "lower than that of the non-members"), 272 (same).  "Lumping" UBS with the Fixing Banks, and accusing UBS based on the conduct of the Fixing Banks, is plainly impermissible "group pleading."[15]  It violates basic requirements at "the pleading stage [of an] antitrust case," when "each defendant is entitled to know how he is alleged to have conspired, with whom and for what purpose."  *See, e.g.*, *In re Zinc*, 155 F. Supp. 3d at 384.  Purported economic evidence concerning the Fixing Banks cannot support an antitrust conspiracy claim against UBS.[16]

---

[15]  Plaintiffs may not "merely 'lump[] all the defendants together in each claim and provid[e] no factual basis to distinguish their conduct.'"  *Ochre LLC v. Rockwell Architecture Planning & Design, P.C.*, No. 12 Civ. 2837, 2012 WL 6082387, at *6 (S.D.N.Y. Dec. 3, 2012) (quoting *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (alterations in original)), *aff'd*, 530 F. App'x 19 (2d Cir. 2013); *see In re Elevator*, 502 F.3d at 50 (courts reject allegations "in entirely general terms without any specification of any particular activities by any particular defendant"); *TheECheck.com, LLC v. NEMC Fin. Servs. Grp. Inc.*, No. 16 Civ. 8722, 2017 WL 2627912, at *2 (S.D.N.Y. June 16, 2017); *In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 602 (S.D.N.Y. 2011).

[16]  To be sure, the TAC refers to undisclosed studies by unidentified "consultants," which purport to compare UBS's spot market pricing conduct to "average normalized gold prices around the time of the PM Fixing."  TAC ¶¶ 354-57.  Although those studies cannot be addressed as long as Plaintiffs withhold the underlying data and methodology, the purported "analyses" do not show that UBS had the power to move the gold markets by itself, or that the Fixing Banks needed UBS's assistance in altering prices.  The "analyses" merely repeat the prior "allegations that UBS quoted prices that were lower than market averages around the PM Fixing," which this Court ruled inadequate.  *Gold Fix*, 213 F. Supp. 3d at 678.  No "predatory pricing conspiracy" is asserted, *Matsushita Elec.*, 475 U.S. at 588-90, and prices below average are not presumed illegal.

**D.      Plaintiffs Lack Antitrust Injury And Antitrust Standing Because UBS Could Not Have Been The Proximate Cause Of Harms Based On Suppressed Fix Prices.**

The claim against UBS as to Gold Fix manipulation is properly dismissed for lack of antitrust injury and antitrust standing.  UBS's exclusion from the Gold Fix auctions interrupts the chain of proximate causation between manipulation of the Gold Fix and the asserted injuries.[17]

Here, UBS's absence from the Gold Fix determination process is a basic feature of "the structural design of the London Gold Fixing" (TAC ¶ 275), as the Fixing Banks were the "sole contributors to the Fixing auction," *Gold Fix*, 213 F. Supp. 3d at 671.  The TAC fails to allege that any conduct by UBS, as an outsider to the PM Fixing, was the proximate cause of Plaintiffs' asserted injuries, which stem from their purchases of physical gold or gold financial instruments, in transactions never alleged to have involved UBS as a counterparty.  TAC ¶¶ 35-63, 104-110; *see Gold Fix*, 213 F. Supp. 3d at 679 n.39 (Plaintiffs are not UBS clients).[18]  By omitting allegations of a proximate causal connection between UBS's alleged conduct and the "suppression of the gold benchmark" pivotal to their claims (TAC ¶ 122), Plaintiffs cannot now tout this Court's prior conclusions as to the allegations against Fixing Banks.  That prior reasoning revolved around direct control of the benchmark, which UBS lacked.[19]  UBS's

---

[17]   The alleged misconduct must be the proximate cause of the asserted harm, and that causal nexus must be plausibly alleged under the doctrines of antitrust injury and antitrust standing.  *See In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 162 (2d Cir. 2016) ("courts must apply a 'proximate cause' test to alleged antitrust injury"); *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 78-79 (2d Cir. 2013) (directness-of-injury requirement, the first and foremost of four "efficient enforcer" factors under *Associated Gen. Contractors of Cal., Inc. v. Cal. St. Council of Carpenters*, 459 U.S. 519 (1983) ("AGC"), requires "close[ness] in the chain of causation") (internal quotation marks omitted).

[18]   Since *Gold Fix*, several courts in this District have reasoned that Section 1 claims are properly limited to those plaintiffs who transacted directly with defendants.  *Platinum Fix*, 2017 WL 1169626, at *22; *Sullivan v. Barclays PLC*, 2017 WL 685570, at *15; *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11-MD-2262, 2016 WL 7378980, at *16 (S.D.N.Y. Dec. 20, 2016) ("*LIBOR VI*").  Even assuming that the common rationale of those decisions does not apply to the Fixing Banks here, there is no reason not to follow that common rationale as to UBS.

[19]   In the SAC, Plaintiffs met the antitrust injury requirement by "alleg[ing] that they were harmed by being forced to sell their Gold Investments at artificially suppressed prices as a result of Defendants' *manipulation of the PM Fixing*," and they met the antitrust standing requirement "*to the extent* that Defendants relied on Plaintiffs' and other market participants' *trading on a manipulated Fix Price* in order to carry out their alleged scheme."  *Gold Fix*, 213 F. Supp. 3d at 652-53 (emphases added); *see also id.* at 678 n.39 (Plaintiffs' alleged harm is from sales prices "artificially lowered . . . in connection with the PM Fixing") (internal quotation marks omitted).

participation (or lack of it) would not have changed the ability of the Fixing Banks to engage in the purported conspiracy. Allegations of proximate causation are, accordingly, missing from the TAC, and Plaintiffs have not plausibly shown they have antitrust injury or antitrust standing as to UBS.

**II.      Plaintiffs Lack Antitrust Standing To Recover For The Alleged Order Manipulation, And In Any Event They Fail To Allege A Plausible Overarching Conspiracy To Achieve Such Manipulation.**

Lacking evidence for the notion that UBS agreed to manipulate the Gold Fix, Plaintiffs attempt to compensate for the inherent implausibility of that notion by emphasizing fragments of Deutsche Bank chats, which they assert show UBS "shar[ing] customer order information and execut[ing] coordinated trades," and thus implicate UBS in a "conspiracy to drive gold prices downward." TAC ¶¶ 11, 364. As an initial matter, a freewheeling conspiracy regarding gold *in general* is not alleged here: Plaintiffs conceded that the TAC pleads injury from a conspiracy to manipulate the *Gold Fix*, and this Court agreed.[20] Plaintiffs induced the Court's reliance on their representation that the purported conspiracy was trained on the benchmark, and should not now be permitted to make a "contradictory" course change. *Cf. New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). In any event, any such claim against UBS should nevertheless be dismissed, because (1) Plaintiffs have not plausibly alleged antitrust standing for UBS's alleged spot market order manipulation, or, alternatively, (2) that overarching order manipulation conspiracy is incoherent and facially implausible.

---

[20]   *Compare* Pls.' Reply on Lv. to Amend 14 (describing crucial allegation that "UBS was engaged in activities concerning the *manipulation of the PM Fixing*") (emphasis added) *with* Mem. Order 9 (June 8, 2017) (Dkt. 258) ("this is still a case that alleges benchmark fixing").

**A.      Plaintiffs Are Not Efficient Enforcers Of A Claim For Order Manipulation Because They Did Not Transact With UBS Or Any Fixing Bank.**

Plaintiffs are not "efficient enforcer[s] of the antitrust laws" as to a purported conspiracy to engage in coordinated trades to manipulate gold spot pricing. *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 443 (2d Cir. 2005).  The "efficient enforcer" analysis typically requires examination of, among other things, "(1) the directness or indirectness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; and (3) the speculativeness of the alleged injury." *Gatt*, 711 F.3d at 78.  In the analysis of those factors as to order manipulation, the Court's prior conclusion that Plaintiffs had plausibly alleged antitrust standing as to their benchmark manipulation claims against the Fixing Banks is unavailing.  The unique importance of the "Fix Price" as a "price altering event" that set the dominant price benchmark was the linchpin of that prior conclusion, *see Gold Fix*, 213 F. Supp. 3d at 658, and because the TAC pleads no plausible or nonconclusory connection between the allegations of UBS's misconduct as to spot market prices and the PM Fixing outcome, Plaintiffs cannot rely on that conclusion here.

▪ *Causation*:  Plaintiffs' order manipulation allegations fail to satisfy the directness or proximate causation requirement, which "must be met in every case." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1392 (2014).  Plaintiffs have ignored the fundamental teaching of *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), that "[g]enerally, only direct purchasers have standing to bring civil antitrust claims." *Simon v. KeySpan Corp.*, 694 F.3d 196, 201-02 (2d Cir. 2012).  The TAC never alleges that any Plaintiff directly bought gold from, or sold gold to, UBS, or that UBS was the direct counterparty to any Plaintiff.  So the purported "chain of causation" is too remote and attenuated to give rise to antitrust standing.

*AGC*, 459 U.S. at 540.  That is especially so when the time stamps Plaintiffs omitted from the

TAC are examined; they show the traders were trading on Singapore time, which is not even a

time zone in which any Plaintiff claims to have traded.  *See* Stock Decl. Ex. 1.  The TAC does

not even *attempt* to plead the links in a causal chain as to actual trades conducted or orders

allegedly mishandled *by UBS*.[21]

▪ ***More Direct Victims***:  The TAC at most describes transactions involving alleged

collusion—namely the particular trades subject to the alleged "customer order information

[sharing] and . . . coordinated trad[ing]" (TAC ¶ 11).  Hence there is a far more obvious and

identifiable group of "more direct victims" whose "self-interest would normally motivate them to

vindicate the public interest in antitrust enforcement": the counterparties and customers who

directly transacted with UBS.  *AGC*, 459 U.S. at 542, 545; *Gatt*, 711 F.3d at 79.

▪ ***Speculative Damages***:  Alleged damages to these named Plaintiffs are also highly

speculative and would not be susceptible to "a just and reasonable estimate … even with the aid

of expert testimony."  *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 779 (2d Cir. 2016); *see*

*LIBOR VI*, 2016 WL 7378980, at *17, 18.  Indeed, this Court already noted its "concern" about

speculative damages, since "Plaintiffs cannot deny that other market variables may have affected

gold prices before and after the PM Fixing."  *Gold Fix*, 213 F. Supp. 3d at 657.  While the

Court's conclusions about the connection between Plaintiffs' asserted injuries and the Fixing

Banks' alleged manipulation of the benchmark ultimately overcame that concern, the balance to

---

[21]   *See Arista Records LLC v. Lime Grp. LLC*, 532 F. Supp. 2d 556, 574 (S.D.N.Y. 2007) (where plaintiff fails to "specifically articulate any of the links in this causal chain," it is "improper" for court to "assume" plaintiff can fill gap in ways not alleged).  And "vaguely defined links," even if they had been alleged, are insufficient.  *AGC*, 459 U.S. at 540; *see also, e.g.*, *LIBOR VI*, 2016 WL 7378980, at *16 ("[W]here a plaintiff's counterparty is reasonably ascertainable and is not a defendant bank, a plaintiff is not an efficient enforcer."); *accord Platinum Fix*, 2017 WL 1169626, at *22.

be drawn here, as to UBS's alleged manipulation of orders in the spot market, is an entirely

different one.[22]

## B.   The Order Manipulation Conspiracy Is Facially Implausible and Incoherent.

In any event, even if Plaintiffs had plausibly alleged that they are "efficient enforcers" of

the antitrust laws as to a spot market order manipulation conspiracy, they have not plausibly

alleged that conspiracy.  At most, the factual allegations in the TAC describe "episodic"

misconduct by traders employed at particular defendants, "varying in direction" in that they

could have moved the price of gold *up or down*.[23]  Other than through impermissible

conclusions, the order manipulation allegations do not show there was an overarching conspiracy

among all of the Defendants for the Class Period, to move the gold price downward.[24]

To begin with, although Plaintiffs seek to characterize them as pernicious, many of the

chats do not describe improper conduct at all.  Exchanges of market information or "market

color" do not imply the existence of a broad conspiracy to manipulate spot prices.  *See, e.g.*,

TAC ¶¶ 360 (UBS trader described past fixings that went "real wrong" before), 370 (Deutsche

---

[22]   Part of the problem is that the TAC fails to allege at what price Plaintiffs purchased gold or gold financial instruments.  "If the effect of the Fix was constant, there may be no impact on their profit, since both purchase and sale prices were similarly suppressed," *Platinum Fix*, 2017 WL 1169626, at *24, or if the purchase price was suppressed to a greater extent than the sales price, Plaintiffs may have even earned profit from the alleged manipulation.  Plaintiffs' attempts to analyze purchase and sale prices for "a vast—and yet undetermined—number of market participants who are not defendants in this case" would push their damages calculations away from the requisite "plausible computation[]" and toward impermissible "hopeless speculation."  *Id.* at *24-25.

[23]   *LIBOR II*, 962 F. Supp. 2d at 620-22; *see LIBOR III*, 27 F. Supp. 3d at 461; *Harry*, 2017 WL 1134851, at *9 & n.6.  Those decisions registered an important distinction between schemes in which markets are consistently suppressed over time, such as Plaintiffs' banner claim against the Fixing Banks concerning the Gold Fix, and those schemes in which the supposed effects are instead "episodic and varying in direction," such as the order manipulation described (at most) in the chats new to the TAC.  *LIBOR II*, 962 F. Supp 2d. at 620.  It is not plausible that a plaintiff was injured by the alleged conduct without knowing which positions he held on which dates, because "there may be some days when plaintiffs were actually helped, rather than harmed, by the alleged artificiality, depending on their position in the market."  *LIBOR III*, 27 F. Supp. 3d at 461 (emphasis omitted).  And generalized allegations cannot cure this fatal flaw.

[24]   *See, e.g.*, *In re Optical Disk Drive Antitrust Litig.*, No. 3:10-md-2143, 2011 WL 3894376, at *9 (N.D. Cal. Aug. 3, 2011) (allegations of sporadic misconduct involving a "subset of defendants" was "a far cry from establishing plausibility for a broad six year continuing agreement among all defendants to fix the prices of all [optical disk drives] sold through innumerable other channels").

Bank trader opined that gold prices should "move").  Such an exchange of "market color" information does not signify price fixing and is not by itself an antitrust violation.[25]  A mere allegation of information sharing among market makers thus cannot support the inference that UBS joined a trader-based manipulation conspiracy, and certainly not one with a unifying and coherent objective.  Likewise unavailing to establish a plausible overarching conspiracy is Plaintiffs' assertion that the chats show UBS and the Fixing Banks striving to "drive gold prices *downward*."  TAC ¶ 359 (emphasis added).  While Plaintiffs attempt to leverage cherry-picked portions of the chats in which traders used colorful phrases, such as by talking about "whack[ing]" the gold price (TAC ¶¶ 364, 368), they prominently overlook instances—within the tiny fragments quoted in the TAC itself—that the traders also described conduct that would have tended to *raise* the gold price.  In the June 14, 2011 chat, the UBS trader spoke of when he "pushed *up* gold too" (TAC ¶ 369) (emphasis added), and in the February 9, 2012 chat, the UBS trader said that he was "buying gold" (TAC  ¶ 372), which of course would tend to increase the gold price by manifesting greater demand for it.  These allegations of trader-based manipulation "allegedly varying in direction" do not answer the question how the episodic moves up or down can have produced, over time, the downward suppression Plaintiffs allege as critical to their injuries.  *See LIBOR III*, 27 F. Supp. 3d at 461.

The improper trading strategies described in the government resolutions which Plaintiffs also invoke likewise undermine the TAC's allegations that UBS colluded to use those techniques

---

[25]  *See Apex Oil Co. v. DiMauro*, 822 F.2d 246, 257-58 (2d Cir. 1987) ("[E]vidence of the mere exchange of information by competitors cannot establish a conspiracy."); *see also United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978) ("The exchange of price data and other information among competitors does not invariably have anticompetitive effects; indeed such practices can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive. For this reason, we have held that such exchanges of information do not constitute a *per se* violation of the Sherman Act."); *Five Smiths, Inc. v. NFL Players Ass'n*, 788 F. Supp. 1042, 1047 (D. Minn. 1992) (applying *U.S. Gypsum*).

to suppress the gold price.  For its part, FINMA addressed stop-loss orders and front running by

UBS traders, but such misconduct does not inherently lead to lower gold prices.  *See* TAC ¶¶ 239

n.47 (stop-loss orders), 10 n.4 (front running).  Moreover, because the trading strategies FINMA

mentioned can be accomplished unilaterally, use of those strategies does not imply that the banks

colluded to implement them, even when they "chatted" about them.  The June 2017 government

proceedings against one former Deutsche Bank trader likewise undermine the trader-based

manipulation conspiracy alleged.  He pleaded guilty to conspiracy to commit wire fraud and

spoofing, but *not* to any violation of the antitrust laws.  Moreover, the CFTC described an

episode of stop-loss manipulation on March 29, 2011 when the former Deutsche Bank trader, at

the request of Trader A (the alleged partner in the scheme), "bought gold futures contracts with

the *intent to push prices up* as requested."  CFTC Consent Order 4 (Dkt. 261-2) (emphasis

added).  Driving gold prices *up* is, of course, contrary to the contention that Plaintiffs were

injured when gold prices *dropped*.  *See, e.g.*, TAC ¶ 165.  The CFTC's account thus cannot

support the conspiracy allegations here.[26]

## C.    Plaintiffs Have Not Met The FTAIA's Limitations As To Foreign Conduct.

UBS AG is incorporated and headquartered abroad (TAC ¶ 75), rendering Plaintiffs'

Sherman Act claim impermissibly extraterritorial.  Although Plaintiffs have sought to obscure

that point by omitting allegations about the locations of the particular traders whose chats are

incorporated into the TAC, or the booking locations of any of the trades allegedly described in

the chats, those traders were transacting abroad, and so the Foreign Trade Antitrust

Improvements Act of 1982 ("FTAIA"), 15 U.S.C. § 6a, bars the Section 1 claim.  *F. Hoffmann-*

---

[26]   *See In re Iowa Ready-Mix.*, 768 F. Supp. 2d at 975 (plaintiffs missed the "'larger picture' from which inferences of a wider conspiracy can be drawn from guilty pleas to separate bilateral conspiracies"); *In re Optical*, 2011 WL 3894376, at *9; *see also Prime Healthcare Servs., Inc. v. Serv. Employees Int'l Union*, 11–cv-2652, 2013 WL 3873074, at *9 (S.D. Cal. July 25, 2013) ("isolated action" insufficient to "prove the existence of a huge antitrust conspiracy with multiple objectives and goals"), *aff'd*, 642 F. App'x 665 (9th Cir. 2016).

*La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 162 (2004).  To avoid the statutory bar, *first*, the conduct must have a "direct, substantial, and reasonably foreseeable effect" on American domestic, import, or (certain) export commerce.  15 U.S.C. § 6a(1).  *Second*, the "effect" must "giv[e] rise to a [Sherman Act] claim."  *Id.* § 6a(2).  Plaintiffs have not met those requirements.  The TAC does not connect any domestic effect suffered by any named Plaintiff to particular acts of trader-based manipulation alleged to have occurred abroad by UBS personnel, including the conduct purportedly described in the chats.  Still less does the TAC allege a "reasonably proximate causal nexus" between such foreign conduct and any domestic effect that gives rise to the Sherman Act claim.  *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 398 (2d Cir. 2014).  After all, Plaintiffs are *not* customers or counterparties of UBS.  Plaintiffs apparently presuppose that—in allegedly manipulating spot market orders of customers not before the Court—traders abroad created impacts that flowed into domestic commerce.  That is "nothing more than what courts have termed a 'ripple effect' on the United States domestic market," and cannot support liability.  *In re Intel Corp. Microprocessor Antitrust Litig.*, 452 F. Supp. 2d 555, 561 (D. Del. 2006)*.*

## III.    The CEA Claims Against UBS Should Be Dismissed.

The CEA claims are properly examined under Rule 9(b) because the claims sound in fraud.  Plaintiffs accuse UBS of colluding with the Fixing Banks to manipulate the Fix Price through *falsehoods* about the "*actual* levels of market supply and demand" for gold (TAC ¶ 384) (emphasis added), "in order to gain an unfair trading advantage over other market participants," *Gold Fix*, 213 F. Supp. 3d at 668.  So Plaintiffs must "state with particularity the circumstances

constituting fraud." Fed. R. Civ. P. 9(b).[27]  In any event, the various CEA claims alleged against

UBS fail even under Rule 8(a)'s "less rigid—though still operative—strictures."  *Iqbal*, 556 U.S.

at 687.

**A.      The CEA Claims Against UBS Are Time Barred.**

The CEA's two-year statute of limitations bars Plaintiffs' claims.  *See* 7 U.S.C. § 25(c).

Even assuming that earlier events did not trigger the duty to inquire, the FINMA Report issued

on November 12, 2014 put Plaintiffs on inquiry notice[28] of potential injury from UBS's alleged

misconduct in the precious metals markets more than two years before they sought leave to file

the TAC (Dkt. 163 (Nov. 17, 2016)), in which Plaintiffs first sought to impose liability on UBS

based on the Deutsche Bank chats.  Moreover, the TAC does not plead with particularity a basis

for equitably tolling the limitations period, other than via impermissible "generalized and

conclusory allegations" substantially directed at the Fixing Banks' exploitation of the auctions,

not conduct by UBS (TAC ¶ 399).  *See Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir. 1983).

At the very least, the limitations period bars any order manipulation claims never previously

---

[27]  *See In re Amaranth Nat. Gas Commodities Litig.* ("*Amaranth I*"), 587 F. Supp. 2d 513, 535 (S.D.N.Y. 2008); *In re Crude Oil Commodity Litig.*, 06 Civ. 6677, 2007 WL 1946553, at *5 (S.D.N.Y. June 28, 2007); *In re Nat. Gas Commodity Litig.*, 358 F. Supp. 2d 336, 343 (S.D.N.Y. 2005); *cf. ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007) (in securities context, "a claim for market manipulation is a claim for fraud" and thus "must be pled with particularity under Rule 9(b)"); *Rombach v. Chang*, 355 F.3d 164, 170-71 (2d Cir. 2004) (Rule 9(b) applies to securities claims "premised on allegations of fraud," even if fraud is not an element of claim).

[28]  In civil actions under the CEA, "discovery of the injury, not discovery of the other elements of the claim, is what starts the clock." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 697 (S.D.N.Y. 2013) ("*LIBOR I*") (internal quotation marks and citation omitted), *rev'd on other grounds, Gelboim v. Bank of Am. Corp.*, 823 F.3d 759 (2d Cir. 2016).  The limitations period, however, is also subject to "an inquiry notice analysis." *Id.* at 698.  Thus, "[w]hen the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, the investor has a duty to inquire."  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262, 2015 WL 6243526, at *114 (S.D.N.Y. Oct. 20, 2015) ("*LIBOR IV*") (internal quotation marks and citation omitted).  "If the investor makes some inquiry, then knowledge is imputed when a reasonably diligent investor would have discovered the fraud.  If, however, the investor makes no inquiry, then knowledge is imputed from the date when the duty arose." *Id.* (citations omitted).  Inquiry notice is "readily resolve[d]" at the pleading stage. *Rio Tinto PLC v. Vale S.A.*, No. 14 Civ. 3042, 2015 WL 7769534, at *6 n.10 (S.D.N.Y. Nov. 20, 2015).

asserted against UBS.[29]  Indeed, given the FINMA Report, *see Gold Fix*, 213 F. Supp. 3d at 678,

Plaintiffs cannot claim unawareness of their purported injury from order manipulation during the

limitations period, or that their ignorance resulted from anything but lack of due diligence on

their part.  *See LIBOR I*, 935 F. Supp. 2d at 710 .

## B.     Plaintiffs Lack Actual Damages Necessary For CEA Standing.

The TAC does not plausibly allege CEA standing.  Under § 22(a) of the CEA, plaintiffs

have standing only if they suffered "actual damages" as a result of the defendant's manipulation.

7 U.S.C. § 25(a)(1).  The term "actual damages" mandates "a showing of actual injury caused by

the violation."  *LIBOR II*, 962 F. Supp. 2d at 620.  Where, as here, the CEA claims against UBS

are based on "discrete, episodic instances of manipulation," Plaintiffs must allege that they

"engaged in a transaction at a time during which prices were artificial as a result of defendants'

alleged . . . manipulative conduct, and that the artificiality was adverse to their position."  *Gold

Fix*, 213 F. Supp. 3d at 667 (quoting *LIBOR II*, 962 F. Supp. 2d at 622).

Plaintiffs' CEA standing against the Fixing Banks hinged on their assertion that they sold

gold futures on dates on which the Fixing Banks "suppressed the Fix Price," and the special

status of the benchmark supported the notion that downward movement of the benchmark could

have persisted into later in the trading day.  *See Gold Fix*, 213 F. Supp. 3d at 667.  But, of course,

UBS did not participate in the Gold Fix and lacked the ability to manipulate the benchmark, as

---

[29]   The allegations of spot market order manipulation against UBS do not relate back to the SAC.  Under Rule 15(c)(1)(B), for relation back to apply, "the basic claim must have arisen out of the conduct set forth in the original pleading," and the "central inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations by the general fact situation alleged in the original pleading."  *ASARCO LLC v. Goodwin*, 756 F.3d 191, 202 (2d Cir. 2014) (internal quotation marks and citations omitted).  But the SAC did not give notice of the TAC's order manipulation allegations.  Plaintiffs did not previously seek to hold UBS liable for order manipulation.  Instead, they affirmatively argued that the SAC described persistent suppression of the gold benchmark, instead of episodic manipulation capable of moving gold prices up or down of the kind Plaintiffs *now* assert are depicted in the Deutsche Bank chats.  *See* Pls.' FRCP 12(b)(6) Opp'n 39, 14 Civ. 2124 (Dkt. 26) (filed June 15, 2015) (arguing that Plaintiffs alleged "*systemic suppression*" and not liability for "a small list of days of up-or-down, trader-based, intermittent manipulation") (emphasis in original).

discussed in greater detail above.  And, absent the structural capability to determine the Gold

Fix, the presupposition that suppression of the PM Fix Price could have endured later into the

trading day does not apply to conduct by UBS.  *Cf. id.* ("[T]he Fixing marked an abrupt

downward aberration in pricing, which abated gradually, but perhaps not completely, over

time.").  UBS thus is not plausibly alleged to have caused Plaintiffs "actual damages" based on

the purported benchmark suppression.  *See id.*  Plaintiffs fare no better with their allegations of

spot market order manipulation against UBS based on the Deutsche Bank chats.  At most, those

chats support allegations of manipulation of the price of physical gold, and futures contracts for

which gold is the underlying commodity, on particular days at particular times.  Order

manipulation, in other words, is not presupposed to linger throughout the trading day.  In *LIBOR*

*II*, Judge Buchwald rejected similar allegations, in a proposed amended complaint, of LIBOR

manipulation that "was episodic and varying in direction," "consist[ing] of a number of discrete

instances of allegedly false LIBOR submissions" that "were, at times, artificially high and, at

other times, artificially low."  *LIBOR II*, 962 F. Supp. 2d at 620.[30]  Likewise, Plaintiffs have not

plausibly alleged that they have CEA standing as against UBS based on order manipulation on

the days at issue in the chats.

## C.    The CEA Claims Are Impermissibly Extraterritorial.

The CEA claim as alleged in the TAC against UBS and predicated on order manipulation

also should be dismissed because it concerns purely foreign conduct outside the scope of the

---

[30]   To "plead actual damages based on such manipulation," the court concluded, "plaintiffs would need to allege that the resulting artificiality in LIBOR caused them injury, in light of their" particular "trading of Eurodollar futures contracts."  *Id.*  The *LIBOR II* plaintiffs "failed to meet this burden" because their proposed pleading did "not include any allegations that make plausible (1) that they transacted in Eurodollar futures contracts on days" in which the prices of such contracts "were artificial as a result of trader-based manipulation of LIBOR, or (2) that their positions were such that they were injured."  *Id.* at 620-21 (citation omitted).  That is, to establish standing, the court "expect[ed] plaintiffs to allege how their positions were negatively affected by trader-based manipulation."  *Id.* at 622.  They failed to do so, and the court denied leave to amend.  *Id.* at 624.

CEA.  *In re North Sea Brent Crude Oil Futures Litig*. *(North Sea Brent)* is instructive.  No. 13-md-2475, 2017 WL 2493135 (S.D.N.Y. June 8, 2017).  There, Judge Carter dismissed Sherman Act, CEA, and unjust enrichment claims raised in two putative class actions—one by traders of crude oil futures and derivatives and one by landowners of oil-producing property in the United States—alleging manipulation of Dated Brent, the primary benchmark for Brent crude oil.  *Id.* at *1-2, 12.  To avoid dismissal on extraterritoriality grounds under *Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 214-15 (2d Cir. 2014), and *Loginovskaya v. Batratchenko*, 764 F.3d 266, 271-72 (2d Cir. 2014), Judge Carter reasoned that a private CEA plaintiff must allege either that "(1) the transaction occurred on a domestic exchange; or (2) the transaction itself is domestic."  *Id.* at *6; *see Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010).  But meeting this test is not enough:  "The Trader Plaintiffs' claims are based on Defendants' allegedly manipulative and misleading reporting to Platts *in London* about physical Brent crude oil transactions conducted *entirely outside of the United States* that indirectly affected the price of Brent futures and derivatives contracts traded on exchanges."  *Id.* at *7 (emphases added).  Because the defendants' alleged manipulation of Dated Brent occurred abroad, "[t]he extension of U.S. commodity rules and regulations to Defendants' conduct" would implicate concerns "that individuals and entities will be subject to multiple, and potentially incompatible, laws in the absence of clear congressional intent to do so."  *Id.* (citation omitted).  Judge Carter therefore dismissed the CEA claims.

Similarly, here, the order manipulation alleged is impermissibly extraterritorial.  The UBS trader on whose chats Plaintiffs chiefly rely was trading on Singapore time, and Plaintiffs have not alleged the links in the causal nexus between Singapore-booked trades and mispricing of physical gold or derivatives in the United States.

**D.      The TAC Fails To Plausibly Allege That UBS Manipulated The Gold Futures Market.**

"The CEA provides a private right of action against individuals 'who purchased or sold a [futures] contract' if those individuals 'manipulat[ed] the price of any such contract or the price of the commodity underlying such contract.'"  *Harry*, 2017 WL 1134851, at *10 (quoting *Hershey v. Energy Transfer Partners, L.P.*, 610 F.3d 239, 246 (5th Cir. 2010)) (in turn quoting 7 U.S.C. § 25(a)(1)(D)).  Such a CEA manipulation claim requires allegations that: "(1) Defendants possessed an ability to influence market prices; (2) an artificial price existed; (3) Defendants caused the artificial prices; and (4) Defendants specifically intended to cause the artificial price."  *Gold Fix*, 213 F. Supp. 3d at 668 (quoting *In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 173 (2d Cir. 2013)) (internal quotation marks omitted); TAC ¶¶ 421-25 (Claim Two).

This Court agreed with Plaintiffs that the SAC sufficiently alleged the four elements against the Fixing Banks given their special role the gold market as masters of the benchmark. That is, the Court accepted as well pleaded Plaintiffs' averments that as the exclusive "participants in the Fixing auction," or "the sole contributors to the Fixing auction," the Fixing Banks were not only capable but "motivated to manipulate the Gold Fix" and thereby create artificial prices, and the Court further tracked Plaintiffs' argument that they "have plausibly alleged that the Fixing Banks conspired to manipulate the Fix Price around the PM Fixing."  *See Gold Fix*, 213 F. Supp. 3d at 669-71; *cf*. Pls.' FRCP 12(b)(6) Opp'n 41, 44.

Conversely, here, the CEA claim against UBS fails for the *same* reasons the Section 1 claim fails.  The driving engine of the manipulation conspiracy as Plaintiffs have alleged it is the Fixing Banks' unique and exclusive foreknowledge and control of the Gold Fix.  But lacking the advance knowledge and control of the Gold Fix, UBS could not have caused the artificial prices

34

to which Plaintiffs attribute their asserted injuries, let alone done so with the *specific intent* to cause such prices—as the Court previously reasoned. *Gold Fix*, 213 F. Supp. 3d at 678-79. Nothing in the TAC burnishes Plaintiffs' prior allegations of market manipulation, because, as explained above, the Deutsche Bank chats do not show Deutsche Bank, or any other Fixing Bank, apportioning to UBS any foreknowledge or control of the PM Fixing, such that UBS could have caused the suppression of the gold benchmark, or acted with specific intent to cause that suppression.

Nor is UBS liable to these named Plaintiffs under the CEA on a claim based on order manipulation allegedly described in the chats. As explained, such spot market order conduct is disconnected from Gold Fix manipulation, including because the UBS trader on whose chats Plaintiffs chiefly rely was transacting on Singapore time, and because the trading strategies described can move commodity prices *up or down*. Consider the specific intent element, which would require allegations that UBS acted "with the purpose or conscious object of causing or affecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand."[31] Indeed, because "actionable manipulation must be directed at 'the price of the commodity underlying *such* contract,'" *Harry v. Total Gas & Power N. Am., Inc.*, 15 Civ. 9689, 2017 WL 1134851, at *10 (S.D.N.Y. 2017) (quoting *Hershey v. Energy Transfer Partners, L.P.*, 610 F.3d 239, 247 (5th Cir. 2010)), Plaintiffs need to show a specific intent to manipulate the price of gold underlying their contracts, and a "generalized" intent to benefit from price swings is

---

[31]  *In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.*, No. 11-md-2213, 2012 WL 6700236, at *10 (S.D.N.Y. Dec. 21, 2012) (citation and alteration omitted) ("*Silver I*"); *see Beatty v. JP Morgan Chase & Co.* (*In re Commodity Exch., Inc. Silver Futures & Options Trading Litig.*), 560 F. App'x 84, 86-87 (2d Cir. 2014) (summary order) ("*Silver II*"); *see also* 7 U.S.C. § 13(a)(2).

not enough.[32]  Lacking allegations that link their derivatives transactions to the UBS trading

activity purportedly described in the chats, Plaintiffs do not even begin to allege specific intent.

### E.       The Manipulative Device Claims Also Fail Against UBS.

The TAC's manipulative device claims under CEA §§ 6(c)(1) and 9(a)(2), 7 U.S.C.

§§ 9(1), 13(a)(2) and CFTC Rule 180.1, are also inadequate.  *See* TAC ¶¶  426-30 (Rule 180.1

claim for "market manipulation") (Claim 3), ¶¶  431-34 (Rule 180.1 claim for "false reports" of

"London Gold Fixing") (Claim 4).  To begin with, Rule 180.1 became effective on August 15,

2011, and conduct predating that date cannot support liability under it.  *Gold Fix*, 213 F. Supp.

3d at 672.  Moreover, the plausibility of the Rule 180.1 claims against the Fixing Banks revolved

around their alleged exploitation of the auction process, *i.e.*, "both misrepresentations (*i.e.*, the

Fixing Banks' misstatements regarding their supply and demand for gold *in the context of the

PM Fixing*) and manipulation (*i.e.*, the Fixing Banks' quoting and trading practices *leading up to

and during the PM Fixing call*) as part of a single scheme."  *Id.* at 673 (emphasis added).  But

UBS of course had no control over the PM Fixing.

### F.       Plaintiffs Fail to State a Claim Against UBS for Principal-Agent Liability or Aiding
             and Abetting Under the CEA.

The CEA principal-agent liability and aiding and abetting claims also fail.  *See* TAC

¶¶ 435-37 (Claim 5), ¶¶ 438-40 (Claim 6).  *First*, the claims are valid only where a primary CEA

violation survives.[33]  Plaintiffs have failed to allege a primary CEA violation, so their principal-

agent liability and aiding and abetting claims also must be dismissed.  *Second*,  Plaintiffs fail to

---

[32]  *See Silver II*, 560 F. App'x at 86 (insufficient to contend that "large short position in silver futures incentivized [defendant] to depress prices"); *Crude Oil*, 2007 WL 1946553, at *8 (allegation that defendants "stood to gain large profits from their dealings in crude oil by manipulating prices of crude oil to obtain trading profits" was "generalized" and "insufficient to show intent").

[33]  *See Silver II*, 560 F. App'x at 87 ("As plaintiffs failed to allege a CEA violation, their aiding and abetting claim was properly dismissed as well."); *In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d at 183 ("[A]iding and abetting requires knowledge of the primary violation and an intent to assist it . . . .").

adequately plead these derivative claims.  Beyond the conclusory assertion that UBS is liable for the acts of supposed agents (TAC ¶ 436), Plaintiffs do nothing to plead grants of authority or control over the agents' undertakings.  *See Laydon v. Mizuho Bank, Ltd.*, No. 12 Civ. 3419, 2014 WL 1280464, at *6 n.2 (S.D.N.Y. Mar. 28, 2014) ("*Laydon I*").  As for aiding and abetting, Plaintiffs fail to allege with any particularity that UBS knew of any Fixing Bank's primary violation and intentionally committed some act in furtherance of that violation.  The Deutsche Bank chats describe episodic, unilateral behavior, at most coordinated at times.  But generalized assertions that defendants collectively aided or abetted fail to satisfy even the most basic pleading standard, let alone Rule 9.  *See In re Amaranth Natural Gas Commodities Litig.*, 612 F. Supp. 2d 376, 390-91 (S.D.N.Y. 2009) ("*Amaranth II*").

## IV.    Plaintiffs Again Fail To State A Plausible Unjust Enrichment Claim.

The state law unjust enrichment claim also fails.  *See* TAC ¶¶ 441-44 (Claim 7).  *First*, it is untimely:  When an unjust enrichment claim is "duplicative of another claim with a shorter limitations period, the shorter period will apply."  *Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 479 (S.D.N.Y. 2016) (internal quotation marks omitted).  Here, because Plaintiffs' unjust enrichment claim duplicates the CEA claims, it is governed by the same two-year period.  *Id.* *Second*, it is meritless:  Yet again, Plaintiffs fail to plead that they had any direct relationship with UBS.  Nor do Plaintiffs plausibly plead that UBS was enriched at Plaintiffs' expense.  *See, e.g.*, *North Sea Brent Crude*, 2017 WL 2493135, at *12; *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 55 (2d Cir. 2011).

## V.    The TAC Fails To Allege That The Court Has Personal Jurisdiction Over UBS AG.

Plaintiffs have not met their burden to plead facts showing that exercise of personal jurisdiction over UBS AG would comply with due process.  Of course, the Court lacks general

37

jurisdiction because UBS AG is incorporated and headquartered abroad (TAC ¶ 75), and is not "essentially at home" here. *Daimler AG v. Bauman*, 134 S. Ct. 746, 751 (2014).

Moreover, the Court lacks specific personal jurisdiction over the claims here asserted against UBS AG. As to benchmark manipulation, the TAC identifies no U.S.-based transactions by UBS AG that could have materially affected the Gold Fix. As to the order manipulation claims based on the chats not previously alleged in Plaintiffs' pleadings, the TAC likewise fails to allege "*suit-related* conduct" by UBS AG that "creates a *substantial connection*" with this forum. *Waldman v. PLO*, 835 F.3d 317, 335 (2d Cir. 2016) (quoting *Walden v. Fiore*, 134 S. Ct. 1115, 1121-23 (2014)) (emphases added). "[T]here must be an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Bristol-Myers Squibb Co. v. Super. Ct. of Cal., S.F. Cnty.*, 137 S. Ct. 1773, 1780 (2017) ("*BMS*") (internal quotation marks and brackets omitted). The relevant forum is New York, not the United States,[34] yet Plaintiffs have alleged no such "affiliation" between New York, or even the United States, and the "underlying controversy" as to UBS AG. "[U]nconnected activities" do not suffice.[35]

---

[34] Because the TAC fails to allege any transactions by UBS AG anywhere in the United States causally connected to the named Plaintiffs' claims, there is no need to examine the constitutionality of the so-called "nationwide contacts" approach here. *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 142 n.21 (2d Cir. 2014); *see BMS*, 137 S. Ct. at 1783-84 (again reserving question, citing *Omni Capital Int'l Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 102 n.5 (1987)). The nationwide service of process provision in the Clayton Act, 15 U.S.C. § 22, is not available here, because the TAC does not allege any valid federal claim under the Clayton Act. *See ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 498 n.6 (2d Cir. 2013); *Chevron Corp. v. Naranjo*, 667 F.3d 232, 246 n.17 (2d Cir. 2012); *see 7 W. 57th St. Realty Co. v. Citigroup, Inc.*, No. 13 Civ. 981, 2015 WL 1514539, at *7 n.2 (S.D.N.Y. Mar. 31, 2015) (defective RICO and antitrust claims invalidate reliance on corresponding statutory "nationwide personal jurisdiction provisions"). In any event, even if there were a need to reach the constitutional question, due process compels rejection of the "nationwide contacts" approach. *See Livnat v. Palestinian Auth.*, 851 F.3d 45, 55 n.6 (D.C. Cir. 2017) (noting that some courts have reasoned that "under the Fifth Amendment, even if the defendant has sufficient nationwide contacts, a plaintiff must additionally justify jurisdiction in the particular state") (citing *Peay v. BellSouth Med. Assistance Plan*, 205 F.3d 1206, 1211 (10th Cir. 2000); *Republic of Panama v. BCCI Holdings (Lux.) S.A.*, 119 F.3d 935, 947 (11th Cir. 1997)).

[35] *See BMS*, 137 S. Ct. at 1781 ("defendant's unconnected activities in the [forum]" insufficient). That is, bare "presence" in the United States "is irrelevant because continuous presence in the forum does not confer specific

Having failed to allege in-forum conduct by UBS AG with a "substantial connection" with any act of benchmark or order manipulation, Plaintiffs strain to assert that from outside the forum UBS AG caused in-forum "effects." *See Walden*, 134 S. Ct. at 1123-24.  Under the "effects" test, "the defendant must 'expressly aim[ ]' his conduct at" the forum, *Waldman*, 835 F.3d at 337 (citation omitted); *see 7 W. 57th St.*, No. 13 Civ. 981, 2015 WL 1514539, at *11 (S.D.N.Y. Mar. 31, 2015).  Yet Plaintiffs have not alleged such a "but for" connection between UBS AG's foreign conduct and their asserted injuries.  The bulk of the chats depicted in the TAC were between one UBS AG trader and one Deutsche Bank trader, both of whom traded on Singapore hours, *see* Stock Decl. Ex. 1, and yet Plaintiffs do not allege nonconclusory factual matter connecting Singapore trades to their averred *domestic* investment losses, including those based on COMEX gold futures contracts.  The TAC thus fails to meet the "express[] aim" requirement, under the same reasoning by which courts in this district have held "that general allegations of price manipulation abroad alone do not establish that a foreign defendant expressly aimed its conduct at" the United States.  *Platinum Fix*, 2017 WL 1169626, at *45.[36]

UBS AG did not forfeit its personal jurisdiction defense by not raising it against the SAC. *See Corporación Mexicana De Mantenimiento Integral v. Pemex-Exploración Y Producción*, 832 F.3d 92, 101 & n.2 (2d Cir. 2016) (distinguishing waiver from forfeiture).  That prior pleading did not present the chats or their underlying Singapore-based conduct as a basis for

---

jurisdiction unless its presence involves 'suit related conduct.'"  *Platinum Fix*, 2017 WL 1169626, at *44 (citing *Waldman*, 835 F.3d at 335; *7 W. 57th St. Realty Co. v. Citigroup, Inc.*, 2015 WL 1514539, at *10); *see Sullivan*, 2017 WL 685570, at *45 ("[A]n assortment of U.S. ties related to UBS's presence in the broader financial services industry" is not "suit-related conduct.");  *FrontPoint*, 2017 WL 3600425, at *6 (trading with in-forum counterparties of derivatives linked to benchmarks allegedly manipulated not "suit related conduct").

[36]  *See FrontPoint*, 2017 WL 3600425, at *7 ("[A]bsent allegation that defendant's conduct was expressly aimed at the United States, the fact 'that Defendants' alleged manipulation of the Fix Price had harmful effects on U.S.-based exchanges is insufficient' to confer personal jurisdiction.") (quoting *Platinum Fix*, 2017 WL 1169626, at *44); *see also Laydon II*, 2017 WL 1113080, at *4 (dismissing where pleading contained "no facts to suggest that [foreign bank] expressly aimed the effects of their alleged manipulative conduct at the United States").

order manipulation claims.  The SAC therefore did not raise the specific jurisdiction question addressed in *BMS* or *Waldman*:  "'[A] party cannot be deemed to have waived objections or defenses which were not known to be available at the time they could first have been made.'" *Hawknet, Ltd. v. Overseas Shipping Agencies*, 590 F.3d 87, 92 (2d Cir. 2009) (quoting *Holzsager v. Valley Hosp.*, 646 F.2d 792, 796 (2d Cir. 1981)).[37]

In any event, even if (contrary to law) the personal jurisdiction defense were forfeited, the TAC should be dismissed because, following the same rationale as those recent decisions that have dismissed for lack of personal jurisdiction cited above, the claims are impermissibly extraterritorial as to UBS AG under the FTAIA and CEA.  Points II.C., III.C., *supra*.

## CONCLUSION

Dismissal is warranted as to the UBS Defendants with prejudice under Rule 12(b)(6), and as to UBS AG under Rule 12(b)(2).

DATE:  September 11, 2017

D. Jarrett Arp
Melanie L. Katsur
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone: (202) 955-8500
jarp@gibsondunn.com
mkatsur@gibsondunn.com

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

/s/  Eric J. Stock
Mark A. Kirsch
Eric J. Stock
Indraneel Sur
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
mkirsch@gibsondunn.com
estock@gibsondunn.com
isur@gibsondunn.com

*Attorneys for Defendants
UBS AG and UBS Securities LLC*

---

[37]  *See* Fed. R. Civ. P. 12(g)(2); *see also* 5C Charles Alan Wright, et al., *Federal Practice & Procedure Civil* § 1388 (3d ed. updated 2016); *cf. Sears Petroleum & Trans. Corp. v. Ice Ban Am., Inc.*, 217 F.R.D. 305, 307 (N.D.N.Y. 2003) ("[I]f the amended complaint also contains new matter, the defendant may bring a second motion under Rule 12 to object to the new allegations only.").