**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE: COMMODITY EXCHANGE, INC. GOLD FUTURES AND OPTIONS TRADING LITIGATION<br><br>*This Document Relates To All Actions* | Case No. 14-MD-2548 (VEC)<br>14-MC-2548 (VEC)<br><br>**ORAL ARGUMENT REQUESTED** |

**PLAINTIFFS' OPPOSITION TO UBS'S MOTION TO DISMISS**
**THE THIRD CONSOLIDATED AMENDED COMPLAINT**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................................1

BACKGROUND ......................................................................................................................3

    A.    Plaintiffs' Motion for Leave to Amend is Granted ................................................3

    B.    UBS's Active Involvement in the Conspiracy to Manipulate Gold Prices.............5

LEGAL STANDARD...............................................................................................................8

ARGUMENT ...........................................................................................................................9

II.    PLAINTIFFS HAVE STATED A SECTION 1 CLAIM FOR UBS'S
    INVOLVEMENT IN THE FIX-SUPPRESSION CONSPIRACY ...................................9

    A.    Plaintiffs Have Plausibly Pled UBS's Active Involvement in the Fix-
        Suppression Conspiracy.......................................................................................10

        1.    The "Structural Design" of the Fix Does Not Negate UBS's Role
            in the Conspiracy ......................................................................................10

        2.    The Chats Corroborate UBS's "Foreknowledge" and Participation
            in the Conspiracy ......................................................................................13

        3.    The Government Investigations Are Circumstantial Evidence of
            UBS's Participation in the Conspiracy .....................................................17

        4.    Economic Analyses Demonstrate UBS's Involvement in the
            Conspiracy ................................................................................................18

    B.    Plaintiffs Have Antitrust Standing .......................................................................21

III.    PLAINTIFFS HAVE STATED A CEA CLAIM FOR UBS'S ROLE IN
    MANIPULATING THE FIX.............................................................................................23

    A.    Plaintiffs Have Standing to Bring CEA Claims Against UBS .............................23

    B.    Plaintiffs Have Plausibly Pled CEA Claims as to UBS .......................................24

        1.    Plaintiffs Have Plausibly Pled Claims for Market Manipulation .............24

        2.    Plaintiffs Have Also Pled Manipulative Device Claims and
            Secondary Liability...................................................................................25

IV.    THE COURT HAS PERSONAL JURISDICTION OVER UBS AG.............................26

    A.    UBS AG Waived Its Personal Jurisdiction Defense .............................................26

    B.    The TAC Nonetheless Sufficiently Establishes Personal Jurisdiction Over
        UBS AG ...............................................................................................................28

V.    THE REMAINDER OF UBS'S ARGUMENTS ARE BASED ON A FALSE
    PREMISE AND NEED NOT BE ADDRESSED BY THE COURT...............................31

CONCLUSION......................................................................................................................34

## **TABLE OF AUTHORITIES**

**Page**

**Cases**

*In re Aluminum Warehousing Antitrust Litig.,*
  2015 WL 1378946 (S.D.N.Y. Mar. 26, 2015) ...................................................... 10

*Anderson News, LLC. v. Am. Media, Inc.,*
  680 F.3d 162 (2d Cir. 2012) ..................................................................... 8, 16

*Arkwright Mut. Ins. Co. v. Scottsdale Ins. Co.,*
  874 F.Supp. 601 (S.D.N.Y. 1995) .................................................................. 28

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)................................................................................ 9

*In re Assante,*
  470 B.R. 707 (S.D.N.Y. 2012)...................................................................... 28

*Atuahene v. City of Hartford,*
  10 F. App'x 33 (2d Cir. 2001) ..................................................................... 21

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)........................................................................... 1, 6, 9

*Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n,*
  620 F.2d 1360 (9th Cir. 1980) ..................................................................... 10

*Blue Shield of Virginia v. McCready,*
  457 U.S. 465 (1982)............................................................................... 22

*City of N.Y. v. Mickalis Pawn Shop, LLC,*
  645 F.3d 114 (2d Cir. 2011) ....................................................................... 28

*In re Commodity Exch., Inc., Gold Futures and Options Trading Litig.,*
  213 F. Supp. 3d 631 (S.D.N.Y. 2016) ...................................................... *passim*

*Continental Ore Co. v. Union Carbide & Carbon Corp.,*
  370 U.S. 690 (1962).................................................................................. 9

*In re Currency Conversion Fee Antitrust Litig.,*
  2012 WL 401113 (S.D.N.Y. Feb. 8, 2012)....................................................... 9, 20

*In re Elec. Books Antitrust Litig.,*
  859 F. Supp. 2d 671 (S.D.N.Y. 2012) .......................................................... 8, 10

*In re Elevator Antitrust Litig.*,
  502 F.3d 47 (2d Cir. 2007) ................................................................................. 16, 21

*Emerald Asset Advisors LLC v. Schaffer*,
  895 F. Supp. 2d 418 (E.D.N.Y. 2012) ........................................................................ 30

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*,
  542 U.S. 155 (2004) ........................................................................................... 33

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
  2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016) .................................................................. 15

*In re Foreign Exchange Benchmark Rates Antitrust Litig.*,
  74 F. Supp. 3d 581, 592 (S.D.N.Y. 2015) ..................................................................... 18

*In re Foreign Exchange Benchmark Rates Antitrust Litig.*,
  2016 WL 1268267 (S.D.N.Y. Mar. 31, 2016) ............................................................ 28, 29, 30

*FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*,
  2017 WL 3600425 (S.D.N.Y. Aug. 18, 2017) ................................................................... 31

*Gelb v. Royal Globe Ins. Co.*,
  798 F.2d 38 (2d Cir. 1986) .................................................................................... 17

*Hamilton v. Atlas Turner, Inc.*,
  197 F.3d 58 (2d Cir. 1999) .................................................................................... 27

*Hirsch Film Acq. Corp. v. Mechner*,
  1991 WL 45054 (S.D.N.Y. Mar. 25, 1991) ...................................................................... 32

*Laydon v. Mizuho Bank, Ltd.*,
  2015 WL 1499185 (S.D.N.Y. 2015) .............................................................................. 27

*Lotes Co. v. Hon Hai Precision Indus. Co.*,
  753 F.3d 395 (2d Cir. 2014) ................................................................................... 22

*Livshits v. Natural Y Surgical Specialties, Inc.*,
  1989 WL 116428 1 (SD.N.Y. Sep. 26, 1989) .................................................................... 28

*In re Magnetic Audiotape Antitrust Litig.*,
  334 F.3d 204 (2d Cir. 2003) ............................................................................... 28, 31

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
  84 F.3d 560 (2d Cir. 1996) .................................................................................... 31

*Meyer v. Jinkosolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014) .................................................................................... 8

*Minpeco, S.A. v. Conticommodity Servs., Inc.*,
  673 F. Supp. 684 (S.D.N.Y. 1987) ....................................................... 20

*In re Natural Gas Commodity Litig.*,
  358 F. Supp. 2d 336 (S.D.N.Y. 2005) ................................................... 24

*Ochre LLC v. Rockwell*,
  2012 WL 6082387 (S.D.N.Y. Dec. 3, 2012) ......................................... 21

*In re Platinum & Palladium Antitrust Litig.*,
  2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017) ....................................... 31

*In re Processed Egg Products Antitrust Litig.*,
  902 F. Supp. 2d 704 (E.D. Pa. 2012) .................................................... 10

*In re Publ'n Paper Antitrust Litig.*,
  690 F.3d 51 (2d Cir. 2012) .......................................................... 13, 23

*Schutte Bagclosures Inc. v. Kwik Lok Corp.*,
  48 F. Supp. 3d 675 (S.D.N.Y. 2014) ..................................................... 30

*Smith v. City of New York*,
  2013 WL 5942224 (S.D.N.Y. Nov. 6, 2013) ............................................ 8

*Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*,
  2017 WL 4250480 (S.D.N.Y. Sept. 25, 2017) ...................................... 28

*U.S. v. Socony–Vacuum Oil Co.*,
  310 U.S. 150 (1940) ............................................................................. 13

*Vandervelde v. Put & Call Brokers & Dealers Ass'n*,
  344 F. Supp. 118 (S.D.N.Y. 1972) ....................................................... 20

*Waldman v. Palestine Liberation Organization*,
  835 F.3d 317 (2d Cir. 2016) ................................................................ 27

*In re Zinc Antitrust Litig.*,
  155 F. Supp. 3d 337 (S.D.N.Y. 2016) ................................................... 12

## Rules and Regulations

Fed. R. Civ. P. 15(c)(1)(B) ...................................................................... 33

## Treatises

5C Charles A. Wright & Arthur R. Miller
*Federal Practice & Procedure*, § 1388 (3d ed. 2014) ............................... 27

## PRELIMINARY STATEMENT

It is now clear that UBS participated in the conspiracy to manipulate gold prices around the PM Fixing.  Although the Court previously dismissed Plaintiffs' claims against UBS because "[i]n the absence of any other circumstantial evidence or plus factors," Plaintiffs' allegations that "UBS engaged in parallel conduct by offering (along with the Fixing Banks)[1] below market quotes that coincided with downward swings in the price of gold around the PM Fixing," was "inadequate to create a plausible inference of conspiracy," Plaintiffs' Third Consolidated Amended Class Action Complaint ("TAC") cures this deficiency.  *In re Commodity Exch., Inc., Gold Futures and Options Trading Litig.*, 213 F. Supp. 3d 631, 678 (S.D.N.Y. 2016) ("*Gold I*").

The TAC includes additional economic analyses—specifically targeted at UBS—that demonstrate UBS was actively involved in efforts to suppress gold prices during the entire Class Period.  TAC ¶¶ 354-57.  And more importantly, the TAC incorporates communications between UBS and a Fixing Bank that reveal UBS's pricing behavior was not the product of uncoordinated conduct.  *Id.* at ¶¶ 358-73.  The chat transcripts show regular communication between UBS and the Fixing Banks about gold trading and the Fix, and they reveal that UBS and a Fixing Bank coordinated trading activities around the PM Fixing based on foreknowledge that the prices would drop.  These communications place UBS's pricing behavior "'in a context that raises a suggestion of a preceding agreement.'"  *Gold I*, 213 F. Supp. 3d at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).  Unable to counter these allegations, and having admitted these communications are "inappropriate and unprofessional," and plausibly allege

---

[1]  The Fixing Banks  include Deutsche Bank, HSBC, Barclays, Société Générale, and Bank of Nova Scotia.

"coordinated trading," *see* Dkt. No. 185 at 2; Dkt. No. 298 ("UBS. Mot.") at 12, UBS is forced to

resign itself to a series of misplaced and legally flawed arguments.

On the central issue whether UBS manipulated gold prices downward, UBS crafts a self-

serving presumption that due to "its exclusion from the auction process, UBS did not, unlike the

Fixing Banks" conspire to manipulate gold prices because UBS did not have "foreknowledge of

the Gold Fixing outcome on any particular date[.]"  UBS Mot. at 1-2.  That UBS was not a

Fixing Bank, however, does not preclude it from participating in the conspiracy.  The

allegations—based on statistically significant analyses corroborated by evidence that UBS

engaged in improper, coordinated trading with a Fixing Bank—more than plausibly suggest that

the clustering of UBS's gold quotes driving the market downward was not the result of

accidental parallel behavior but was the result of coordination with the Fixing Banks.

The rest of UBS's motion is a confusing rehash of arguments the Court has already

rejected (such as those related to standing) and arguments that UBS could have raised earlier, but

never did, and has clearly waived (such as those related to personal jurisdiction).  With other

arguments—such as those related to the plausibility of Plaintiffs' CEA claims, timeliness, and

extraterritoriality—UBS relies on the false premise that Plaintiffs have shifted the theory of their

case from one involving benchmark manipulation to one purportedly involving "spot market

order manipulation."  *See* UBS Mot. at 23-29.  But, the Court has already rejected this exact

argument in denying UBS's opposition to file the TAC, by expressly recognizing that Plaintiffs'

case remains centered on Defendants' conspiracy to suppress gold prices around the PM Fixing.

Dkt. No. 258 ("Amendment Order") at 9.  Accordingly, as the Court did at the amendment stage,

it "need not address" each of UBS's arguments that flow from this false premise.  *Id.* at 10.

Because UBS has presented no proper basis for dismissal of the TAC, its motion should be denied.

## **BACKGROUND**

### A.   **Plaintiffs' Motion for Leave to Amend is Granted**

As relevant here,[2] Plaintiffs sought leave to amend to file the TAC to address the Court's determination that the prior complaint failed to plausibly allege "that UBS caused Plaintiffs' injuries, whether acting separately or in concert with the Fixing Banks."  Dkt. No. 183 ("Amendment Mot.") at 1.  Specifically, in dismissing UBS without prejudice, the Court determined that Plaintiffs had merely alleged "that UBS engaged in parallel conduct by offering (along with the Fixing Banks) below-market quotes that coincided with downward swings in the price of gold around the PM Fixing," further noting that Plaintiffs failed to "identify a single communication between UBS and the Fixing Banks suggestive of manipulative conduct."  *Gold I*, 213 F. Supp. 3d at 678.  In seeking leave to amend, Plaintiffs  presented new economic analyses that confirmed UBS—despite not being a member of the Fixing panel itself—was actively involved in efforts to suppress gold prices, and that UBS's parallel conduct with the Fixing Banks was no mere coincidence.  *See* Amendment Mot. at 2-3.  Based on a limited set of cooperation materials produced by Fixing Bank Deutsche Bank in September 2016 (the "DB Cooperation Materials"), the TAC set forth specific allegations of communications between UBS and Deutsche Bank that establish that they "(i) coordinated their trading activities around the time of PM Fixing to make 'good money'; (ii) often colluded to drive gold prices downward; and

---

[2]   In the interest of brevity, Plaintiffs assume the Court's familiarity with the prior proceedings in this case and the Court's opinion in *Gold I*.  *See also* Amendment Order at 2.

(iii) routinely exchanged confidential customer information to facilitate the conspiracy to manipulate gold prices." *Id.* at 8-9.

In opposing Plaintiffs' motion for leave to amend, UBS argued—as it does here—that Plaintiffs' "attempt in the [TAC] to impose liability on UBS for (at most) episodic instances of gold spot market" manipulation constitutes "a changed theory of liability" as "Plaintiffs' case up to this point has been a precious metals ***benchmark*** manipulation case, and there is no warrant for morphing it at the eleventh hour before discovery into a freewheeling precious metals spot market ***order*** manipulation case."  Dkt. No. 185 at 3, 10 (emphasis in original).  As Plaintiffs explained, however, the TAC did not assert a new theory of liability.  *See* Dkt. No. 192 at 10. The TAC remained centered on Defendants' conspiracy to suppress gold prices around the PM Fixing, and the evidence of improper sharing of information between UBS and a Fixing Bank made it more plausible that UBS's strikingly parallel pricing behavior around the Fix was not the result of happenstance.  *Id.*

On June 8, 2017, the Court granted Plaintiffs' motion for leave to amend, and rejected UBS's argument that the TAC unfairly raised a new theory of liability:

> The Court is not persuaded that the [TAC] presents a substantially revised theory of liability.  Plaintiffs have consistently alleged that manipulation of the PM Fixing required collusive trading tactics in the spot and derivatives markets . . . Consistently, Plaintiffs have alleged a variety of manipulative conduct intended to facilitate an artificially low PM Fixing Price.  UBS's role in the conspiracy is also unchanged.  The [Second Amended Consolidated Complaint ("SAC")] and the [TAC] allege that UBS facilitated the conspiracy by providing air support to the conspirators:  'A single actor could not and would not have attempted to move the market so consistently.  There would not have been enough 'ammo' to do so, and the risk (and cost) would have been too high.' [TAC] ¶ 15.  In short, this is still a case that alleges benchmark fixing and UBS has not shown a prejudicial change in Plaintiffs' theory of liability.

Amendment Order at 9.  As the majority of UBS's arguments proceeded from this erroneous assumption—as it also does here—the Court found that no further analysis was necessary, and granted leave to file the TAC.  *Id.* at 9-10.

**B.**      **UBS's Active Involvement in the Conspiracy to Manipulate Gold Prices**

The TAC plausibly pleads that UBS participated in the conspiracy to manipulate gold prices around the PM Fixing.  Despite not being a member of the Fixing panel itself, UBS and the Fixing Banks had every reason to act in concert to manipulate gold prices.  "UBS facilitated the conspiracy by providing air support to the conspirators."  Amendment Order at 9.  The Fixing Banks benefitted from UBS's involvement.  It is "a leading provider of physical and derivative precious metal products," and it is one of only five full market making members of The London Bullion Market Association, and one of only six clearing members of London Precious Metal Clearing Ltd.  TAC ¶¶ 78, 97-98.  Similar to the other Fixing Banks, UBS has its own large proprietary (*i.e.*, fully discretionary and clearly for-profit) investments in gold, and would profit from foreknowledge of the downward price spikes in gold prices.  *Id.* at ¶ 352.  UBS was part of this joint effort and used its "leading" position in the gold market to collude and profit because "[a] single actor could not and would not have attempted to move the market so consistently. There would not have been enough 'ammo' to do so, and the risk (and cost) would have been too high."  *Id.* at ¶ 15.  The economic analysis and communications between UBS and Deutsche Bank in the TAC plausibly demonstrate UBS's knowledge of and participation in the conspiracy.

Multiple economic analyses demonstrate that UBS was an active participant in driving gold prices down around the PM Fixing along with the Fixing Banks.  *See id.* at ¶¶ 349-57. Economic analysis of over 300,000 gold spot quotes shows that the Fixing Banks' and UBS's gold spot quotes around the PM Fixing were clustered together, far more so than other non-conspiring market participants.  *Id.* at ¶ 350.  UBS's participation in the conspiracy is also

5

demonstrated by an analysis showing that Defendants' gold spot quotes (including quotes from UBS) were substantially lower than prevailing market prices in the ten-minute period around the PM Fixing than from the previous second—demonstrating that Defendants (including UBS) were acting as a group to drive prices down around the PM Fixing. *Id.* at ¶ 351. Similarly, economic analysis shows that downward price spikes around the PM Fixing were correlated with the COMEX short positions of the Fixing banks and UBS, rather than general market forces. *Id.* at ¶ 353. Economic analysis further shows that UBS, like the other Fixing Banks, was heavily invested in gold, motivating all Defendants to profit from downward manipulation of gold prices. *Id.* at ¶ 352.

New economic analyses in the TAC specifically targeted at UBS also show that UBS used its transactions and substantial presence in the gold market to drive prices downward. From 2004 to 2012, UBS's gold spot prices consistently spiked downward at the time of the PM Fixing by an even greater degree than market prices as a whole. *Id.* at ¶ 355. And from 2004 to 2012, UBS's prices around the time of the PM Fixing fell in the bottom 5% and 10% of prices for the day much more often then they fell into the top 5% and 10%. *Id.* at ¶ 357. These allegations, at a minimum, confirm that UBS's prices were not in line with normal market expectations, and instead plausibly reflect UBS's active participation—with the Fixing Banks—in leading the charge to lower prices around the PM Fixing.

The chat transcripts in the TAC place UBS's parallel pricing behavior "'in a context that raises a suggestion of a preceding agreement.'" *Gold I*, 213 F. Supp. 3d at 678 (quoting *Twombly*, 550 U.S. at 557). These communications—which UBS has conceded are "inappropriate and unprofessional" and at least plausibly allege "coordinated trading"—show that UBS's gold traders were in regular communication with a Fixing Bank about gold trading

and the Fix.  Dkt. No. 185 at 2; UBS Mot. at 12.  Chat transcripts reveal specific instances where UBS and Deutsche Bank traders coordinated trading activities to drive gold prices downward and recognized the profit-making potential from colluding around the Fix.  TAC ¶ 359; *see also id.* at ¶¶ 360-73.  For example, in one instance, UBS and Deutsche Bank traders discussed how the PM Fix presented "decent" opportunities to "make good money," and discussed their prior attempts to do so by "pushing" and using "ammo" to drive the price of gold down.  *Id.* at ¶ 360.  In another instance, UBS and Deutsche Bank traders exchanged stories about "trading on the fix" to "push prices," and the UBS trader acknowledged the dangers of "pushing too early" when attempting to manipulate prices at the Fix.  *Id.* at ¶ 361.  The UBS and Deutsche Bank traders even discussed a trading loss sustained during the Fix due to a "miscomm."  *Id.*

The chats also show that UBS coordinated trading to push gold prices lower.  For example, when market participants were attempting to increase the price of gold, UBS and Deutsche Bank traders took action to coordinate downward movements.  *Id.* at ¶¶ 366-67; *see also id.* at ¶ 364.  When a trader at Deutsche Bank told his counterpart at UBS "im feeling helpful to ubs today," the UBS trader responded with "need to push this back lower," to which the Deutsche Bank trader stated "ok . . . lets do it."  *Id.* at ¶ 365.  UBS knew it derived a great benefit from manipulating the Fix.  As one UBS trader acknowledged: "we just smashed [the fix] good."  *Id.* at ¶ 363.

Corroborating these allegations, on June 1, 2017, one of the traders involved in the chats referenced in the TAC, pled guilty to manipulation in the markets for gold and other precious metals both individually and in collusion with other traders.  *Id.* at ¶ 24; *see also* Dkt. No. 261.  The plea agreement demonstrates that even the conduct and communications of traders in Asia—where the trader was located—are relevant.  Gold trading is global.  As the plea agreement

states, "due to the nature of the nearly 24-hour trading cycle, [the trader] interacted with members of the trading team in the United States and the United Kingdom." Dkt. No. 261-1, Ex. A at 6.  This is further corroborated by the recent arrest and indictment of Andre Flotron, the former head of UBS's gold desk who had been placed on leave for unspecified reasons in January 2014.  *See* TAC ¶ 305; *see also* Dkt. No. 1 (Case No. 3:17-mj-1467 (D. Conn.)) ("Flotron Indictment").  The indictment, which was filed after the TAC (and is subject to judicial notice),[3] notes that UBS "operated a global commodities trading business" with its primary precious metals trading desks in Connecticut, Switzerland and Singapore, and that Flotron worked at different times in both Connecticut and Switzerland.  Flotron Indictment at ¶¶ 6, 7.  The indictment also notes that Flotron trained at least one other trader at UBS in the practice of using techniques to manipulate precious metals markets.  *Id.* at ¶ 23.

## LEGAL STANDARD

At the motion to dismiss stage, the Court must "accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff."  *Gold I*, 213 F. Supp. 3d at 649 (citing *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 249 (2d Cir. 2014)).  Alternative explanations offered by a defendant for its conduct are unavailing and misplaced at this stage.  *Anderson News, LLC. v. Am. Media, Inc.*, 680 F.3d 162, 189 (2d Cir. 2012) ("[T]he question at the pleading stage is not whether there is a plausible alternative to the plaintiff's theory"); *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 687 (S.D.N.Y. 2012) (rejecting defendants' attempt to "claim that there are legitimate alternative explanations for their parallel actions").

---

[3]  *See, e.g.*, *Smith v. City of New York*, 2013 WL 5942224, at *1 (S.D.N.Y. Nov. 6, 2013) (district court may take judicial notice of "public records such as arrest reports**,** indictments, and criminal disposition data").

To survive a motion to dismiss, "a complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face." *Gold I*, 213 F. Supp. 3d at 649 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Plausibility is not certainty. *Iqbal* does not require the complaint to allege facts which can have no conceivable other explanation, no matter how improbable that explanation may be." *Id.* at 649-50. "But factual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 650 (citing *Twombly*, 550 U.S. at 570). And, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.*

## ARGUMENT

## II.    PLAINTIFFS HAVE STATED A SECTION 1 CLAIM FOR UBS'S INVOLVEMENT IN THE FIX-SUPPRESSION CONSPIRACY

When the allegations of the TAC are properly examined under Plaintiffs' Fix-suppression conspiracy theory, there is no doubt that Plaintiffs have stated a claim against UBS. Although UBS attempts to make evidentiary attacks on each aspect of Plaintiffs' allegations, at the motion to dismiss stage, the relevant inquiry is not whether each aspect, standing alone, is sufficient to state a claim, but whether the complaint, when viewed as a whole, is sufficient to state a claim. *See Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("[t]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole"); *see also In re Currency Conversion Fee Antitrust Litig.*, 2012 WL 401113, at *8 (S.D.N.Y. Feb. 8, 2012) (a court "must accord plaintiffs the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each"). With this principal in mind, and for the reasons set forth below, Plaintiffs have stated a claim of relief against UBS.

### A.    Plaintiffs Have Plausibly Pled UBS's Active Involvement in the Fix-Suppression Conspiracy

#### 1.    The "Structural Design" of the Fix Does Not Negate UBS's Role in the Conspiracy

UBS argues that "a fundamental barrier to the plausibility" of Plaintiffs' theory is that because UBS did not have "control over the Fixing," it did not have "the opportunity to manipulate prices around the Fixing." UBS Mot. at 12-13. Not only does this conclusory assertion ignore the well-pled allegations of the TAC, but it is directly contrary to the law and the Court's holding in *Gold I*.

As an initial matter, that UBS was not a Fixing Bank does not immunize it from the conspiracy. As courts have consistently recognized, "[p]articipation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability, for each conspirator may be performing different tasks to bring about the desired result." *Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1367 (9th Cir. 1980); *see also In re Aluminum Warehousing Antitrust Litig.*, 2015 WL 1378946, at *6 (S.D.N.Y. Mar. 26, 2015) (denying motion to dismiss Sherman Act conspiracy claim where defendants "were not all doing the same thing but were united in obtaining benefits from their combined endeavors"); *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d at 690 (that a company was "involved in only a portion" of a conspiracy "does not undermine the existence of the conspiracy itself or [that company's] role as a participant"); *In re Processed Egg Products Antitrust Litig.*, 902 F. Supp. 2d 704, 715 n.11 (E.D. Pa. 2012) ("While a complaint must allege that each individual defendant joined the conspiracy and played some role in it, it need not allege that each defendant was involved in every aspect of the conspiracy"). And as the Court has held, it is not the structure of the Fix that is "particularly damning in itself," rather, it is "the co-occurrence of the PM Fixing at the same time as Defendants' alleged price manipulation [that] constitutes circumstantial evidence of an

agreement to restrain trade." *Gold I*, 213 F. Supp. 3d at 662. As such, coordinated activity to manipulate the price of gold does not require that UBS be a member of the Fixing panel.

Here, the TAC plausibly alleges UBS's active role in the conspiracy. Given UBS's "leading" position in the market as well as its significant investments in gold (including proprietary investments), UBS could contribute to coordinated efforts to push the price of gold down. *See* TAC ¶¶ 78, 97-98, 352. UBS was part of this joint effort because "[a] single actor could not and would not have attempted to move the market so consistently" as "there would not have been enough 'ammo' to do so, and the risk (and cost) would have been too high." *Id.* at ¶ 15. Contrary to UBS's suggestion that the Fixing Banks stood to gain no economic benefit by including UBS in the conspiracy, *see* UBS Mot. at 13, by including a market maker like UBS, the Fixing Banks could more aggressively move the price of gold in the market downward thereby increasing their own profits. *See, e.g.*, *id.* at ¶¶ 267-68. Moreover, economic analyses confirm UBS engaged in activity to bring about this desired result. *Id.* at ¶¶ 350-57. These economic analyses confirm UBS consistently moved prices downward around the PM Fixing, and interfirm communications establish that UBS and the Fixing Banks coordinated trading activities to drive gold prices around the PM Fix and at other times. *See supra* at 5-6; *see also infra* at 18-21.

Completely ignoring these allegations, UBS asserts that "even if Plaintiffs had plausibly described a practical or economic reason for the Fixing Banks to assign UBS a function" in the conspiracy, Plaintiffs have not alleged the "*means* through which such apportionment occurred" because UBS "did not participate in the daily Fixing conference." UBS Mot. at 14 (emphasis in original). But, that UBS was not on the Fixing call does not immunize its participation in the conspiracy (especially because this was not the sole forum and means for collusion). *See, e.g.*,

11

*Gold I*, 213 F. Supp. 3d at 645 (noting that Defendants "allegedly communicated with each other throughout the day through phone calls, chat rooms, and other forms of electronic communication to coordinate trading (including to 'net off' large buy orders) in order to ensure that their efforts to drive down the gold price were not undone by counteracting trading activity").

The price suppression did not occur simply during the Fixing call, as the TAC makes clear that Defendants (and UBS) pushed the price of gold lower "*leading up to* and during the Fixing window, opportunistically pushing the Fix in the desired direction *before the Fixing process began*."  TAC ¶ 267 (emphasis added); *see also Gold I*, 213 F. Supp. 3d at 644-45 ("leading up to the London PM Fixing, Defendants allegedly collected confidential client order information and then improperly shared that information amongst themselves in order to compare and coordinate the execution of particularly large sell trades, thereby driving down the gold spot price immediately before and during the Fixing call").  Further, the TAC sets forth over a dozen chat transcripts between UBS and Fixing Bank Deutsche Bank that establish regular communications between UBS and a Fixing Bank about manipulating gold prices and the PM Fixing.  *See, e.g.*, TAC ¶¶ 360, 363; *see also id.* at ¶¶ 350-73.

In the face of these well-pled allegations, UBS's self-serving argument that it was not needed for the conspiracy cannot be credited.  Although UBS relies on *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337 (S.D.N.Y. 2016), to argue otherwise, that case is inapposite.  UBS Mot. at 14-15.  In *Zinc*, plaintiffs failed to allege why certain defendants needed other defendants to monopolize or otherwise restrain the zinc market.  *Id.* at 372.  There were also no allegations of interfirm communications that corroborated the coordinated activity.  Here, on the other hand, Plaintiffs have alleged UBS's specific role in the conspiracy as well as referenced several

communications that plausibly suggest coordinated trading.  Moreover, there is no "necessity" requirement to be part of a conspiracy.  It is well-established that antitrust plaintiffs need only "demonstrate that the defendants entered into a conspiracy 'formed for the purpose and with the effect of'" impacting prices.  *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 61 (2d Cir. 2012) (quoting *U.S. v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 223 (1940)).  And even if UBS's argument was plausible (which it is not), the "Court may not pick and choose among plausible explanations and must assume that Plaintiffs' well-pled allegations are true, regardless of whether they are probable."  *Gold I*, 213 F. Supp. 3d at 670.

> 2.   The Chats Corroborate UBS's "Foreknowledge" and Participation in the Conspiracy

The Court granted UBS's prior motion to dismiss, noting that Plaintiffs had failed to "identify a single communication between UBS and the Fixing Banks suggestive of manipulative conduct."  *Gold I*, 213 F. Supp. 3d at 678.  The chat transcripts between UBS and Fixing Bank Deutsche Bank in the TAC rectify the weakness the Court perceived with Plaintiffs' prior pleading and are relevant circumstantial evidence that UBS's parallel pricing behavior was the result of "an agreement with the Fixing Banks to manipulate the Fixing."  *Id.*

"[E]vidence of a high level of interfirm communications" is a recognized "plus factor" that places "allegations of parallel conduct . . . in a context that raises a suggestion of a preceding agreement."  *Id.* at 660-61 (internal quotes and citations omitted).  As alleged in the TAC and acknowledged by the Court in its Amendment Order, the chats demonstrate that UBS and Deutsche Bank repeatedly shared confidential customer trading information, coordinated their trading activities for the express purpose of manipulating gold prices, and discussed their tactics and efforts to manipulate the PM Fixing.  *See generally* TAC ¶¶ 358-73; Amendment Order at 4-5.  The chats, therefore, corroborate UBS's participation in the conspiracy with the other

13

Defendants to manipulate gold prices during the Class Period.  Indeed, UBS does not even attempt to offer any purported pro-competitive justification for these communications, but concedes that the chats are "inappropriate and unprofessional," and at least plausibly allege "coordinated trading."  Dkt. No. 185 at 2; UBS. Mot. at 12.  Unable to credibly dispute that these communications are suggestive of coordination and manipulation, UBS seeks to avoid liability by raising a series of arguments, none which have merit.

UBS's primary argument is that because the chats happened on Singapore time, "no-well pleaded allegations show that trades conducted around Singapore business hours could have materially affected the Gold Fix determined on London time."  UBS Mot. at 17.  UBS also argues that because "[a]t most, the[] chats could support a claim of episodic manipulation of gold *spot market* prices," they do not show that "UBS had any role in suppressing the Gold Fix benchmark."  *Id.* at 15 (emphasis in original).  These arguments, however, miss the point.

As Plaintiffs allege, these chats, regardless of location and time, show coordination, foreknowledge, and active involvement between UBS and a Fixing Bank to drive gold prices downward, including through the PM Fixing.  While UBS deems them to be "episodic," what the chats reveal are the open lines of communication between UBS and other banks, which were used to improperly share the exact type of information needed to coordinate trading activities.  They help place UBS's Fixing Bank-like trading practices in a context more indicative of collusion.  That these chats happened in Singapore is thus largely irrelevant.  Further, as the recent criminal cases reflect, trader location matters little given the global, "24-hour trading cycle" in which Defendants operate.  *See supra* at 7-8.  At the very least, the chats establish that even those in Asia knew the Fix was being manipulated, and further bolster the allegation that UBS was not acting alone around the time of the Fixing.  *See, e.g.*, TAC ¶ 360 ("speaking of the

14

fix i gotta do that when im there").  These types of interfirm communications between

competitors constitute "circumstantial evidence of an antitrust conspiracy and [are] sufficient at

the pleading stage."  *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2016 WL 5108131, at

*4 (S.D.N.Y. Sept. 20, 2016) (finding inappropriate inter-bank chats produced by settling

defendants and government regulators to be compelling evidence of a conspiracy, even if those

specific chats "themselves did not set spreads or fixes"); *see also Gold I*, 213 F. Supp. 3d at 661.

 While UBS offers its own explanations for the chats to refute its participation in the

conspiracy, those self-serving explanations do nothing to undermine the plausibility of UBS's

participation in the conspiracy.  For example, when Plaintiffs allege that UBS and Deutsche

Bank traders discussed prior attempts to profit off of the Fixing, including the tactics they used

and the risks of miscalculating trading strategies around the Fixing, *see* TAC ¶ 360, UBS argues

that the chat simply reflected that participation in the Fixing was not a "riskless profit."  UBS

Mot. at 17.  But, UBS does not and cannot deny that its trader and a Fixing Bank trader were

specifically discussing trading strategies related to the "pm fix."  TAC ¶ 360.  Such interfirm

communications are highly probative circumstantial evidence of conspiracy.  *See In re Foreign

Exch. Benchmark Rates Antitrust Litig.*, 2016 WL 5108131, at *4.

 UBS also takes issue with *one* chat that it claims solely discusses the silver market.  *See*

UBS Mot. at 18 (citing TAC ¶ 363).  According to UBS, that "chat has no value in this case"

because "[n]o one believes (let alone plausibly alleges) that the gold and silver markets are the

same."  *Id.*  Although UBS has not attached the relevant chat in its entirety to its motion to

dismiss, Plaintiffs dispute UBS's contention.  *See* Dkt. No. 258 (Case No. 14-md-2573) (Jun. 16,

2017) ¶ 311 (Third Amended Complaint in *In re London Silver Fixing, Ltd. Antitrust Litigation*

quoting May 11, 2011 chat, which refers to "the fixes").[4]

UBS's self-serving arguments also have no place at the motion to dismiss stage. As the Court has recognized, it must "accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Gold I*, 213 F. Supp. 3d at 649. That UBS offers an alternative explanation for these chats does not mean that Plaintiffs' allegations about these same chats are not plausible. *See Anderson News, LLC.*, 680 F.3d at 187-90 (vacating dismissal where amended complaint alleged defendants made statements that "may plausibly be interpreted as evincing their [anticompetitive] agreement," and that "although an innocuous interpretation of the defendants' conduct may be plausible, that does not mean that the plaintiff's allegation that that conduct was culpable is not also plausible").

In short, Plaintiffs have now identified *over a dozen* communications that demonstrate that UBS's pricing behavior (along with the Fixing Banks) was not innocent or independent, but was instead the result of coordinated activity. UBS was not acting alone. The chats relate to the *same* banks, using the *same* tactics, to manipulate the prices in the *same* market. And the referenced chats, obtained in just the first production of the DB Cooperation Materials, are no doubt just the tip of the iceberg.

---

[4]   Moreover, absent further discovery, UBS's factual contention cannot be credited at this stage especially since Defendants' "precious metals" trading desks covered both the gold and silver markets, and the traders could switch between discussing gold and silver trades. *See, e.g.*, Dkt. No. 261-2, Ex. B at 2. And the one case UBS relies on to argue otherwise—*In re Elevator Antitrust Litig.*, 502 F.3d 47 (2d Cir. 2007)—does not apply here. UBS Mot. at 18. In that case, the court found that plaintiffs failed to allege any link between the acts that occurred in Europe and those that occurred in America such that the notion that "if it happened there, it could have happened here" was not plausible. Here, Defendants' global, "24-hour trading" operations and coverage of both the silver and gold markets, render that decision inapposite.

3.     The Government Investigations Are Circumstantial Evidence of UBS's
Participation in the Conspiracy

UBS argues that the government investigations (as well as the DB Cooperation Materials,

which were produced by Deutsche Bank to regulators) are "especially harmful to the plausibility

of the conspiracy" because "no government agency *ever* decided that UBS conspired to

manipulate the Gold Fix."  UBS Mot. at 19 (emphasis in original).  In other words, UBS claims

that because it has not been criminally charged, it is innocent.  This argument, however, defies

logic as the standard to bring criminal charges is significantly more demanding than the standard

to plead plausibility for an antitrust claim, and a government may not choose to pursue even

viable claims due to lack of resources or a variety of other reasons.  That UBS has not yet been

*criminally* charged for manipulating gold prices does not mean that UBS can avoid *civil* liability

for antitrust violations stemming from its involvement to drive the price of gold downward

around the PM Fixing with the other Fixing Banks.  *See, e.g.*, *Gelb v. Royal Globe Ins. Co.*, 798

F.2d 38, 43 (2d Cir. 1986) ("higher burden of proof in the criminal than in the civil context").

Moreover, Plaintiffs are neither using these government investigations as direct evidence

of a conspiracy, nor using them to solely support the allegations against UBS.  At a bare

minimum, Plaintiffs continue to maintain that the existence of these investigations is a plus

factor that further supports the plausibility of UBS's involvement in the conspiracy.  Although

the Court previously placed no weight on the FINMA fine against UBS because, standing alone,

it "does not support Plaintiffs' allegation that UBS conspired with the Fixing Banks," *see Gold I*,

213 F. Supp. 3d at 678, when viewed in connection with the Deutsche Bank chats in the TAC,

17

the FINMA fine is at least circumstantial evidence of UBS's manipulative trading activities here.[5]

Additionally, recent events only further support the significance of these government investigations.  For example, although UBS contends that the June 2017 government proceedings against a former Deutsche Bank trader located in the "Asia-Pacific region" "do not describe collusion by UBS to alter the Gold Fix," UBS Mot. at 20, UBS's argument once again misses the mark.  The trader (who is quoted in the chats referenced in the TAC) had pled guilty to manipulating the gold markets, and the CFTC found that he colluded with other traders to manipulate gold futures contracts, including a UBS trader.  *See* TAC ¶ 24; Dkt. No. 261.  The recent Flotron indictment also demonstrates the same; that those at UBS's gold desk engaged in spoofing and other practices to defraud market participants in gold and other precious metals. *See supra* at 7-8.  At a minimum, and as alleged in the TAC, these findings are circumstantial evidence that plausibly suggest that Defendants' traders engaged in collusive conduct affecting the gold market.

### 4.      Economic Analyses Demonstrate UBS's Involvement in the Conspiracy

The Court has already recognized that economic analyses demonstrate that "UBS engaged in parallel conduct by offering (along with the Fixing Banks) below-market quotes that coincided with downward swings in the price of gold around the PM Fixing."  *Gold I*, 213 F. Supp. 3d at 678.  The additional economic analyses in the TAC, which specifically focus on

---

[5]  UBS also contends that "unadjudicated assertions in such proceedings are immaterial as a matter of law to Plaintiffs' allegations."  *See* UBS Mot. at n. 13.  But, there is no blanket prohibition that prevents a court from looking at facts contained within "settlements and penalties" as a "plus factor" in assessing the plausibility of a conspiracy claim.  *In re Foreign Exchange Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 588, 592 (S.D.N.Y. 2015).  Indeed, the *Foreign Exchange* court explicitly relied on facts revealed and contained in "settlements and penalties" materials in finding it plausible that the banks, including *the same unit within UBS* as is at issue here, conspired to rig currency-exchange rates.  *Id.*

UBS's pricing behavior, only further supports this holding as it confirms the eerie similarities between UBS's behavior and that of the Fixing Banks. *See* TAC ¶¶ 354-57 (reflecting below market downward trend of UBS's gold prices around the PM Fixing). When viewed alongside the chat transcripts between UBS and a Fixing Bank concerning coordinated gold trading and the PM Fixing, *see* TAC ¶¶ 360-63, these economic analyses more than "nudge Plaintiffs' claims over the line from the realm of the possible to the realm of the plausible." *Gold I*, 213 F. Supp. 3d at 661. UBS nonetheless argues that Plaintiffs' "purported pricing conduct allegations" somehow remain "inadequate." UBS Mot. at 20. Yet the arguments UBS makes in support of this assertion do not withstand scrutiny.

For example, UBS argues that Plaintiffs have not provided enough examples of UBS driving prices downward around the Fix to raise an inference of a conspiracy because Plaintiffs only "direct attention to the spot market trading activity on a miniscule 11 specified dates (out of a Class Period that spans thousands of trading days)." *Id.* But, Appendix A of the TAC references over *2,400* days on which Defendants, including UBS, engaged in conduct that resulted in the artificial downward price movements around the PM Fixing, and the UBS-specific analyses also demonstrate UBS's pricing behavior for "all days" of the Class Period. *See* TAC ¶¶ 355-57. Thus, UBS is linked to the conspiracy for the *entire* Class Period, not just the 11 specified dates.[6] UBS's contention is not only factually inaccurate but legally flawed. Courts in this District have long recognized that "[o]nce a conspiracy is shown, only slight evidence is

---

[6] Although UBS claims that it cannot address these studies "as long as Plaintiffs withhold the underlying data and methodology," the TAC explains the data sources and methods behind these studies. *See* TAC ¶¶ 123-209, 355-57, Appendix C. Moreover, the Court has rejected the underlying premise of UBS's argument by making clear that it is not "relying on Plaintiffs' *opinions* (expert or otherwise) but rather on Plaintiffs' factual assertions regarding pricing and other economic data, which courts generally accept at the pleading stage." *Gold I*, 213 F. Supp. 3d at 666 (emphasis in original); *see also* Amendment Order at 8, n. 6 (rejecting Fixing Banks' attempt to file a new motion to dismiss based on two purported "discrepancies" with the data and coding underlying certain studies).

needed to link another defendant with it." *In re Currency Conversion Fee Antitrust Litig.*, 2012 WL 401113, at *4 (internal citations omitted); *see also Minpeco, S.A. v. Conticommodity Servs., Inc.*, 673 F. Supp. 684, 688 (S.D.N.Y. 1987) (same); *Vandervelde v. Put & Call Brokers & Dealers Ass'n*, 344 F. Supp. 118, 154-55 (S.D.N.Y. 1972) (same).

UBS also claims that because Plaintiffs have failed to adequately link the "alleged pricing conduct to the chats," the allegations must fail as well. UBS Mot. at 20. Specifically, UBS argues that because the pricing conduct allegations have not yet been connected to "any actual trades by the UBS trader on Singapore hours to alteration of the benchmark determined at 3 P.M. in London," the chats themselves cannot lend "force to the 'spot quote pricing behavior' allegations." *Id.* at 20-21. But, as previously discussed, the premise of UBS's argument is wrong. Plaintiffs are using the chats—which demonstrate coordination, foreknowledge, open lines of communication between UBS and a Fixing Bank, and active involvement to drive gold prices downward—as a plus factor to show that UBS's pricing behavior was not the result of some independent parallel behavior. *See supra* at 13-16.

Finally, UBS claims that Plaintiffs' pricing allegations constitute "impermissible group pleading" because Plaintiffs have "lumped" UBS's behavior with the behavior of the Fixing Banks. UBS Mot. at 20-21. But studies derived from UBS's own pricing behavior, showing UBS was engaging in activities more akin to that of the Fixing Banks rather than the larger market, is damning evidence that has nothing to do with the "group pleading" doctrine. Further, the TAC not only contains economic analyses that reflect the aggregated impact of UBS's behavior alongside the Fixing Banks' behavior, but the TAC also contains UBS-specific analyses that specifically isolate UBS's pricing behavior for each day of the Class Period. *See* TAC ¶¶ 355-57. And, of course, the UBS-specific chats are the antithesis of "group pleading." Although

UBS cites several cases for the proposition that group pleading is impermissible, *see* UBS Mot. at 21 n.15, none of those cases are relevant here given that the TAC does include specific, particularized allegations about UBS's pricing behavior, explaining with particularity how UBS conspired, with whom, and for what purpose.[7]

### B.      Plaintiffs Have Antitrust Standing

UBS's argument as to why Plaintiffs do not have antitrust standing seeks to turn the doctrine of antitrust standing on its head.  At bottom, UBS argues that even though the Court has found standing appropriate as to five of the conspirators, despite being involved in the *same* conspiracy, standing as to the actions by UBS would be improper because UBS was "an outsider to the PM Fixing."  UBS Mot. at 22.  That UBS was not a Fixing Bank, however, is irrelevant.  If Plaintiffs have standing to bring antitrust claims arising out of the fix-suppression conspiracy as to one co-conspirator (which they do), then Plaintiffs have standing to bring antitrust claims arising out of the same conspiracy against all of the joint and severally liable co-conspirators.  As the Court held, Plaintiffs had standing under the SAC because:

> Plaintiffs do not allege that Defendants suppressed the price of a particular bar of gold that was later sold through a distribution chain to Plaintiffs but rather that Defendants suppressed the Fix Price, which had a direct (and negative) impact on the value of their Gold Investments . . . under such circumstances, there appears to be little, if any, difference between the injuries suffered by market participants who sold gold to one of the Defendants (the alleged cartel members) and those who sold to non-conspiring third-parties.  Accepting as true Plaintiffs' allegations

---

[7]   In contrast, each of the cases UBS cites involves allegations that fail to specify in any detail the actions that made a defendant's conduct unlawful.  *See, e.g.*, *Ochre LLC v. Rockwell*, 2012 WL 6082387, at *5-6 (S.D.N.Y. Dec. 3, 2012) (dismissing claims where plaintiffs "lack[ed] specific allegations of copyright infringement against each of the defendants" and instead "lumped" the claims against the defendants without any particularized allegations); *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (affirming dismissal of claims where *pro se* plaintiff merely listed all defendants by name and made a "vague and conclusory" assertion that "the defendants" committed legal violations); *In re Elevator*, 502 F.3d at 50-51 (affirming dismissal of claims where plaintiffs offered only a generic "theoretical" list of "every type of conspiratorial activity that one could imagine . . . without any specification of any particular activities by any particular defendant").

that Defendants' suppression of the Fix Price had a direct impact on market
participants who sold gold on days when the PM Fixing was manipulated
(regardless of the counterparty), the Court finds that at least some subset of
Plaintiffs have sufficiently alleged proximate causation for purposes of antitrust
standing.

*Gold I*, 213 F. Supp. 3d at 655-656.  The Court's holding is consistent with a long line of cases.

*Id.* at 655 (citing cases).

Here, the allegations against UBS in the TAC fall squarely within this analysis.

Plaintiffs do not allege that UBS suppressed the price of a particular bar of gold that was later

sold through a distribution chain to Plaintiffs.  Instead, Plaintiffs allege that UBS—with the other

Defendants—conspired to manipulate (and did manipulate) the Fix price, which had a direct (and

negative) impact on Plaintiffs' gold investments.  *See, e.g.*, TAC ¶¶ 358-63.[8]

Although UBS tries to sidestep this analysis by claiming that the Court's reasoning in

*Gold I* "revolved around direct control of the benchmark," UBS Mot. at 22, there is no such

limitation in the Court's holding.  That is because the question is ultimately whether the claimed

injury is a "type of loss" the conspiracy's conduct "would be likely to cause," *Blue Shield of*

*Virginia v. McCready*, 457 U.S. 465, 479 (1982), *i.e.*, whether the injury is "within the scope of

the risk created by" the defendants' conduct.  *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753

F.3d 395, 412 (2d Cir. 2014); *see also In re Publ'n Paper Antitrust Litig.*, 690 F.3d at 66 ("It is

enough that the illegality is shown to be a material cause" and not "the sole cause of the

plaintiffs' alleged injuries[.]").  As the TAC alleges, because UBS conspired with the Fixing

---

[8]  While UBS claims that since *Gold I*, "several courts in this District have reasoned that Section
1 claims are properly limited to those plaintiffs who transacted directly with defendants," UBS Mot. at n.
18, the cases UBS relies on neither change the law on this issue nor do they involve a substantially similar
factual record.  Consistent with this Court's holding in *Gold I*, given that "the record is not (and could not
reasonably be) sufficiently developed with respect to Plaintiffs' claim that the effect of Defendants'
alleged manipulation persisted throughout the trading day and into future days, the Court finds that these
questions must be deferred to the class certification stage." *Gold I*, 213 F. Supp. 3d at 656.

Banks to artificially suppress the price of gold, its behavior caused Plaintiffs' losses.  *See* TAC ¶¶ 388-91.

## III.   PLAINTIFFS HAVE STATED A CEA CLAIM FOR UBS'S ROLE IN MANIPULATING THE FIX

In previously dismissing Plaintiffs' CEA claims against UBS, the Court determined that "[b]oth Plaintiffs' price manipulation and manipulative device claims require allegations that UBS caused (and intended to cause) the artificial price in question.  Because Plaintiffs have failed to allege plausibly that UBS played a role in the Fixing Banks' conspiracy to suppress gold prices, Plaintiffs cannot establish that UBS caused (and intended to cause) the downward price manipulation at issue."  *Gold I*, 213 F. Supp. 3d at 678-79 (internal citations omitted).  As explained above, that is no longer true.  Given this, the Court's prior determination that Plaintiffs have standing to pursue and have adequately alleged CEA claims against the Fixing Banks should apply equally to UBS.  *See id.* at 667-75.

### A.     Plaintiffs Have Standing to Bring CEA Claims Against UBS

UBS's brief argument on Plaintiffs' purported lack of standing—an argument, once again, predicated on the fact that UBS was not on the Fixing panel—can be disposed of quickly. According to UBS, since it did "not participate in the Gold Fix," it could have neither caused "the suppression of the PM Fix Price," nor Plaintiffs' damages resulting from the lower gold prices that "endured later in the trading day."  UBS Mot. at 31-32.  This argument, however, ignores the Court's holding in *Gold I* that Plaintiffs have CEA standing where they have alleged that they "sold gold futures on specifically identified dates on which Defendants are alleged to have artificially suppressed the Fix Price."  *Gold I*, 213 F. Supp. 3d at 667.  Because the TAC does exactly this with UBS—by identifying the days on which UBS, with the Fixing Banks, engaged in manipulation that resulted in an abrupt downward aberration around the Fixing—no

further analysis is necessary to confer CEA standing.  *E.g.*, *compare* TAC ¶¶ 268-69 (describing how on September 1, 2011, HSBC and UBS submitted large quotes out of line with prior pricing trend triggering a downward spike in the price of gold right before the Fixing window) *with* TAC Appendix B (multiple Plaintiffs sold Gold Investments on September 1, 2011); *compare also* TAC ¶ 273 *with* TAC Appendix B (multiple Plaintiffs sold Gold Investments on May 31, 2012; Feb. 13, 2013).

### B.   Plaintiffs Have Plausibly Pled CEA Claims as to UBS

UBS's primary argument—once again—is that because it was not "[t]he driving engine of the manipulation conspiracy," the "CEA claim against UBS fails for the *same* reasons the Section 1 claim fails."  UBS Mot. at 34 (emphasis in original).  But Plaintiffs have alleged plausible Section 1 claims, as explained above, and the CEA claims are viable for largely the same reasons.  This is true whether or not the Court assesses the CEA claims under Rule 8 or Rule 9, because even if the Court were to conclude that Plaintiffs' CEA claims against UBS "sound in fraud" and are thus subject to the more stringent pleading requirements of Rule 9(b), "[t]his standard is generally relaxed in the context of manipulation-based claims where the complaint must simply specify 'what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue.'"  *Gold*, 213 F. Supp. 3d at 668 (quoting *In re Natural Gas Commodity Litig.*, 358 F. Supp. 2d 336, 343 (S.D.N.Y. 2005)).

### 1.   Plaintiffs Have Plausibly Pled Claims for Market Manipulation

Here, Plaintiffs have specifically alleged that UBS used its dominant market-share to execute price-moving transactions, including on the COMEX, to manipulate prices around the Fixing.  Multiple economic analyses in the TAC demonstrate that UBS was an active participant in driving gold prices down around the PM Fixing along with the Fixing Banks on a significant

number of days.  *See* TAC ¶¶ 349-57.  That UBS did this in coordination with the Fixing Banks

is further corroborated by the chat transcripts that show UBS traders had regular and

"inappropriate" communications with a Fixing Bank concerning "coordinated trading" and the

Fix.  *See id.* at ¶¶ 359-73; *see also supra* at 5-8.

Taken together, these allegations plausibly allege that UBS "conspired to manipulate the

Fix Price around the PM Fixing" in coordination with the Fixing Banks, and that UBS, with the

Fixing Banks, was "no doubt aware of their ability to influence the Fix Price (both individually

and collectively), which, in turn, affected gold futures markets."  *Gold I*, 213 F. Supp. 3d at 671.

As such, UBS, with the Fixing Banks, "could not have acted accidentally (or even negligently)"

in suppressing the price of gold.  *Id.*  As these allegations plausibly suggest that UBS's conduct,

in coordination with the Fixing Banks, "was at least one cause of the alleged artificial pricing

around the PM Fixing," there is no basis to dismiss Plaintiffs' price manipulation claims.  *Id.*

### 2. Plaintiffs Have Also Pled Manipulative Device Claims and Secondary Liability

For the same reasons, Plaintiffs also adequately allege manipulative device claims as well

as aiding and abetting and principal-agent liability claims under the CEA.  As to Plaintiffs'

manipulative device claims, UBS's *only* argument as to why it should be dismissed is that "UBS

of course had no control over the PM Fixing."  UBS Mot. at 36.  But, as explained above, this

argument is misplaced.  *See supra* at 10-13.  Given that the TAC alleges "the nature, purpose,

and effect of the fraudulent conduct and the roles of the defendants," Plaintiffs have met their

burden of proof on this claim.  *Gold I*, 213 F. Supp. 3d at 673.[9]

---

[9]  The only additional argument that UBS asserts is that the false reporting claim should be
dismissed with respect to actions occurring before August 15, 2011, the date that Rule 180.1 became
effective.  UBS Mot. at 36.  Plaintiffs recognize that the Court previously agreed with the Fixing Banks'

As to Plaintiffs' aiding and abetting and principal-agent liability claims, as discussed throughout, the TAC adequately alleges—through multiple economic analyses and interfirm communications—that UBS conspired to manipulate gold prices with the Fixing Banks, and had a common motive for doing so.  *See supra* at 5-6, 18-21.  Far from being "generalized assertions," *see* UBS Mot. at 37, these detailed allegations support the aiding and abetting claim as to UBS.  *See Gold I*, 213 F. Supp. 3d at 673-74 ("Plaintiffs' conspiracy allegations, particularly with respect to anomalous price movements that occurred uniquely at the PM Fixing, the Fixing Banks' below-market price quotes leading up to the PM Fixing, their private communications during the Fixing auction, and their common motive to manipulate the Fixing for commercial gain are sufficient to state an aiding and abetting claim").  Moreover, there is no indication that any trader—either from UBS or any Fixing Bank—acted outside the scope of his or her employment.  As such, there is no basis to dismiss the principal-agent liability claim as to UBS, and UBS's arguments to the contrary are without merit.  *See id.* at 674.[10]

## IV.   THE COURT HAS PERSONAL JURISDICTION OVER UBS AG

### A.   UBS AG Waived Its Personal Jurisdiction Defense

Although UBS AG moved to dismiss the SAC for failure to state a claim *more than two years ago*, it never contested the Court's personal jurisdiction over it.  Tellingly, not a single one of the Defendant banks raised this defense even though each of the Defendant banks is headquartered outside the U.S., and the Fixing auction was held in London.  That is because the

---

similar argument on this point.  *See Gold  I*, 213 F. Supp. 3d at 672-73.  As such, Plaintiffs are not seeking to re-litigate that issue at this time.

[10]   Although UBS also seeks dismissal of the unjust enrichment claim as duplicative of Plaintiffs' CEA claims, *see* UBS Mot. at 37, Plaintiffs have made clear that inclusion of that claim "is not an attempt to re-litigate the Court's dismissal of those claims, but rather is being done for preservation purposes."  TAC ¶ 1, n.1.

basis for the Court's specific personal jurisdiction over the Defendants could not be more apparent:  Plaintiffs have consistently alleged that Defendants committed acts in furtherance of the conspiracy in the U.S., used their manipulation of the PM Fixing to make large profits from trading in the U.S., including on COMEX, and harmed investors in the U.S.  *See* SAC ¶¶ 4-6, 14, 17, 26-28; *see also* TAC ¶¶ 4-6, 18, 21, 32-34.

While UBS now claims that the "TAC identifies no U.S.-based transactions by UBS AG that could have materially affected the Gold Fix," UBS Mot. 38, nothing prevented UBS from making this argument in its 2015 motion, or even at any time prior the Court's ruling in *Gold I*.[11] UBS's belated assertion of this purported defense therefore constitutes waiver as a matter of law. *See Laydon*, 2015 WL 1499185, at *6 (failure to promptly raise the issue of personal jurisdiction constitutes a waiver of that defense); *Hamilton v. Atlas Turner, Inc*., 197 F.3d 58, 62-63 (2d Cir. 1999) (finding that defendant "forfeited its personal jurisdiction defense" where it had multiple prior opportunities to raise the defense, but failed to do so); 5C Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1388 (3d ed. 2014) ("The filing of an amended complaint will not revive the right to present by motion defenses that were available but were not asserted in timely fashion prior to the amendment of the pleading; conversely, a Rule 12 defense that becomes available because of new matter in the amended complaint may be asserted by motion").[12]

---

[11]   UBS previously argued to the Court that leave to file the TAC should be denied because the Second Circuit's "subsequent" decision *Waldman v. Palestine Liberation Organization*, 835 F.3d 317 (2d Cir. 2016) presents a novel legal issue the Court has yet to address.  Dkt. No. 185 at 18 n.6.  But, *Waldman* was issued months prior to the Court's ruling in *Gold I*, and a party's failure to "raise a previously-unavailable defense as soon as practicable," results in waiver.  *Laydon v. Mizuho Bank, Ltd.*, 2015 WL 1499185, at *6 (S.D.N.Y. 2015).

[12]   *See also In re Assante*, 470 B.R. 707, 713 (S.D.N.Y. 2012) (holding that by failing to assert personal jurisdiction in their initial Rule 12 motion, defendants waived the defense in subsequent Rule 12 motions); *Arkwright Mut. Ins. Co. v. Scottsdale Ins. Co.*, 874 F.Supp. 601, 604 (S.D.N.Y. 1995); (same);

### B.     The TAC Nonetheless Sufficiently Establishes Personal Jurisdiction Over UBS AG

In any event, even if UBS had not waived its personal jurisdiction argument, specific

jurisdiction is appropriate here.  As the TAC alleges, Defendants, including UBS, benefited from

their manipulation scheme by using their foreknowledge and ability to influence the gold prices

around the PM Fixing to make large profits from trading in the U.S., including on COMEX,

which is located in this District.  *See* TAC ¶¶ 11-13, 32, 349-73.  These allegations alone are

sufficient to assert specific personal jurisdiction over UBS AG.  *See Sonterra Capital Master*

*Fund Ltd. v. Credit Suisse Grp. AG*, 2017 WL 4250480, at *46 (S.D.N.Y. Sept. 25, 2017)

(specific jurisdiction appropriate where foreign defendants (including UBS AG) "engaged in

manipulation for the purpose of profiting from their substantial derivatives operations in the

United States."); *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 208 (2d Cir. 2003)

(holding that an allegation that defendants met once in Korea to discuss price fixing that may

have impacted a worldwide market would have sufficiently alleged specific jurisdiction for

purposes of surviving a motion to dismiss).

Although UBS claims the Court nonetheless lacks specific jurisdiction because "the TAC

identifies no U.S.-based transactions by UBS AG that could have materially affected the Gold

Fix," UBS Mot. at 38, this argument is wholly misplaced and has been rejected in this district.

*See In re Foreign Exch. Benchmark Rates Antitrust Litig. ("FX")*, 2016 WL 1268267, at *6

(S.D.N.Y. Mar. 31, 2016) (rejecting defendants' argument that "Plaintiffs have not identified a

single trade at issue in this litigation that links any of the [New Foreign Defendants] to this

---

*Livshits v. Natural Y Surgical Specialties, Inc.*, 1989 WL 116428, at*1 (SD.N.Y. Sep. 26, 1989); (same); *see generally City of N.Y. v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 134 (2d Cir. 2011) ("It is well-established that a party forfeits its defense of lack of personal jurisdiction by failing timely to raise the defense in its initial responsive pleading" ).

forum" because "a demand for specifics" is not required at the pleading stage). A specific transaction is not necessary so long as there are minimum contacts—as there are here—to support specific jurisdiction.

Minimum contacts for purposes of specific jurisdiction "exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being hauled into court there." *Id.* at *4 (internal quotation marks and citations omitted). "It may also exist even if none of the relevant conduct took place inside the forum, under the 'effects test.' The 'effects test' is a theory of personal jurisdiction typically invoked where the conduct that forms the basis for the controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff. For these claims, the exercise of personal jurisdiction may be constitutionally permissible if the defendant expressly aimed its conduct at the forum." *Id.* (internal citations omitted).

*FX* is instructive here. The *FX* court found that it had specific jurisdiction over foreign defendants for conspiring to manipulate fix benchmark rates under the "purposeful availment" and "effects test" because plaintiffs had alleged defendants had "entered into FX transactions, including spot transactions . . . in this District and throughout the United States," that a substantial amount of "FX futures contracts were traded in the United States during the Class Period," and that "Defendants' conspiracy, and the resulting impact on the prices of FX instruments, occurred in and affected interstate commerce and commerce in and between the Territories of the United States." *Id.* at *4-5.

Here, the TAC alleges sufficiently similar jurisdictional facts as in *FX*.  UBS (and its employees and agents):[13]

- has offices in New York, New York and Stamford, Connecticut.  TAC ¶ 75.

- benefited from the manipulation scheme by using its foreknowledge and ability to influence gold prices around the PM Fixing to make large profits from trading in the U.S., including on COMEX, which is located in this District.  *Id.* at ¶¶ 11-13, 31-32, 349-73.

- conducts a substantial amount of trading in Gold Investments including on COMEX, which is located in this District.  *Id.* at ¶¶ 75-77, 212, 352-53.

- holds itself out as "a leading provider of physical and derivative precious metal products to a broad range of customers around the globe."  *Id.* at ¶ 78.

These factual allegations—specifically that UBS AG had traders in the U.S. trading to push the price of gold down and that resulting harm impacted the price of gold investments for Plaintiffs in the U.S.—establish that UBS AG, as well as the other Fixing Banks, not only purposefully availed themselves of the privilege of doing business in New York and the U.S.,[14] but also expressly aimed their conduct at the forum.  *See FX,* 2016 WL 1268267, at *4-6.[15]

---

[13]  For personal jurisdiction purposes, a plaintiff need only plead that the agent "engaged in purposeful activities in this State in relation to [the allegedly infringing products] for the benefit of and with the knowledge and consent of the . . . defendant[], and that [defendant] exercised some control over [the corporation] in the matter."  *Schutte Bagclosures Inc. v. Kwik Lok Corp.*, 48 F. Supp. 3d 675, 686-87 (S.D.N.Y. 2014).  A "formal" agency is not required.  *See id.*  Here, UBS AG does not deny U.S. trading activity by its employees and agents.  But even if it had, that would only provide a basis for discovery— not for dismissal as a matter of law.  *See Emerald Asset Advisors LLC v. Schaffer*, 895 F. Supp. 2d 418, 433-34 (E.D.N.Y. 2012).  To the extent the Court disagrees that it has specific jurisdiction over UBS AG, Plaintiffs respectfully request that they be allowed to seek jurisdictional discovery prior to dismissal.

[14]  UBS AG argues that the "relevant forum is New York, not the United States," because "the nationwide service of process provision in the Clayton Act . . .  is not available here."  UBS Mot. at 38, n. 34.  But as discussed above, because Plaintiffs have stated a valid Section 1 claim against UBS, the nationwide service of process provision in the Clayton Act is applicable, and the relevant forum is the United States.  *See In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d at 207 (Section 12 of the Clayton Act permits a minimum contacts analysis that "looks to a corporation's contacts with the United States as a whole to determine if the federal court's exercise of personal jurisdiction comports with due process").

[15]  The cases UBS cites to argue otherwise are not applicable to the facts here.  *See* UBS Mot. at n. 35.  For example, UBS relies on *FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, 2017 WL

Since UBS AG has presented no other "compelling" reason that due process is not satisfied, the Court has specific jurisdiction over UBS AG. *See Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996) ("the exercise of jurisdiction is favored where plaintiff has made a threshold showing of minimum contacts" and can be defeated only where the defendant "presents a compelling case that the presence of some other consideration would render jurisdiction unreasonable") (internal quotation marks omitted).

## V.   THE REMAINDER OF UBS'S ARGUMENTS ARE BASED ON A FALSE PREMISE AND NEED NOT BE ADDRESSED BY THE COURT

The remainder of UBS's arguments amount to nothing more than a distraction that the Court should ignore. Rather than focus on the actual theory of manipulation alleged in the TAC, UBS seeks to dismiss this case on the basis that the TAC does not support allegations for a purported "spot market manipulation" theory. UBS Mot. at 2. Oddly, while UBS acknowledges that such a theory does not exist, it nonetheless wastes the Court's time by basing most of its arguments on this non-existent theory. *See id.* at 23 ("a freewheeling conspiracy regarding gold in general is not alleged here . . . the TAC pleads injury from a conspiracy to manipulate the *Gold Fix*") (emphasis in original). UBS's tactics are even odder considering that the Court has already rejected them, and held that the Plaintiffs' case remains centered on Defendants' conspiracy to suppress gold prices around the PM Fixing. *See* Amendment Order at 9-10 ("In short, this is still a case that alleges benchmark fixing . . . [b]ecause UBS's other arguments

---

3600425 (S.D.N.Y. Aug. 18, 2017), to argue that its conduct here does not amount to "suit related conduct" for purposes of specific jurisdiction. But tellingly, UBS fails to mention that the plaintiffs in *FrontPoint* did no more than request that the court "infer that the Foreign Defendants likely were participants in the U.S. derivatives market." *Id.* at *6. Similarly, UBS relies on *In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017), to make the same point. But again, the plaintiffs in *Platinum* only made "vague references to the Fixing Members' use of chat rooms" located within the United States. Here, Plaintiffs have alleged specific conduct and specific harm UBS AG engaged in that either happened in the U.S. or was directed at the U.S.

proceed from the assumption that the [TAC] presents a substantially revised theory of liability, the Court need not address them further.").[16]  Because they stem from the same false premise the Court has already rejected, the Court "need not address" the following arguments:

***Efficient Enforcer*** (*see* UBS Mot. 24-26).  UBS argues that Plaintiffs are not efficient enforcers "as to a purported conspiracy to engage in coordinated trades to manipulate gold spot pricing."  UBS Mot. at 24.  But under the actual theory pled by Plaintiffs, Plaintiffs are the efficient enforcers, and have antitrust standing as explained above.  *See supra* at 21-23.

***Plausibility (Sherman Act)*** (*see* UBS Mot. 26-28).  UBS argues that Plaintiffs "have not plausibly alleged" a "spot market order manipulation conspiracy" because "the order manipulation allegations do not show there was an overarching conspiracy among all of the Defendants for the Class Period, to move the gold price downward."  UBS Mot. at 26.  This argument ignores the fact that, as discussed above, Plaintiffs have plausibly alleged UBS's active involvement in the Fix-suppression conspiracy at issue.  *See supra* at 9-21.

***Foreign Trade Antitrust Improvements Act ("FTAIA")*** (*see* UBS Mot. 28-29).  UBS argues that Plaintiffs' Section 1 claim is barred by the FTAIA because "the TAC does not connect any domestic effect suffered by any named Plaintiff to particular acts of trader-based manipulation alleged to have occurred abroad by UBS."  UBS Mot. at 28-29.  But under Plaintiffs' actual theory, it is obvious that the FTAIA does not apply because there is nothing "wholly foreign" about Plaintiffs' claim.  *See F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542

---

[16]   If discovery and government investigations yield evidence confirming that the conspiracy extended throughout the day, then that may properly become part of this case as well.  *See, e.g.*, *Hirsch Film Acq. Corp. v. Mechner*, 1991 WL 45054, at \*8 (S.D.N.Y. Mar. 25, 1991) (leave to amend granted so that "pleadings conform to the evidence" to reflect "the Federal Rules' general purposes that truth be ascertained and issues revolved on their merits"); *see also In re Foreign Exchange Benchmark Rates Antitrust Litig.*, No. 13-cv-7789, Dkts. 297, 332 (S.D.N.Y.) (granting plaintiffs leave to amend to include additional types of manipulation, times of day, markets, and claims, "to conform allegations to evidence" obtained from settling Defendants and government regulators).

U.S. 155, 162 (2004) (FTAIA does not exclude import commerce, or foreign commerce that has a "direct, substantial, and reasonably foreseeable effect on" U.S. commerce).  By manipulating the PM Fixing, Defendants, including UBS AG, directly effected all manner of gold and gold-related transactions in the U.S., including on COMEX, which is located in this District.  *See* TAC ¶¶ 31-63, 169-75.

*Plausibility (CEA Claims)* (*see* UBS Mot. 28-29).  UBS argues that it is not "liable to these named Plaintiffs under the CEA on a claim based on order manipulation allegedly described in the chats."  UBS Mot. at 35.  This argument ignores the fact that, as discussed above, Plaintiffs have plausibly alleged manipulation under the CEA for the fix-suppression conspiracy at issue.  *See supra* at 23-26.

*Timeliness* (*see* UBS Mot. 30-31).  UBS argues that Plaintiffs' CEA claims are time-barred because the "order manipulation" claims in the TAC were "never previously asserted against UBS," and thus cannot relate back to the SAC.  UBS Mot. at 30-31.  But because Plaintiffs are not asserting a new theory that would cause UBS surprise or prejudice, *see* Amendment Order at 9-10, Plaintiffs' CEA claims are timely.  *See* Fed. R. Civ. P. 15(c)(1)(B) ("An amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim . . . that arose out of the conduct, transaction, or occurrence set out— or attempted to be set out—in the original pleading.").

*Extraterritoriality* (*see* UBS Mot. 32-33).  UBS argues that Plaintiffs' CEA claims for "the order manipulation alleged [are] impermissibly extraterritorial" because "[t]he UBS trader on whose chats Plaintiffs chiefly rely was trading on Singapore time, and Plaintiffs have not alleged the links in the causal nexus between Singapore-booked trades and mispricing of physical gold or derivatives in the United States."  UBS Mot. at 33.  Plaintiffs' CEA claims,

however, are not predicated on "order manipulation" or on "purely foreign conduct," and UBS has admitted that the UBS trader in the chats was located in the United States for a period of time. *See* 14-md-2573, S.D.N.Y. (*Silver* action), Dkt. No. 303, at 53 n.26 ("But, as explained, the time stamps for the chats make it clear that the UBS trader, even when located in the United States, was trading in the Singapore market during Singapore business hours.").

**Personal Jurisdiction** (*see* UBS Mot. 38-40). UBS argues that personal jurisdiction "[a]s to the order manipulation claims" is improper because the TAC "fails to allege suit-related conduct by UBS AG that creates a substantial connection with this forum." UBS Mot. at 38. UBS further argues that it "did not forfeit its personal jurisdiction defense" because the SAC "did not present the chats or their underlying Singapore-based conduct as a basis for order manipulation claims." *Id.* at 39-40. But because there is no order manipulation claim and because the Court has noted that the TAC did not change "UBS's role in the conspiracy," Amendment Order at 9, UBS has clearly waived this defense.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny UBS's motion to dismiss the TAC in its entirety.

DATED:   New York, New York
         November 13, 2017

**BERGER & MONTAGUE, P.C.**

By: */s/ Merrill G. Davidoff*
Merrill G. Davidoff
Martin I. Twersky
Michael C. Dell'Angelo
Zachary D. Caplan
1622 Locust Street
Philadelphia, Pennsylvania 19103

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

By: */s/ Daniel L. Brockett*
Daniel L. Brockett
Daniel P. Cunningham
Steig D. Olson
Sami H. Rashid
51 Madison Avenue, 22nd Floor
New York, New York 10010

Telephone:  (215) 875-3000  
Fax:  (215) 875-4604  
mdavidoff@bm.net  
mtwersky@bm.net  
mdellangelo@bm.net  
zcaplan@bm.net  

Telephone:  (212) 849-7000  
Fax:  (212) 849-7100  
danbrockett@quinnemanuel.com  
danielcunningham@quinnemanuel.com  
steigolson@quinnemanuel.com  
samirashid@quinnemanuel.com  

Jeremy D. Andersen (*pro hac vice*)  
Chris R. Barker *(pro hac vice)*  
865 South Figueroa Street, 10th Floor  
Los Angeles, California 90017  
Telephone:  (213) 443-3000  
Fax:  (213) 443-3100  
jeremyandersen@quinnemanuel.com  
chrisbarker@quinnemanuel.com  

***Counsel for Plaintiffs and the Proposed Class***