# GIBSON DUNN
Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Eric J. Stock
Direct: +1 212.351.2301
Fax: +1 212.716.0801
EStock@gibsondunn.com

February 15, 2018

**VIA ECF**

Hon. Valerie E. Caproni
United States District Judge, Southern District of New York
Thurgood Marshall United States Courthouse, 40 Foley Square
New York, New York 10007

Re: *In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*, 14-MD-2548

Dear Judge Caproni:

We write on behalf of UBS AG and UBS Securities LLC ("UBS") to respond to Plaintiffs' February 13, 2018 letter ("Letter") (Dkt. 304) concerning certain recently announced government proceedings, including the Consent Order by the Commodity Futures Trading Commission ("CFTC") in *In re UBS AG*, CFTC Docket No. 18-07 (Jan. 29, 2018) ("Consent Order"). UBS responded on February 12, 2018 to a similar letter, sent by the *Silver Fix* plaintiffs. *See In re London Silver Fixing, Ltd. Antitrust Litig.*, No. 14-MD-2573 (Dkt. 347).

The Consent Order that UBS entered into with the CFTC actually undermines the allegations by Plaintiffs in this case. Plaintiffs' allegations of conspiracy here revolve around supposed ***persistent suppression*** of the Gold Fix ***benchmark***. The Consent Order, by contrast, does not describe or refer to any such conspiracy, but instead alleges that former UBS traders engaged in episodic examples of ***spoofing*** (as well as some attempted stop-loss order manipulation). The Consent Order ***never even mentions*** the Gold Fix, and describes opportunistic conduct intended to move prices ***up*** as well as down. In short, the Order, which stems from conduct that UBS self-reported to the CFTC, does nothing to support Plaintiffs' claims here.

***First***, contrary to Plaintiffs' contention (Letter 1–2), the allegations in the Consent Order are disconnected from and cannot sustain the plausibility under Rule 12(b)(6) of Plaintiffs' allegations in the Third Amended Complaint ("TAC") (Dkt. 266) (June 16, 2017). The Consent Order does not assert that UBS engaged in any conduct, collusive or otherwise, that could have affected the Gold Fix. It is "control" and "foreknowledge" of the Gold Fix that remain critical to the conduct Plaintiffs contend resulted in "artificially lowered prices" and "suppression of the gold benchmark." TAC ¶ 122; *see* TAC ¶¶ 5–6, 13, 18–19, 125, 174, 208, 236, 276–78.

The Consent Order alleges that certain former traders at UBS engaged in episodic "spoofing," *i.e.*, bidding or offering with the intent to cancel the bid or offer before execution. Consent Order, Pt. II.C.1. The Consent Order also includes allegations that one former UBS trader engaged in episodes of attempted manipulation of spot market prices to

**GIBSON DUNN**

Hon. Valerie E. Caproni, Feb. 15, 2018, Page 2

trigger stop-loss orders of certain clients during Singapore trading hours—not when the Gold Fix was set at 3 P.M. in London. *Id.*, Pt. II.C.2. UBS neither admitted nor denied the CFTC's findings or conclusions. *Id.*, Pt. I ¶ 2.[1] But crucially, as noted, the Consent Order says ***not one word*** about the Gold Fix. It does nothing to support Plaintiffs' notion that UBS formed an agreement with the Fixing Banks to manipulate the Gold Fix.

Moreover, as noted, the CFTC's allegations of spoofing and attempted (but not completed) stop-loss order manipulation depict traders engaged in episodes of opportunistic conduct: The alleged attempted manipulation sometimes sought to move prices upwards, and sometimes downward, depending on the trader's incentives on a particular day. Indeed, the CFTC describes the alleged "spoofing" practice as involving the placement of "spoof orders with the intent to create the false appearance of market depth, which the Traders believed and intended to create the impression of greater ***buying or selling*** interest than would have existed otherwise." Consent Order, Pt. II.C.1 ¶ 2 (emphasis added); *see also id.*, Pt. II.A ¶ 2 (before they were quickly canceled, traders' allegedly misleading orders were "intended to induce other market participants into ***buying and selling*** precious metals futures contracts" (emphasis added)). To illustrate, an episode of alleged spoofing seeking to momentarily ***raise*** the price of a precious metal is the July 19, 2011 chat in which UBS Trader F asked whether Trader H "want[ed] [him] to ***ram up*** gold," and Trader H assented. *See id.*, Pt. II.C.1 ¶ 9 (emphasis added).[2] This alleged up-or-down conduct, varying in direction, with only a fleeting impact on trading prices, is in total contrast to Plaintiffs' central contention that UBS and other banks conspired to persistently ***suppress*** the Gold Fix over the multiyear Class Period. *See, e.g.*, TAC ¶¶ 130, 132, 189 (allegations focusing on 2001–2012); *cf.* TAC ¶ 406 (alleging nine-and-a-half year class period).

***Second***, contrary to Plaintiffs' contention (Letter 2), nothing in the Consent Order shows that Plaintiffs have met their burden of alleging a *prima facie* case of specific personal jurisdiction as to UBS AG under Rule 12(b)(2). The Consent Order does not concern the "specific claims at issue" ***in this case***, which are those of the named Plaintiffs. *See Bristol-Myers Squibb Co. v. Super. Ct. of Cal., S.F. Cty.*, 137 S. Ct. 1773, 1781 (2017). Accordingly, Plaintiffs continue to lack nonconclusory allegations that UBS AG's "suit-related conduct . . . create[d] a ***substantial connection*** with the forum State." *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014) (emphasis added). Even assuming the accuracy of the

---

[1] Plaintiffs' effort to rely on such a consent order is contrary to precedent. *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893–94 (2d Cir. 1976), concluded that a civil complaint's references to a consent judgment were properly discarded under Rule 12. At issue was "a consent judgment between a federal agency and a private corporation," the court observed, "which is not the result of an actual adjudication of any of the issues." *Id.* at 893. Instead, "[t]he consent decree . . . was the result of private bargaining, and there was no hearing or rulings or any form of decision on the merits by the district court." *Id.* at 894.

[2] The Consent Order similarly depicts the alleged stop-loss order manipulation as aimed at moving prices up, not just down. For example, in the March 29, 2011 chat, UBS Trader F asked Trader H "for assistance in the gold futures market," in particular for Trader H to "***push it up***." Consent Order, Pt. II.C.2 ¶ 8 (emphasis original).

GIBSON DUNN

Hon. Valerie E. Caproni, Feb. 15, 2018, Page 3

Consent Order's reference to conduct occurring in Stamford, Connecticut, the Consent Order does not show that any of the clients or counterparties who may potentially have been affected by such conduct included any named Plaintiff, or that such conduct was the "but for" cause of any named Plaintiffs' claims against UBS AG.  *See* UBS Rule 12 Mem. 38–39 (Dkt. 298) (Sept. 11, 2017); UBS Rule 12 Reply 19–20 (Dkt. 302) (Dec. 13, 2017).[3]

For these reasons, UBS's motion to dismiss should be granted, and the recent actions by the CFTC do not indicate otherwise.

Respectfully submitted,

/s/ Eric J. Stock

    Eric J. Stock

cc: All Counsel of Record (via ECF)

---

[3] The proper focus is, of course, on the claims of the named Plaintiffs:  In a putative class action, "personal jurisdiction is based on a defendant's contacts with the forum state and actions giving rise to the named plaintiffs' causes of action.  Contacts with unnamed class members may not be used as a jurisdictional basis, especially before a class has been certified." *Beach v. Citigroup Alt. Invs. LLC*, No. 12 Civ. 7717, 2014 WL 904650, at *6 (S.D.N.Y. Mar. 7, 2014) (citing *Selman v. Harvard Med. Sch.*, 494 F. Supp. 603, 613 n.6 (S.D.N.Y. 1980)).